HUESTON HENNIGAN LLP
John C. Hueston, State Bar No. 164921
jhueston@hueston.com
Douglas J. Dixon, State Bar No. 275389
ddixon@hueston.com
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone:     (949) 229-8640

Joseph A. Reiter, State Bar No. 294976
jreiter@hueston.com
Michael K. Acquah, State Bar No. 313955
macquah@hueston.com
William M. Larsen, State Bar No. 314091
wlarsen@hueston.com
Julia L. Haines, State Bar No. 321607
jhaines@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:     (213) 788-4340

Attorneys for Plaintiffs Match Group, LLC;
Humor Rainbow, Inc.; PlentyofFish Media ULC;
and People Media, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATCH GROUP, LLC, a Delaware corporation; HUMOR RAINBOW, INC., a New York corporation; PLENTYOFFISH MEDIA ULC, a Canadian corporation; and PEOPLE MEDIA, INC., a Delaware corporation,<br><br>              Plaintiffs,<br><br>       v.<br><br>GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LIMITED; and GOOGLE PAYMENT CORP.,<br><br>              Defendants. | Case No. 5:22-cv-02746<br><br>**PLAINTIFFS MATCH GROUP, LLC'S, HUMOR RAINBOW, INC.'S, PLENTYOFFISH MEDIA ULC'S, AND PEOPLE MEDIA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................................... 1

II.    BACKGROUND ............................................................................................................. 2

       A.    Google Illegally Ties GPB To Google Play ........................................................ 2

       B.    Google Knowingly Permitted Match Group To Offer Alternative
             Payment Options For More Than A Decade ........................................................ 3

       C.    Google Seeks to Change The Status Quo To Require That Match
             Group Exclusively Use GPB ............................................................................... 4

       D.    Google Has No Legitimate Reason For Changing The Status Quo ..................... 5

       E.    Google Only Recently Started Enforcing Its Policy Change ............................... 6

III.   ARGUMENT ................................................................................................................... 6

       A.    Absent An Injunction, Google Will Irreparably Harm Match Group .................. 7

             1.    Banning its Apps from Google Play Will Irreparably Harm
                   Match Group ............................................................................................ 7

             2.    Complying with Google's Mandate Will Irreparably Harm
                   Match Group ............................................................................................ 8

       B.    Maintaining the Status Quo Will Not Harm Google .......................................... 9

       C.    Match Group is Likely to Succeed on the Merits ............................................. 10

             1.    Google Continues to Intentionally Interfere with Match
                   Group's Contracts ................................................................................. 10

             2.    Google's Conduct Violates the Unfair Competition Law ...................... 14

IV.    CONCLUSION ............................................................................................................. 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*,
    534 F. App'x 633 (9th Cir. 2013) .......................................................................................... 7

*Apple Inc. v. Psystar Corp.*,
    673 F. Supp. 2d 943 (N.D. Cal. 2009) ............................................................................. 8, 9

*B.D. v. Blizzard Ent., Inc.*,
    76 Cal. App. 5th 931 (2022) ............................................................................................. 10

*Bank of the W. v. Superior Ct.*,
    2 Cal. 4th 1254 (1992) ...................................................................................................... 15

*Blizzard Ent. Inc. v. Ceiling Fan Software LLC*,
    28 F. Supp. 3d 1006 (C.D. Cal. 2013) .............................................................................. 15

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ................................................................................................ 14, 15

*Douglas Dynamics, LLC v. Buyers Prod. Co.*,
    717 F.3d 1336 (Fed. Cir. 2013) ......................................................................................... 7

*Facebook, Inc. v. Brandtotal Ltd.*,
    No. 20-CV-07182-JCS, 2021 WL 2354751 (N.D. Cal. June 9, 2021) ............. 11, 12, 13, 14

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    273 F. Supp. 3d 1099 (N.D. Cal. 2017) ................................................................... 9, 14, 15

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    No. 17-16783, 2022 WL 1132814 (9th Cir. 2022) ..................................................... passim

*Imperial Ice Co. v. Rossier*,
    18 Cal. 2d 33 (1941) ......................................................................................................... 14

*Kim v. Allison*,
    8 F.4th 1170 (9th Cir. 2021) ............................................................................................. 10

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) .................................................................................................... 11

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
    50 Cal. 3d 1118 (1990) ................................................................................................ 11, 12

*Quelimane Co. v. Stewart Title Guar. Co.*,
    19 Cal. 4th 26 (1998) .................................................................................................. 10, 11

<u>TABLE OF AUTHORITIES (cont.)</u>

<u>Page(s)</u>

*Regents of Univ. of Cal. v. American Broadcasting Cos.*,
  747 F.2d 511 (9th Cir. 1984) ............................................................................ 8

*Sebastian Int'l, Inc. v. Russolillo*,
  162 F. Supp. 2d 1198 (C.D. Cal. 2001) ......................................................... 11

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001) ............................................................................ 7

*Stuller, Inc. v. Steak N Shake Enterprises, Inc.*,
  695 F.3d 676 (7th Cir. 2012) ............................................................................ 8

<u>Statutes</u>

Cal. Bus. and Prof. Code §§ 17200 ....................................................... 1, 15

6183767

# TABLE OF ABBREVIATIONS

| Term | Abbreviation |
|---|---|
| California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 | UCL |
| Declaration of Peter Foster | Foster Decl. |
| Developer Distribution Agreement | DDA |
| Epic Games, Inc.'s Motion for a Preliminary Injunction ("Epic Motion") in the related matter of *Epic Games, Inc. v. Google LLC*, Case No. 3:20-cv-0561-JD at Dkt. Nos. 213-221 | Epic Motion |
| Google Play Billing | GPB |
| Google Play Store | Google Play |
| The term "Match Group" includes only the operating entities named as Plaintiffs. Match Group LLC; Humor Rainbow, Inc.; PlentyofFish Media ULC; and People Media, Inc. are part of the Match Group family of companies with the ultimate parent company Match Group, Inc. ("MGI"), a nonoperating holding company. MGI's other subsidiaries are not included in the definition of "Match Group" in this motion. | Match Group |
| Match Group, Inc. | MGI |

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

A temporary restraining order is necessary to preserve the status quo and stop Google from ending consumer choice by enforcing an anticompetitive ultimatum that would disrupt millions of Match Group's customer relationships, prevent Match Group from distributing its apps to hundreds of millions of potential customers globally, and inflict other irreparable harms. Because of Google's illegal monopolization, Google Play is the only commercially viable marketplace for app developers to reach Android device users. Google has abused this power by requiring developers that use Google Play to also use a separate Google product (GPB) to process in-app purchases for "digital" content. Through this requirement, Google extracts an unconscionable fee (between 15-30%) on each of these purchases.

For more than a decade, Google exempted Match Group from this requirement. Match Group brought some of the most popular dating apps to Google Play and enabled in-app purchases with the assurance that it could offer its alternative payment options that are superior to GPB and preferred by customers. Google reaped the rewards of hosting such hugely popular apps, including harvesting vast amounts of user data that Google sells for advertising and receiving several hundred million dollars in "fees" from transactions by customers who chose to use GPB.

But that did not satisfy Google's greed. Google abruptly changed course and now seeks to force Match Group to *exclusively* use GPB to process all in-app purchases. Just recently, because Match Group did not accede to Google's mandate, Google started prohibiting Match Group from updating its apps on Google Play. On June 1, 2022, Google will ban Match Group's apps entirely.

Google has already irreparably harmed Match Group by preventing it from distributing critical app updates to its users. If Google enforces its ban on June 1, Match Group will lose access to more than half of its potential customers overnight. The ban will also interfere with Match Group's customer relationships and its apps will quickly cease to function as intended on Android devices, precluding users from accessing the services they seek and paid for, permanently damaging Match Group's brand recognition and goodwill, and decreasing the size of its user networks. Match Group cannot avoid irreparable harm by complying with Google's mandate. Beyond the significant financial

loss, compliance would require major redesigns of Match Group's apps and systems, require Match Group to put other projects on hold, interfere with Match Group's customer relationships, prevent Match Group from providing payment options that its customers use and prefer, confuse and deter customers who are forced to switch to GPB, limit Match Group from resolving customer service issues, and deprive Match Group of its relationships with its users and data that it uses to enhance user safety and improve its apps. In the fiercely competitive mobile dating market, Google's mandate is a death knell for Match Group. By contrast, if an injunction issues, Google will not suffer any harm, and will instead continue to benefit through its monetization of Match Group's apps.

Though the balance of harms by itself strongly favors an injunction, Match Group is also likely to succeed on the merits because, among other reasons, Google's mandate (1) interferes with Match Group's contracts with third parties, (2) violates the UCL, and (3) is an illegal tie in violation of the Sherman and Cartwright Acts. Finally, the public benefits from consumer choice on payment options and being able to continue using Match Group's apps.

For these reasons and those discussed below, a temporary restraining order should issue.

## II.  BACKGROUND

### A.  Google Illegally Ties GPB To Google Play

As alleged in the Complaint and detailed in the Epic Motion in the related matter of *Epic Games, Inc. v. Google LLC*, Case No. 3:20-cv-0561-JD, Google has monopoly positions that it acquired and maintains using exclusionary contracts, predatory practices, "bait and switch" tactics, payments not to compete, and erecting barriers to entry. Because of Google's unlawful conduct, Google Play processes more than 90% of all downloads of Android apps and an overwhelming proportion of dating apps for mobile devices. Developers of Android apps and/or dating apps are effectively required to use Google Play to reach consumers. *See* Foster Decl. ¶¶ 14-16, 104.

Google abuses its monopoly power by forcing most developers that use Google Play to exclusively use GPB to process in-app payments for "digital" content. Google imposes this requirement through its DDA and incorporated "Payments Policy." *Id.* ¶¶ 17-20.

Worse, Google imposes a tax between 15-30% on every transaction that GPB processes. *Id.* ¶¶ 22-23. This tax – which Google takes from app developers and results in higher prices for users –

bears no relation to any service or value provided by Google. Any argument otherwise is rebutted by the facts detailed below that show Google's Payments Policy is wildly underinclusive and inconsistently enforced. *Id.* ¶¶ 25-53. Other payment processors charge significantly lower fees: PayPal, Square, Stripe, and Braintree all charge under 3% of the transaction value. Even Google's Chrome Web Store charges only 5% for each app download. *Id.* ¶ 24.

As established in the Epic Motion, Google's conduct constitutes an illegal tie in violation of the Sherman and Cartwright Acts. Match Group hereby joins and incorporates Epic's arguments.

**B.     Google Knowingly Permitted Match Group To Offer Alternative Payment Options For More Than A Decade**

Match Group owns and operates popular dating apps for Android devices, including the world's leading dating app, Tinder®, as well as Match®, OkCupid®, PlentyOfFish®, and OurTime®. Match Group pioneered and revolutionized the dating app industry. Its apps are responsible for millions of marriages, relationships, and families across the world. Currently, Match Group offers dating services and apps in over 40 languages and serves nearly one hundred million monthly active users. *Id* ¶¶ 4-13.

Most of Match Group's apps follow a "freemium" model in which users can access basic functions for free with the option of paying for upgraded features. For example, Tinder presents profile cards of other Tinder users on one user's screen to give him or her the opportunity to "Like" the other user, or alternatively, to decline interest. If two users express mutual interest, they are a match and can begin a conversation through a chat feature on the platform. Tinder users can access these basic features for free, but also have the option of purchasing various subscription tiers, which currently include Tinder Plus®, Tinder Gold™, and Tinder Platinum®. Each tier offers users different enhanced features such as, among others, unlimited "Likes." *Id.* ¶ 6. In addition, Tinder offers options to purchase enhanced features à la carte. More than ten million users purchased Tinder's subscriptions or à la carte digital services in 2021 alone. *Id.* Like Tinder, Match, OkCupid, PlentyOfFish, and OurTime also offer subscriptions and à la carte features for purchase. *Id.* ¶¶ 7-12.

For more than a decade, until recently, Google did not require Match Group's apps to use GPB at all, much less exclusively. *Id.* ¶¶ 29-37. In fact, Google's DDA previously included an

express exemption for the purchase of "digital content that may be consumed outside the app itself." *Id*. ¶ 29; Ex. 5. That policy applied to Match Group for two independent reasons. First, each app offers a website that users can access through a desktop computer or laptop to consume the digital content they paid for "outside the app itself." *Id*. ¶ 30. Second, the digital content users pay for facilitates face-to-face, in-person interactions with the individuals with whom they match. *Id*. ¶ 31. For example, when Tinder users pay for premium features, they buy digital content to facilitate and enhance their ability to have in-person interactions with other users. *Id*.

Consequently, with Google's full knowledge, some of Match Group's apps have never offered GPB as a payment option, while others have given consumers the choice of paying through GPB or alternative payment options, including credit card or Paypal. *Id*. ¶¶ 32-37. Specifically, the Match app (published in 2010), PlentyOfFish (2010), and OurTime (2014) have never offered GPB. *Id*. ¶¶ 33, 35, 36. Since 2010, OkCupid has offered a variety of payment options, including GPB. *Id*. ¶ 34. Tinder offers GPB but has provided alternative payment options since 2019. *Id*. ¶ 37.

### C. Google Seeks to Change The Status Quo To Require That Match Group Exclusively Use GPB

For years, Google was happy to reap the considerable benefits of hosting Match Group's hugely popular dating apps even if they did not exclusively use GPB. The apps helped popularize Google Play, and Match Group sent several hundred million dollars to Google in "fees" from in-app purchases made by users who chose GPB. *Id*. ¶ 28. Google further monetized Match Group's apps by gathering valuable consumer data, which Google uses to sell targeted advertising. *Id*.

But Google's greed took over. Google could not resist forcing more app developers to pay Google's fees. In 2019, after Tinder began offering an alternative payment option, Google complained to Tinder's parent, MGI. Tinder stood its ground because its alternative payment options complied with Google's DDA and were better for users – a majority of whom in the United States chose it over GPB. *Id*. ¶¶ 38, 75-86. Without recourse, Google backed down and continued to let Tinder provide users with that choice. *Id*. ¶ 38.

On September 28, 2020, however, Google abruptly changed its Payments Policy to require the exclusive use of GPB for in-app purchases of digital content. *Id*. ¶ 39. In announcing this change,

Google claimed it had merely "clarified" its Payments Policy. *Id*. ¶40; Ex. 6. Not so. As explained above, Google's Payments Policy previously did not require the use of GPB when users purchased "digital content that may be consumed outside the app itself." *Id*. ¶ 41; Ex. 5. Google removed that exception and added entirely new language that targets Match Group's apps by requiring the exclusive use GPB for "in-app purchase of . . . subscription services (such as . . . dating)." *Id*.; Ex. 2.

**D.    Google Has No Legitimate Reason For Changing The Status Quo**

Google has no legitimate or lawful justification for changing its Payments Policy. Any argument to the contrary is pretextual and contradicted by the facts:

*First*, Google long permitted Match Group to offer alternative payment options without issue.

*Second*, and relatedly, Match Group offers better payment options to users that GPB does not support, including the ability to pay with installments and more flexible subscription plans. *Id*. ¶¶ 75-86. Match Group's data suggests that consumers prefer its payment options over GPB. *Id*. ¶¶ 38, 75, 86. Further, users that chose to use GPB have lodged myriad complaints with Match Group about GPB, ranging from cancellations that were never processed to fraudulent charges. *Id*. ¶ 88.

*Third*, Google's Payments Policy is wildly underinclusive. It does not require huge categories of apps to use GPB, including those that sell what Google has arbitrarily labeled "physical" goods or services. This exemption covers some of the largest and most popular apps on Google Play, including Uber, Doordash, Facebook, and Amazon, which pay only $25 to use Google Play, while Match Group pays hundreds of millions in fees for the same services. *Id*. ¶¶ 21, 25-48. Even today, Google admits that only "3% of developers on Google Play are subject to a service fee" at all. *Id*.; Ex. 4.

*Fourth*, Google has granted arbitrary exceptions to its Payments Policy. Google recently announced an exception coined "User Choice Billing," which allows app developers to offer alternative payment options in addition to GPB. But Google rejected Match Group's request to participate, calling this a "pilot program" with restricted access. So far, only Spotify has been publicly announced. *Id*. ¶ 47. Google's disparate treatment of Match Group and Spotify is telling. Google previously tried to deter Jared Sine, Chief Business Affairs and Legal Officer of MGI, from giving testimony that critiqued Google's unilateral policy change before the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights. *See id*. ¶¶ 48-53. By contrast, Spotify also

testified at the hearing but said nothing about Google. Spotify then received an offer to participate in "User Choice Billing." Match Group did not. *Id.* ¶ 53.

In sum, Google cannot argue that forcing Match Group to use GPB is required for any legitimate reason – such as a technical requirement, user safety, or to cover Google's costs – because if any of those reasons were valid, Google would not have made so many exceptions over the years for Match Group and others, allow Spotify to participate in "User Choice Billing," or allow 97% of its developers to not use GPB.

### E.    Google Only Recently Started Enforcing Its Policy Change

Google initially set an enforcement date of September 30, 2021. On July 16, 2021, Google announced a global extension to March 31, 2022. *Id.* ¶ 44; Ex. 7. This was an attempt to avoid scrutiny from antitrust authorities across the world. For example, the Assembly of the Republic of Korea passed a law that forbade Google's Payments Policy. And Google extended the deadline in India twice after pressure from the Indian government and developer community. *Id.* ¶¶ 44-45.

At first, the March 31, 2022, deadline passed without event. Match Group frequently updates its apps on Google Play, and Google continued to accept and publish those apps after March 31. *Id.* ¶¶ 54-55. The rejections did not start until almost a month later. *Id.* ¶¶ 56-59. On April 20, 2022, Google rejected an update by OkCupid for not complying with the Payments policy. *Id.* ¶ 57; Ex. 8. On April 25, 2022, Google rejected updates by OurTime and Match for the same reason. *Id.* ¶ 58; Ex. 9. And on May 4, 2022, Google likewise rejected a Tinder update. *Id.* ¶ 59; Ex. 10.

Google has threatened to remove Match Group's apps from Google Play on June 1, 2022, unless they exclusively offer GPB. *Id.* ¶ 64. Injunctive relief is needed to maintain the status quo.

## III.   ARGUMENT

A temporary restraining order should issue because (1) Match Group is "likely to suffer irreparable harm in the absence of preliminary relief," (2) Match Group is "likely to succeed on the merits," (3) the "balance of equities tips in [Match Group's] favor," and (4) an "injunction is in the public interest." *hiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-16783, 2022 WL 1132814, at *5 (9th Cir. 2022). Under the Ninth Circuit's "sliding scale" approach, "a stronger showing of one element may offset a weaker showing of another." *Id.* (citation omitted). Match Group meets each factor.

**A.      Absent An Injunction, Google Will Irreparably Harm Match Group**

Match Group has only two alternatives: (1) lose access to Google Play or (2) comply with Google's mandate. Either will irreparably harm Match Group in ways impossible to reduce to a monetary payment and will also disrupt Match Group's contracts, *see* § III.C.1 *infra*. The irreparable harms resulting under each scenario are addressed in turn.

1.      Banning its Apps from Google Play Will Irreparably Harm Match Group

*Inability to reach Android users*. If Google implements its ban, more than one billion Android device users around the world would be prevented from downloading Match Group's apps from Google Play, leaving Match Group with no viable alternative to reach those consumers. Foster Decl. ¶¶ 64-67. Google's ban would cause Match Group to lose access to more than half its potential customers, as well as current customers. This constitutes irreparable harm. *See hiQ Labs*, 2022 WL 1132814 at *6 (affirming preliminary injunction where plaintiff's business relied on access to LinkedIn profiles and there was "no current viable alternative"); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers [] certainly supports a finding of the possibility of irreparable harm.").

*Loss of market share*. "[M]ere damages will not compensate for a competitor's increasing share of the market." *Douglas Dynamics, LLC v. Buyers Prod. Co*., 717 F.3d 1336, 1345 (Fed. Cir. 2013). The dating app market is highly competitive, with many competing options available to users. Foster Decl. ¶ 71. There is low cost to a user who wants to switch products, and a consistent stream of new entrants. If Google bans Match Group's apps from Google Play, users will switch to competitor dating apps for myriad reasons explained herein. *Id*.

*Loss of network effects*. Generally, dating apps that have more users are more attractive, because they can offer users a better chance of a romantic match. *Id*. ¶ 69. The absence of Match Group apps on Google Play would significantly diminish Match Group's apps' pools of users, making those apps less attractive, which in turn will lead to even more users (both Android and iOS) leaving the apps' dating pools. This downward spiral will be incredibly difficult, if not impossible, to reverse. *Id*. ¶¶ 69-71; *see also Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013) (finding irreparable harm based on "threatened loss of . . . customers").

***Loss of app functionality***. Android users will be unable to obtain critical updates and bug fixes, which would quickly cause their apps to lose functionality and compatibility, cease to function as intended, degrade the user experience, and deprive users of features they expect and paid for. Foster Decl. ¶ 68. This will interfere with Match Group's contracts with customers and cause further loss of customers. *Id*. ¶ 68, 72; *see also Apple Inc. v. Psystar Corp*., 673 F. Supp. 2d 943, 948–49 (N.D. Cal. 2009) (finding irreparable harm where defendant caused consumers to associate "decreased functionality and quality" of software with "Apple's operating system").

***Damage to reputation and goodwill***. In the crowded dating app market, Match Group's apps' reputations for providing an enjoyable, safe, and seamless dating experience is crucial. Foster Decl. ¶ 91. If Google removes the Match Group apps from Google Play, increased functionality issues, version discord, and user discontent will irreparably harm Match Group's hard-fought goodwill developed over more than a decade. *Id*. When reputation and goodwill are diminished through anticompetitive activity, the resulting harm is irreparable. *Stuhlbarg*, 240 F.3d at 84; *Regents of Univ. of Cal. v. American Broadcasting Cos*., 747 F.2d 511, 519-20 (9th Cir. 1984) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.").

### 2.  Complying with Google's Mandate Will Irreparably Harm Match Group

Compliance with Google's mandate likewise would irreparably harm Match Group.

***Loss of significant investments and substantial redesign***. Match Group will have to abandon its prior investments and incur substantial, additional, and otherwise unnecessary costs, time, and effort to redesign its apps, ensure continuity of service for its users, alter its payment methodologies, and restructure its subscription plans and price offerings. Foster Decl. ¶ 74. Match Group will also have to delay other projects, including updating apps and adding features. *Id*. In short, Match Group would have to substantially change how it has done business for over a decade. *See Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 679 (7th Cir. 2012) (finding irreparable harm where a mandated pricing policy "would be a significant change to [franchisor's] business model").

***Inability to offer better and customer-preferred payment options***. GPB is inflexible and does not support payment features that Match Group provides. Foster Decl. ¶¶ 75-85. For example, GPB (i) does not allow developers to choose payment forms; (ii) offers limited flexibility in the design of

subscription plans, which precludes Match Group from giving consumers additional options on subscription lengths; (iii) does not allow users to make recurring installment payments and instead requires lump sum payments, which deters customers; (iv) limits Match Group's ability to make special offers to its users, such as discounted subscriptions; (v) does not allow Match Group to offer retention discounts to incentivize existing users to renew or purchase added products; and (vi) does not provide an easy way to offer groupings of products together. *Id.*

Match Group's data shows that consumers prefer using Match Group's payment options. *Id.* ¶ 86. As of March 2022, a majority of Tinder in-app purchase revenue on Android came from the brand's payment system instead of GPB. *Id.* Similarly, users opting for Tinder's payment system tended to renew existing subscriptions more often compared to users paying through GPB. *Id.* ¶ 87. Notwithstanding those preferences, if consumers transition to GPB, it will be very difficult, if not impossible, to get them to return to Match Group's payment options.

***Loss of critical data***. Match Group's inability to use its payment systems would deprive it of critical data that it uses to improve its business and services. *Id.* ¶ 90. Match Group also uses this data to enhance customer safety, including performing registered sex offender screenings, identifying and removing minors (who may not register) on its dating apps, and monitoring for fraudulent transactions. *Id.* This lack of access to important data will irreparably harm Match Group. *Id.* Google, by contrast, will obtain valuable data on every paying Match Group through Google Play Billing, which Google can then harvest to sell advertising or even build a competing app. *See id.* ¶ 28.

***Inability to resolve payment/customer service issues***. When customers use Match Group's payment systems, Match Group can ensure that any issues are resolved to their satisfaction. *Id.* ¶ 89. By requiring use of GPB, Google becomes the "merchant of record" and takes over customer service responsibilities, even though it lacks the same incentives to provide good customer service that Match Group has if something goes wrong. *Id.* Indeed, Match Group has received numerous customer complaints about GPB that it lacks the power to resolve. *Id.* ¶ 88. This dynamic will cause Match Group irreparable harm. *See Apple*, 673 F. Supp. 2d at 948-49.

**B.    Maintaining the Status Quo Will Not Harm Google**

Google, by contrast, will suffer no harm if the status quo is maintained. Google permitted

1   Match to offer its own payment options for more than a decade with no harm to Google. *See hiQ*

2   *Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1107 (N.D. Cal. 2017) (granting preliminary

3   injunction where "despite the fact that hiQ has been aggregating LinkedIn's public data for five years

4   with LinkedIn's knowledge, LinkedIn has presented no evidence of harm, financial or otherwise

5   resulting from hiQ's activities"). Thus, the balance of equities strongly favors Match Group.

6       **C.     Match Group is Likely to Succeed on the Merits**

7           Where, as here, the "balance of hardships tips sharply in the plaintiff's favor," "the plaintiff

8   need only demonstrate serious questions going to the merits." *hiQ Labs*, 2022 WL 1132814, at *8.

9   At minimum, there are serious questions on the merits of three claims: Google's (1) intentional

10  interference with Match Group's contracts, (2) violation of the UCL, and (3) illegal tying.[1]

11              1.    Google Continues to Intentionally Interfere with Match Group's Contracts

12          "Intentionally inducing or causing a breach of an existing contract is … a wrong in and of

13  itself." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55–56 (1998). The elements are

14  "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract;

15  (3) defendant's intentional acts designed to induce a breach or disruption of the contractual

16  relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."

17  *hiQ Labs*, 2022 WL 1132814, at *8 (citation omitted). Match Group satisfies each element.

18              *a.    Match Group Has Valid Contracts with Third Parties*

19          Match Group has contracts with millions of customers who use its brands' apps on Android

20  devices. Foster Decl. ¶¶ 13, 93-100. Those users agreed to the apps' terms of use in exchange for,

21  inter alia, limited "license[s] to access and use [Match Group's] services." *Id.* ¶ 99; Ex. 14 at § 6

22  ("For as long as you comply with these Terms, Match grants you a personal, worldwide, royalty-

23  free, non-assignable, non-exclusive, revocable, and non-sublicensable license to access and use our

24  Services."); Exs. 12, 13, 15, 16 at § 6. These constitute valid contracts. *See, e.g., B.D. v. Blizzard*

25  *Ent., Inc.*, 76 Cal. App. 5th 931 (2022) (discussing and upholding "sign-in wrap" agreements).

26

27

28

---

[1] On its tying claim, Match Group incorporates by reference the arguments in the Epic Motion.

Relatedly, millions of those users have purchased subscriptions in exchange for the right (consistent with the terms of use to which they have agreed) to access additional services and content for the length of their subscriptions, which automatically renew until terminated by the user. Foster Decl. ¶ 100; Ex. 12 at § 10 ("If you terminate or cancel your [Tinder] subscription, you may use your subscription until the end of your then-current subscription term."); Exs. 13-16 at § 8. Many users have also purchased the right to use à la carte features. *Id.* ¶ 100.

### b.    Google Knows of Match Group's Contracts

Google knows of the contracts described above. In Google Play, Google provides a link to the terms of use for Match Group's apps. Google also knows that users of Match Group's apps pay for subscriptions. Foster Decl. ¶ 101. Indeed, GPB has processed some of these subscription payments, including for users of Tinder and OkCupid. *Id.* ¶¶ 34, 37, 101; *Sebastian Int'l, Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1204 (C.D. Cal. 2001) (explaining that the defendant need "not know the specific identity of the contractual party").

### c.    Google Has Taken and Threatens Further Intentional Acts

"[I]ntentional interference with contract does not contain a specific intent requirement." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1156 (2003). The tort applies to "an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." *Id.*; *see also Quelimane*, 19 Cal. 4th at 56.

Google has taken and threatens to take several intentional acts that are relevant here. First, Google changed its policy to prohibit Match Group from providing alternative payment options. Foster Decl. ¶¶ 39-43. Second, Google has prohibited Match Group from distributing updated versions of its apps. *Id.* ¶¶ 56-60. Third, Google has threatened to remove Match Group's apps from Google Play altogether on June 1, 2022. *Id.* ¶ 61. As explained below, the "necessary consequence" of Google's intentional acts is interference with Match Group's contracts. *Id.* ¶¶ 72, 92, 102-107.

### d.    Google's Actions Will Disrupt Match Group's Contracts

The element of "disruption" of a contract can be satisfied by "actual breach" or "where the plaintiff's performance has been prevented or rendered more expensive or burdensome." *Facebook, Inc. v. Brandtotal Ltd.*, No. 20-CV-07182-JCS, 2021 WL 2354751, at *5 (N.D. Cal. June 9, 2021)

(citations omitted); *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1129 (1990) ("Plaintiff need not allege an actual or inevitable breach of contract in order to state a claim for disruption of contractual relations."). Match Group satisfies this element for multiple reasons and whether or not it complies with Google's new Payments Policy:

*First*, removal of Match Group's apps from Google Play will disrupt contracts with existing customers who need to replace their Android device due to loss or damage and who did not backup their data or otherwise cannot transfer existing apps to their new device. Foster Decl. ¶ 103. Because these customers could not download the apps to their new or replacement devices from Google Play, they would lose access to the apps, including features they paid for. Although Match Group could in theory educate these customers on alternative and complicated ways of downloading apps, doing so would make Match Group's "performance . . . more expensive or burdensome," *Facebook*, 2021 WL 2354751, at *5. Indeed, Google has erected technological barriers that make it extremely difficult to "sideload" apps from websites. Foster Decl. ¶ 104. Google Play is Match Group's only commercially viable means of offering app downloads to Android device users. Foster Decl. ¶ 64-67, 104.

*Second*, Google's policy will disrupt Match Group's customers' subscriptions. If Match Group's apps are banned from Google Play, the subscriptions for those apps that were paid for using GPB would not automatically renew and continue, as they are contractually set to do. *Id*. If Match Group complies with Google's policy change, then subscribers that currently use Match Group's alternative payment options will need to switch to GPB, including when making any change to their subscription or purchase of additional features. *Id*. ¶ 105. That switch requires additional user actions and steps that will deter and confuse users and interfere with these transactions. *Id*. Either way, Google's actions will interfere with Match Group's contracts.

*Third*, Match Group frequently updates its apps (typically every other week) to fix bugs, enhance functionality, add new features, and other reasons. *Id*. ¶ 54. Google recently rejected Match Group's updates, and has threatened to remove its apps from Google Play altogether, *id*. ¶¶ 56-61, which would make it impossible – or at least "more expensive or burdensome" – to update apps on Android devices, *Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1129. Without updates, Match Group customers will quickly lose app features and functionality, including those they paid for. Foster Decl. ¶¶ 60, 68,

107. For similar reasons, customers will face compatibility issues connecting with users of upgraded apps or that use other operating systems (e.g., Apple's iOS), which is a key feature customers expect, and a huge problem for dating apps meant to connect people. *Id*. ¶¶ 68-69.

### e. *Match Group Will Suffer Damages*

Match Group will suffer damages. Although Match Group will suffer monetary damages from being forced to pay Google's "fee" of between 15%-30% on in-app purchases, monetary damages are insufficient to compensate Match Group for the harm caused by Google's interference because that harm also includes irreparable damage to Match Group's reputation, goodwill, market share, users, and customer relationships for the reasons explained above.

### f. *Google Cannot Prove a Legitimate Business Purpose*

Google cannot meet its burden of proving a legitimate business purpose for its interference. *hiQ Labs*, 2022 WL 1132814, at *9. The Ninth Circuit's recent affirmance of a preliminary injunction in *hiQ* is instructive. There, LinkedIn had banned hiQ from collecting information shared on LinkedIn profiles, which interfered with hiQ's contracts with third parties. *Id.* at *8. Like Google, LinkedIn made excuses that its actions were necessary to "protect . . . the investment made in developing its platform and enforcing its User Agreements' prohibitions." *Id.* at 10; *see also* Foster Decl. ¶ 25; Ex. 4 (Google claiming that its "fee" "reflects the value provided by Android and Google Play and is how we earn money as a business"). The Ninth Circuit found those excuses "relatively weak" because, inter alia, LinkedIn's "core business model – providing a platform to share professional information – does not require prohibiting hiQ's use of that information, as evidenced by the fact that hiQ used LinkedIn data for some time before LinkedIn sent its cease-and-desist letter." *hiQ Labs*, 2022 WL 1132814, at *10; *see also Facebook*, 2021 WL 2354751, at *8 ("A defendant's enforcement of its own contract is not an absolute defense to interference—even then, the 'determinative question' is whether the party acted in good faith."). Further, LinkedIn planned to compete with hiQ and had banned it for that reason. *hiQ Labs*, 2022 WL 1132814, at *10. Consequently, the Ninth Circuit found "serious questions" as to whether hiQ's "strong commercial interest in fulfilling its contractual obligations" outweighed LinkedIn's purported justifications. *Id.*

This Court should do the same. Google cannot plausibly contend that its "core business model" or any technical or security concerns require that Match Group use GPB. After knowingly permitting Match Group's apps to offer alternative payment options for more than a decade, Google can point to "no evidence of harm" that now justifies changing the status quo. *See hiQ Labs,* 273 F. Supp. 3d at 1107. Moreover, Google admits that it *still* exempts *major* categories of app developers (97% on Google Play) from using GPB, even though those apps are responsible for a huge proportion of Google Play downloads. Google even recently launched the "User Choice Billing" program to exempt developers subject to Google's current policy. Foster Decl. ¶¶ 46-47, 53.

Google's long history of allowing alternative payment options, as well as its underinclusive and selectively enforced policy, rebuts any excuse it may now offer, such as a technical reason or user safety. For similar reasons, Google cannot claim that its above-market "fees" are necessary to compensate Google for its services. Google provides the same services to app developers that pay no fee. Google also already charges all developers a $25 registration to use Google Play. *Id.* ¶¶ 25-27.

Rather, Google's conduct reveals an illegitimate motive – to compete with Match Group and others that offer alternative payment options by forcing use of Google's own payment system (GPB). But, as the Ninth Circuit has held, "interference with an existing contract is not justified simply because a competitor 'seeks to further his own economic advantage at the expense of another.'" *hiQ Labs,* 2022 WL 1132814, at *9 (citations omitted); *see also Facebook,* 2021 WL 2354751, at *6 ("Courts must determine whether the defendant's interest outweighs societal interests in stability of contracts (the defendant's mere pursuit of economic advantage generally does not)."); *Imperial Ice Co. v. Rossier,* 18 Cal. 2d 33, 36 (1941) ("[A] person is not justified in inducing a breach of contract simply because he . . . seeks to further his own economic advantage at the expense of the other.").

In addition, as explained above, Match Group's alternative payment options promote consumer choice, are better for consumers, and enable Match Group to provide superior customer service. *See* § III.A *supra.* Match Group also uses data from its alternative payment options to perform safety checks and detect fraud. Foster Decl. ¶ 90. Google's attempt to obtain an economic advantage does not outweigh the "societal interest in contractual stability," any of the "specific interests" just discussed, *hiQ Labs,* 2022 WL 1132814, at *9, or consumer choice.

2. <u>Google's Conduct Violates the Unfair Competition Law</u>

The UCL has a "broad" scope, *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999), that prohibits any "unlawful, unfair or fraudulent business act or practices." Cal. Bus. & Prof. Code § 17200. Google's conduct violates the UCL for at least two reasons:

*First*, Google's interference with Match Group's contracts violates the UCL's "unlawful" prong. *Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1017 (C.D. Cal. 2013) (explaining that "[t]he UCL prohibits "unlawful actions that constitute tortious interference.").

*Second*, even if Google's conduct does not fully constitute a tort, it is just the kind of unfair conduct the UCL was intended to capture and prevent. *Cel-Tech*, 20 Cal. 4th at 180 ("[A] practice may be deemed unfair even if not specifically proscribed by some other law."); s*ee also Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1266–67 (1992) ("[T]o state a claim under the act one need not plead and prove the elements of a tort."). For example, Google exploiting its control over the Android app distribution market to force app developers to use GPB, so Google can compete with those developers and extract supracompetitive fees, has "effects . . . comparable to or the same as a violation of [antitrust] law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187; *see also* Epic Motion. Under similar circumstances, Judge Chen in this District granted a preliminary injunction. *See hiQ Labs, Inc.*, 273 F. Supp. 3d at 1104 ("hiQ has presented some evidence supporting its assertion that LinkedIn's decision to revoke hiQ's access to its data was made for the purpose of eliminating hiQ as a competitor in the data analytics field, and thus potentially violates the policy or spirit of the Sherman Act . . . While hiQ will have to do much more to prove such a claim, it has raised at least serious enough questions on the merits of its UCL claim at this juncture to support the issuance of a preliminary injunction.") (citations omitted).

## IV.   CONCLUSION

A temporary restraining order should issue to preserve the status quo and prevent Google from enforcing its policy change that will irreparably harm Match Group. Google, by contrast, will suffer no harm at all from maintaining the status quo. The balance of harms overwhelmingly favors Match Group, and it has demonstrated a likelihood of success on its claims.

Dated:  May 10, 2022

Respectfully submitted,

By: _____
        Douglas J. Dixon

HUESTON HENNIGAN LLP
John C. Hueston
jhueston@hueston.com
Douglas J. Dixon
ddixon@hueston.com
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone:  (949) 229-8640

Joseph A. Reiter
jreiter@hueston.com
Michael K. Acquah
macquah@hueston.com
William M. Larsen
wlarsen@hueston.com
Julia L. Haines
jhaines@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:  (213) 788-4340

*Attorneys for Plaintiffs Match Group,*
*LLC; Humor Rainbow, Inc.; PlentyofFish*
*Media ULC; and People Media, Inc.*