HUESTON HENNIGAN LLP
John C. Hueston, State Bar No. 164921
jhueston@hueston.com
Douglas J. Dixon, State Bar No. 275389
ddixon@hueston.com
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone:     (949) 229-8640

HUESTON HENNIGAN LLP
Joseph A. Reiter, State Bar No. 294976
jreiter@hueston.com
Christine Woodin, State Bar No. 295023
cwoodin@hueston.com
Michael K. Acquah, State Bar No. 313955
macquah@hueston.com
William M. Larsen, State Bar No. 314091
wlarsen@hueston.com
Julia L. Haines, State Bar No. 321607
jhaines@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:     (213) 788-4340

Attorneys for Plaintiffs Match Group, LLC;
Humor Rainbow, Inc.; PlentyofFish Media ULC;
and People Media, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Match Group, LLC, et al. v. Google LLC, et al.,* Case No. 3:22-cv-02746-JD | Case No. 3:21-md-02981-JD<br><br>**MATCH PLAINTIFFS' MOTION TO DISMISS GOOGLE DEFENDANTS' COUNTERCLAIMS**<br><br>Date:          September 8, 2022<br>Time:          10:00 a.m.<br>Judge:         Hon. James Donato<br>Courtroom:   11, 19th Floor, 450 Golden Gate Ave, San Francisco, CA 94104 |

1

2       **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3       **PLEASE TAKE NOTICE** that on September 8, 2022, at 10:00 a.m., in Courtroom 11 of

4       the above-entitled Court, located on the 19th floor of 450 Golden Gate Avenue, San Francisco,

5       California 94102, before the Honorable James Donato, Plaintiffs and Counterclaim-Defendants

6       Match Group, LLC; Humor Rainbow, Inc.; PlentyofFish Media ULC; and People Media, Inc.

7       (collectively, Match Plaintiffs)[1] will and hereby do move to dismiss Google's counterclaims.  *See*

8       Dkt. 283.

9           The grounds for Match Plaintiffs' motion are set forth more fully in the attached

10      memorandum.  But in brief, (1) Google's breach of contract claim fails because in each of the four

11      relevant time periods, Match Plaintiffs were not in breach or Google otherwise waived performance;

12      (2) Google's false promise and breach of the implied covenant claims rest on purported "promises"

13      that promised nothing, and Google fails to plead any other purported false statements with

14      specificity; and (3) Google's quasi-contract claim fails because California law prohibits such claims

15      when the parties' relationship is governed by an express contract.

16          This Motion is based on this Notice of Motion, Memorandum of Points and Authorities, the

17      Declaration of William Larsen, the accompanying Request for Judicial Notice, all pleadings and

18      papers filed in this action, and such other matters as may be presented to the Court at the time of or

19      before the hearing.

20

21      Dated: August 1, 2022                    HUESTON HENNIGAN LLP

22

23                                               By:   */s/ Douglas J. Dixon*

24                                                     Douglas J. Dixon

25                                                     *Attorneys for Plaintiffs Match Group, LLC;*
                                                       *Humor Rainbow, Inc.; PlentyofFish Media ULC;*
26                                                     *and People Media, Inc.*

27      _____

28      [1] For the purposes of this case, the term "Match Plaintiffs" includes only the operating entities
        named as Plaintiffs, which are part of the Match Group, Inc. portfolio of companies.

1

### TABLE OF CONTENTS

2
<u>Page</u>

3  I.      INTRODUCTION .................................................................................................1

4  II.     BACKGROUND ...................................................................................................2

5  III.    LEGAL STANDARD ...........................................................................................5

6  IV.     ARGUMENT.........................................................................................................6

7          A.      Google's Breach of Contract Claim Fails in Four Relevant Periods........6

8                  1.      Until September 28, 2020, Google's Payments Policy
                           permitted alternative payment systems for apps with certain
9                          kinds of digital content ..................................................................6

10                 2.      From September 28, 2020 to September 30, 2021, Google
                           allowed all developers a one-year "extension" to comply.............8
11
                   3.      From September 30, 2021 to March 31, 2022, Google granted
12                         Match Plaintiffs a further extension ...............................................8

13                 4.      From March 31, 2022 to June 1, 2022, Google publicly
                           announced it would not take action to remove noncompliant
14                         apps .................................................................................................9

15         B.      The False Promise Claim Fails Because Match Plaintiffs Promised
                   Nothing ......................................................................................................9
16
                   1.      Google identifies no clear, unambiguous promise to comply
17                         with the DDA, and Google's reliance on Match Plaintiffs'
                           statements was not reasonable .......................................................9
18
                   2.      To the extent Google alleges other false promises, Google
19                         fails to plead them with particularity ..........................................13

20         C.      The Breach of Implied Covenant Claim Fails for the Same Reasons ....14

21         D.      Google Is Precluded from Asserting a Quasi-Contract Claim Because
                   It Does Not Allege That the DDA and Payments Policy Are
22                 Unenforceable ........................................................................................14

23  V.      CONCLUSION....................................................................................................15

24

25

26

27

28

- i -

1

<u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**<u>Cases</u>**

4

*Aguilar v. Int'l Longshoremen's Union Loc. No. 10,*
5
    966 F.2d 443 (9th Cir. 1992) .................................................................................................. 10

6

*Alliance Mortg. Co. v. Rothwell,*
    10 Cal.4th 1226 (1995) ....................................................................................................... 12
7

*Aquilina v. Certain Underwriters at Lloyd's Syndicate #2003,*
8
    407 F. Supp. 3d 1016 (D. Haw. 2019) ................................................................................ 14

9

*Arch Ins. Co. v. Allegiant Prof'l Bus. Servs., Inc.,*
    2012 WL 1400302 (C.D. Cal. Apr. 23, 2012) ................................................................... 13
10

11

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...................................................................................................... 5, 10

12

*Bank of the West v. Superior Ct.,*
    2 Cal. 4th 1254 (1992) ......................................................................................................... 7
13

14

*Barrous v. BP PLC,*
    2010 WL 4024774 (N.D. Cal. Oct. 13, 2010) ..................................................................... 8
15

16

*Bedrosian v. Tenet Healthcare Corp.,*
    208 F.3d 220 (9th Cir. 2000) ............................................................................................... 7
17

*Cal. Medical Ass'n, Inc. v. Aetna US Healthcare of Cal., Inc.,*
18
    94 Cal. App. 4th 151 (2001) .............................................................................................. 15

19

*Dooms v. Fed. Home Loan Mortg. Corp.,*
    2011 WL 1232989 (E.D. Cal. Mar. 31, 2011) .................................................................... 5
20

21

*DuBeck v. Cal. Physicians' Serv.,*
    234 Cal. App. 4th 1254 (2015) ............................................................................................ 8

22

*Durell v. Sharp Healthcare,*
    183 Cal. App. 4th 1350 (2010) .......................................................................................... 15
23

24

*First Advantage Background Servs. Corp. v. Priv. Eyes, Inc.,*
    2007 WL 2572191 (N.D. Cal. Sept. 5, 2007) ..................................................................... 9
25

26

*First Advantage Background Servs. Corp. v. Private Eyes, Inc.,*
    569 F. Supp. 2d 929 (N.D. Cal. 2008) ..................................................................... 5, 10, 11

27

*Foster v. Reverse Mortg. Solutions, Inc.,*
    2020 WL 4390374 (C.D. Cal. May 13, 2020) .................................................................. 12
28

- ii -

1

TABLE OF AUTHORITIES (cont.)

2

Page(s)

3

*Glen Holly Ent., Inc. v. Tektronix Inc.*,

4
    343 F.3d 1000 (9th Cir. 2003) ...................................................................... 10

5

*Granadino v. Wells Fargo Bank, N.A.*,
    236 Cal. App. 4th 411 (2015) .................................................................. 10, 11

6

*Hills Transp. Co. v. Southwest Forest Indus., Inc.*,

7
    266 Cal.App.2d 702 (1968) ...................................................................... 10, 12

8

*In re CMR Mortg. Fund, LLC*,

9
    416 B.R. 720 (Bankr. N.D. Cal. 2009) ........................................................... 8

10

*In re Gilead Sci. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ......................................................................... 5

11

*Kearns v. Ford Motor Co.*,

12
    567 F.3d 1120 (9th Cir. 2009) ....................................................................... 14

13

*Klein v. Chevron USA, Inc.*,
    202 Cal. App. 4th 1342 (2012) ..................................................................... 15

14

15

*Kruse v. Bank of Am.*,
    202 Cal. App. 3d 38 (1988) .......................................................................... 12

16

*Mat-Van, Inc. v. Sheldon Good & Co. Auctions, LLC*,

17
    2008 WL 346421 (S.D. Cal. Feb. 6, 2008).................................................... 13

18

*Mewawalla v. Middleman*, No. 21-CV-0,

19
    2022 WL 1304474 (N.D. Cal. May 2, 2022).................................................. 13

20

*Miles v. Deutsche Bank Nat'l Trust Co.*,
    236 Cal.App.4th 394 (2015) ........................................................................... 6

21

*Mostowfi v. I2 Telecom Int'l, Inc.*,

22
    2005 WL 8162717 (N.D. Cal. May 23, 2005)................................................ 14

23

*Nguyen v. Stephens Institute*,
    529 F. Supp. 3d 1047 (N.D. Cal. 2021)......................................................... 15

24

25

*Phillips v. JP Morgan Chase Bank, N.A.*,
    2011 WL 13101726 (S.D. Cal. Nov. 14, 2011)........................................ 9, 11

26

*Sanchez v. Aurora Loan Servs., LLC*,

27
    2014 WL 12589660 (C.D. Cal. June 10, 2014) ............................................ 12

28

*Saroya v. Univ. of the Pacific*,
    503 F. Supp. 3d 986 (N.D. Cal. 2020) .......................................................... 15

- iii -

<u>TABLE OF AUTHORITIES</u> (cont.)

Page(s)

*Sundance Image Tech., Inv. v. Inkjetmall.com, Ltd.,* ,
    2005 WL 8173279 (S.D. Cal. Oct. 4, 2005) ..................................................................... 10

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ............................................................................................... 14

*Tarmann v. State Farm Mut. Auto. Ins. Co.*,
    2 Cal. App. 4th 153 (1991) ................................................................................................... 5

*UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*,
    117 F. Supp. 3d 1092 (C.D. Cal. 2015) ............................................................................. 13

*United States ex rel. Swoben v. United Healthcare Ins. Co.*,
    848 F.3d 1161 (9th Cir. 2016) .............................................................................................. 5

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) .................................................................................... 5, 7, 10

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir.2003) ........................................................................................ 13, 14

*Wells v. Chase Home Fin., LLC*,
    2010 WL 4858252 (W.D. Wash. Nov. 19, 2010) ............................................................... 11

*Whitesides v. E*TRADE Sec., LLC*,
    2021 WL 2590156 (N.D. Cal. June 24, 2021) ..................................................................... 8

*Woods v. Google Inc.*,
    2011 WL 3501403 (N.D. Cal. Aug. 10, 2011) ..................................................................... 8

*Workman-Johnson v. Kaplan Higher Educ. Corp.*,
    2008 WL 11336910 (S.D. Cal. Aug. 11, 2008) ................................................................... 12

*Zepeda v. PayPal, Inc.,*,
    777 F. Supp. 2d 1215 (N.D. Cal. 2011) ........................................................................... 7, 8

**Statutes**

Cal. Code Civ. Proc. § 337(a) .................................................................................................... 2

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................................................... 5, 9

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    INTRODUCTION

Google has long known that Match Plaintiffs' dating apps[2] offer in-app purchases through alternative payment processing systems.  Google also knows that Match Plaintiffs did so in compliance with Google's Developer Distribution Agreement (DDA) and incorporated Payments Policy.  For many years, the Payments Policy expressly allowed apps selling "digital content that may be consumed outside of the app itself" to bypass Google's payment system and the unconscionable fees that Google takes from app developers and consumers.  (Larsen Decl., Ex. 1.)  There is no question that Match Plaintiffs fell within that exception because Google's own counterclaims admit as much.  As Google alleges, the digital content that Match Plaintiffs sell through their apps are "available on a website [*i.e.*, outside of the app itself] or through the app, regardless of where the user made the original in-app or subscription purchase."  (Dkt. 283 (Counterclaim) ¶ 29; *see also id.* ¶ 32.)

That changed in September 2020, when Google changed its Payments Policy to remove the "outside of the app" exception and require apps offering "digital goods and services" to use Google's billing system.  (Counterclaim ¶ 43.)  But Google extended that compliance deadline and continued to allow Match Plaintiffs to offer alternative billing systems, and never purported to enforce its new policy against Match Plaintiffs (or any other developer) until June 1, 2022.

Now that Match Plaintiffs have challenged Google's anticompetitive conduct and abuse of its monopoly power in app distribution and in-app payment processing, Google brings counterclaims against Match Plaintiffs, claiming they were in breach all along and then somehow engaged in fraud.  Nothing could be further from the truth.   Google's own allegations, policies, and other documents incorporated in its counterclaims show that Google's claims either fail as a matter of law or should be severely limited.

**Breach of contract**.  Google alleges that Match Plaintiffs violated the DDA and Payments Policy by "using [their] own external payment systems in [their] apps" and "by failing to pay

---

[2] For the purposes of this case, those apps include Tinder, OkCupid, Match, PlentyofFish, and OurTime.

6228763

1    Google's agreed-to service fees on [their] in-app transactions." (Counterclaim ¶ 59.)  But the

2    DDA's exception for "digital content that may be consumed outside the app itself" was in place

3    from well before July 11, 2018[3] to September 2020, when Google updated its Payments Policy.

4    (Larsen Decl., Exs. 1, 4.)  Google later granted app developers (including Match Plaintiffs) an

5    "extension" to, effectively, June 1, 2022 to comply with the new Payments Policy.  (Larsen Decl.,

6    Ex. 5.)  Google's breach of contract claim should thus be limited to conduct after June 1, 2022.

7           **False promise**.  Google alleges that Match Plaintiffs made false "representations that

8    [Match Plaintiffs] would comply with the DDA" to obtain the extension to comply with Google's

9    new Payments Policy.  Google identifies two purported "promises": (1) an email from Peter

10   Foster wherein Mr. Foster expressly states Match Plaintiffs will <u>not</u> comply, and (2) Match

11   Plaintiffs' response of "yes" to Google's extension form question, "Do you need more time to

12   comply with Google Play's Payments policy?"  (Counterclaim ¶ 50.)  Neither statement is a

13   promise to do anything.

14          **Breach of implied covenant**.  Google's implied covenant claim rests on the same conduct

15   underlying the false promise claim and fails for the same reasons.

16          **Quasi-contract**.  California law is clear that when two parties' relationship is governed by

17   an express contract (here, at least as Google alleges, the DDA), Google cannot plead both a breach

18   of contract claim and a quasi-contract claim unless Google also alleges, in the alternative, that the

19   DDA is unenforceable or invalid.  Google does not plead that, so it has not adequately pleaded its

20   quasi-contract claim.[4]

21   **II.    BACKGROUND**

22          For the purposes of Match Plaintiffs' motion, Match Plaintiffs take Google's allegations as

23   true, as is required on a motion to dismiss.  Match Plaintiffs first published a dating app on Google

24

25   _____

26   [3] July 11, 2018 is the beginning of the four-year statute of limitations period applicable to Google's
     breach of contract claim under Cal. Code Civ. Proc. § 337(a).  Google has not alleged that it seeks
27   to recover prior to the start of the limitations period.

28   [4] Match Plaintiffs do not challenge, in this motion, Google's declaratory judgment claim or whether
     Google has adequately pleaded a breach of contract claim for the period following June 1, 2022, but
     reserves all rights to do so and to raise other defenses (e.g., laches) at the appropriate time.

Play (then called Android Market) in 2010.  (Counterclaim ¶ 40.)  In the twelve years since, Match Plaintiffs and their associated brands and sister entities published over thirty other apps on the Google Play Store (*id.*), and those apps have collectively been downloaded nearly 100 million times from Google Play (*id.* ¶ 31).

Because Match Plaintiffs distribute apps through Google Play, the relationship between Match Plaintiffs and Google is governed by Google's DDA.  (Counterclaim ¶ 43.)  Among other things, the DDA prohibits apps from "lead[ing] users to a payment method other than Google Play's billing system," and requires that app developers pay Google a "service fee on the in-app sale of digital goods, including subscriptions."  (Counterclaim ¶ 58 (citing DDA ¶ 3.4).)

The DDA also incorporates all of Google's "Developer Program Policies," including the Payments Policy.  (Counterclaim ¶ 43 (citing DDA ¶ 4.1).)  The Payments Policy has changed over the years.  In particular, from at least 2016 until September 2020, the Payments Policy generally required use of Google Play's payment system, but contained an exception for "digital content that may be consumed out of the app itself":

**In-store purchases:** Developers charging for apps and downloads from Google Play must use Google Play's payment system.

**In-app purchases:**

- Developers offering products within a game downloaded on Google Play or providing access to game content must use Google Play In-app Billing as the method of payment.
- Developers offering products within another category of app downloaded on Google Play must use Google Play In-app Billing as the method of payment, except for the following cases:
  - Payment is solely for physical products
  - Payment is for digital content that may be consumed outside of the app itself (e.g. songs that can be played on other music players).

(Larsen Decl., Ex. 1.)  On September 28, 2020, Google changed its Payments Policy to remove the "outside of the app" exception, among other changes.  (Counterclaim ¶ 43.)  Google alleges that the new Payments Policy applies to app developers because the "DDA expressly provides that Google may make changes to the DDA at any time."  (*Id.*)

When it announced its September 2020 policy change, Google "afforded non-compliant developers over a year, until September 30, 2021, to make any necessary changes" to their apps. (Counterclaim ¶ 48.)  This initial extension was automatic; no application was required to receive it.  But when the initial one-year period was almost up, Google offered a "form accessible to all developers" which, if completed and subsequently accepted by Google, further extended the

- 3 -

6228763

1    deadline to March 31, 2022.  (Counterclaim ¶¶ 50–52.)  Google later announced that "[s]tarting

2    June 1, 2022," apps that continued to offer alternative payments "will be removed from Google

3    play."  (Larsen Decl., Ex. 5.)

4           Match Plaintiffs complied with Google's procedures.  On August 5, 2021, Match Plaintiffs'

5    Peter Foster emailed Google's Brandon Barras and stated, "I am reaching out regarding Google's

6    announcement that it is granting extensions to its September 30, 2021 deadline for apps to use

7    Google Play's billing system exclusively.  In light of this extension, ***Match will continue to use its***

8    ***bespoke payment system to process payments***."  (Larsen Decl., Ex. 2 (emphasis added).)  Mr.

9    Barras responded that Match would need to "appeal for an extension" by filling out Google's

10   prescribed form, and would need to do so for each app.  (*Id*.)

11          Per Mr. Barras's instructions, Match Plaintiffs submitted Google's required forms.  In

12   response to Google's question, "[t]his extension is intended to aid developers that need more time

13   to comply with Google Play's Payments policy. Do you need more time to comply with Google

14   Play's Payments policy?", Match Plaintiffs answered "Yes[.]"  (Larsen Decl., Ex. 3.)  And in

15   response to Google's request that Match Plaintiffs "[p]lease explain why you need additional time

16   to comply with Google Play's Payments policy," Match Plaintiffs responded, "Our bespoke

17   payment system is critical to our user experience. Due to significant feature gaps (payment / subs /

18   discounts), ***Google's system is not a suitable substitute and exclusive use of Google's systems will***

19   ***meaningfully harm our users (inflate prices) & undermine our business***[.]"  (*Id*. (emphasis

20   added).)  Google granted Match Plaintiffs an extension to March 31, 2022.  (Counterclaim ¶ 51.)

21          Following Match Plaintiffs' complaint, and pursuant to the parties' stipulation entered May

22   22, 2022, Match Plaintiffs' apps remain on Google's Play Store—and consistent with Mr. Foster's

23   statement, those apps continue to use Match Plaintiffs' own payment processing system.

24          Google now brings five counterclaims against Match Plaintiffs for (1) breach of contract,

25   based on the DDA and Payments Policy, (2) breach of the implied covenant of good faith and fair

26   dealing, based on Match Plaintiffs' purportedly having "misled Google to believe that Match"

27   Plaintiffs would "comply with the DDA's Payment policy," (3) false promise, based on Match

28   Plaintiffs' alleged promise to "comply with the DDA," (4) quasi-contract, based on Match

1   Plaintiffs' alleged "induc[ement]" to Google to "make modifications to its billing systems and

2   provide distribution and other services," and (5) declaratory judgment.  (Counterclaim ¶¶ 55–86.)

3   **III.    LEGAL STANDARD**

4          A complaint must be dismissed unless it "contain[s] sufficient factual matter, accepted as

5   true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

6   (2009) (citation omitted).  The Court accepts factual allegations as true, but that rule is

7   "inapplicable to legal conclusions."  *Id*.  The Court need not "accept as true allegations that are

8   merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Sci.*

9   *Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

10         "In alleging fraud or mistake, a party must state with particularity the circumstances

11  constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Under Rule 9(b), a plaintiff "must allege 'the

12  who, what, when, where, and how of the misconduct charged,' including what is false or

13  misleading about a statement, and why it is false."  *United States ex rel. Swoben v. United*

14  *Healthcare Ins. Co*., 848 F.3d 1161, 1180 (9th Cir. 2016) (citation omitted).  Specifically, "[i]n a

15  fraud action against a corporation, a plaintiff must 'allege the names of the persons who made the

16  allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said

17  or wrote, and when it was said or written.'"  *Dooms v. Fed. Home Loan Mortg. Corp.*, No. CV F

18  11-0352 LJO DLB, 2011 WL 1232989, at *14 (E.D. Cal. Mar. 31, 2011) (quoting *Tarmann v.*

19  *State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 157 (1991)).

20         On a motion to dismiss, the Court may consider "documents attached to the complaint,

21  documents incorporated by reference in the complaint, or matters of judicial notice[.]"  *United*

22  *States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  A document may be "incorporated by

23  reference into a complaint if the plaintiff refers extensively to the document or the document forms

24  the basis of the plaintiff's claim."  *Id.*; *First Advantage Background Servs. Corp. v. Private Eyes,*

25  *Inc.*, 569 F. Supp. 2d 929, 944 n.3 (N.D. Cal. 2008) ("Where a plaintiff alleges the contents of a

26  document in the complaint, but does not attach the document, the defendant may provide that

27  document to the court, and the court may consider it on a Rule 12(b)(6) motion to dismiss.").

28

**IV.    ARGUMENT**

    **A.    Google's Breach of Contract Claim Fails in Four Relevant Periods**

To state a breach of contract claim under California law, Google must allege the "(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *Miles v. Deutsche Bank Nat'l Tr. Co.*, 236 Cal.App.4th 394, 402 (2015).  For the majority of the relevant period (7/11/2018 to present), Google's claim fails as a matter of law because Match Plaintiffs did not breach anything.  Instead, Google expressly permitted the conduct it now claims was breach all along.  As a result, Match Plaintiffs ask the Court to dismiss Google's counterclaim as to four relevant periods: (1) prior to September 28, 2020, during which Google's prior Payments Policy was in effect; (2) September 28, 2020 to September 30, 2021, during which Google granted all developers a blanket extension to comply with the new Payments Policy; (3) September 30, 2021 to March 31, 2022, during which Google granted Match Plaintiffs a further extension; and (4) March 31, 2022 to June 1, 2022, up until Google's announcement that it would "start[]" removing apps that continued to offer alternative payments.

        *1.    Until September 28, 2020, Google's Payments Policy permitted alternative payment systems for apps with certain kinds of digital content*

The basic thrust of Google's claim is that Google's DDA and Payments Policy allegedly "expressly require[] that Match [Plaintiffs] use Google Play's billing system for in-app purchases . . . and that Google be paid a service fee on such in-app purchases"; Google alleges that Match Plaintiffs breached by "using [their] own external payment systems" and "failing to pay" Google's "service fees."  (Counterclaim ¶¶ 58–59.)  But Google quotes only from its current Payments Policy and mentions only in passing that its Payment Policies have changed during the relevant time period.  Google does not acknowledge or quote from the language of the old Payments Policy at all, and does not attach either the DDA, the current Payments Policy, or the old Payments Policy to its counterclaims. The Court need not play along with Google's attempt to hide the ball.

Instead, the Court can and should consider the DDA and Payments Policy (both new and old) because they are incorporated by reference in Google's counterclaims and "form[] the basis

1   of" Google's claims.  *Ritchie*, 342 F.3d at 908 (9th Cir. 2003).  Though Google's Payments Policy
2   <u>now</u> requires app developers like Match Plaintiffs to use Google's billing system in violation of
3   federal and state law (Larsen Decl., Ex. 4), that was not always the case.  Until September 28,
4   2020 (Counterclaim ¶ 43), Google's *prior* Payments Policy expressly allowed app developers like
5   Match Plaintiffs to bypass "Google Play In-app Billing" when "[p]ayment is for digital content
6   that may be consumed outside of the app itself."  (Larsen Decl., Ex. 1.)

7       The Court's analysis need not go further than Google's own allegations, which admit that
8   Match Plaintiffs satisfied the "outside of the app" exception.  For example, Google alleges that
9   Match Plaintiffs sell "digital content" and that Match Plaintiffs' subscription and á la carte
10  products can be consumed outside of Match Plaintiffs' dating apps: the "premium" features that
11  Match Plaintiffs sell through apps are "available on a website or through the app, regardless of
12  where the user made the original in-app or subscription purchase."  (Counterclaim ¶¶ 29, 41, 43,
13  58; *see also id.* ¶ 32.)

14      "Resolution of contractual claims on a motion to dismiss is proper if the terms of the
15  contract are unambiguous."  *Bedrosian v. Tenet Healthcare Corp.*, 208 F.3d 220 (9th Cir. 2000).
16  The old Payments Policy is unambiguous: if "digital content" (e.g., subscriptions) can be
17  "consumed outside the app itself" (i.e., on another platform, such as on a website), an app
18  developer did not have to use Google's billing system or pay a commission on sales made through
19  that billing system.  But even if that language were ambiguous when considered in isolation,
20  Google's admissions render the pre-September 28, 2020 Payments Policy clear and unambiguous
21  as to Match Plaintiffs—because Google itself alleges that Match Plaintiffs met the only criteria for
22  inclusion.  And when "contractual language is clear and explicit, it governs."  *Bank of the West v.*
23  *Superior Ct.*, 2 Cal. 4th 1254, 1264 (1992).

24      Ninth Circuit district courts routinely grant motions to dismiss under similar facts.  In
25  *Zepeda v. PayPal, Inc.*, for example, plaintiffs claimed PayPal breached its user agreements by
26  placing holds on their accounts without suspicion of "restricted activities."  777 F. Supp. 2d 1215,
27  1220 (N.D. Cal. 2011).  But the contract permitted PayPal to hold user accounts "in its sole
28  discretion."  *Id*.  The Court found the contract unambiguous, and explained that because Plaintiffs'

MATCH PLAINTIFFS' MOTION TO DISMISS GOOGLE DEFENDANTS' COUNTERCLAIMS
6228763

1  complaint "fail[ed] to address the effect[s] of" those contract provisions, the "pleading in its

2  current form fails to give rise to the reasonable inference that PayPal is liable for breach of

3  contract." *Id*. *Zepeda* is consistent with common practice and common sense: when contract

4  language unambiguously forecloses a breach claim, courts dismiss that claim. *See, e.g.*, *Barrous v.*

5  *BP PLC*, No. 10-CV-2944-LHK, 2010 WL 4024774, at *4 (N.D. Cal. Oct. 13, 2010) (granting

6  motion to dismiss when contract was "unambiguous in imposing no requirement that Defendants

7  undertake any particular remediation"); *Whitesides v. E*TRADE Sec., LLC*, No. 20-CV-05803-

8  JSC, 2021 WL 2590156, at *3 (N.D. Cal. June 24, 2021) (same); *Woods v. Google Inc.*, No. 05:11-

9  CV-1263-JF, 2011 WL 3501403, at *6 (N.D. Cal. Aug. 10, 2011) (same); *see also In re CMR*

10  *Mortg. Fund, LLC*, 416 B.R. 720, 731 (Bankr. N.D. Cal. 2009) (granting motion to dismiss when

11  complaint alleged defendant "engaged only in conduct that was expressly permitted" under

12  contract).  Because Google's counterclaims similarly "fail to address the effect of" the old

13  Payments Policy, those claims "fail[] to give rise to the reasonable inference" that Match Plaintiffs

14  are liable for conduct prior to September 28, 2020.  *Zepeda*, 777 F. Supp. 2d at 1220.

15           *2.     From September 28, 2020 to September 30, 2021, Google allowed all*

16                   *developers a one-year "extension" to comply.*

17           After Google changed its Payments Policy, Google "afforded non-compliant developers

18  over a year" to come into compliance.  (Counterclaim ¶ 48.)  Google has not alleged that app

19  developers were required to take any action—much less make affirmative statements—to qualify

20  for this one-year waiver period.  Rather, Google made the unilateral decision to excuse Match

21  Plaintiffs (and all other "non-compliant" developers) from performance during that one-year

22  period.  Taking Google up on that offer was not a breach.  *See, e.g.*, *DuBeck v. Cal. Physicians'*

23  *Serv.*, 234 Cal. App. 4th 1254, 1267–68 (2015) (insurer's admitted one-year delay in enforcing

24  right to investigate precluded exercise of contractual right to rescind).

25           *3.     From September 30, 2021 to March 31, 2022, Google granted Match*

26                   *Plaintiffs a further extension.*

27           After the broad, no-strings-attached extension expired, Google made a "form" available to

28  "all developers" offering a further extension of time from September 30, 2021 to March 31, 2022

1   to comply with Google's new Payments Policy.  (Counterclaim ¶ 50.)  Match Plaintiffs applied for

2   and received that extension.  Google's permission to continue operating Match Plaintiffs' own

3   payment processing services through March 31, 2022 similarly precludes a breach claim during

4   this period.  Google may argue that Match Plaintiffs cannot fairly take advantage of this latter

5   period because of Google's allegations of "false promise."  (Counterclaim ¶¶ 52–53.)  But

6   Google's remedy for that is its fraud claim—which fails for the reasons discussed below.

7          4.      *From March 31, 2022 to June 1, 2022, Google admits it would not yet*

8                  *"start[]" to remove apps offering alternative payments.*

9          Finally, Google publicly announced that it would not "start[]" to remove apps offering

10  alternative payments until June 1, 2022.  (Larsen Decl., Ex. 5.)  Through its counterclaims, Google

11  now seeks what it publicly disclaimed at the time.  The Court should not permit Google to create

12  an actionable breach claim through its own about-face.

13  **B.      The False Promise Claim Fails Because Match Plaintiffs Promised Nothing**

14         In addition to its contract claim, Google alleges that Match Plaintiffs are liable for false

15  promise because they promised to "bring [their] apps into compliance with the DDA and Google's

16  Payments policy during the extension period" and "did not perform the promised act."

17  (Counterclaim ¶ 74.)  "Under California law, a cause of action for fraud based on a false promise

18  must allege: (1) a material promise, (2) knowledge of its falsity, (3) intent to defraud or induce

19  reliance, (4) justifiable reliance, and (5) resulting damage."  *First Advantage Background Servs.*

20  *Corp. v. Priv. Eyes, Inc.*, No. C-07-2424 SC, 2007 WL 2572191, at *4 (N.D. Cal. Sept. 5, 2007).

21  For the two statements Google identifies, Google cannot establish the promise and reliance

22  elements and should be dismissed with prejudice.  For the remaining statements, Google fails to

23  allege the required who, what, where, when, and how necessary to comply with Rule 9(b), and

24  Google's allegations should be dismissed without prejudice.

25          1.      *Google identifies no clear, unambiguous promise to comply with the DDA,*

26                  *and Google's reliance on Match Plaintiffs' statements was not reasonable.*

27         To be actionable, alleged "[p]romises in promissory fraud or promissory estoppel claims

28  must be clear and unequivocal."  *Phillips v. JP Morgan Chase Bank, N.A.*, No. 11-CV-1404 W

1   (MDD), 2011 WL 13101726, at *9 (S.D. Cal. Nov. 14, 2011) (citing *Hills Transp. Co. v. Sw.*

2   *Forest Indus., Inc.*, 266 Cal. App. 2d 702 (1968)).  "[A] promise that is 'vague, general or of

3   indeterminate application' is not enforceable." *Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d

4   1000, 1017 (9th Cir. 2003) (quoting *Aguilar v. Int'l Longshoremen's Union Loc. No. 10*, 966 F.2d

5   443, 446 (9th Cir. 1992)).  In addition, a promise must be an actual "promise": i.e., an "assurance

6   that a person will or will not do something." *Granadino v. Wells Fargo Bank, N.A.*, 236 Cal. App.

7   4th 411, 417 (2015).  A "prediction that relates to future facts" is "not a promise at all" and "is not

8   actionable as fraud." *Sundance Image Tech., Inc. v. Inkjetmall.com, Ltd.*, No. 02CV2258-B (AJB),

9   2005 WL 8173279, at *6 (S.D. Cal. Oct. 4, 2005).  Because neither of the purported "promises"

10  Google identifies is an actual promise, both fail as a matter of law.

11      <u>August 5, 2021 Foster email</u>.  Google alleges that in August 2021, "Match's General

12  Manager, Global Advertising & Brand Solutions," Peter Foster, made a "request" for an

13  extension." (Counterclaim ¶ 70.)  To the best of Match Plaintiffs' knowledge, Google's allegation

14  refers to an August 5, 2021 email from Mr. Foster to Google's Brandon Barras.  Though Google

15  does not quote the email in its complaint (tellingly and perhaps strategically), the Court can

16  consider it on a motion to dismiss because it is incorporated in Google's counterclaims and "forms

17  the basis" of Google's false promise claim. *Ritchie*, 342 F.3d at 908.  Mr. Foster wrote:

18
19      Brandon[,] I am reaching out regarding Google's announcement that it is granting
        extensions to its September 30, 2021 deadline for apps to use Google Play's billing
        system exclusively.  ***In light of this extension, Match will continue to use its bespoke
        payment system to process payments.***
20

21  (Larsen Decl., Ex. 2 (emphasis added).)  The Court need not go further than its "experience and

22  common sense" to conclude that Mr. Foster promised nothing at all. *Iqbal*, 556 U.S. at 664.  If

23  anything, far from promising to "update its apps" to use Google Play Billing, Mr. Foster explicitly

24  states that Match Plaintiffs will *continue* to use their existing payment systems.  (Counterclaim

25  ¶ 70.)  At most, Mr. Foster's August 5, 2021 email was a "statement of fact": Match Plaintiffs

26  would continue business-as-usual during the extension period. *Granadino*, 236 Cal. App. 4th at

27  417 (statement that plaintiffs were "being reviewed for a loan modification" was not a promise that

28  defendants would not sell plaintiffs' property to support promissory estoppel claim); *see also First*

*Advantage Background Servs. Corp.*, 569 F. Supp. 2d at 944 (email indicating willingness to

- 10 -

1   "resume the normal practice of billing for services" was insufficient to support false promise

2   claim); *Wells v. Chase Home Fin., LLC*, No. C10-5001RJB, 2010 WL 4858252, at *8 (W.D.

3   Wash. Nov. 19, 2010) (similar).

4   <u>August 2021 extension requests</u>.  Google alleges that "later in August 2021," Match

5   Plaintiffs made "further representations" that they needed "additional time" to "comply with the

6   DDA," including an "August 19, 2021 communication from Casey Daniell."  (Counterclaim ¶ 70.)

7   Match Plaintiffs understand that the referenced communication is the extension request alleged

8   elsewhere in Google's claims.  (Counterclaim ¶ 50.)  Again, while Google has not attached the

9   extension request, the Court may consider it since it forms the basis of Google's claims.  The

10  extension request was identical for all of Match Plaintiffs' apps and read:

11      [Google] This extension is intended to aid developers that need more time to comply
        with Google Play's Payments policy. Do you need more time to comply with Google
12      Play's Payments policy?

13      [Match Plaintiffs] Yes[.]

14      [Google] Please explain why you need additional time to comply with Google Play's
        Payments policy.
15
        [Match Plaintiffs] Our bespoke payment system is critical to our user experience. Due
16      to significant feature gaps (payment/subs/discounts), Google's system is not a suitable
        substitute and exclusive use of Google's systems will meaningfully harm our users
17      (inflate prices) & undermine our business[.]

18  (Larsen Decl., Ex. 3 (bracketed content added).)  These statements are <u>not promises at all</u>—much

19  less the kind of "clear and unequivocal" promise necessary to support a promissory fraud claim.

20  *Phillips*, 2011 WL 13101726, at *9.  They provide no "assurance that a person will or will not do

21  something."  *Granadino*, 236 Cal. App. 4th at 417.  Instead, Match Plaintiffs make two

22  "statements of fact" (*id.*): (1) that Match Plaintiffs "need more time to comply," and (2) that the

23  reason is because "Google's system is not a suitable substitute," among other reasons.  Google's

24  extension request form did not ask "do you plan to comply," nor did Match Plaintiffs answer that

25  question—and none of Match Plaintiffs' statements promise that Match Plaintiffs would "bring

26  [their] apps into compliance with the DDA," let alone unambiguously.  (Counterclaim ¶ 73.)

27  Even on stronger allegations than Google makes here, courts routinely grant motions to

28  dismiss false promise claims that fail to plead a false promise.  *See, e.g.*, *First Advantage*

MATCH PLAINTIFFS' MOTION TO DISMISS GOOGLE DEFENDANTS' COUNTERCLAIMS

6228763

1  *Background Servs. Corp.*, 569 F. Supp. 2d at 944 (promise to "resum[e] our services under the

2  terms of our agreement" failed to state a claim as a matter of law); *Sanchez v. Aurora Loan Servs.,*

3  *LLC*, No. CV 13-08846 MMM (RZx), 2014 WL 12589660, at *19 (C.D. Cal. June 10, 2014)

4  ("purported promise to refrain from initiating foreclosure proceedings" was insufficient);

5  *Workman-Johnson v. Kaplan Higher Educ. Corp.*, No. 08CV339 JLS (RBB), 2008 WL 11336910,

6  at *6 (S.D. Cal. Aug. 11, 2008) (letter "did not guarantee a year's worth of compensation," despite

7  allegations to the contrary); *Hills Transp. Co.*, 266 Cal. App. 2d at 713 (letter showing agreement

8  "for a period of a few months (to) see what the results are" fatally undermined alleged promise at

9  pleading stage (alteration in original)).  Google's alleged false promises show that at every turn,

10 Match Plaintiffs explicitly *disclaimed* any intent to use Google's billing system.  (Larsen Decl.,

11 Exs. 2, 3.)  That those denials followed questions about whether Match Plaintiffs needed "time to

12 comply" does not transmute them into promises.

13      Separately and additionally, Google fails to allege facts showing reasonable reliance.

14 "[W]hether a party's reliance was justified may be decided as a matter of law if reasonable minds

15 can come to only one conclusion based on the facts."  *Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th

16 1226, 1239 (1995) (citation omitted).  Google alleges that it "would not have granted the extension

17 if it knew that Match Group would not bring its apps into compliance with the DDA and Google's

18 Payments policy during the extension period."  (Counterclaim ¶ 73.)  But Google knew that Match

19 Plaintiffs would not "bring its apps into compliance . . . during the extension period" *because*

20 *Match Plaintiffs expressly told Google that they would not do so*.  The August 5, 2021 Foster email

21 (that forms one of the bases for Google's fraud claims) unequivocally states that Match Plaintiffs

22 "will continue to use its bespoke payment system to process payments."  (Larsen Decl., Ex. 2.)

23 And Match Plaintiffs' extension request explains why: because Google's payment system is "not a

24 suitable substitute."  (*Id.*, Ex. 3.)

25      Perhaps Google hoped that Match Plaintiffs would reverse course.  But Google's "hopeful

26 expectations cannot be equated with the necessary justifiable reliance" to support a fraud claim.

27 *Kruse v. Bank of Am.*, 202 Cal. App. 3d 38, 55 (1988); *see also Foster v. Reverse Mortg. Solutions,*

28 *Inc.*, No. CV 19-10039 DSF (FFMx), 2020 WL 4390374, at *8 (C.D. Cal. May 13, 2020) (when a

1   party's "understanding" was not "based on anything clear and unambiguous actually said," party

2   failed to show reliance for promissory estoppel claim).

3          2.     *To the extent Google alleges other false promises, Google fails to plead*

4                 *them with particularity.*

5          It is not clear whether Google alleges any other purported false promises.  For example,

6   Google alleges that Match Plaintiffs' extension request form submission was just an "example" of

7   Match Plaintiffs' "further representations" about its intent to use Google's billing system—and

8   further alleges that "in addition, Match's CEO communicated directly with Google during the

9   extension period about" whether Match's apps would use Google's billing system.  (Counterclaim

10  ¶¶ 70, 74.)  To the extent Google bases its false promise claim on any other statements, those

11  statements are not alleged with sufficient particularity under Rule 9(b).

12         "In diversity cases, the substantive elements of fraud are determined by state law but the

13  complaint must conform with the requirements of the Federal Rules of Civil Procedure," including

14  Rule 9(b).  *Mat-Van, Inc. v. Sheldon Good & Co. Auctions, LLC*, No. 07-CV-912-IEG BLM, 2008

15  WL 346421, at *5 (S.D. Cal. Feb. 6, 2008) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097,

16  1106 (9th Cir. 2003)).  "The requirement of specificity in a fraud action against a corporation

17  requires the plaintiff to allege the names of the persons who made the allegedly fraudulent

18  representations, their authority to speak, to whom they spoke, what they said or wrote, and when it

19  was said or written."  *Arch Ins. Co. v. Allegiant Prof'l Bus. Servs., Inc.*, No. CV 11–1675 CAS

20  (PJWx), 2012 WL 1400302, at *3 (C.D. Cal. Apr. 23, 2012).

21         None of the other statements Google referenced in Google's counterclaims include the

22  "time, place, and specific content of the false representations," and thus fall short under Rule 9(b).

23  *UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092, 1106 (C.D. Cal. 2015).

24  Google does not allege who "Match's CEO" spoke to, when those conversations happened, or

25  what (if anything) Google contends she promised.  The other allegations fail to even include the

26  "identities of the parties."  *Id.*  Google's fraud allegations further "impermissibly lump defendants

27  together," failing to allege with specificity who made statements on behalf of which entity.

28  *Mewawalla v. Middleman*, No. 21-CV-09700-EMC, 2022 WL 1304474, at *13 (N.D. Cal. May 2,

- 13 -

2022).  "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.'"  *Swartz v. KPMG LLP*, 476 F.3d 756, 764–765 (9th Cir. 2007) (citation omitted).  If the Court grants Google leave to amend its false promise claim, it should instruct Google to cure that defect in the amended pleading.

**C.**     **The Breach of Implied Covenant Claim Fails for the Same Reasons**

"Under established Ninth Circuit law, fraud need not be an essential element of a claim to subject it to the heightened pleading standard of Rule 9(b)."  *Aquilina v. Certain Underwriters at Lloyd's Syndicate #2003*, 407 F. Supp. 3d 1016, 1029 (D. Haw. 2019) (citing *Vess*, 317 F.3d at 1107).  When a plaintiff alleges a "unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of [its] claim," that claim "is said to be 'grounded in fraud,'" and thus "as a whole must satisfy the particularity requirement of Rule 9(b)."  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).

Google's claim that Match Plaintiffs breached the implied covenant of good faith and fair dealing rests on the same conduct underlying Google's false promise claim: that Match Plaintiffs purportedly "misled Google to believe that Match [Plaintiffs] would make necessary modifications to comply with the DDA's Payment policy."  (Counterclaim ¶ 66.)  Because those allegations are insufficient to support the false promise claim, they are also insufficient to establish the breach of implied covenant claim.  *See, e.g.*, *Mostowfi v. I2 Telecom Int'l, Inc.*, No. C 03-5784 VRW, 2005 WL 8162717, at *11 (N.D. Cal. May 23, 2005) (dismissing breach of implied covenant claim for failure to plead particularity under Rule 9(b)).

**D.**     **Google Is Precluded from Asserting a Quasi-Contract Claim Because It Does Not Allege That the DDA and Payments Policy Are Unenforceable**

In addition to Google's breach of contract claim under the DDA, Google alleges a "quasi-contract / unjust enrichment" claim premised on Match Plaintiffs' purported "induc[ement]" of Google to "make modifications to its billing systems."  (Counterclaim ¶ 78.)  Google's quasi-contract claim fails because "[a]s a matter of law, an unjust enrichment claim does not lie where

1    the parties have an enforceable express contract." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th

2    1350, 1370 (2010).  Google alleges that the DDA is valid and enforceable.  (Counterclaim ¶ 56.)

3         Of course, "at the pleading stage, [a plaintiff] may alternatively allege both a breach of

4    contract claim and a quasi-contract claim." *Nguyen v. Stephens Inst.*, 529 F. Supp. 3d 1047, 1057

5    (N.D. Cal. 2021).  But courts have repeatedly held that to allege contract and quasi-contract claims

6    in the alternative, a plaintiff "must allege that the supposed contract between him and [defendant]

7    was unenforceable or void." *Id*. (collecting cases); *see also Saroya v. Univ. of the Pac.*, 503 F.

8    Supp. 3d 986, 998–99 (N.D. Cal. 2020) (same); *Klein v. Chevron USA, Inc.*, 202 Cal. App. 4th

9    1342, 1389 (2012) (same); *Cal. Medical Ass'n, Inc. v. Aetna US Healthcare of Cal., Inc.*, 94 Cal.

10   App. 4th 151, 173 (2001) (same).  Google has not done so.

11        Of course, Match Plaintiffs have challenged certain components of those agreements in

12   their own complaint.  But Google has denied those allegations.  (*See, e.g.*, Answer ¶ 152.)  And

13   Google has not alleged, either expressly or impliedly, that the DDA and Payments Policy are

14   otherwise invalid or unenforceable.  Because Google's "breach of contract claim pleaded the

15   existence of an enforceable agreement and [its] unjust enrichment claim did not deny the existence

16   or enforceability of that agreement," Google is "therefore precluded from asserting a quasi-

17   contract claim." *Klein*, 202 Cal. App. 4th at 1389–90.

18   **V.    CONCLUSION**

19        For the reasons above, Match Plaintiffs request that the Court (1) dismiss Google's breach

20   of contract claim with prejudice as to the pre-6/1/2022 period; (2) dismiss Google's false promise

21   and breach of implied covenant claims with prejudice as to the purported false promises alleged

22   with particularity, and without prejudice as to any other alleged false promises; and (3) dismiss

23   Google's quasi-contract claim without prejudice.

24   Dated:  August 1, 2022                           HUESTON HENNIGAN LLP

25

26                                                     By:  */s/ Douglas J. Dixon*
                                                           Douglas J. Dixon

27                                                     *Attorneys for Plaintiffs Match Group, LLC;*
                                                       *Humor Rainbow, Inc.; PlentyofFish Media ULC;*
28                                                     *and People Media, Inc.*

MATCH PLAINTIFFS' MOTION TO DISMISS GOOGLE DEFENDANTS' COUNTERCLAIMS

6228763