1   Paul J. Riehle (SBN 115199)
    paul.riehle@faegredrinker.com
2   **FAEGRE DRINKER BIDDLE & REATH**
    **LLP**
3   Four Embarcadero Center, 27th Floor
    San Francisco, CA 94111
4   Telephone: (415) 591-7500

5   Christine A. Varney (*pro hac vice*)
    cvarney@cravath.com
6   **CRAVATH, SWAINE & MOORE LLP**
    825 Eighth Avenue
7   New York, NY 10019
    Telephone: (212) 474-1000

8
    *Counsel for Plaintiff Epic Games, Inc. in Epic*
9   *Games, Inc. v. Google LLC et al.*

10  Karma M. Giulianelli (SBN 184175)
    karma.giulianelli@bartlitbeck.com
11  **BARTLIT BECK LLP**
    1801 Wewatta St., Suite 1200
12  Denver, CO 80202
    Telephone: (303) 592-3100
13
14  Hae Sung Nam (*pro hac vice*)
    hnam@kaplanfox.com
15  **KAPLAN FOX & KILSHEIMER LLP**
    850 Third Avenue
16  New York, NY 10022
    Telephone: (212) 687-1980

17  *Co-Lead Counsel for the Class in In re Google*
    *Play Consumer Antitrust Litigation*

    Brendan P. Glackin (SBN 199643)
    bglackin@agutah.gov
    **OFFICE OF THE UTAH ATTORNEY**
    **GENERAL**
    160 E 300 S, 5th Floor
    PO Box 140872
    Salt Lake City, UT 84114-0872
    Telephone: (801) 366-0260

    *Counsel for the Plaintiff States*

    Douglas J. Dixon (SBN 275389)
    ddixon@hueston.com
    **HUESTON HENNIGAN LLP**
    620 Newport Center Drive, Suite 1300
    Newport Beach, CA 92660
    Telephone: (949) 229-8640

    *Counsel for Plaintiffs Match Group, LLC, et al.*

18
19
20
21
22
23
24
25
26
27
28  [Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

**IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**

THIS DOCUMENT RELATES TO:

*Epic Games, Inc. v. Google LLC et al.*,
Case No. 3:20-cv-05671-JD

*In re Google Play Consumer Antitrust Litigation*,
Case No. 3:20-cv-05761-JD

*State of Utah et al. v. Google LLC et al.*,
Case No. 3:21-cv-05227-JD

*Match Group, LLC et al. v. Google LLC et al.*,
Case No. 3:22-cv-02746-JD

Case No. 3:21-md-02981-JD

**PLAINTIFFS' PROPOSED REMEDY RE GOOGLE'S DESTRUCTION OF CHAT EVIDENCE**

Judge:  Hon. James Donato

1

## TABLE OF CONTENTS

2
**Page**

3
TABLE OF AUTHORITIES ................................................................................................................ ii

4
**I.**   Google Intentionally Deprived Plaintiffs of Evidence That Would Have Strengthened
Their Case. ........................................................................................................................... 4

5

6
        A.   Google Intentionally Deprived Plaintiffs of Evidence Regarding
             Anticompetitive Agreements with OEMs. .............................................................. 4

7
             i.    Revenue Sharing Agreements ..................................................................... 5

8
             ii.   Mobile App Distribution Agreements ......................................................... 6

9
             iii.  Google's Efforts to Pay Samsung Not to Compete ...................................... 6

10
        B.   Google Intentionally Deprived Plaintiffs of Evidence Regarding
             Anticompetitive Agreements with Android Developers. ......................................... 9

11

12
             i.    Project Hug .................................................................................................. 9

13
             ii.   Google's Agreements Not to Compete with ABK, Riot and Supercell ........... 10

14
        C.   Google Intentionally Deprived Plaintiffs of Evidence Regarding Post-Litigation
             Changes to Google Play's Business Model. ........................................................... 11

15
             i.    September 2020 Policy Changes .................................................................. 11

16
             ii.   Project Runway .......................................................................................... 13

17
        D.   Google Intentionally Deprived Plaintiffs of Evidence Regarding Google's
             Relationship with Apple. ....................................................................................... 13

18

19
**II.**   A Permissive Adverse Inference Instruction Would Be Proportional. ................................... 14

20
**III.**  Google's Arguments Against an Adverse Inference Instruction Fail. .................................... 15

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp 2d 1132 (N.D. Cal. 2012)....................................14, 15

*Glover v. BIC Corp.*, 6 F.3d 1318 (9th Cir. 1993) ..........................................................................3

*Io Group, Inc. v. GLBT, Ltd.,* 2011 WL 4974337 (N.D. Cal. Oct. 19, 2011) .......................................14

*Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401 (9th Cir. 2011) ...........................................3

*Radio City, Inc. v. Celestron Acquisition, LLC*, 2023 WL 5519324 (N.D. Cal. Aug. 25, 2023)..............................................................................................................................14, 15

1

**INTRODUCTION**

2    After several rounds of briefing, two evidentiary hearings that included the testimony of four

3 Google employees and a production of over 210,000 additional documents, this Court made the

4 following findings:  "Google fell strikingly short" of its duty to preserve evidence (Dkt. 469 at 16);[1]

5 Google knowingly "gave each employee carte blanche to make his or her own call about what might

6 be relevant in this complex antitrust case," employing a "'don't ask, don't tell' policy for Chat

7 preservation, at the expense of its preservation duties" (*id.* at 17-18); and Google did so as part of a

8 deliberate, long-running scheme in which "intentionality manifested at every level within Google to

9 hide the ball with respect to Chat," with "individual users . . . conscious of litigation risks and valu[ing]

10 the 'off the record' functionality of Chat" (*id.* at 17).  Moreover, to perpetuate this scheme, Google

11 concealed its conduct from Plaintiffs and the Court—it "falsely assured the Court in a case

12 management statement in October 2020 that it had 'taken appropriate steps to preserve all evidence

13 relevant to the issues reasonably evident in this action,' without saying a word about Chats."  (*Id.*

14 at 16.)  Put simply, "Google intended to subvert the discovery process" by intentionally destroying

15 "relevant, substantive business communications."  (*Id* at 18.)  This Court has also already found that

16 Google's intentional Chat destruction "certainly" prejudiced Plaintiffs.  (*Id.*)

17    This Court held that "sanctions are warranted" to address Google's deliberate misconduct, but

18 it asked the parties to brief the appropriate sanctions, explaining that "[t]he remaining question is about

19 the remedy," and "[t]he remedy should fit the wrong."  (*Id.* at 1, 18-19.)  To determine "an appropriate

20 non-monetary sanction," the Court asked "to see the state of play of the evidence at the end of fact

21 discovery," so that Plaintiffs could "tell the Court what *might* have been lost in the Chat

22 communications," recognizing the inherent difficulty of showing that which no longer exists—or, as

23 the Court referred to it, "plaintiffs' dilemma of trying to prove the contents of what Google has

24 deleted."  (*Id.* at 19 (emphasis added).)  As the Court noted during the September 7, 2023 hearing:

25    [Y]ou can't talk about things you don't know about.  But you should be
      able to give me at least some informed sense of things that you expected
26    to have seen or you thought you would have seen or you saw a little bit
      of, or whatever, and you think the chat issue impacted that in a negative
27    way.  (September 7, 2023 Hearing Transcript at 35:20-25.)

28
———————————————
[1] Citations to "Dkt." are to *In re Google Play Store Antitrust Litigation*, No. 3:21-md-02981-JD.

While no one can speak to the actual Chats that Google intentionally deleted, the record contains example after example of Google employees beginning to discuss topics highly relevant to this litigation and then quickly agreeing to turn history off to trigger automatic deletion and shield further discussion from discovery, necessarily ending the record available to Plaintiffs. These interrupted Chats are the tip of the iceberg and are powerful evidence of key information—which by any reasonable inference is information that Google thought would be harmful to its legal position if disclosed—being deliberately and permanently destroyed, and thus hidden from Plaintiffs and the Court.

Had all relevant Chats been preserved and produced, Plaintiffs believe they would have had additional evidence, which in all likelihood would include clearer and more candid communications, to prove the anticompetitive purpose of the contracts Google signed with original equipment manufacturers ("OEMs") and developers. For example, Plaintiffs believe that these deleted documents would have shown that Google's revenue share agreements with OEMs were meant to preserve Google Play's app distribution dominance and that Google's Project Hug agreements with would-be app store competitors were intended to pay them not to compete. Further, Plaintiffs believe Google employees discussed the true, anticompetitive motivations behind Google's post-litigation policy changes to Google Play, as well as its top-secret agreements with Apple. But Google employees were trained to speak freely about these topics and others without the risk of disclosure in this litigation by simply keeping history off in Chats, which they did in droves. (*See generally* Dkt. 469.)

The record before this Court easily justifies an adverse inference instruction. Google intentionally engaged in a scheme targeted specifically at concealing from discovery its most sensitive—and most damning—communications, including about the topics at the heart of this litigation. Google's assertion that Plaintiffs obtained most or all relevant communications is unfounded because Google itself does not know what information it destroyed. Moreover, the evidence squarely contradicts Google's assertion, unequivocally showing that Google employees deliberately took their most sensitive discussions, including those subject to litigation holds, from preserved formats to "History Off" Chats, and that Google did in fact delete hundreds of thousands—perhaps millions—of those Chats rather than produce them in litigation. This was standard practice at

Google.  Indeed, Google instructed its employees that history off Chats were protected from disclosure, encouraged copying counsel to apply attorney-client privilege (sometimes referred to as "fake privilege"), and warned employees that careless communications could end up being repeated in a courthouse.  For more than 10 years, Google automatically destroyed Chats, even for custodians under a legal hold during active litigation.  (Dkt. 429-3 ¶ 9.)  The only reasonable conclusion is that Google *succeeded* in its scheme and that the destroyed Chats would have been (at least on average) *more* sensitive and *more* damning to Google's positions in this litigation than the communications Google actually preserved and produced.  Google's only failure is that in this litigation, for the first time in more than a decade, it got caught and its scheme was exposed.

Despite all that, and in light of this Court deciding against a "terminating" remedy (Dkt. 469 at 19), Plaintiffs seek a relatively modest remedy:  a permissive adverse inference instruction that (i) sets forth at the beginning of trial the facts the Court has already found regarding Google's intentional destruction of Chats, and (ii) directs the jury at the end of trial that it "may" infer that the evidence Google destroyed would have been harmful to Google's case and helpful to Plaintiffs' case.  As explained further below, this adverse inference instruction is both an appropriate remedy as a matter of law and proportional to the conduct at issue.

## ARGUMENT

"[A] trial court . . . has the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) (citation omitted); *see Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401, 422 (9th Cir. 2011) (finding no abuse of discretion where an "instruction would 'creat[e] a presumption in favor of [defendant] that the spoliated evidence was unfavorable to [plaintiff]' (citation omitted)" if the factfinder (there, the jury) concluded that evidence was destroyed). This Court has already determined that sanctions are appropriate; the only unresolved aspect is determining that "the remedy fit the wrong."  (Dkt. 469 at 18-19.)

Google's deletion of Chats deprived Plaintiffs of the most candid and unsanitized discussions regarding Google's anticompetitive conduct.  Such evidence could have eradicated Google's defenses in this litigation, but is unavailable to Plaintiffs and the jury due to Google's intentional discovery

misconduct.  Such evidence would not be duplicative of the evidence that *is* available to Plaintiffs, because Google's scheme was geared to destroying the *most* sensitive communications—and based on the evidence, that scheme succeeded.  Accordingly, an adverse inference instruction is proportional to the wrong and should be issued.

> **I.      Google Intentionally Deprived Plaintiffs of Evidence that Would Have Strengthened Their Case.**

As discussed in detail below, Google's destruction of Chats made it more difficult for Plaintiffs to prove their case.  Google has deprived Plaintiffs of evidence regarding multiple critical aspects of its conduct, including its agreements with OEMs (Section I.A, below); its agreements with developers (Section I.B, below); its post-litigation changes to its business model (Section I.C, below); and its concealed business relationship with Apple (Section I.D, below).

> **A.      Google Intentionally Deprived Plaintiffs of Evidence Regarding Anticompetitive Agreements with OEMs.**

Plaintiffs previously established that Google employees destroyed countless Chats regarding Google's Mobile Application Distribution Agreements ("MADAs") and Revenue Share Agreements ("RSAs"), as well as other aspects of its OEM partnerships.  (*See* Dkt. 468 at 2-3.)  These agreements are central to Plaintiffs' cases and Plaintiffs intend to prove that they restrain competition.  As noted above, Plaintiffs will be forced to prove this point with an incomplete record.  The top executives responsible for these agreements, including Jamie Rosenberg and Jim Kolotouros, deleted all their Chats.[2]  As Mr. Kolotouros recently testified at the Department of Justice's Search antitrust trial against Google, he was cognizant that Google was constantly under regulatory pressure and therefore approached his written communications in a manner designed "to protect Google."  (Moskowitz Decl., Ex. 31 at 956:12-958:3.)  Accordingly, Mr. Kolotouros—who has "used Chat with Mr. Rosenberg to discuss Samsung revenue share" (*id.* at 971:8-11)—never turned his history on (*id.* at 969:22-970:6).  Google has thus deprived Plaintiffs of valuable evidence regarding core issues in dispute in these cases that Plaintiffs could have used to great effect at trial.

---

[2] Moskowitz Decl., Ex. 21 at 481:17-23 (███████████████████████████
██████████████████████████"); Ex. 29 at 103:14-17 (Rosenberg:  "I have not done anything to preserve chats for this litigation.").

1                  **i.**      *Revenue Share Agreements*

2          In 2019, Google recognized that "███████████████████████████

3 █████████████████████████████████████████████████████████████████

4 █████████" (Moskowitz Decl., Ex. 21 at 244:22-245:3; Ex. 5 at 8107.R.)  It needed a solution to

5 ████████████████████████████████. (Moskowitz Decl., Ex. 21 at 218:10-14;

6 Ex. 1 at -9615.)  The RSA 3.0 program provided that solution.  Google decided "█████████████

7 █████████████████████████████████████████████████████████████████

8 ██████████████████" (Moskowitz Decl., Ex. 21 at 250:5-14.)  In exchange, ████████████

9 █████████████████████████████████████████████████████████████████

10 ██ "███████████████████████████████████████████" (*id.* at 290:21-291:2.)  Google

11 began entering into RSAs with Google Play exclusivity terms in 2020.  ████████████████████

12 ████████████████████████████████████

13          RSAs were a regular topic of discussion in Chats that have been destroyed.  For example, the

14 lead strategy executive for Android boasted, "I talk about RSA related things all day and I don't have

15 history on for all my chats :)."  (Dkt. 469 at 12.)  When one of her colleagues noted that he was on a

16 litigation hold (as was she) and thus was uncomfortable with having such discussions off the record,

17 the strategy executive decided it was better to "take you off this convo 😊," which she apparently did.

18 (*Id.*)  This was one of many Chats where this strategy executive instructed others to turn history off

19 when discussing Google's RSAs or other relevant topics, including those directly subject to litigation

20 holds.  (*See, e.g.*, Dkt. 468-6 (RSAs); Dkt. 468-7 (OEM partnerships); Dkt. 468-8 (MADAs).)

21          Google has contended that its decision to pay OEMs to "███████████████████

22 ████████████████" ██████████████████████████████████████████████

23 █████████████████████████████████████████████████████████████████

24 ██████. (Moskowitz Decl., Ex. 21 at 291:23-292:16.)  Plaintiffs believe that Google's deleted Chats

25 (including those from the *strategy* executive) would have flatly refuted that theory.  For example,

26 behind closed doors (as in their "History Off" conversations) employees may have chatted freely about

27 the motivation for these provisions, revealing that the RSAs were about impeding competition rather

28 than the party line of ████████████████ "█████████."  Or they may have celebrated that an

1    agreement was executed and another competitive threat was extinguished.  It is also likely that Google

2    employees discussed the success of the program in achieving Google's anticompetitive goals, such as

3    whether "███████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████."  (*Id.*

5    at 291:3-10.)  Plaintiffs will never be able to show the Chats about these topics to the jury because

6    Google intentionally destroyed them.

7                        ii.        *Mobile Application Distribution Agreements*

8              Through the MADA, Google licenses to OEMs a bundle of 11 Google apps and hundreds of

9    thousands of APIs.  The bundle includes Google's most popular apps—such as YouTube, Maps and

10   Chrome—as well as Google Play.  The APIs are essential for Android smartphones; they "████████

11   ████████████████████."  (*Id.* at 447:14-18.)  Through the MADA, Google ties

12   Google Play to its popular apps and APIs, because Google requires that "████████████████

13   █████████████████████████████████████████████████████

14   █████."  (*Id.* at 105:9-14.)  And Google "████████████████████████████████

15   █████"  (Moskowitz  Decl., Ex. 30 at 39:4-8.)  The MADA thus helps secure Google Play's

16   dominance, because it ensures that "████████████████████████████████████████████

17   ████████████████████"  (*Id.* at 44:14-18.)

18             Chats about the MADAs undoubtedly took place and were deleted during the pendency of these

19   lawsuits.  In one Chat Google produced, two employees began discussing the MADAs, and one

20   promptly asked:  "would it be too much to ask you to turn history off? . . . lots of sensitivity with legal

21   these days :)."  (Dkt. 468-8.)  Following this request, the Chat abruptly ended, revealing that history

22   was turned off and all further discussions that took place were destroyed forever.  This is effectively

23   conclusive proof that highly relevant communications were deleted, precisely *because* of their

24   relevance to litigation.  The loss of these sensitive Chats about foundational agreements to Google's

25   anticompetitive behavior undoubtedly prejudiced Plaintiffs, left to piece together Google's misconduct

26   from the sanitized remnants of Google's "Communicate with Care" training.  (*See* Dkt. 469 at 3-6.)

27                        iii.       *Google's Efforts to Pay Samsung Not To Compete*

28             Samsung devices are responsible for ████████████████████████████████████████

1   ███████████. (Moskowitz Decl., Ex. 21 at 310:4-18; Ex. 5 at -8123.)  After Epic launched

2   Fortnite on Samsung's Galaxy Store—the first-ever major app to launch on that store and not on

3   Play—Google launched Project Banyan, which had a goal of eliminating the Galaxy Store as an

4   independent distribution channel for Android apps so as "███████████████

5   ████████████" (Moskowitz Decl., Ex. 21 at 363:16-20; Ex. 2 at -8211.)  To further that goal,

6   senior Google executives met with top Samsung executives, and "████████████████

7   ████████████████" (Moskowitz Decl., Ex. 21 at 374:20-23.)  In exchange for

8   these payments, Google asked Samsung to effectively shut down the Galaxy Store.  (*Id.* at 375:18-22.)

9   "███████████████████████████████████████

10  ██████████████████████████." (*Id.* at 376:13-19.)  Project Banyan ended

11  abruptly in 2019 because ██████████████████████.

12          The destroyed Chats undoubtedly would have revealed the anticompetitive intent behind

13  Google's plans, and there is already evidence in the record establishing that Google employees

14  responsible for the relationship with Samsung discussed their strategy with respect to Samsung over

15  Chat.  (Moskowitz Decl., Ex. 29 at 93:1-10.)  Plaintiffs expect the Chats the jury will never see—

16  because Google destroyed them—would have revealed conversations about the need to stop the

17  Samsung Galaxy Store from competing with Play.  They would have discussed how Google could pay

18  off Samsung, like it had done with other competitors, and have Samsung forego pursuing app store

19  competition.  Employees would have also discussed the benefits Google would reap from preventing

20  competition and Google's disappointment at not being able to finalize the deal with Samsung.  These

21  sensitive discussions would have been conducted in the safety of "history off" Chats and then

22  permanently deleted.

23          Google reconceived Project Banyan in 2020, when it proposed to "███████████████

24  ████████" ██████████ ████████████████████████

25  ████████████. (Moskowitz Decl., Ex. 25 at 360:4-15; Ex. 8 at -8762.R.)  Google believed

26  this deal—which would require "████████████████████████████

27  ████████████" (Moskowitz Decl., Ex. 25 at 359:12-360:2)—would secure ████████ for Google

28  ████████████████████████" (*id.* at 366:24-367:3; Moskowitz Decl., Ex. 8 at -8768.R).

1  Google and Samsung ███████████████████████████████████████████████

2  ████████████████████████████████████████" (Moskowitz Decl., Ex. 25 at 388:9-15; Ex. 12 at

3  -2105), but they ultimately did not ████████████████████████████.  When asked

4  during his deposition why Google abandoned that term, Christopher Li, the lead Samsung partnership

5  executive, claimed he ██████████ "███████████████████████████████████████████

6  ██████████.  (Moskowitz Decl., Ex. 25 at 377:1-378:6.)[3]  But Jamie Rosenberg had previously

7  indicated that if Google "██████████████████████████████████████████████████████

8  ██████████" ███████████████████████████████████ "████████" ██████████████████████

9  ██████████.  (Moskowitz Decl., Ex. 4 at -7017.)  In the same email, he noted that any

10  understanding reached would need to be █████████████████████████████████████████

11  ██████████████████" (*Id.*)

12      Google employees unquestionably discussed Google's approach to eliminating competition

13  from Samsung over Chat.  Mr. Rosenberg admitted to having such discussions during the January 12,

14  2023 hearing (Moskowitz Decl., Ex. 29 at 93:1-10), and admitted he had "not done anything to

15  preserve chats for this litigation" (*id.* at 103:14-17).[4]  The deleted Chats likely would have explained

16  why Google was prepared to pay hundreds of millions, ██████████████████████████████

17  ██████████; why explicit formal agreements to do so were never executed; and whether

18  Google arrived at any unwritten understandings with Samsung as part of their current ████████

19  ██████████████████ that gave Google the "confidence" Mr. Rosenberg suggested would be the gating

20  item for any deal.[5]  By deleting its Chats, Google deprived Plaintiffs of important evidence on these

21  highly relevant topics.

22

23

24

---

25      [3] This executive, like so many others, could not recall turning his Chat history on even once during
his custodial period.  (Dkt. 432-2 at 14, Ex. C.)

26      [4] The other executives most involved in Google's dealings with Samsung likewise ***never once***
turned on their Chat history, including Mr. Kolotouros, Mr. Li, Mr. Samat and Mr. Lockheimer.

27  (Dkt. 432-2 at 14, Ex. C); Dkt. 469 ¶ 34 (finding that Google employees such as Mr. Rosenberg did not
preserve their Chats while engaging in discussions material to this litigation).

28      [5] Moskowitz Decl., Ex. 29 at 103:14-17 (Rosenberg:  "I have not done anything to preserve chats
for this litigation.").

PLAINTIFFS' PROPOSED REMEDY RE GOOGLE'S DESTRUCTION OF CHAT EVIDENCE
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

8

### B. Google Intentionally Deprived Plaintiffs of Evidence Regarding Anticompetitive Agreements with Android Developers.

One of Plaintiffs' core claims is that Google had an initiative called "Project Hug" that involved dozens of anticompetitive agreements with customers and would-be competitors. By intentionally ensuring the destruction of Chats, Google disadvantaged Plaintiffs at trial by depriving them of evidence that would have helped prove that these agreements are intended to—and do—restrain competition.

#### i. *Project Hug*

In 2019, Google determined that " ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████" (Moskowitz Decl., Ex. 19 at 169:16-23, Ex. 3 at -2825.) By July 2022, Google entered into agreements with at least 24 top developers that have " ████████████████████████ ████████████████████████████" (Moskowitz Decl., Ex. 27 at 170:7-11; Ex. 11 at -9919.) ████████████████████████████████████████. (Moskowitz Decl., Ex. 15 at 6705.R.) ████████████████████████████████████████ ████████.

Project Hug was discussed over Chat during the period when Google's retention obligations for this litigation were in force. For example, Purnima Kochikar—Google's most senior developer partnerships executive—admitted that she had her "default setting to delete chats every 24 hours" (Moskowitz Decl., Ex. 27 at 22:2-9), and that "Project Hug" and related programs are her "day-to-day work" (*id.* at 104:4-8). Lawrence Koh, another lead executive who worked on Project Hug, admitted that "[e]veryone at Google used it [Google Chat] at least on my team, used it on a daily basis." (Moskowitz Decl., Ex. 19 at 113:14-114:8.) Mr. Koh could not recall ever turning Chat to "history on." (*Id.* at 114:15-23; *see also* Moskowitz Decl., Ex. 20 at 31:4-11.)

Google's destruction of its Project Hug Chats is highly prejudicial to Plaintiffs. Google has stated that it "will show at trial that these agreements are pro-competitive efforts to satisfy its developer customers and compete with Apple." (Dkt. 480 at 2.) Plaintiffs disagree with these contentions but will be forced to respond to them at trial using only the documents that Google decided

1   to preserve.  The candid, unfiltered Chats that Google intentionally destroyed undoubtedly contained

2   more frank discussions of Project Hug's true goal—preventing app store competition *within* Android.

3   Such evidence could defeat Google's defenses, but it is unavailable to Plaintiffs due to Google's

4   discovery misconduct.

5                  **ii.**   ***Google's Agreements Not To Compete with ABK, Riot and Supercell***

6          Activision Blizzard, Inc. ("ABK") and Riot Games, Inc. ("Riot") are among the Project Hug

7   developers who "specifically told Google that they were considering their own competing Android app

8   stores."  (Dkt. 376-9 at 200:4-20.)  When Google sought to enlist ABK in Project Hug, ABK told

9   Google that "[i]f this deal falls through . . . they will launch their own mobile distribution platform

10  (partnering with another 'major mobile company')."  (Dkt. 376-4 at -0919; *see also* Moskowitz Decl.,

11  Ex. 15 at -6694.R.)  Google agreed to pay ABK $360 million between 2020 and 2023 to stop that

12  threat.  (Dkts. 376-7, 376-8.) ███████████████████████████████████████

13  ██████████████████████████████████████████████████████████

14  ███████████████████.  (Moskowitz Decl., Ex. 28 at -4347.)

15         In a similar deal (albeit on a smaller scale), Google agreed to pay Riot $28 million in marketing

16  support in 2020 (Dkts. 376-5, 376-6) with ████████████" ████████████ "███

17  ████████████████████."  (Moskowitz Decl., Ex. 19 at 299:13-20; Ex. 7

18  at -8691.) ████████████████████████████.  (Moskowitz

19  Decl., Ex. 6 at -0008.) ████████████████████████████

20  █████████.  (Moskowitz Decl., Ex. 17 at -2563.)

21         Google also entered into an agreement not to compete with Supercell Oy ("Supercell"), another

22  major developer, in the ████████.  (Moskowitz Decl., Ex. 27 at 179:1-7.) ████████

23  ██████████████████████████████████████████████

24  ████████████████."  (*Id.* at 178:6-10.) ████████████████████

25  ████████████."  (*Id.* at 179:10-13.)

26         Google claims that none of these agreements is in fact "an actual horizontal agreement not to

27  compete," because (Google brazenly asserts) there is no "direct evidence of a meeting of the minds"

28  between Google and the developers, and no "direct evidence of a promise not to open a competing app

store." (Dkt. 355 at 12-13.) Plaintiffs disagree with Google's characterizations, but Google's arguments make the prejudice of Google's Chat destruction clear. Google's produced documents represent just the tip of the iceberg in terms of Google's internal discussions about these major deals and their true anticompetitive goals; consistent with Google's scheme and admonitions to its employees, more candid "sensitive" discussions about the nature and goals of deals with these developers would have been moved to off-the-record Chats—which Google destroyed. Whereas the Project Hug contracts and emails support a finding of a conspiracy, the Chats are where the conspiracy would have been less circumspectly described. Plaintiffs have thus been prejudiced by Google's intentional destruction of Chats.

## C.   Google Intentionally Deprived Plaintiffs of Evidence Regarding Post-Litigation Changes to Google Play's Business Model.

After these lawsuits were filed, Google changed many of its policies and agreements concerning Android app distribution and in-app payments. Google has argued that these business model changes are evidence that it listens to developer concerns and competes vigorously with Apple. The limited documents Google has produced about these changes suggest otherwise: that Google's decisions were driven by litigation and regulatory pressure, rather than competition.

Chats in which employees planned and discussed these changes almost certainly would have shown Google's true motives. In addition, Google's post-litigation evaluations of its business model—when legal risks and the likelihood of evidentiary disclosures would have been top of mind—assessed broad changes that Google could have made to its business model if required by regulators. Those discussions over Chat could have demonstrated the existence of less-restrictive alternatives to its challenged practices, and the Chats in which employees discussed them would have provided evidence of their viability. Here, as elsewhere, Google's destruction of Chats deprived Plaintiffs of the best evidence they could have used to confront and impeach Google's witnesses in depositions and at trial. Only an adverse inference instruction can address the prejudice Plaintiffs have suffered.

### i.   *September 2020 Policy Changes*

In the wake of this litigation, Google announced a change to its policy of issuing pretextual security warnings to Android users who attempt to download apps from competing stores every time

1   the user attempted such a download.  Google publicly positioned this announcement as an effort "to

2   make it even easier for people to use other app stores" in the forthcoming Android 12.  (Moskowitz

3   Decl., Ex. 32.)  Google is likely to argue this change was benevolent, made in the spirit of openness

4   and as a response to requests from developers.  But in one of the few Chats Google produced on this

5   topic, Android's Head of Security referred to this announcement as "████████" and wrote that ██

6   ████████████████████████████████████████████████████ "████████████████████████

7   ████████  ████████████████████" (Moskowitz Decl., Ex. 10 at -1967 (emphasis added).)  It is highly

8   likely that other employees, such as Mr. Samat, spoke candidly on this topic in Chats, and admitted

9   that it was driven by litigation and regulatory concerns and would not in fact make direct downloading

10   easier.  The jury will never see those Chats because Google intentionally destroyed them.

11          It is also highly likely that Google deleted Chats explaining why YouTube—which is one of

12   Google's own businesses—refused for years to use Google Play Billing ("GPB"), and instead used its

13   own payment solution, until Google implemented another policy change in 2022.  In a Chat that

14   Google did not destroy, the CEO of YouTube complained to Hiroshi Lockheimer, the Senior Vice

15   President who runs Google Play and Android, that the policy change was "obviously a big change and

16   our team feels it will hurt us competitively," that moving to GPB would require "extra eng from

17   Sundar" (meaning extra resources), and that "Spotify is our competitor who is being exempted so we

18   need to know how we can innovate on billing and not be stuck with a lot of larger prioritizations

19   decisions that might be right for play billing but bad for YouTube."  (Dkt. 414-08 at 2-3.)  Likewise,

20   Eric Chu, a YouTube employee and one of the few outlier custodians who actually turned history on

21   and for whom a significant number of Chats were preserved, held candid discussions about the effects

22   of YouTube's move to GPB, noting that it "████████████████████████████████████████████

23   ████████████████████████████." (Moskowitz Decl., Ex. 9 at -0816.)

24          While these admissions support Plaintiffs' arguments about the policy change, they are only the

25   tip of the iceberg.[6]  The destroyed Chats likely would have offered valuable details about YouTube's

26   reasons for resisting and the challenges it faced when it ultimately switched from its own payment

27

28          [6] Mr. Lockheimer could not recall turning on his Chat history even once.  (Dkt. 432-2 at 14, Ex. C.)
    All of his Chats on this topic have been destroyed, unless, as apparently happened here, the other
    employee preserved them.

PLAINTIFFS' PROPOSED REMEDY RE GOOGLE'S DESTRUCTION OF CHAT EVIDENCE
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

12

solution to GPB—an event that occurred and would have been discussed after this litigation began.

### ii.   *Project Runway*

On March 16, 2021, Google announced that it was reducing its revenue share "to 15% for the first $1M (USD) of revenue every developer earns each year." (Moskowitz Decl., Ex. 33 at 1-2.) This announcement was the outcome of Project Runway, a program that began shortly after this litigation commenced and through which Google considered much broader changes to the Google Play business model. (Dkt. 468 at 4.)

Project Runway and Google's other business model changes are highly relevant because they recognize the viability of multiple less-restrictive alternatives to Google's challenged restraints and demonstrate that the incremental changes that Google did adopt were driven by regulation and litigation rather than competition, as well as Google's desire to extract more monopoly rents from developers. It is clear that Project Runway was discussed over Chat, and the deleted Chats likely would have shed important light on these topics, as well as Google's reasons for rejecting broad changes to its business model in favor of the modest one that it announced. For example, in a Project Runway "war room" Chat from the time of its March 2021 launch, one employee asked "why we moved to a small dev[eloper] framing"—a key question about Google's motive for the change it made—but others decided "to change from a room to a group chat to get the right settings here (i.e., history off)" without answering that question on the record. (Dkt. 468-10.) This is yet another example of conclusive evidence that shows relevant information that was intentionally deleted. By destroying these Chats, Google has ensured that the record on Project Runway is incomplete.

### D.   **Google Intentionally Deprived Plaintiffs of Evidence Regarding Google's Relationship with Apple.**

Google has argued that a wide variety of its restraints—including Project Hug, Project Banyan, and the challenged MADA and RSA 3.0 terms—are "procompetitive" because they are driven by competition with Apple. Plaintiffs will show that in fact, instead of competing, Google and Apple "▮▮▮▮▮▮▮▮"—to quote one Google executive—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (Moskowitz Decl., Ex. 21 at 74:14-75:11.) According to Mr. Pichai, ▮▮▮▮▮▮▮▮▮▮ "▮▮▮▮▮▮▮▮▮▮" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "▮▮▮▮▮▮▮▮▮▮▮▮▮."

PLAINTIFFS' PROPOSED REMEDY RE GOOGLE'S DESTRUCTION OF CHAT EVIDENCE
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

13

1   (Moskowitz Decl., Ex. 30 at 28:5-13.)  In exchange, the agreement ensures that, "███████

2   ████████████████████████████████████████████████████████████."

3   (Moskowitz Decl., Ex. 26 at 345:20-346:2.)  For over a year, Google refused to produce to Plaintiffs

4   core documents about this major commercial arrangement, claiming the agreement between the two

5   companies was one of Google's and Apple's "most sensitive business documents."  (Moskowitz Decl.,

6   Ex. 16 at 1.)  Ultimately, Google reluctantly produced few documents discussing this agreement, and

7   virtually no Chats—even though Mr. Pichai, who clearly approved the deal and meets with Apple's

8   CEO to discuss it has testified that ████████████████████████████."

9   (Moskowitz Decl., Ex. 30 at 185:23-25.)  Mr. Pichai, like many other Google employees, never turned

10  on his Chat history and instructed others to turn it off when discussing sensitive topics (which Google

11  admits the agreement with Apple undoubtedly is).  In one Chat, Mr. Pichai began discussing a

12  substantive topic, and then immediately wrote: "also can we change the setting of this group to history

13  off."  (Moskowitz Decl., Ex. 18 at -3593.)  Nine seconds later, Mr. Pichai apparently attempted

14  (unsuccessfully) to delete this incriminating message.  (*Id.*)  Chats from Google's highest-ranking

15  executive, including about the Apple agreement, would have been probative in this litigation, and their

16  absence substantially prejudices Plaintiffs.

17  **II.      A Permissive Adverse Inference Instruction Would Be Proportional.**

18          A permissive adverse inference instruction is an appropriate—even modest—remedy where, as

19  here, a party intentionally and prejudicially destroyed an entire category of relevant evidence.  *Radio*

20  *City, Inc. v. Celestron Acquisition, LLC*, 2023 WL 5519324, at *4 (N.D. Cal. Aug. 25, 2023); *Apple*

21  *Inc. v. Samsung Elecs. Co.*, 881 F. Supp 2d 1132, 1149-51 (N.D. Cal. 2012); *Io Group, Inc. v. GLBT,*

22  *Ltd.,*  2011 WL 4974337, *8,  (N.D. Cal. Oct. 19, 2011).  Courts in this district have recognized that

23  the "[s]anctions levied for the destruction of evidence 'should be designed to:  (1) deter parties from

24  engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully

25  created the risk; and (3) restore the prejudiced party to the same position he would have been absent

26  the wrongful destruction of evidence by the opposing party.'"  *Radio City,* 2023 WL 5519324, at *4

27  (quoting *Apple*, 881 F. Supp. 2d at 1136).  The intentional nature of Google's conduct, combined with

28  the pervasive nature of the destruction, make an adverse inference instruction appropriate.  (*See, e.g.,*

1   Dkt. 468-6 ("[C]an I ask you to turn off history :)"); Dkt. 468-7 (similar).)

2        A decision from this district involving less egregious facts is illustrative.  In *Apple Inc. v.*

3   *Samsung Electronics Co.*, the court found that Samsung committed a discovery violation where it

4   "consciously disregarded" its obligation to preserve certain emails by failing to suspend an auto-

5   deletion mechanism for certain custodians' emails.  881 F. Supp 2d 1132, 1149 (N.D. Cal. 2012).  The

6   court explained that it was "mindful, however, that any sanction must be the least drastic available to

7   adequately mitigate the prejudice Apple suffered."  *Id.* at 1150.  The court determined that a

8   permissive adverse inference satisfied that standard.  It found that Apple suffered prejudice because

9   "literally thousands of documents" were likely destroyed for certain custodians, and those custodians

10  "are senior Samsung employees whose internal communications would have been especially probative

11  to the claims at issue in this litigation."  *Id.* at 1150.

12       Here, Google went much further than Samsung.  While Samsung likely destroyed "thousands

13  of documents," judging by the widespread preference among Google employees for off-the-record

14  Chats, Google destroyed hundreds of thousands, if not millions.  Moreover, unlike Samsung, Google

15  intentionally directed and trained employees to use a certain medium for their most sensitive

16  communications and then destroyed the entire category of relevant documents from that medium—***all***

17  off-the-record Chats for ***all*** employees, including ***all*** custodians.  And while the *Apple* plaintiff could

18  have obtained some of the deleted emails from other sources (for example, other custodians who were

19  copied on those emails), Plaintiffs do not have that safeguard here because there are no other sources.

20  This means that, unlike in *Apple*, a significant component of the prejudice Plaintiffs suffered is that the

21  Chats Google destroyed were likely to be among the most candid and sensitive conversations held by

22  high-ranking Google employees, and they are unrecoverable and unavailable from any other source.

23       **III.    Google's Arguments Against an Adverse Inference Instruction Fail.**

24       Google has suggested that instead of ordering an adverse inference instruction, the Court

25  should "let [Plaintiffs] put on some evidence, not a lot, but some evidence to the jury."  (8/3/2023

26  Tr. at 68:12-15.)  Google has also proposed that "if Plaintiffs establish that they have been prejudiced

27  by a gap in the record . . . Google should be permitted to introduce evidence of its preservation

28  practices and the circumstances of this case to explain why it did not act with the intent to destroy

1   unhelpful documents and that the jury should not infer that any such documents would have been

2   helpful to Plaintiffs." (Dkt. 429 at 15.)  Google's proposals ignore that these issues have already been

3   litigated and decided.  The Court found that Plaintiffs "certainly" proved prejudice, and that Google's

4   objection "that the prejudice is limited . . . is not well taken." (Dkt. 469 at 18.)  And the Court found

5   that "the intentionality manifested at every level within Google to hide the ball with respect to Chat."

6   (*Id.* at 17.)  Requiring Plaintiffs to present evidence regarding Google's Chat destruction, in order to

7   prove facts that they have already proven, would be no sanction at all and would force Plaintiffs to use

8   their valuable trial time to retread the same ground that an instruction by the Court could cover.  To the

9   contrary, it would *reward* Google by forcing Plaintiffs to devote precious trial time to matters other

10   than Google's core anticompetitive conduct.

11          Further, discovery since Plaintiffs' last submission on this topic has revealed that Google's

12   intentional destruction of relevant Chats is not an isolated instance of discovery misconduct, but rather

13   is one facet of a pervasive corporate culture in which Google deliberately encourages its employees to

14   shield evidence from discovery and instructs them how to do so.  Every additional production by

15   Google—including the production of Chats that the Court ordered Google to make as part of the Chats

16   proceedings—exposed additional layers of intentional discovery misconduct.

17          For example, in a January 26, 2021 Chat, ██████████████████████████████████

18   ██████████████████████████████████████████." (Moskowitz  Decl., Ex.  14

19   at -0332.)  In a March 17, 2022 Chat, the same Google attorney stated that ███████████████

20   ███████████████████████████████████████████

21   ███████" (Moskowitz Decl., Ex.  23 at -0631.)  In a May 19, 2022 Chat, a Google employee who

22   was deposed in this case noted that ███████████████████████████████████████

23   ███ "[██████████████████████████████████

24   (Moskowitz Decl., Ex.  24 at -8223-24.)  The employee ███████████ "███████████████

25   ██████████" █████████████ "██████████████████████████████." (*Id.*)

26   And in a January 8, 2021 Chat, a Google employee referenced a ██████████████████████

27   "██████████" █████████ "████████████████████████████." (Moskowitz Decl.,

28   Ex. 13 at -7173.)  Another employee decided to "████████████████████████" ███ "█

1   ███████" █ "█████████████," █████████████. (*Id.* at -7173-74.)

2   These documents show that Google's culture of destroying and concealing evidence to protect

3   Google pervaded the entire company and extended well beyond destroyed Chat evidence.  As a result,

4   Plaintiffs have been deprived of even more evidence than the Chat hearings exposed.

5   *   *   *

6   A permissive adverse inference instruction would go no further than is needed to address the

7   serious harm caused by Google's conduct.  At the start of trial, the Court should instruct the jury of the

8   facts surrounding Google's Chat destruction, and at the end of trial it should instruct the jury that it

9   may, if it chooses, infer that the evidence Google destroyed would have been harmful to Google's case

10   and helpful to Plaintiffs' cases.

11   Plaintiffs therefore respectfully request that the Court order the adverse inference instruction

12   attached as Exhibit A.

13

14

15   Dated:  September 21, 2023         CRAVATH, SWAINE & MOORE LLP
             Christine Varney *(pro hac vice)*
16             Gary A. Bornstein *(pro hac vice)*
             Timothy G. Cameron *(pro hac vice)*
17             Yonatan Even *(pro hac vice)*
             Lauren A. Moskowitz *(pro hac vice)*
18             Justin C. Clarke *(pro hac vice)*
             Michael J. Zaken *(pro hac vice)*
19             M. Brent Byars *(pro hac vice)*

20         FAEGRE DRINKER BIDDLE & REATH LLP
             Paul J. Riehle (SBN 115199)
21
         Respectfully submitted,
22
         By: */s/ Lauren A. Moskowitz*
23             Lauren A. Moskowitz

24         *Counsel for Plaintiff Epic Games, Inc.*

25

26

27

28

Dated:  September 21, 2023

BARTLIT BECK LLP
   Karma M. Giulianelli

KAPLAN FOX & KILSHEIMER LLP
   Hae Sung Nam

Respectfully submitted,

By: */s/ Karma M. Giulianelli*                 
   Karma M. Giulianelli

*Co-Lead Counsel for the Class in In re Google Play*
*Consumer Antitrust Litigation*

Dated:  September 21, 2023

PRITZKER LEVINE LLP
   Elizabeth C. Pritzker

Respectfully submitted,

By: */s/ Elizabeth C. Pritzker*              
   Elizabeth C. Pritzker

*Liaison Counsel for the Class in In re Google Play*
*Consumer Antitrust Litigation*

Dated:  September 21, 2023

OFFICE OF THE UTAH ATTORNEY GENERAL
   Brendan P. Glackin
   Lauren M. Weinstein

Respectfully submitted,

By: */s/ Lauren M. Weinstein*               
   Brendan P. Glackin

*Counsel for the Plaintiff States*

Dated:  September 21, 2023

HUESTON HENNIGAN LLP
   Douglas J. Dixon
   Christine Woodin
   Joseph A. Reiter

Respectfully submitted,

By: */s/ Douglas J. Dixon*                  
   Douglas J. Dixon

*Counsel for Plaintiffs Match Group, LLC et al.*

1

## **EXHIBIT A**

2      Before this trial began, the Court ruled that Google intentionally destroyed relevant evidence.

3  In reaching that conclusion, the Court found the following facts.

4      1.   Google employees use Google Chat every day to discuss a variety of topics, including

5  substantive business issues, including matters relevant to this antitrust litigation.

6      2.   In the ordinary course, Google automatically deletes all private (1-on-1) and group Chats 24

7  hours after they are sent unless the Google employee manually turns on Chat history.  Such messages

8  are referred to within Google as "off the record" or "History Off" Chats.

9      3.   Google instructed employees in trainings entitled "Communicate with Care" about strategies

10 for seeking to make their written communications "protected by the attorney-client privilege," even

11 when this status was not accurate.

12     4.   Google employees were trained that because Google is in the public eye and courthouse,

13 chatting "off the record" is sometimes better than email.  The Court found evidence that Google

14 employees regularly divert sensitive topics to Chat, and that Google employees are aware that their

15 Chats are generally not preserved.

16     5.   Beginning no later than the filing of this lawsuit on August 13, 2020, Google had a legal

17 obligation to preserve evidence, including Chats.

18     6.   Google chose not to comply with that obligation.  Even though Google could have preserved

19 Chats using technology readily available to it, Google chose not to.

20     7.   Google also did not check to see if custodians—Google employees whose documents were

21 turned over to Plaintiffs in this case—were actually preserving relevant Chats as directed by the

22 litigation hold notice.

23     8.   As a result of Google's misconduct, Chat messages relevant to this case were systematically

24 destroyed every 24 hours and cannot be recovered or restored.  You therefore will not see all the

25 evidence that is relevant to this case.

26     9.   You may infer that Chat messages destroyed by Google would have been unfavorable to

27 Google in this case.

28

1

## **E-FILING ATTESTATION**

2

I, Douglas J. Dixon, am the ECF User whose ID and password are being used to file this

3

document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories

4

identified above has concurred in this filing.

5

6

*/s/ Douglas J. Dixon*

7

Douglas J. Dixon

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28