1   Douglas J. Dixon (SBN 275389)
    ddixon@hueston.com
2   **HUESTON HENNIGAN LLP**
    620 Newport Center Drive, Suite 1300
3   Newport Beach, CA 92660
    Telephone: (949) 229-8640
4

5   *Counsel for Plaintiffs Match Group, LLC;*
    *Humor Rainbow, Inc.; PlentyofFish Media*
6   *ULC; and People Media, Inc.*

7   Brendan P. Glackin (SBN 199643)
    bglackin@agutah.gov
8   **OFFICE OF THE UTAH ATTORNEY**
    **GENERAL**
9   160 E 300 S, 5th Floor
    PO Box 140872
10  Salt Lake City, UT 84114-0872
    Telephone: (801) 366-0260
11

12  *Counsel for the Plaintiff States*
13
    Glenn D. Pomerantz (SBN 112503)
14  glenn.pomerantz@mto.com
    **MUNGER, TOLLES & OLSON LLP**
15  350 South Grand Avenue, Fiftieth Floor
    Los Angeles, CA 90071
16  Telephone: (213) 683-9100
17
    Brian C. Rocca (SBN 221576)
18  brian.rocca@morganlewis.com
    **MORGAN, LEWIS & BOCKIUS LLP**
19  One Market, Spear Street Tower
    San Francisco, CA 94105-1596
20  Telephone: (415) 442-1000
21
    *Counsel for Defendants Google LLC et al.*
22

Karma M. Giulianelli (SBN 184175)
karma.giulianelli@bartlitbeck.com
**BARTLIT BECK LLP**
1801 Wewetta St., Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100


Hae Sung Nam (*pro hac vice*)
hnam@kaplanfox.com
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980

*Co-Lead Counsel for Consumer Plaintiffs in In*
*re Google Play Consumer Antitrust Litigation*

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH**
**LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500


Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000

*Counsel for Plaintiff Epic Games, Inc.*

23

24

25

26

27

28

1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **NORTHERN DISTRICT OF CALIFORNIA**
10          **SAN FRANCISCO DIVISION**
11

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO: | **JOINT PRETRIAL STATEMENT** |
| *Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | Judge:   Honorable James Donato |
| *In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD | Date:        October 19, 2023<br>Time:        1:30 p.m.<br>Courtroom:  17 |
| *State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD | |
| *Match Group, LLC, et al., v. Google LLC, et al., Case No. 3:22-cv-02746-JD* | |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    In accordance with Paragraph 3 of this Court's Standing Order for Civil Jury Trials, the

2    Parties hereby submit this Joint Pretrial Statement.  Pending before the Court are:

3    • Google's Motion for Partial Summary Judgment (ECF 483[1])

4    • Match Plaintiffs' Motion for Partial Summary Judgment (ECF 486)

5    Also pending before the Court is Google's Motion to Exclude Merits Opinions of Dr. Marc

6    Rysman (ECF 484), but that motion should be held in abeyance and would be mooted by a final

7    settlement among States, Consumers, and Google.  Similarly, the issue raised in Google's summary

8    judgment motion relating to whether the Consumers and States have antitrust standing should be

9    held in abeyance and would be mooted by a final settlement among States, Consumers, and

10   Google.  Resolution of these motions may affect the nature and scope of the issues to be tried.  The

11   Parties do not intend to waive any rights or arguments by submitting this Joint Pretrial Statement.[2]

12   **I.    SUBSTANCE OF THE ACTIONS**

13   This multidistrict litigation involves claims brought by (i) 39 U.S. States, Commonwealths,

14   and Districts (by and through their respective Attorneys General), (ii) individual consumers,

15   (iii) Epic Games, Inc., and (iv) four dating app developers (Match Group, LLC, Humor Rainbow,

16   Inc., PlentyofFish Media ULC, and People Media, Inc. (collectively, the "Match Plaintiffs")).

17   Plaintiffs bring their claims against Google under the Sherman Act (15 U.S.C. § 1 *et seq.*),

18   California's Cartwright Act, and California's Unfair Competition Law and multiple other U.S.

19   states' laws.  All Plaintiffs seek injunctive relief, and Plaintiffs, other than Epic, seek damages

20   and/or equitable relief.  The States also seek civil penalties under their state laws as well.

21   Google asserts counterclaims against Epic and the Match Plaintiffs under California state

22   law and seeks declaratory relief, damages, and restitution.  Google's position in this submission

23   assumes that the claims of both Epic and the Match Plaintiffs will be tried together.  If that were to

24   _____

25   [1] Unless otherwise noted, docket citations refer to *In re: Google Play Store Antitrust Litigation*,
Case No. 21-md-02981-JD.

26   [2] The Parties reserve all rights, including to modify positions in this Joint Pretrial Statement and

27   remove any Parties or claims and defenses, as necessary, including after any of the pending
motions are decided or, for example, if the settlement in principle between the State Plaintiffs,

28   Consumers, and Google is finalized.

1  change, then it is Google's position that the Court and the parties may need to revisit the question

2  of which claims and defenses will be tried to a jury.

3  **A.    <u>The Parties</u>**

4  The Plaintiffs are:

5  - The States, Commonwealths, and Districts of Alaska, Arizona, Arkansas, California,

6    Colorado, Connecticut, Delaware, District of Columbia, Florida, Idaho, Indiana,

7    Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Minnesota, Mississippi,

8    Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico,

9    New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South

10   Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and West

11   Virginia, by and through their respective Attorneys General (collectively, the

12   "States");

13  - Matt Atkinson, Alex Iwamoto, Mary Carr, Daniel Egerter, Zach Palmer, and Serina

14    Moglia (collectively the "Individual Consumers," or "Consumers");

15  - Epic Games, Inc. ("Epic"); and

16  - The Match Plaintiffs.

17  The Defendants are:

18  - Google LLC; Google Ireland Limited; Google Commerce Limited; Google Asia

19    Pacific Pte. Limited; and Google Payment Corp. (collectively, "Google" or

20    "Defendants").

21  The Counter-plaintiffs are:

22  - Google LLC; Google Ireland Limited; Google Commerce Limited; and Google Asia

23    Pacific Pte. Limited (collectively, "Google" or Counter-Plaintiffs").

24  The Counter-defendants are:

25  - Epic; and

26  - The Match Plaintiffs.

27

28

1

**B.**     <u>**Plaintiffs' Statement Regarding the Substance of Their Claims**</u>

2     Plaintiffs claim that Google has used a web of agreements and technological restrictions to

3 unreasonably restrain trade in, and unlawfully monopolize, the markets for (i) distributing Android

4 apps (the "Android App Distribution Market"), and (ii) in-app billing services on Android devices

5 (the "Android In-App Billing Market").

6     Google convinced billions of people and businesses around the world to use the Android

7 mobile operating system ("Android" or "Android OS") on what were ultimately false promises of

8 an open ecosystem that would promote fair and open competition for app services, including app

9 distribution services and in-app transaction services.  Instead, Google deployed anticompetitive

10 tactics across all corners of the Android ecosystem, including entering into a series of

11 anticompetitive agreements with mobile network operators ("carriers"), original equipment

12 manufacturers ("OEMs") and app developers, and deceiving consumers about Android's openness

13 and alternative ways of obtaining and paying for apps and in-app content.  These anticompetitive

14 tactics also include, among others: (i) entering into revenue share agreements with competitors

15 and/or potential competitors that had opened, or aspired to open, competing Android app stores;

16 (ii) entering into agreements not to compete with competitors and/or potential competitors that

17 opened, or aspired to open, competing Android app stores; (iii) entering into exclusionary

18 agreements with OEMs and carriers to preinstall Google Play on the home screen of their Android

19 devices, and/or not to preinstall competing Android app stores; (iv) imposing technological

20 restraints that prevent developers from directly and effectively distributing their apps and app

21 stores to Android users and unfairly dissuade consumers from downloading Android apps from

22 non-Play sources; (v) imposing unduly restrictive technological restraints that diminish the

23 functionality of competing Android app stores; (vi) coercing potential competitors, such as

24 Facebook, through a pattern of economic threats and bribes to abandon or delay efforts to distribute

25 third-party applications directly, or to otherwise compete with Google's app distribution services;

26 (vii) imposing anti-steering provisions that prohibit developers from communicating with users

27 inside their apps about a user's ability to make purchases outside the app; and (viii) leveraging its

28 power to impose exclusionary terms, including parity and most-favored-nation obligations, on

1 Android app developers, thereby ensuring no other Android app distribution platform gains the

2 traction, scale, or differentiation necessary to fairly compete with Google Play.

3     Google also restrains trade in, and unlawfully acquired and maintains a monopoly over, the

4 Android In-App Payment Solutions Market.  Google forces app developers and consumers to use

5 Google's separate product, Google Play Billing, to facilitate sales of in-app transactions of digital

6 goods and services sold through apps distributed on Google Play.  Using this tie, Google charges

7 supra-competitive prices for in-app transactions of digital goods and services—a revenue share of

8 up to 30%—and restrains innovation by potential competitors.

9     Google's unfair tactics to restrain trade and unlawfully acquire and maintain its monopolies

10 have resulted in substantial and ongoing harms to consumers, Android app developers and

11 Google's actual and potential competitors in the relevant markets.  Google has no legitimate

12 procompetitive justification for its unlawful conduct.  To the extent Google has any procompetitive

13 justifications, they are outweighed by the anticompetitive harms that Google's conduct inflicts.

14 Injunctive relief, damages, and civil penalties are needed to remedy these ongoing harms.

15             1.    *Plaintiffs' Sherman Act and Cartwright Act Claims*

16     Plaintiffs assert several Sherman Act and Cartwright Act claims against Google:

17 • Unreasonable Restraints of Trade in the Android In-App Billing Market Under § 1 of

18     the Sherman Act and the Cartwright Act.  *See* ECF[3] 188, States' First Am. Compl.

19     ("States' FAC") (Counts 6, 8); ECF 172, Consumers' Second Am. Class Compl.

20     ("Consumers' SACC") (Counts 5, 9); ECF 378, Epic Games' Second Am. Compl.

21     ("Epic Games' SAC") (Counts 7, 11); ECF 380, Match Plaintiffs' First Am. Compl.

22     ("Match Plaintiffs' FAC") (Counts 4, 12).

23         o    The jury will determine liability and the amount of monetary damages, if

24             any, for these claims.  The Court will determine the appropriate injunctive

25             relief, along with any award of fees, expenses, and costs of suit.

26

27

---

28 [3] *State of Utah et al. v. Google LLC et al.*, 21-cv-05227-JD.

- Unlawful Restraints of Trade (*Per Se* and Rule of Reason) in the Android App Distribution Market Under § 1 of the Sherman Act and the Cartwright Act.  *See* States' FAC (Counts 2, 3, 8); Consumers' SACC (Counts 2, 3, 7, 8); Epic Games' SAC (Counts 2, 3, 4, 5, 9, 10); Match Plaintiffs' FAC (Counts 3, 6, 7, 11).

    o The jury will determine liability and the amount of monetary damages, if any, for these claims.  The Court will determine the appropriate injunctive relief, along with any award of fees, expenses, and costs of suit.

- Unlawful Tying of Google Play to Google Play Billing Under § 1 of the Sherman Act and the Cartwright Act.  *See* States' FAC (Counts 4, 8); Consumers' SACC (Counts 6, 10); Epic Games' SAC (Counts 8, 12); Match Plaintiffs' FAC (Counts 1, 10).

    o The jury will determine liability and the amount of monetary damages, if any, for these claims.  The Court will determine the appropriate injunctive relief, along with any award of fees, expenses, and costs of suit.

- Unlawful Exclusive Dealing in the Android In-App Billing Market Under the Sherman Act § 1 and the Cartwright Act.  *See* States' FAC (Counts 7, 8); Consumers' SACC (Counts 4, 5).

    o The jury will determine liability and the amount of monetary damages, if any, for these claims.  The Court will determine the appropriate injunctive relief, along with any award of fees, expenses, and costs of suit.

- Unlawful Monopolization/Monopoly Maintenance in the Android App Distribution Market and in the Android In-App Billing Market Under the Sherman Act § 2.  *See* States' FAC (Counts 1, 5); Consumers' SACC (Counts 1, 4); Epic Games' SAC (Counts 1, 6); Match Plaintiffs' FAC (Counts 2, 8).

    o The jury will determine liability and the amount of monetary damages, if any, for these claims.  The Court will determine the appropriate injunctive relief, along with any award of fees, expenses, and costs of suit.

- Attempted Monopolization of the Android In-App Billing Market Under the Sherman Act § 2.  *See* Match Plaintiffs' FAC (Count 9).

1          o   The jury will determine liability and the amount of monetary damages, if

2              any, for these claims.  The Court will determine the appropriate injunctive

3              relief, along with any award of fees, expenses, and costs of suit.

4          2.    *Plaintiffs' California UCL Claims*

5      Plaintiffs bring claims under California's Unfair Competition Law (Cal. Bus. Prof. Code

6  Section 17200, the "UCL"), which prohibits a broader range of conduct than the Sherman Act and

7  Cartwright Act.  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023) (reiterating

8  UCL's "wide standard" that is "intentionally framed in . . . broad, sweeping language . . .").

9  Google's abovementioned course of conduct is unfair, unlawful, and deceptive in violation of the

10  UCL.  *See* States' FAC (Count 8); Consumers' SACC (Count 11); Epic Games' SAC (Count 13);

11  Match Plaintiffs' FAC (Count 13).

12      •   Liability and any monetary or injunctive relief under California's Unfair Competition

13          Law will be determined solely by the Court.

14          3.    *The States' Non-California State Law Claims*

15      The States allege violations of the antitrust, consumer protection, and unfair trade practice

16  laws of various States, Commonwealths, and Districts.[4]

17      •   The jury will determine liability and the amount of monetary damages, if any, for these

18

19  _____

20  [4] *See, e.g.*, Alaska Stat. §§ 45.50.562, 45.50.564, 45.50.471; Ariz. Rev. Stat. §§ 44-1402, 44-1403,
44-1522; Ark. Code §§ 4-75-206, 4-75-302; Cal. Bus. & Prof. Code §§ 16720, 16726; Colo. Rev.

21  Stat. §§ 6-4-104, 6-4-105; Conn. Gen. Stat. §§ 35-26, 35-27, 42-110b; Del. Code tit. 6, § 2103;
D.C. Code §§ 28-3904, 28-4502, 28-4503; Fla. Stat. §§ 501.204. 542.18, 542.19; Idaho Code

22  §§ 48-104, 48-105; Ind. Code §§ 24-1-2-1, 24-1-2-2, 24-5-0.5-3; Iowa Code §§ 553.4-5, 714.16;
Ky. Rev. Stat. § 367.175; La. Rev. Stat. tit. 51, §§ 122-124; Md. Com. Law Code §11-204; Mass.

23  Gen. Laws ch. 93A, § 2; Minn. Stat. § 325D.51, 325D.52; Miss. Code §§ 75-21-1, 75-21-3, 75-24-
5; Mo. Rev. Stat. §§ 416.031, 407.020; Mont. Code §§ 30-14-205, 30-14-103; Neb. Rev. Stat.

24  §§ 59-801, 59-802, 59-1602, 59-1603, 59-1604; Nev. Rev. Stat. §§ 598A.060, 598.0923; N.H. Rev.
Stat. §§ 356:2, 356:3; N.J. Stat. §§ 56:9-3, 56:9-4, 56:8-2, 56:8-4; N.M. Stat. §§ 57-1-1, 57-1-2;

25  N.Y. Gen. Bus. Law § 340; N.Y. Exec. Law § 63(12); N.C. Gen. Stat. §§ 75-1, 75-1.1, 75-2, 75-
2.1; N.D. Cent. Code §§ 51-08.1-02; 51-08.1-03; 79 Okla. Stat. § 203; Or. Rev. Stat. §§ 646.725,

26  646.730; R.I. Gen. Law §§ 6-36-4, 6-36-5; S.D. Codified Laws §§ 37-1-3.1, 37-1-3.2; Tex. Bus. &
Com. Code § 15.05; Utah Code §§ 76-10-3104, 13-11-4; 9 Vt. Stat. § 2453; Va. Code §§ 59.1-9.5,

27  59.1-9.6; Wash. Rev. Code §§ 19.86.020, 19.86.030, 19.86.040; and W. Va. Code §§ 47-18-3, 47-
18-4.

28

claims.[5]  The jury will make any assessment of whether the relevant conduct was

knowing or willful. The Court will determine the injunctive relief,[6] disgorgement and/or

---

[5] *See, e.g.*, Alaska (States' FAC at ¶ 336(a)-(b)); Arizona (States' FAC at ¶¶ 342, 344); Arkansas (States' FAC at ¶ 347(a)); California (States' FAC at ¶ 353(b)); Colorado (States' FAC at ¶ 356(a)); Connecticut (States' FAC at ¶¶ 363, 366(a)); Delaware (States' FAC at ¶ 369(a)); District of Columbia (States' FAC at ¶¶ 372(a), 374(a)); Florida (States' FAC at ¶¶ 377(a), 380(a)); Idaho (States' FAC at ¶ 384(a)); Indiana (States' FAC at ¶ 387(a)); Iowa (States' FAC at ¶ 392(b)); Kentucky (States' FAC at ¶ 398(a)); Louisiana (States' FAC at ¶ 404(a)); Maryland (States' FAC at ¶ 408(a)); Massachusetts (States' FAC at ¶ 412(a)); Minnesota (States' FAC at ¶ 416(a)); Mississippi (States' FAC at ¶ 419); Missouri (States' FAC at ¶ 425(a)); Montana (States' FAC at ¶ 430(e)); Nebraska (States' FAC at ¶ 433(a)); Nevada (States' FAC at ¶ 436(a)); New Hampshire (States' FAC at ¶ 441(a)); New Jersey (States' FAC at ¶ 447(c)); New Mexico (States' FAC at ¶460); New York (States' FAC at ¶ 466(a)); North Carolina (States' FAC at ¶¶ 469(a), 471(a)); North Dakota (States' FAC at ¶ 474(a)); Oklahoma (States' FAC at ¶ 479(a)); Oregon (States' FAC at ¶ 484(a)); Rhode Island (States' FAC at ¶ 487(a)); South Dakota (States' FAC at ¶ 490(d)); Texas (States' FAC at ¶ 496(a)); Utah (States' FAC at ¶¶ 504(a), 507(a)); Vermont (States' FAC at ¶ 510)); Virginia (States' FAC at ¶ 515)); Washington (States' FAC at ¶ 518)); and West Virginia (States' FAC at ¶ 523(a)).

[6] *See, e.g.*, Alaska (States' FAC at ¶¶ 336(c), 339(a), (d)); Arizona (States' FAC at ¶¶ 342(a), 342(c), 344(b), 344(e), 344(f)); Arkansas (States' FAC at ¶ 347(c)); California (States' FAC at ¶ 353(c)); Colorado (States' FAC at ¶¶ 356(b), 356(e)); Connecticut (States' FAC at ¶¶ 366(c), 366(f)); Delaware (States' FAC at ¶¶ 369(c), 369(f)); District of Columbia (States' FAC at ¶¶ 372(c), 372(f), 374(c), 374(f)); Florida (States' FAC at ¶¶ 377(b), 380(c)); Idaho (States' FAC at ¶¶ 384(c), 384(f)); Indiana (States' FAC at ¶¶ 387(c), 387(e), 389(b), 389(e)); Iowa (States' FAC at ¶¶ 392(a), 394(c), 394(f)); Kentucky (States' FAC at ¶¶ 398(c), 398(f)); Louisiana (States' FAC at ¶¶ 404(b), 404(d)); Maryland (States' FAC at ¶¶ 408(c), 408(f)); Massachusetts (States' FAC at ¶¶ 412(d), 412(g)); Minnesota (States' FAC at ¶¶ 416(c), 416(f)); Mississippi (States' FAC at ¶¶ 419(b), 421(c), 421(f), 422); Missouri (States' FAC at ¶¶ 425(c), 425(e), 427(c), 427(g)); Montana (States' FAC at ¶ 430(e)); Nebraska (States' FAC at ¶¶ 433(c), 433(f)); Nevada (States' FAC at ¶¶ 436(c), 436(f), 438(c), 438(g)); New Hampshire (States' FAC at ¶¶ 441(b), 441(e)); New Jersey (States' FAC at ¶¶ 447(a), 447(d), 449(a), 449(d)); New Mexico (States' FAC at ¶¶ 460(a), 460(c), 460(e)); New York (States' FAC at ¶¶ 466(b), 466(e)); North Carolina (States' FAC at ¶¶ 469(c), 469(f), 471(c), 471(f)); North Dakota (States' FAC at ¶¶ 474(c), 474(f)); Oklahoma (States' FAC at ¶¶ 479(c), 479(e)); Oregon (States' FAC at ¶¶ 484(c), 484(f)); Rhode Island (States' FAC at ¶¶ 487(c), 487(f)); South Dakota (States' FAC at ¶¶ 490(a), 490(e)); Texas (States' FAC at ¶¶ 496(b), 496(e)); Utah (States' FAC at ¶¶ 504(c), 504(f) 507(c), 507(e)); Vermont (States' FAC at ¶¶ 510(c), 510(f), 512(c) 512(f)); Virginia (States' FAC at ¶¶ 515(b), 515(e)); Washington (States' FAC at ¶¶ 518(b), 518(e), 520(b), 520(e)); and West Virginia (States' FAC at ¶¶ 523(c), 523(f)).

restitution,[7] civil penalties,[8] fees, expenses, and costs,[9] and other equitable relief,[10] if

[7] *See, e.g.*, Alaska (States' FAC at ¶¶ 336(c), 339(a)); Arizona (States' FAC at ¶¶ 342(a), 344(a)); Arkansas (States' FAC at ¶ 347(b)); California (States' FAC at ¶ 353(a)); Colorado (States' FAC at ¶ 356(b)); Connecticut (States' FAC at ¶ 366(b)); Delaware (States' FAC at ¶ 369(b)); District of Columbia (States' FAC at ¶¶ 372(b), 374(b)); Florida (States' FAC at ¶ 380(b)); Idaho (States' FAC at ¶ 384(b)); Indiana (States' FAC at ¶¶ 387(b), 389(a)); Iowa (States' FAC at ¶¶ 392(a), 394(a)-(b)); Kentucky (States' FAC at ¶ 398(b)); Maryland (States' FAC at ¶ 408(b)); Massachusetts (States' FAC at ¶ 412(b)-(c)); Minnesota (States' FAC at ¶ 416(b)); Mississippi (States' FAC at ¶¶ 419(a), 421(a)-(b)); Missouri (States' FAC at ¶¶ 425(b), 427(a)-(b), (f)); Montana (States' FAC at ¶ 430(e)); Nebraska (States' FAC at ¶ 433(b)); Nevada (States' FAC at ¶¶ 436(b), 438(a)-(b)); New Hampshire (States' FAC at ¶ 441(b)); New Jersey (States' FAC at ¶ 449(a)); New Mexico (States' FAC at ¶460(c)); New York (States' FAC at ¶ 466(a)); North Carolina (States' FAC at ¶¶ 469(b), 471(b)); North Dakota (States' FAC at ¶ 474(b)); Oklahoma (States' FAC at ¶ 479(b)); Oregon (States' FAC at ¶ 484(b)); Rhode Island (States' FAC at ¶ 487(b)); Texas (States' FAC at ¶ 496(b)); Utah (States' FAC at ¶ 504(b)); Vermont (States' FAC at ¶¶ 510(a)-(b), 512(a)-(b)); Virginia (States' FAC at ¶ 515(a)); Washington (States' FAC at ¶ 518(a), 520(a)); and West Virginia (States' FAC at  ¶ 523(b)).

[8] *See, e.g.*, Alaska (States' FAC at ¶¶ 336(d), 339(b)); Arizona (States' FAC at ¶¶ 342(a)-(b), 344(c)); Arkansas (States' FAC at ¶ 347(d)); California (States' FAC at ¶ 353(d)); Colorado (States' FAC at ¶ 356(c)); Connecticut (States' FAC at ¶ 366(d)); Delaware (States' FAC at ¶ 369(d)); District of Columbia (States' FAC at ¶¶ 372(d), 374(d)); Florida (States' FAC at ¶¶ 377(c), 380(d)); Idaho (States' FAC at ¶ 384(d)); Indiana (States' FAC at ¶ 389(c)); Iowa (States' FAC at ¶¶ 392(c), 394(d)); Kentucky (States' FAC at ¶ 398(d)); Maryland (States' FAC at ¶ 408(d)); Massachusetts (States' FAC at ¶ 412(e)); Minnesota (States' FAC at ¶ 416(d)); Mississippi (States' FAC at ¶¶ 419(c), 421(d)); Missouri (States' FAC at ¶ 427(d)); Montana (States' FAC at ¶ 430(e)); Nebraska (States' FAC at ¶ 433(d)); Nevada (States' FAC at ¶¶ 436(d), 438(d)-(e)); New Hampshire (States' FAC at ¶ 441(c)); New Jersey (States' FAC at ¶¶ 447(b), 449(b)); New Mexico (States' FAC at ¶ 460(b)); New York (States' FAC at ¶ 466(c)); North Carolina (States' FAC at ¶¶ 469(d), 471(d)); North Dakota (States' FAC at ¶ 474(d)); Oregon (States' FAC at ¶ 484(d)); Rhode Island (States' FAC at ¶ 487(d)); South Dakota (States' FAC at ¶ 490(b)); Texas (States' FAC at ¶ 496(b)); Utah (States' FAC at ¶ 504(d), 507(a)); Vermont (States' FAC at ¶¶ 510(d), 512(d)); Virginia (States' FAC at ¶ 515(c)); Washington (States' FAC at ¶ 518(c), 520(c)); and West Virginia (States' FAC at  ¶ 523(d)).

[9] *See, e.g.*, Alaska (States' FAC at ¶¶ 336(e), 339(c)); Arizona (States' FAC at ¶¶ 342(a), 344(d)); Arkansas (States' FAC at ¶ 347(d)); California (States' FAC at ¶ 353(e)); Colorado (States' FAC at ¶ 356(d)); Connecticut (States' FAC at ¶ 366(e)); Delaware (States' FAC at ¶ 369(e)); District of Columbia (States' FAC at ¶¶ 372(e), 374(e)); Florida (States' FAC at ¶¶ 377(d), 380(e)); Idaho (States' FAC at ¶ 384(e)); Indiana (States' FAC at ¶¶ 387(d), 389(d)); Iowa (States' FAC at ¶¶ 394(e)); Kentucky (States' FAC at ¶ 398(e)); Louisiana (States' FAC at ¶ 404(c)); Maryland (States' FAC at ¶ 408(e)); Massachusetts (States' FAC at ¶ 412(f)); Minnesota (States' FAC at ¶ 416(e)); Mississippi (States' FAC at ¶ 421(e)); Missouri (States' FAC at ¶¶ 425(d), 427(e)); Montana (States' FAC at ¶ 430(e)); Nebraska (States' FAC at ¶ 433(e)); Nevada (States' FAC at ¶¶ 436(e), 438(f)); New Hampshire (States' FAC at ¶ 441(d)); New Jersey (States' FAC at ¶¶ 447(c), 449(c)); New Mexico (States' FAC at ¶ 460(d)); New York (States' FAC at ¶ 466(d)); North Carolina (States' FAC at ¶¶ 469(e), 471(e)); North Dakota (States' FAC at ¶ 474(e)); Oklahoma (States' FAC at ¶ 479(d)); Oregon (States' FAC at ¶ 484(e)); Rhode Island (States' FAC at ¶ 487(e)); South Dakota (States' FAC at ¶ 490(c)); Texas (States' FAC at ¶ 496(c)); Utah (States' FAC at ¶¶ 504(e), 507(d)); Vermont (States' FAC at ¶¶ 510(e), 512(e)); Virginia (States' FAC at ¶ 515(d)); Washington (States' FAC at ¶ 518(d), 520(d)); and West Virginia (States' FAC at  ¶ 523(e)).

any.

The States also allege violations (identified in States' FAC Section III) of the consumer protection and unfair trade practice laws of various States, Commonwealths, and Districts.[11]

- The jury will determine liability and the amount of monetary damages,[12] if any, for these claims. The jury will make any assessment of whether the relevant conduct was knowing or willful. The Court will determine the injunctive relief,[13] disgorgement

[10] *See, e.g.*, Alaska (States' FAC at ¶¶ 336(c), 339(a), (d)); Arizona (States' FAC at ¶¶ 342(a), 342(c), 344(b), 344(e), 344(f)); Arkansas (States' FAC at ¶ 347(c)); California (States' FAC at ¶ 353(c)); Colorado (States' FAC at ¶¶ 356(b), 356(e)); Connecticut (States' FAC at ¶¶ 366(c), 366(f)); Delaware (States' FAC at ¶¶ 369(c), 369(f)); District of Columbia (States' FAC at ¶¶ 372(c), 372(f), 374(c), 374(f)); Florida (States' FAC at ¶¶ 377(b), 380(c)); Idaho (States' FAC at ¶¶ 384(c), 384(f)); Indiana (States' FAC at ¶¶ 387(c), 387(e), 389(b), 389(e)); Iowa (States' FAC at ¶¶ 392(a), 394(c), 394(f)); Kentucky (States' FAC at ¶¶ 398(c), 398(f)); Louisiana (States' FAC at ¶¶ 404(b), 404(d)); Maryland (States' FAC at ¶¶ 408(c), 408(f)); Massachusetts (States' FAC at ¶¶ 412(d), 412(g)); Minnesota (States' FAC at ¶¶ 416(c), 416(f)); Mississippi (States' FAC at ¶¶ 419(b), 421(c), 421(f), 422); Missouri (States' FAC at ¶¶ 425(c), 425(e), 427(c), 427(g)); Montana (States' FAC at ¶ 430(e)); Nebraska (States' FAC at ¶ 433(c), 433(f)); Nevada (States' FAC at ¶¶ 436(c), 436(f), 438(c), 438(g)); New Hampshire (States' FAC at ¶¶ 441(b), 441(e)); New Jersey (States' FAC at ¶¶ 447(a), 447(d), 449(a), 449(d)); New Mexico (States' FAC ¶¶ 460(a), 460(c), 460(e)); New York (States' FAC at ¶¶ 466(b), 466(e)); North Carolina (States' FAC at ¶¶ 469(c), 469(f), 471(c), 471(f)); North Dakota (States' FAC at ¶¶ 474(c), 474(f)); Oklahoma (States' FAC at ¶¶ 479(c), 479(e)); Oregon (States' FAC at ¶¶ 484(c), 484(f)); Rhode Island (States' FAC at ¶¶ 487(c), 487(f)); South Dakota (States' FAC at ¶¶ 490(a), 490(e)); Texas (States' FAC at ¶¶ 496(b), 496(d)); Utah (States' FAC at ¶¶ 504(c), 504(f) 507(a), 507(e)); Vermont (States' FAC at ¶¶ 510(c), 510(f), 512(c) 512(f)); Virginia (States' FAC at ¶¶ 515(b), 515(e)); Washington (States' FAC at ¶¶ 518(b), 518(e), 520(b), 520(e)); and West Virginia (States' FAC at ¶¶ 523(c), 523(f)).

[11] *See, e.g.*, Alaska Stat. § 45.50.471; Ariz. Rev. Stat. § 44-1522; Ark. Code § 4-88-107; Colo. Rev. Stat. § 6-1-105; Conn. Gen. Stat. § 42-110b; D.C. Code § 28-3904; Fla. Stat. § 501.204; Ind. Code § 24-5-0.5-3; Iowa Code § 714.16; Ky. Rev. Stat. § 367.170; La. Rev. Stat. tit. 51, § 1405; Mass. Gen. Laws ch. 93A, § 2; Miss. Code § 75-24-5; Mo. Rev. Stat. § 407.020; Mont. Code § 30-14-103; Nev. Rev. Stat. §§ 598.0915, 598.0923; N.H. Rev. Stat. § 358-A:2; N.J. Stat. § 56:8-2; N.M. Stat. § 57-12-3; N.Y. Gen. Bus. Law § 349; N.Y. Exec. Law § 63(12); N.C. Gen. Stat. § 75-1.1; N.D. Cent. Code § 51-15-02; 15 Okla. Stat. § 753; S.D. Codified Laws § 37-24-6; Tex. Bus. & Com. Code § 17.46; Utah Code § 13-11-4; 9 Vt. Stat. § 2453; and Wash. Rev. Code § 19.86.020.

[12] *See, e.g.*, Arkansas (States' FAC at ¶ 349(a)); Connecticut (States' FAC at ¶ 366(a)); District of Columbia (States' FAC at ¶ 374(a)); Florida (States' FAC at ¶ 380(a)); Kentucky (States' FAC at ¶ 400(a)); Louisiana (States' FAC at ¶ 405(c)); Massachusetts (States' FAC at ¶ 412(a)); Montana (States' FAC at ¶ 430(e)); New York (States' FAC at ¶ 466(a)); North Carolina (States' FAC at ¶ 471(a)); North Dakota (States' FAC at ¶ 476(a)); Texas (States' FAC at ¶ 501(b)); and Utah (States' FAC at ¶ 507(a)).

[13] Alaska (States' FAC at ¶ 339(a);(d)); Arizona (States' FAC at ¶ 344(b);(f)); Arkansas (States' FAC at ¶ 349(b)); Colorado (States' FAC at ¶ 358(a)); Connecticut (States' FAC at ¶ 366(c)); District of Columbia (States' FAC at ¶ 374(c)); Florida (States' FAC at ¶ 380(c)); Indiana (States' FAC at ¶ 389(b)); Iowa (States' FAC at ¶ 394(c)); Kentucky (States' FAC at ¶ 399(b); ¶ 400(c));

and/or restitution,[14] civil penalties,[15] fees, expenses, and costs,[16] and other equitable

relief,[17] if any.

---

Louisiana (States' FAC at ¶ 405(b)); Massachusetts (States' FAC at ¶ 412(d)); Mississippi (States' FAC at ¶ 421(c)); Missouri (States' FAC at ¶ 427(c)); Montana (States' FAC at ¶ 430(e)); Nevada (States' FAC at ¶ 438(c)); New Hampshire (States' FAC at ¶ 443(b)); New Jersey (States' FAC at ¶ 449(a)); New Mexico (States' FAC at ¶ 461(b)-(c)); New York (States' FAC at ¶ 466(b)); North Carolina (States' FAC at ¶ 471(c)); North Dakota (States' FAC at ¶ 476(c)); Oklahoma (States' FAC at ¶ 481(a)); South Dakota (States' FAC at ¶ 493(a)); Texas (States' FAC at ¶ 501(a)); Utah (States' FAC at ¶ 507(a)); Vermont (States' FAC at ¶ 512(c)); and Washington (States' FAC at ¶ 520(b)).

[14] *See, e.g.*, Alaska (States' FAC at ¶ 339(a)); Arizona (States' FAC at ¶ 344(a)); Colorado (States' FAC at ¶ 358(a)); Connecticut (States' FAC at ¶ 366(b)); District of Columbia (States' FAC at ¶ 374(b)); Florida (States' FAC at ¶ 380(b)); Indiana (States' FAC at ¶ 389(a)); Iowa (States' FAC at ¶ 394(a)-(b)); Kentucky (States' FAC at ¶ 400(b)); Louisiana (States' FAC at ¶ 405(c)); Massachusetts (States' FAC at ¶ 412(b)-(c)); Mississippi (States' FAC at ¶ 421(a)-(b)); Missouri (States' FAC at ¶ 427(a)-(b);(f)); Montana (States' FAC at ¶ 430(e)); Nevada (States' FAC at ¶ 438(a)-(b)); New Hampshire (States' FAC at ¶ 443(a)); New Jersey (States' FAC at ¶ 449(a)); New Mexico (States' FAC at ¶ 461(c)); New York (States' FAC at ¶ 466(a)); North Carolina (States' FAC at ¶ 471(b)); North Dakota (States' FAC at ¶ 476(b)); Oklahoma (States' FAC at ¶ 481(a)); South Dakota (States' FAC at ¶ 493(a)); Texas (States' FAC at ¶ 501(b)); Vermont (States' FAC at ¶ 512(a)-(b)); and Washington (States' FAC at ¶ 520(a)).

[15] Alaska (States' FAC at ¶ 339(b)); Arizona (States' FAC at ¶ 344(c)); Arkansas (States' FAC at ¶ 349(b)); Colorado (States' FAC at ¶ 356(b)); Connecticut (States' FAC at ¶ 366(d)); District of Columbia (States' FAC at ¶ 374(d)); Florida (States' FAC at ¶ 380(d)); Indiana (States' FAC at ¶ 389(c)); Iowa (States' FAC at ¶ 394(d)); Kentucky (States' FAC at ¶ 400(d)); Louisiana (States' FAC at ¶ 405(a)); Massachusetts (States' FAC at ¶ 412(e)); Mississippi (States' FAC at ¶ 421(d)); Missouri (States' FAC at ¶ 427(d)); Montana (States' FAC at ¶ 430(e)); Nevada (States' FAC at ¶ 438(d)-(e)); New Hampshire (States' FAC at ¶ 443(c)); New Jersey (States' FAC at ¶ 449(b)); New Mexico (States' FAC at ¶ 461(a)); New York (States' FAC at ¶ 466(c)); North Carolina (States' FAC at ¶ 471(d)); North Dakota (States' FAC at ¶ 476(d)); Oklahoma (States' FAC at ¶ 481(b)); South Dakota (States' FAC at ¶ 493(b)); Texas (States' FAC at ¶ 501(c)); Utah (States' FAC at ¶ 507(a)); Vermont (States' FAC at ¶ 512(d)); and Washington (States' FAC at ¶ 520(c)).

[16] Alaska (States' FAC at ¶ 339(c)); Arizona (States' FAC at ¶ 344(d)); Arkansas (States' FAC at ¶ 349(d)); Colorado (States' FAC at ¶ 356(c)); Connecticut (States' FAC at ¶ 366(e)); District of Columbia (States' FAC at ¶ 374(e)); Florida (States' FAC at ¶ 380(e)); Indiana (States' FAC at ¶ 389(d)); Iowa (States' FAC at ¶ 394(e)); Kentucky (States' FAC at ¶ 400(e)); Massachusetts (States' FAC at ¶ 412(f)); Mississippi (States' FAC at ¶ 421(e)); Missouri (States' FAC at ¶ 427(e)); Montana (States' FAC at ¶ 430(e)); Nevada (States' FAC at ¶ 438(f)); New Hampshire (States' FAC at ¶ 443(d)); New Jersey (States' FAC at ¶ 449(c)); New York (States' FAC at ¶ 466(d)); North Carolina (States' FAC at ¶ 471(e)); North Dakota (States' FAC at ¶ 476(e)); Oklahoma (States' FAC at ¶ 481(c)); South Dakota (States' FAC at ¶ 493(c)); Texas (States' FAC at ¶ 501(d)); Utah (States' FAC at ¶ 507(d)); Vermont (States' FAC at ¶ 512(e)); and Washington (States' FAC at ¶ 520(d)).

[17] Alaska (States' FAC at ¶ 339(a);(d)); Arizona (States' FAC at ¶ 344(b);(f)); Arkansas (States' FAC at ¶ 349(b)); Colorado (States' FAC at ¶ 358(a)); Connecticut (States' FAC at ¶ 366(c)); District of Columbia (States' FAC at ¶ 374(c)); Florida (States' FAC at ¶ 380(c)); Indiana (States' FAC at ¶ 389(b)); Iowa (States' FAC at ¶ 394(c)); Kentucky (States' FAC at ¶ 399(b); ¶ 400(c));

JOINT PRETRIAL STATEMENT
Case Nos. 3:21-md-02981-JD, 3:22-cv-02746-JD, 3:20-cv-05671-JD, 3:20-cv-05761-JD & 3:21-cv-05227-JD

4.    *Match Plaintiffs' State Law Claims*

The Match Plaintiffs assert two further claims against Google under California law for (1) Tortious Interference with Contract and (2) Tortious Interference with Prospective Economic Advantage. *See* Match Plaintiffs' FAC (Counts 14, 15).

- The Match Plaintiffs contend that the jury will determine liability for these claims. The jury will make any assessment of whether the relevant conduct involved oppression, fraud or malice. The Court will determine the appropriate injunctive relief, along with any award of fees, expenses, and costs of suit.

**C.    Google's Statement Regarding the Substance of Plaintiffs' Claims and Google's Defenses**

Plaintiffs will not be able to sustain their claims at trial. Android is one of the most popular operating systems in the world, with billions of users and tens of thousands of app developers. Android's success in the marketplace is no accident. Google has invested billions of dollars in Android to create an ecosystem based on openness and choice that competes with the iPhone. Google also offers Android OEMs a free license to a suite of Google software, including products such as Search, Google Maps, Gmail, and YouTube, as well as a series of Application Programming Interfaces ("APIs") that provide services to app developers. OEMs that choose this free license get the ability to build devices that give consumers key services they expect from a smartphone right out of the box on par with the iPhone. Contrary to Plaintiffs' claims, no OEM is required to accept this license to use Android, nor are OEMs who chose to do so prohibited from installing apps that compete with Google's apps, including the Play store. Android's model fuels innovation by giving OEMs the freedom to customize their phones and preinstall the apps they choose, so customers get more choices on phones, features, and apps.

---

Louisiana (States' FAC at ¶ 405(b)); Massachusetts (States' FAC at ¶ 412(d)); Mississippi (States' FAC at ¶ 421(c)); Missouri (States' FAC at ¶ 427(c)); Montana (States' FAC at ¶ 430(e)); Nevada (States' FAC at ¶ 438(c)); New Hampshire (States' FAC at ¶ 443(b)); New Jersey (States' FAC at ¶ 449(a)); New Mexico (States' FAC at ¶ 461(b)-(c)); New York (States' FAC at ¶ 466(b)); North Carolina (States' FAC at ¶ 471(c)); North Dakota (States' FAC at ¶ 476(c)); Oklahoma (States' FAC at ¶ 481(a)); South Dakota (States' FAC at ¶ 493(a)); Texas (States' FAC at ¶ 501(a)); Utah (States' FAC at ¶ 507(a)); Vermont (States' FAC at ¶ 512(c)); and Washington (States' FAC at ¶ 520(b)).

Google also built the Play store, a trusted place for consumers to obtain apps and in-app content and for developers to make apps and in-app content available to consumers. In Google's view, Android could not have succeeded and successfully competed with iOS without a high-quality app store (indeed, Google introduced the Play store's predecessor, Android Market, before Apple opened its app store to third-party applications).  Apps greatly enhance the utility of a smartphone—facilitating access to a wide array of functionality beyond making and receiving calls and text messages. OEMs, app developers, and users alike all benefit from the significant investments that Google has made into the Android platform and the Play store.

The Play store provides enormous value to developers and users.  For developers, the Play store offers a platform to reach billions of Android users around the world with their apps, as well as services to help developers improve the Android versions of their apps and market their apps. For users, the Play store provides a safe, secure, reliable method to acquire apps that allow the user to customize their Android device.  Google does not charge users to access the Play store, and most developers—97 percent—do not pay Google service fees to use the Play store. Developers do not pay Google any money in service fees unless they make money from (1) paid app downloads from the Play store or (2) selling subscriptions or digital goods in apps downloaded from the Play store. Google's method of collecting a fee for the benefits that the Play store provides—by charging a percentage on paid downloads and in-app purchases—is a standard practice in the industry.  And the Play store's service fee–typically either 15% or 30% depending on the developer and the transaction–is at or below the fees charged by competitors like the Apple App Store and console and PC app stores.

Moreover, unlike Apple's iOS, Android offers users and developers choices when it comes to acquiring apps and making in-app purchases.  Unlike iOS, Android allows for competing app stores, and today every Android phone manufactured by Samsung–the largest OEM by U.S. sales–comes with a competing app store, the Samsung Galaxy Store, pre-installed on the home screen. Unlike iOS, Android allows users to acquire apps directly from websites.  Unlike iOS, Android allows developers to reach agreements with OEMs to pre-install their apps on Android phones. And developers can sell subscriptions or digital goods on other platforms or on their websites, and

1    those subscriptions or digital goods can then be used in a version of their app downloaded from the

2    Play store.  Epic, Match, and many other developers take advantage of these available alternatives.

3    In all these scenarios, Google collects no service fee.

4          Plaintiffs' claims challenge fundamental features of Android and the Play store—design

5    choices, investments, and platform rules that Google has implemented to make its products

6    competitive and secure. All of Plaintiffs' claims will fail.

7          Plaintiffs will not be able to demonstrate valid antitrust product markets in which Google

8    has market power because, at a minimum, Google faces intense competition from Apple's iOS

9    platform and from other channels through which developers and users make digital transactions.

10         Nor will Plaintiffs be able to show an illegal tie: no developer is required to use Google

11   Play's billing system to access the valuable services offered by the Play store. For the small subset

12   of developers who chose to monetize their apps through digital in-app transactions, the fact that

13   Google requires the use of Google Play's billing system to efficiently collect the fees for

14   developers' use of Google's intellectual property and services is not an illegal tie.

15         Plaintiffs also will not be able to show that Google's agreements with OEMs, carriers, and

16   developers; its design of the Android operating system; and the security controls it has developed

17   to protect users are anticompetitive. To the contrary, Google will demonstrate that its actions are

18   procompetitive and reasonable and have provided significant benefits to consumers that could not

19   be achieved with Plaintiffs' proffered alternatives without increased costs.

20         Finally, Match Plaintiffs' state law tortious interference claims will fail because Match is

21   not entitled to use its contracts with users to remake its contractual agreement to pay Google for the

22   use of Google's intellectual property and services.[18]

23         **D.    Google's Statement Regarding the Substance of Its Counterclaims**

24         App developers have many choices for how to distribute apps and sell digital content.

25   Developers can choose among platforms like Android and iOS, and game developers like Epic can

26   also choose among PC and console platforms.  Developers who choose Android can distribute their

27   ────────────────────

28   [18] As noted, Google agrees that a jury trial is appropriate assuming the claims of all remaining
     parties are tried together..

apps without using the Play store, through another app store like the Samsung Galaxy Store or through pre-installation agreements or directly through a website.  Developers who choose the Play store can make their app available on Play without selling digital content through the app, such as by selling the subscriptions or other content from a webpage, which can then be accessed by the user in the app.

Developers who choose to charge users to download their apps from the Play store and developers who choose to sell digital content through apps distributed on the Play store pay a service fee on those transactions.  This service fee reflects Google's compensation for the valuable services that the Play store provides, and this method of collecting a service fee is standard in the industry.  This service fee requirement is set forth in the Payment Policy provision of the Play Developer Distribution Agreement ("DDA").  The Payment Policy in the DDA requires developers to process payments for sales of apps and in-app purchases of digital content using Google Play Billing so that Google can collect a service fee on those transactions.

Epic Games and the Match Plaintiffs willfully violated the Payment Policy, reaping the benefits of the Play store without paying the agreed-upon fees.  In doing so, Epic and the Match Plaintiffs breached their contractual obligations to Google under the DDA.  By using Google's services without paying for their value, Epic and the Match Plaintiffs have also been unjustly enriched.  Worst of all, both Epic and the Match Plaintiffs deceived Google into investing resources to help them get more value from the Play store and comply with their obligations when they had no intention of honoring their agreements.

1. ***Counterclaims Against Epic Games***

In April 2020, Epic submitted a version of its *Fortnite* app to the Play store and agreed to abide by the terms of the DDA, including the Payment Policy.  Google employees worked around the clock to make the *Fortnite* app available to Google Play's billions of users.  What Google did not know was that Epic hatched a scheme it called "Project Liberty"—a secret plan to purposefully breach Epic's developer agreement and thwart Google's ability to collect a fee for the value of the Play store.  To execute on this plan, Epic buried code in its version of the *Fortnite* app that would enable Epic to sell digital content without paying Google the service fees it had agreed to pay. Epic

designed the code to make use of what is known as a "hotfix"—a method of updating the app that allowed Epic to activate secret code that would route payments for digital content through its own payment system rather than through Google Play Billing, in direct and flagrant violation of the Payment Policy.  Epic used the same "hotfix" scheme for its *Fortnite* app in the Apple App Store.

On August 13, 2020, Epic breached the DDA by activating the "hotfix" and enabling its own external payment system that bypassed Google Play Billing.  Epic did not pay service fees on any of the transactions that it routed to its own systems using the "hotfix."  At trial, Google will show that Epic violated the DDA terms knowingly and in bad faith when it concealed and then activated the hotfix that bypassed Google's billing system for apps Epic chose to distribute through Google Play.  Google will show that it suffered injury in the form of lost service fees that Epic owes Google under the DDA.  And Google will show that Epic's breaches of its contractual obligations threaten Google's reputation and goodwill with its users, including by exposing those users to security risks.  Google will also show that Epic took service fees to which Google was entitled under the DDA, and unjustly benefitted from other services—including extensive engineering support—that Google gave Epic to facilitate the launch of *Fortnite* on Play.

Google seeks a permanent injunction enjoining Epic, and all persons and entities in active concert or participation with Epic, from facilitating, assisting, or participating in the continued operation of Epic's unauthorized external payment mechanism in its apps, including *Fortnite*; the introduction of any further unauthorized external payment mechanisms into any apps, including *Fortnite*, on the Play store; and the removal of Epic's payment system as an available payment mechanism for in-app purchases through any Play store apps, including *Fortnite*.  Google also seeks a declaratory judgment that the DDA is a valid, lawful, and enforceable contract; that Epic breached that agreement; and that Google has the contractual right under the DDA to remove *Fortnite* from the Play store and terminate Epic as a registered Google Developer due to its breach.

### 2. *Counterclaims Against Match Group*

The Match Plaintiffs have profited immensely from Google Play.  Play has given the Match Plaintiffs a safe, secure platform to reach billions of Android users, and through that platform tens of millions of users have downloaded Match Plaintiffs apps.  The Match Plaintiffs' apps have also

1  benefited tremendously from Google's service fee model.  Because Google does not charge either

2  developer or user a fee to download apps, the Match Plaintiffs have been able to offer their apps to

3  users for free, building the large user base that is essential to the success of dating apps.

4      The Match Plaintiffs built their businesses knowing the deal.  But many of them refused to

5  use Google Play Billing and refused to pay Google services fees as required by the agreements they

6  signed.  Match Plaintiffs have earned hundreds of millions of dollars by using Google Play, but

7  seeks to further enrich itself by contending it should pay nothing at all to Google.

8      The Match Plaintiffs try to justify this refusal to honor their agreements and pay for what

9  they use by suggesting that they want to use their own billing systems to give consumers better

10  services.  That is not true.  The Match Plaintiffs do not want to use Google Play Billing because (1)

11  they do not want to pay what they agreed and (2) they do not want consumers to be able to easily

12  stop paying for Match Plaintiffs' products they no longer want.   The Match Plaintiffs make it

13  difficult for consumers to cancel subscriptions.  Google Play provides consumers with tools that

14  make it easier to cancel.  The Match Plaintiffs do not want consumers to have those tools because it

15  will hurt the Match Plaintiffs' bottom line.

16      For years, the Match Plaintiffs ignored Google's warnings that they were violating

17  Google's Payment Policy, but Google continued to work with the Match Plaintiffs as valued

18  customers to help them become compliant.  In September 2020, Google clarified its Payment

19  Policy, eliminating any pretext for the Match Plaintiffs' refusal to comply, and unambiguously

20  communicating that the Match Plaintiffs would not be able to continue using the Play store's

21  services without paying for them.  To avoid that result, the Match Plaintiffs misled Google for

22  nearly two years, intentionally and in bad faith, regarding their intention to ultimately comply with

23  Google's policies.  Match Plaintiffs, through their then-CEO and others, repeatedly told Google

24  that they were working on implementing Google Play's billing service on its apps.  In reliance on

25  those promises, Google extended the time for Match Plaintiffs to come into compliance, and

26  Google invested substantial resources to add features to Google Play Billing that would benefit

27  Match Plaintiffs.

28      Despite these representations, Match Plaintiffs never intended to comply with the Payments

1  Policy.  Behind the scenes, Match Plaintiffs were planning to launch a campaign to encourage users

2  to switch to alternative payment methods and to then challenge Google's policies in court.

3  Based on Match Plaintiffs' conduct, Google brings the following claims:  (1) a breach of

4  contract claim based on Match Plaintiffs' breach of the DDA's Payments Policy; (2) a claim for

5  breach of the implied covenant of good faith and fair dealing based on Match Plaintiffs' intentional

6  and bad-faith misrepresentations that it would make necessary modifications to comply with the

7  Payments Policy; (3) a claim for false promise based on Match Plaintiffs' intentional

8  misrepresentations that it would comply with the Payment's Policy, which induced Google to grant

9  extensions and invest its own substantial resources in helping Match Plaintiffs comply; and (4) a

10  quasi-contract/unjust enrichment claim because Match Plaintiffs have been unjustly enriched at

11  Google's expense by inducing Google to modify its billing system and provide distribution and

12  other services to Match Plaintiffs at Match Plaintiffs' request under the understanding that these

13  services were in furtherance of Match Plaintiffs bringing their apps into compliance with the

14  Payments Policy.  Google also seeks a declaratory judgment that (a) the DDA is a valid, lawful,

15  and enforceable contract; (b) Match Plaintiffs breached that agreement; and (c) Google has the

16  contractual right under the DDA to remove Match Plaintiffs' apps from Google Play and terminate

17  Match Plaintiffs as registered Google Developers due to their breach.

18  **E.     Epic's Statement Regarding the Substance of Google's Counterclaims and Epic's Counterclaim Defenses**

19

20  Google's counterclaims against Epic must fail because Google's Payments Policy and other

21  contractual provisions that form the basis of its claims are unlawful, as part of Google's unlawful

22  monopolization of the Android app distribution and in-app payment solutions markets.  The

23  illegality of these terms renders them unenforceable.  "The authorities from the earliest time to the

24  present unanimously hold that no court will lend its assistance in any way towards carrying out the

25  terms of an illegal contract." *McMullen v. Hoffman*, 174 U.S. 639, 654 (1899).  That defeats

26  Google's request for a declaratory judgment and its claims against Epic for breach of contract, for

27  breach of the implied covenant and for unjust enrichment.  Google's effort to cast itself as the

28

1   wronged party is both legally and equitably baseless because the restrictions that it chastises Epic

2   for breaching are a key part of how Google forecloses rivals and extracts supracompetitive profits.

3       **F.      Match Plaintiffs' Statement Regarding the Substance of Google's**
            **Counterclaims and Match's Counterclaim Defenses**

4

5           Google's counterclaims against the Match Plaintiffs fail for numerous reasons.  First,

    Google's Payments Policy forms the basis of each claim.  But as the Match Plaintiffs will

6   demonstrate at trial, Google's Payments Policy is illegal, including because it violates the antitrust

7   laws.  *See, e.g.*, *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77–82 (1982) ("[I]llegal promises will

8   not be enforced in cases controlled by federal law;" court would not enforce contract that violated

9   Sherman Act); *see also Lafortune v. Ebie*, 26 Cal. App. 3d 72, 74–75 (1972) ("A breach of state or

10  federal antitrust law may provide a valid defense in an action for breach of contract."); *Energex*

11  *Lighting Indus., Inc. v. N. Am. Philips Lighting Corp.*, 765 F. Supp. 93, 107 (S.D.N.Y. 1991) ("This

12  agreement is in violation of the Sherman Act and this court will not enforce it.").  Each of Google's

13  counterclaims fails for this reason alone.

14          Second, even if Google's Payments Policy were lawful, its counterclaims fail for other

15  reasons.  For years, the Match Plaintiffs' dating apps have offered in-app purchases through their

16  own billing systems, alongside or instead of Google's system, Google Play Billing, or "GPB."  The

17  Match Plaintiffs did so, historically, with Google's knowing acceptance and in compliance with

18  Google's DDA, which contained a provision allowing for use of non-GPB billing systems for apps

19  whose content could be consumed outside the app.  In reliance on that provision, and Google's

20  claims that Android is an "open" ecosystem, the Match Plaintiffs invested substantial resources

21  developing Android apps and establishing direct customer relationships with millions of Android

22  users.  Contrary to Google's false allegations, the Match Plaintiffs' billing systems provide better

23  experiences for customers, facilitate better customer services, offer more flexibility in payment

24  options, and enhance user safety.  Google wants the Match Plaintiffs to use Google's billing system

25  so Google can collect monopoly rents and harvest consumer transaction data.

26          In September 2020, Google unilaterally changed its rules, removing the "outside the app"

27  provision and requiring certain apps (including the apps owned/operated by Match Plaintiffs) to

28

1  exclusively use GPB.  After making this change, Google set a compliance deadline for the

2  unilateral change to the contract for September 30, 2021.

3          Google then extended the Match Plaintiffs' compliance deadline to this unilateral change to

4  the contract until March 31, 2022.  Google granted this extension to the Match Plaintiffs after they

5  filed a standard form and expressly noted that "Google's system is *not a suitable substitute* and

6  exclusive use of Google's systems *will meaningfully harm our users* (inflate prices) *& undermine*

7  *our business*."  This was consistent with the original contract and with the Match Plaintiffs' long-

8  standing position and communications to Google that they did not want to exclusively use GPB.

9  Google granted a similar extension to hundreds of other app developers as well.

10          Google's counterclaims thus mischaracterize the Match Plaintiffs' extension submissions as

11  a false promise that they would comply with Google's unilateral change to Payments Policy within

12  a particular timeframe.  But there was no promise.  And, in any event, Google did not justifiably

13  rely on any purported "promise" when granting the extension, as Match Plaintiffs' executives and

14  employees directly communicated to Google that Match Plaintiffs would *not* comply.  This is made

15  clear by the fact that Google internally did not believe that the Match Plaintiffs would exclusively

16  use GPB, which is consistent with what the Match Plaintiffs had been doing and telling Google for

17  years.

18          In short, Google's Payments Policy is unlawful, so each of Google's counterclaims fail.

19  But even if Google's Payments Policy were valid and enforceable, the evidence at trial will show

20  that (i) the Match Plaintiffs had no obligation to use GPB before March 31, 2022, so Google's

21  breach of contract and unjust enrichment claims fail for any prior period and (ii) Google's false

22  promise claim fails because Match Plaintiffs consistently told Google they objected to being forced

23  to comply with this unilateral change to the contract and exclusively use GPB and *never* promised

24  to exclusively integrate GPB (let alone made a promise that Google justifiably relied on).

25  **II.    RELIEF REQUESTED**

26          **A.    Plaintiffs' Common Requested Relief**

27  •  A judgment for Plaintiffs and against Google on all claims.

28

JOINT PRETRIAL STATEMENT
Case Nos. 3:21-md-02981-JD, 3:22-cv-02746-JD, 3:20-cv-05671-JD, 3:20-cv-05761-JD & 3:21-cv-05227-JD

- An injunction prohibiting Google's anti-competitive and unfair conduct and mandating that Google take all necessary steps to cease such conduct and to restore competition in the Android App Distribution Market and the Android In-App Billing Market.

- A declaration that the contractual restraints complained of are unlawful and unenforceable.

- Any other injunctive relief that the Court deems appropriate, after a hearing, to restore competition to the marketplace and any other equitable or injunctive relief necessary to prevent and remedy Google's anti-competitive conduct.

- Any further relief that the Court may deem just and fair.

**B.      States' Requested Additional Relief**

- Compensatory, consequential, and punitive, including treble, damages for injuries directly and proximately caused by Google, as described herein, according to proof.

- An award of prejudgment interest.

- An award of attorney's fees and costs.

- An award of disgorgement, restitution, and civil penalties under state antitrust, consumer protection, and unfair trade practice laws.

**C.      Consumers' Requested Additional Relief**

- Compensatory, consequential, and punitive, including treble, damages for injuries directly and proximately caused by Google.

- An award of prejudgment interest.

- An award of reasonable attorney's fees and full costs.

- Any restitutionary relief available to Consumers as a result of Google's violation of the UCL.

**D.      Epic's Requested Additional Relief**

- A judgment for Epic and against Google on all counterclaims.

**E.      Match Plaintiffs' Requested Additional Relief**

- Compensatory, consequential, and punitive, including treble, damages for injuries directly and proximately caused by Google, as described herein, according to proof.

- An award of prejudgment interest.

- An award of reasonable attorney's fees and full costs.

- Any restitutionary relief available to Match Plaintiffs as a result of Google's violation of the UCL.

- A judgment for Match Plaintiffs and against Google on all counterclaims.

**F.     Google's Requested Relief Against Epic**

- Compensatory damages for injuries directly and proximately caused by Epic.

- Restitution and disgorgement of all ill-gotten gains obtained by Epic.

- An award of prejudgment interest.

- An award of reasonable attorney's fees and full costs.

- Injunction permanently enjoining Epic, and all persons and entities in active concert or participation with Epic, from facilitating, assisting, or participating in (a) the continued operation of Epic's unauthorized external payment mechanism in its apps, including Fortnite; (b) the introduction of any further unauthorized external payment mechanisms into any apps, including Fortnite, on Google Play; and (c) the removal of Epic payment system as an available payment mechanism for in-app purchases through any Google Play apps, including Fortnite.

- Declaratory judgment that (a) the DDA is a valid, lawful, and enforceable contract, (b) Epic breached that agreement, and (c) Google has the contractual right under the DDA to remove Fortnite from Google Play and terminate Epic as a registered Google Developer due to its breach.

- A judgment for Google against Epic on all counterclaims.

**G.     Google's Requested Relief Against Match Plaintiffs**

- Compensatory damages for injuries directly and proximately caused by the Match Plaintiffs.

- Restitution and disgorgement of all ill-gotten gains obtained by the Match Plaintiffs.

- An award of prejudgment interest.

- An award of reasonable attorney's fees and full costs.

- Declaratory judgment that (a) the DDA is a valid, lawful, and enforceable contract, (b) the Match Plaintiffs breached that agreement, and (c) Google has the contractual right under the DDA to remove the Match Plaintiffs' apps from Google Play and terminate Match Group as a registered Google Developer due to the breach.

- A judgment for Google against Match Plaintiffs on all counterclaims

## III.   UNDISPUTED FACTS

The parties continue to meet and confer regarding which of the below-listed undisputed facts will be proposed for inclusion in the jury instructions.

### A.   Parties

1.      Defendant Google LLC ("Google LLC") is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google LLC is the primary operating subsidiary of Alphabet Inc. The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California.

2.      Defendant Google Ireland Limited ("Google Ireland") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland. Google Ireland is an indirect subsidiary of Google LLC.

3.      Defendant Google Commerce Ltd. ("Google Commerce") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland. Google Commerce is an indirect subsidiary of Google LLC.

4.      Defendant Google Asia Pacific Pte. Ltd. ("Google Asia Pacific") is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore. Google Asia Pacific is an indirect subsidiary of Google LLC.

5.      Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its principal place of business in Mountain View, California. Google Payment is a subsidiary of Google LLC.

6.      Plaintiff Mary Carr is a natural person who currently resides in the State of Washington.

7.      Plaintiff Daniel Egerter is a natural person who currently resides in the State of California.

8.      Plaintiff Zach Palmer is a natural person who currently resides in the State of Massachusetts.

9.      Plaintiff Serina Moglia is a natural person who currently resides in the State of New York.

10.     Plaintiff Matt Atkinson is a natural person who resides in the State of Wisconsin.

11.     Plaintiff Alex Iwamoto is a natural person who currently resides in the State of Georgia.

12.     The plaintiff States, Commonwealths, and Districts of Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Idaho, Indiana, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and West Virginia, by and through their respective Attorneys General (collectively, the "States") are states in which consumers of Android app distribution services and purchasers of Android in-app digital content using Google's payment solution reside.

13.     Plaintiff Match Group, LLC ("MGL") is a wholly owned, indirect subsidiary of Match Group, Inc. ("MGI"), a publicly traded Delaware corporation based in Dallas, Texas. MGL operates the Match® and Tinder® dating services.

14.     Plaintiff Humor Rainbow, Inc. is a wholly owned, indirect subsidiary of MGI. Humor Rainbow, Inc. is a New York corporation with its principal place of business in Dallas, Texas. Humor Rainbow, Inc. operates the OkCupid® dating service.

15.     Plaintiff PlentyofFish Media ULC is a wholly owned, indirect subsidiary of MGI. PlentyofFish Media ULC is a Canadian corporation with its principal place of business in Vancouver, British Columbia, Canada. PlentyofFish Media ULC operates the PlentyofFish® dating service.

16.     Plaintiff People Media, Inc. is a wholly owned, indirect subsidiary of MGI. People Media, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas. People Media, Inc. operates the OurTime® dating service, among others.

17.     Plaintiff Epic is a Maryland corporation with its principal place of business in Cary, North Carolina. Epic develops and distributes popular applications such as Fortnite and Rocket League, an app store known as the Epic Games Store, an in-app payment solution known as Epic Direct Pay, and Unreal Engine, a powerful software suite available to third-party developers that allows them to create digital content and apps.

**B.     Stipulated Facts Regarding the Parties' Claims**

1.     Google LLC is a wholly-owned subsidiary of Alphabet Inc.

2.     Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Ltd., and Google Payment Corp are subsidiaries of Google LLC.

3.     Google offers various products and services, including Android OS, Chrome, Gmail, Drive, Maps, Play, Search, YouTube, Google Cloud, and Search Ads 360.

4.     Google acquired the Android mobile operating system in 2005.

5.     A mobile operating system ("OS") provides multi-purpose computing functionality to a mobile device such as a smartphone or a tablet.

6.     To be useful to consumers, a mobile OS must be able to run software applications or "apps."

7.     A mobile OS facilitates the use of apps through code, such as application programming interfaces ("APIs"), which app developers use to create apps that are compatible with the OS.

8.     An "app" is software separate from the mobile OS that runs on a mobile device and adds specific functionalities to a mobile device.

9.     Consumers use apps to perform a variety of tasks on their mobile devices.

10.     Entities that manufacture mobile devices—such as Samsung or Motorola—are referred to as original equipment manufacturers ("OEMs").

11.     OEMs pre-install an OS on the mobile devices that they manufacture and sell.

12.     Instead of developing their own OS, almost all OEMs today license a third party's OS for their devices.

13.     Apple does not license iOS to other OEMs.

14.     The Google Play store is an app store owned by Google that distributes apps on devices running the Android OS.

15.     To distribute an app on the Google Play store, app developers must first enter into Google's Developer Distribution Agreement ("DDA").

16.     The predecessor to the Play store was called Android Market.

17.     Google launched Android Market in October 2008.

18.     Google's Android Market app store was rebranded as the Google Play store in March 2012.

19.     Google launched its in-app billing service in 2011.

20.     On August 13, 2020, Epic Games, Inc. ("Epic") filed *Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD.

21.     On July 7, 2021, the States, Commonwealths, and Districts of Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Idaho, Indiana, Iowa, Kentucky, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington, and West Virginia, by and through their respective Attorneys General (collectively, the "States"), filed *State of Utah, et al. v. Google LLC, et al.*, Case No. 3:21-cv-05227-JD.[19]

22.     On May 9, 2022, the Match Plaintiffs filed *Match Group, LLC et al. v. Google LLC et al.*, Case No. 3:22-cv-02746-JD.

23.     Timothy Sweeney is Epic's controlling shareholder, CEO, and board chairman.

---

[19] If a final settlement agreement is reached with the States and Consumers, Google does not stipulate to this fact being introduced to the jury.

1    24.    In April 2020, Epic made the decision to make *Fortnite* available for download

2    through the Play store.

3    25.    Epic and the Match Plaintiffs signed Google's DDA.

4    26.    Match.com launched on the web in 1995.

5    27.    The Match.com app was released on the Play store in 2010.

6    28.    The Tinder app was released on the Play store in 2013.

7    **IV.    DISPUTED FACTUAL ISSUES**

8    The Parties incorporate the disputed fact issues raised in their respective briefs filed in

9    connection with the pending motions for partial summary judgment.  ECF 486 (Match Plaintiffs'

10   Motion for Partial Summary Judgment); 483 (Google's Motion for Partial Summary Judgment).

11   As it relates to the disputed questions of fact regarding the relevant markets at issue

12   underlying the Plaintiffs' State and Federal Antitrust Claims (Section IV.A below), Google

13   contends that, per Court order, Plaintiffs are limited to the presentation of two relevant product

14   markets.  Sept. 8, 2023 Minute Entry, ECF 603 at 2 ("the experts will present testimony on no more

15   than two relevant markets"); Sept. 7 Hr'g Tx. at 39:15-16 ("But two markets, fine.  I don't want

16   two and a half markets or two markets plus this other thing.  Okay?").  Despite this clear directive

17   from the Court, Plaintiffs intend to present to the jury a *third* relevant antitrust market—for

18   licensable operating systems—on the basis that Google should have filed a motion *in limine* to

19   prevent them from doing so, despite  the Court's order limiting them to two markets.  Google

20   contends that no such motion *in limine* was required in light of the Court's order.  Indeed, that

21   order was correct.  Plaintiffs concede that they are not alleging anticompetitive effects in this third

22   market; they only allege harm in two downstream markets.  Defining a third market in which

23   Plaintiffs do not allege any harm to competition will merely confuse the jury about which markets

24   are actually relevant to the elements of Plaintiffs' antitrust claims.   The Court's order was therefore

25   sound.  If the Plaintiffs would like to seek relief from the Court's order, Google will be prepared to

26   address the merits of that application, including at the pretrial conference.

27   Plaintiffs disagree.  Google has been aware for over three years, since Epic filed its

28   complaint on August 13, 2020, that Plaintiffs allege the existence of three relevant markets.  And

just over a year ago, on October 3, 2022, Plaintiffs served their expert economist reports that

defined those markets: one that includes Google's Android OS, one that includes Google's Play

store, and one that includes Google Play Billing.  Google prepared its responsive expert reports and

deposed Plaintiffs' experts on these opinions.  Google did not bring a *Daubert* motion or move *in*

*limine* to exclude them.  Even now, Google does not identify any legal rule that would prohibit

Plaintiffs from explaining to the jury the markets that Plaintiffs believe are relevant to assessing

Google's conduct—because there is no such rule.

Instead, Google has opportunistically seized on an instruction the Court gave in the context

of addressing its concern about "experts on the same side having irreconcilable or conflicting views

of what the market is."  (Sept. 7 Hr'g Tx. at 39:23-25.)  There is no such conflict here.  As

discussed at the September 7, 2023 conference, Plaintiffs' economic experts will testify regarding

the anticompetitive effects that Google's conduct has caused in two markets: Android app

distribution and Android in-app payment solutions.  As part of that testimony, the experts will

explain that Google's power over OEMs through its control of the Android operating system

enables Google's anticompetitive conduct in the two harmed markets.  That is important evidence

for the jury to hear in order to understand a key source of Google's power and to see how Google

has been able to perpetuate its monopoly.  In fact, it is responsive to Google's arguments that

directly implicate conduct outside the two harmed markets.  Google's Trial Brief argues that its

anticompetitive conduct at issue is necessary so that Google's Android operating system can

compete with the Apple iOS operating system. Dkt. 639 at 1:8-9 ("The conduct challenged by Epic

and Match—agreements with phone manufacturers and developers, security policies, and a service

fee model—is how Android competes with Apple's iOS and other platforms.").  Google cannot

make operating systems a focal point of its case while simultaneously prohibiting evidence on the

power Google exploits through its Android operating system.  While Google may wish to keep that

evidence from the jury, the Court should reject Google's last-ditch attempt to try to arbitrarily

restrict the scope of Plaintiffs' long-disclosed expert testimony.

**A.    Disputed Questions of Fact Regarding Plaintiffs' State and Federal Antitrust Claims**

1.      Whether there is a relevant market for licensable mobile operating systems.

2.      Whether there is a relevant market for the distribution of Android apps (the Android App Distribution Market).

3.      Whether there is a relevant market for in-app billing services on Android devices (the Android In-App Billing Market).

4.      Whether the relevant geographic market is worldwide, except China; or in the alternative, whether trade has been unreasonably restrained or unlawfully monopolized by Google in a relevant geographic market of the United States.

*Unreasonable Restraint of Trade*

1.      Whether Google entered into contracts that unreasonably restrained trade in the Android App Distribution Market and the Android In-App Billing Market.

2.      Whether Google knowingly participated in a conspiracy to restrain trade in the Android App Distribution Market and the Android In-App Billing Market.

3.      Whether the challenged restraints have a substantial harmful effect on competition in the Android App Distribution Market and the Android In-App Billing Market.

4.      Whether the challenged restraints result in competitive benefits.

5.      If the challenged restraints result in competitive benefits, whether there was a substantially less restrictive alternative available.

6.      Whether the competitive harms on balance substantially outweigh the competitive benefits.[20]

*Per Se Unlawful Restraint of Trade*

1.      Whether Google and at least one of Activision; Riot Games; and Supercell agreed they would not compete with each other in the Android App Distribution Market.

---

[20] Google preserves for appellate review its objection that the law does not permit plaintiffs to prevail through balancing if they have failed to prove a substantially less restrictive alternative.

1       2.       Whether the Match Plaintiffs have suffered damages or injury from any such

2  agreement.

3       3.       Whether Epic has suffered injury from any such agreement.

4  ***Tying***

5       1.       Whether Android app distribution and Android in-app transaction billing services

6  are separate and distinct products.

7       2.       Whether Google exploited its control over the Android App Distribution Market to

8  force developers and consumers to use Google's in-app billing service, Google Play Billing, to

9  facilitate the sale of in-app digital goods within Android apps instead of competing in-app billing

10  services.

11       3.       Whether Google has sufficient market power in the Android App Distribution

12  Market to enable it to restrain competition in the Android In-App Billing Market.

13       4.       Whether the challenged tying arrangement has foreclosed a substantial volume of

14  commerce in the Android In-App Billing Market.

15       5.       Whether the challenged tying arrangement has unreasonably restrained trade in that

16  it has a substantial adverse effect on competition in the Android In-App Billing Market.

17       6.       Whether the challenged tying arrangement results in competitive benefits.

18       7.       If the challenged tying arrangement results in competitive benefits, whether there

19  was a substantially less restrictive alternative available.

20       8.       Whether the competitive harms on balance substantially outweigh the competitive

21  benefits.[21]

22  ***Monopolization/Attempt to Monopolize***

23       1.       Whether Google has monopoly power in an Android App Distribution Market and

24  an Android In-App Billing Market.

25

26

27

28  ---

[21] Google preserves for appellate review its objection that the law does not permit plaintiffs to
prevail through balancing if they have failed to prove a substantially less restrictive alternative.

2.      Whether Google willfully acquired or maintained monopoly power in an Android App Distribution Market and an Android In-App Billing Market by engaging in anticompetitive conduct.

3.      Whether Google had a specific intent to achieve monopoly power in an Android In-App Billing Market.

4.      Whether there was a dangerous possibility that Google would achieve its goal of monopoly power in an Android In-App Billing Market.

5.      Whether Google, as an alleged monopolist in the alleged markets, engaged in conduct that had a substantial harmful effect on competition in an Android App Distribution Market and an Android In-App Billing Market.

6.      Whether the alleged anticompetitive conduct results in competitive benefits.

7.      If the anticompetitive conduct results in competitive benefits, whether there was a substantially less restrictive alternative available.

8.      Whether the competitive harms on balance substantially outweigh the competitive benefits.[22]

**B.      Disputed Questions of Fact Regarding Plaintiffs' California Unfair Competition Law Claims  (for Court only, not jury)**

1.      Whether Google's alleged anticompetitive acts were unlawful.

2.      Whether Google's alleged anticompetitive acts were unfair.

3.      Whether Google's alleged anticompetitive acts were likely to deceive members of the consuming public.

4.      Whether the harm from Google's alleged anticompetitive acts outweighs the benefits.

**C.      Disputed Questions of Fact Regarding the States' State Law Claims**

1.      Whether Google's alleged anticompetitive acts were done knowingly.

2.      Whether Google's alleged anticompetitive acts were done willfully.

---

[22] Google preserves for appellate review its objection that the law does not permit plaintiffs to prevail through balancing if they have failed to prove a substantially less restrictive alternative.

1       3.     Whether Google made false and misleading statements about the dangers of

2 attempting to sideload apps on Android devices.

3       4.     Whether Google made false assurances that the Android OS would remain an "open

4 system."

5       5.     Whether Google made false and misleading assertions relating to security concerns

6 about alternatives to Google Play Billing.

7       6.     Whether Google's alleged misrepresentations concerned material facts.

8       7.     Whether Google's alleged deceptive trade practices harmed consumers.

9       8.     Whether Google's alleged deceptive trade practices significantly impacted the

10 public as actual or potential consumers of Google's goods or services.

11       9.     Whether Google's alleged misrepresentations were made with intent to defraud.

12       10.    Whether Google's alleged misrepresentations were made with intent that others rely

13 on those misrepresentations.

14       11.    Whether Google's alleged misrepresentations were made knowingly.

15       12.    Whether Google's alleged deceptive trade practices were engaged in willfully.

16       **D.**    **Disputed Questions of Fact Regarding the Match Plaintiffs' State Law Claims**

17 ***Tortious Interference with Contractual Relations***

18       1.     Whether Google's conduct prevented Match Plaintiffs' performance of their

19 contracts with Match Plaintiffs' dating app users, or makes performance more expensive or

20 difficult.

21       2.     Whether Google engaged in independently wrongful conduct apart from interfering

22 with Match's customer relationships.

23       3.     Whether Google, by engaging in alleged wrongful conduct, intended to disrupt the

24 performance of Match Plaintiffs' contracts, or knew that disruption was certain or substantially

25 certain to occur.

26

27

28

*Tortious Interference with Prospective Economic Relations*

1.      Whether Match Plaintiffs and users of Match Plaintiffs' dating apps were in an economic relationship that probably would have resulted in an economic benefit to Match Plaintiffs.

2.      Whether Google engaged in independently wrongful conduct apart from interfering with Match's customer relationships.

3.      Whether Google, by engaging in alleged wrongful conduct, intended to disrupt the relationship or knew that disruption of the relationship was certain or substantially certain to occur.

4.      Whether Google's alleged wrongful conduct disrupted the relationships between Match Plaintiffs and users of Match Plaintiffs' dating apps.

**E.      Disputed Questions of Fact Regarding Google's Counterclaims Against Epic**

1.      Whether the challenged provisions of the DDA entered into by Google and Epic are lawful, valid and enforceable.

2.      Whether, and to what extent, Epic's actions were undertaken in bad faith and unfairly frustrated Google's rights under the DDA.

3.      Whether the challenged portions of the DDA cover the same subject matter as the conduct that is the basis for Google's claim for breach of the implied covenant of good faith and fair dealing.

4.      Whether, and to what extent, Epic was unjustly enriched.

5.      Whether the challenged portions of the DDA cover the same subject matter as the conduct that is the basis for Google's claim for unjust enrichment.

**F.      Disputed Questions of Fact Regarding Google's Counterclaims Against Match Plaintiffs**

1.      Whether the challenged provisions of the DDA are valid, lawful, and enforceable.

2.      Whether Match Plaintiffs made a promise to comply with Google's Payments Policy.

3.      If Match Plaintiffs made a promise to comply with Google's Payments Policy, whether Match Plaintiffs had intent not to perform the promise when they made it.

4.      If Match Plaintiffs made a promise to comply with Google's Payments Policy, whether Match Plaintiffs made the promise with intent to deceive or induce Google's reliance.

5.      If Match Plaintiffs made a promise to comply with Google's Payments Policy, whether Google reasonably relied on the promise.

6.      Whether Google believed Match Plaintiffs would comply with the Payments Policy by April 2022.

7.      If Match Plaintiffs made a promise to comply with Google's Payments Policy, whether Match Plaintiffs acted with fraud, oppression, or malice.

8.      Whether Google modified the DDA such that the Match Plaintiffs were not required to comply with Google's Payments Policy until after March 31, 2022.

9.      Whether Google waived the requirement of Match Plaintiffs complying with Google's Payments Policy until March 31, 2022.

## V.      DISPUTED LEGAL ISSUES

The Parties incorporate by reference the disputed legal issues raised in their respective briefs filed in connection with the pending motions for partial summary judgment. ECF 486 (Match Plaintiffs' Motion for Partial Summary Judgment); 483 (Google's Motion for Partial Summary Judgment).  Assuming that Plaintiffs' claims are tried together, the Parties agree that a jury should decide all issues of liability and damages, except that Plaintiffs' UCL claims will be tried solely to the Court.

### A.      Disputed Questions of Law Regarding Plaintiffs' Antitrust Claims

1.      Whether the evidence establishes a violation of Sherman Act Section 1 and the antitrust, consumer protection, and unfair trade practice laws of various States, Commonwealths, and Districts by Google.

2.      Whether the evidence establishes a violation of Sherman Act Section 2 and the antitrust, consumer protection, and unfair trade practice laws of various States, Commonwealths, and Districts by Google.

3.      Whether Plaintiffs' Sherman Act Section 1 claims involving Google's contracts with Games Velocity Program developers are in fact subject to *per se* treatment.

4.      Whether Plaintiffs' tying claims are in fact subject to *per se* treatment.

**B.      Disputed Questions of Law Regarding Plaintiffs' California Unfair Competition Law claims (UCL claims are for Court, not jury)**

1.      Whether the evidence establishes a violation of California's Unfair Competition Law by Defendants.

2.      Whether Google's conduct constitutes an unlawful, unfair, or deceptive business act or practice within the meaning of the UCL.

3.      Whether injunctive relief is appropriate to protect the public from Google's alleged unlawful, unfair, or deceptive conduct.

**C.      Disputed Questions of Law Regarding the States' Consumer Protection and Unfair Trade Practice Claims**

1.      Whether the evidence establishes a violation of the consumer protection and unfair trade practice laws of various States, Commonwealths, and Districts by Google.

**D.      Disputed Questions of Law Regarding the Match Plaintiffs' State Law Claims**

1.      Whether the evidence establishes that Google tortiously interfered with Match Plaintiffs' contractual relations, in violation of California law.

2.      Whether the evidence establishes that Google tortiously interfered with Match Plaintiffs' prospective economic advantage, in violation of California law.

**E.      Disputed Questions of Law Regarding Google's Counterclaims Against Match Plaintiffs**

1.      Whether the evidence establishes Match Plaintiffs breached the DDA, in violation of California law.

2.      Whether the evidence establishes Match Plaintiffs breached the implied covenant of good faith and fair dealing, in violation of California law.

3.      Whether the evidence establishes Match Plaintiffs made a false promise, in violation of California law.

4.      Whether the challenged provisions of the DDA are valid, lawful, and enforceable.

5.      Whether Google has the contractual right under the DDA to remove Match Plaintiffs' apps from Google Play and terminate Match Plaintiffs as registered Google Developers due to their alleged breach.

6.      Whether Google can assert a quasi-contract claim, in the alternative, where a contract, the DDA, governs the relationship between Google and Match Plaintiffs.

7.      Whether Match Plaintiffs were unjustly enriched by Google.

**F.    Disputed Questions of Law Regarding Google's Counterclaims Against Epic**

1.      Whether the challenged provisions of the DDA are valid, lawful, and enforceable.

2.      Whether the evidence establishes Epic breached the DDA, in violation of California law.

3.      Whether the evidence establishes Epic breached the implied covenant of good faith and fair dealing, in violation of California law.

4.      Whether Google has the contractual right under the DDA to remove Epic's apps from Google Play and terminate Epic as a registered Google Developer due to its alleged breach.

5.      Whether Google can assert a quasi-contract claim, in the alternative, where a contract, the DDA, governs the relationship between Google and Epic.

6.      Whether Epic was unjustly enriched by Google.

## VI.    STIPULATIONS

The Parties stipulate that:

1.      All documents produced by Parties and listed on the joint exhibit list shall be deemed to be true and correct copies of documents maintained in the producing party's files as of the date that party collected the document(s) under Federal Rule of Evidence 901, unless an opposing party raises a good faith objection to authenticity as to any document or based on evidence adduced at trial.  All other objections to trial exhibits are preserved.

2.      The Parties agree that summary exhibits under Federal Rule of Evidence 1006 may be disclosed to the opposing party by October 23, 2023, with objections to any such exhibits to be due October 30, 2023.

3.      All documents produced by Parties, listed on the joint exhibit list, and clearly demarcated as either a "Party Contract" or a "Party Data Set" shall be deemed admissible by all Parties.  Unless requested otherwise by the Court, the Parties further agree such documents do not need to include a description of the exhibit's purpose or identify any sponsoring witness.  The Parties reserve the right to object to the introduction into evidence of any such Party Contract or Party Data Set, including but not limited to on the basis of FRE 402, 403 or 602 depending on the purpose for which an opposing party seeks to introduce it.

4.      Documents used at a deposition that occurs after a deadline pertaining to exhibit lists may be added to the exhibit list following the deposition.  The Parties further agree that any such exhibits should be added within seven days after the deposition occurs, except that if the deposition occurs less than two weeks before trial, the exhibits should be added to the exhibit list within three days.

5.      Except for expert witnesses and a designated representative for each party, witnesses will be excluded from the courtroom during trial until they are excused.

6.      In accordance with Federal Rule of Evidence 703, the Parties may present expert testimony that is based on facts or data that are not admissible or have not been admitted in the case.  When permitted by Rule 703, a testifying expert may disclose such bases to the jury, provided that the bases for such testimony satisfy the requirements of Rule 703 and that the expert's testimony otherwise satisfies the Federal Rules of Evidence.

The Parties continue to discuss additional potential evidentiary stipulations.

## VII.    BIFURCATION

The Parties agree that the damages claims of all Plaintiffs that seek damages should be tried to the jury together with issues of liability.  Plaintiffs have previously requested bifurcation of Google's counterclaims against Epic and the Match Plaintiffs from Plaintiffs' antitrust claims, which this Court denied. (Dkt. No. 603)

As to any trial, hearing or other proceeding on equitable relief, Plaintiffs believe that if there is a liability finding against Google such proceedings should proceed expeditiously, and would propose that the Court set aside time in late January or early February 2024 for any

proceedings that may be necessary regarding such relief.  Google submits that the timing and format of any such proceedings should be decided after the jury trial concludes.  (See ECF 505 at 12-13.)

**VIII.    SETTLEMENT**

The States, Consumers, and Google have reached an agreement in principle to settle this case and are in the process of finalizing a long-form settlement agreement to submit to the Court for approval. (Dkt. No. 596 at 1)

**IX.    ESTIMATE OF TRIAL LENGTH**

**A.    <u>Trial Length</u>**

The Court directed the parties to discuss a reduction of trial hours in the event of a final settlement between Google and the States and Consumers.  ECF 603 at 2.

Consistent with the Parties' prior proposal (Dkt. No 505 at 4), Plaintiffs continue to recommend a trial limit of 100 hours.  For reference, in *Epic v. Apple*, the Court allocated 90 hours for a single-plaintiff bench trial in which no damages were sought and there were no counterclaim defenses to be tried other than the defense of illegality, which overlapped with the plaintiff's main claims.  Further, the court admitted eight hours of deposition testimony and written direct testimony from the experts with no reduction in the Parties' allocated 90 hours.  Here, even if States and Consumers settle, there will still be the additional time associated with a jury trial and there will still be two plaintiffs, damages claims brought by both Match and Google, and unique counterclaim defenses.

Google contends that if Epic and the Match Plaintiffs remain as the only plaintiffs, then there should be a trial limit of 90 hours.  The 100-hour limit was predicated on the State Plaintiffs and the Consumer Plaintiffs making opening and closing statements and putting on their own evidence. There are fact and expert witnesses that will not need to be presented if the State Plaintiffs and the Consumer Plaintiffs are no longer participating in the trial.  A reduction in hours

JOINT PRETRIAL STATEMENT
Case Nos. 3:21-md-02981-JD, 3:22-cv-02746-JD, 3:20-cv-05671-JD, 3:20-cv-05761-JD & 3:21-cv-05227-JD

1  is therefore appropriate.

2       The Parties agree that this time should include all components of each side's presentation,

3  including opening and closing statements, witness examinations, and the presentation of deposition

4  or written discovery designations to the jury.

5

6       If there is no final settlement between Google and the States and Consumers, then the

   Parties continue to recommend a trial limit of 100 hours, consistent with their prior proposal (Dkt.

7  No 505 at 4).

8       **B.**     **Allocation of Trial Time**

9       The Parties agree that trial time will be evenly divided between the Plaintiffs as a group and

10 Google.  Trial time shall be kept pursuant to the procedures set forth in Paragraph 34 of the Court's

11 Standing Order for Civil Jury Trials.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT PRETRIAL STATEMENT
Case Nos. 3:21-md-02981-JD, 3:22-cv-02746-JD, 3:20-cv-05671-JD, 3:20-cv-05761-JD & 3:21-cv-05227-JD

DATED:                                    HUESTON HENNIGAN LLP


                                          By:  s/ Douglas J. Dixon
                                              Douglas J. Dixon
                                              Counsel for Plaintiffs
                                              Match Group, LLC, Humor Rainbow, Inc.,
                                              PlentyofFish Media ULC, and People Media, Inc.


DATED:                                    OFFICE OF THE UTAH ATTORNEY GENERAL


                                          By:  s/ Brendan P. Glackin
                                              Brendan P. Glackin
                                              Lauren M. Weinstein
                                              *Counsel for Plaintiff States*


DATED:                                    BARTLIT BECK LLP


                                          By:  s/ Karma M. Giulianelli
                                              Karma M. Giulianelli
                                              *Co-Lead Counsel for Consumer Plaintiffs*


DATED:                                    KAPLAN FOX & KILSHEIMER LLP


                                          By:  s/ Hae Sung Nam
                                              Hae Sung Nam
                                              *Co-Lead Counsel for Consumer Plaintiffs*

1  DATED:                              CRAVATH, SWAINE & MOORE LLP

2

3                                      By:   s/ Gary A. Bornstein

4                                            Gary A. Bornstein (*pro hac vice*)
                                             *Counsel for Plaintiff Epic Games, Inc.*
5

6

7  DATED:                              MUNGER, TOLLES & OLSON LLP

8

9                                      By:   s/ Glenn D. Pomerantz

10                                           Glenn D. Pomerantz
                                             *Attorneys for Defendants Google LLC et al.*
11

12

13  DATED:                             MORGAN, LEWIS & BOCKIUS LLP

14

15                                     By:   s/ Brian C. Rocca

16                                           Brian C. Rocca
                                             *Attorneys for Defendants Google LLC et al.*
17

18

19

20

21

22

23

24

25

26

27

28

JOINT PRETRIAL STATEMENT
Case Nos. 3:21-md-02981-JD, 3:22-cv-02746-JD, 3:20-cv-05671-JD, 3:20-cv-05761-JD & 3:21-cv-05227-JD

1

**CIVIL L.R. 5-1(i)(3) ATTESTATION**

2

Pursuant to Civil L.R. 5-1(i)(3), the filer of this document attests that concurrence in the

3

filing of the document has been obtained from each of the other signatories.

4

By:   *Dane P. Shikman*
Dane P. Shikman

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT PRETRIAL STATEMENT
Case Nos. 3:21-md-02981-JD, 3:22-cv-02746-JD, 3:20-cv-05671-JD, 3:20-cv-05761-JD & 3:21-cv-05227-JD