Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE &**
**REATH LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000

*Counsel for Plaintiff Epic Games, Inc.*

[Additional counsel appear on signature page]

Douglas J. Dixon (SBN 275389)
ddixon@hueston.com
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone: (949) 229-8640

*Counsel for Plaintiffs Match Group, LLC, et al.*

Glenn D. Pomerantz (SBN 112503)
glenn.pomerantz@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Brian C. Rocca (SBN 221576)
brian.rocca@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

*Counsel for Defendants Google LLC et al*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

**IN RE GOOGLE PLAY STORE
ANTITRUST LITIGATION**

THIS DOCUMENT RELATES TO:

*Epic Games, Inc. v. Google LLC et al.*,
Case No. 3:20-cv-05671-JD

*Match Group, LLC et al. v. Google LLC et al.*,
Case No. 3:22-cv-02746-JD

Case No. 3:21-md-02981-JD

**JOINT SET OF PROPOSED
FINAL JURY INSTRUCTIONS
AND OBJECTIONS**

Judge:  Hon. James Donato
Trial Date:  November 6, 2023
Time:  9:00 am
Place:  Courtroom 11, 19th Floor

# **TABLE OF CONTENTS**

Stipulated Instruction No. 1 Re DUTIES OF JURY TO FIND FACTS AND FOLLOW LAW........ 12

Stipulated Instruction No. 2 Re CLAIMS AND DEFENSES ............................................................ 13

Stipulated Instruction No. 3 Re BURDEN OF PROOF – PREPONDERANCE OF THE
    EVIDENCE.............................................................................................................................. 15

Stipulated Instruction No. 4 Re CORPORATIONS - FAIR TREATMENT ...................................... 16

Stipulated Instruction No. 5 Re WHAT IS EVIDENCE .................................................................... 17

Stipulated Instruction No. 6 Re WHAT IS NOT EVIDENCE ........................................................... 18

Stipulated Instruction No. 7 Re DIRECT AND CIRCUMSTANTIAL EVIDENCE ......................... 19

Stipulated Instruction No. 8 Re DEPOSITION IN LIEU OF LIVE TESTIMONY ........................... 20

Stipulated Instruction No. 9 Re RULING ON OBJECTIONS ........................................................... 21

Stipulated Instruction No. 10 Re CREDIBILITY OF WITNESSES .................................................. 22

Disputed Instruction No. 11  CHAT SPOLIATION ADVERSE INFERENCE INSTRUCTION ..... 23

Stipulated Instruction No. 12 Re EXPERT OPINION ....................................................................... 24

Stipulated Instruction No. 13 Re STIPULATIONS OF FACT ........................................................... 25

Stipulated Instruction No. 14 Re CHARTS AND SUMMARIES ...................................................... 26

Disputed Instruction No. 15  ANTITRUST LAWS—PURPOSE  Offered by Plaintiffs.................... 27

Disputed Instruction No. 15 Re ANTITRUST LAWS—PURPOSE  Offered by Defendants............. 28

Plaintiffs' Argument Re Disputed Instruction No. 15 ANTITRUST LAWS—PURPOSE ................ 29

Defendants' Argument Re Disputed Instruction No. 15 ANTITRUST LAWS—PURPOSE............. 31

Disputed Instruction No. 16 Re SECTION 2 OF THE SHERMAN ACT –
    MONOPOLIZATION – ELEMENTS  Offered by Plaintiffs.................................................... 32

Disputed Instruction No. 16 Re SECTION 2 OF THE SHERMAN ACT –
    MONOPOLIZATION – ELEMENTS Offered by Defendants ................................................. 33

Plaintiffs' Argument Re Disputed Instruction No. 16 SECTION 2 OF THE SHERMAN ACT –
    MONOPOLIZATION – ELEMENTS.................................................................................... 34

Defendants' Argument Re Disputed Instruction No. 16 SECTION 2 OF THE SHERMAN ACT
    – MONOPOLIZATION – ELEMENTS................................................................................. 36

Disputed Instruction No. 17 Re MONOPOLIZATION – MONOPOLY POWER – DEFINED
    Offered by Plaintiffs ............................................................................................................ 37

Disputed Instruction No. 17 Re MONOPOLIZATION – MONOPOLY POWER – DEFINED
    Offered by Defendants.......................................................................................................... 38

Plaintiffs' Argument Re Disputed Instruction No. 17 MONOPOLIZATION – MONOPOLY POWER – DEFINED ........................................................................................................ 39

Defendants' Argument Re Disputed Instruction No. 17 MONOPOLIZATION – MONOPOLY POWER – DEFINED ........................................................................................................ 41

Disputed Instruction No. 18 Re MONOPOLIZATION – RELEVANT PRODUCT MARKET Offered by Plaintiffs ................................................................................................. 42

Disputed Instruction No. 18 Re MONOPOLIZATION – RELEVANT PRODUCT MARKET Offered by Defendants ............................................................................................... 43

Plaintiffs' Argument Re Disputed Instruction No. 18 MONOPOLIZATION – RELEVANT PRODUCT MARKET ........................................................................................ 45

Defendants' Argument Re Disputed Instruction No. 18 MONOPOLIZATION – RELEVANT PRODUCT MARKET ........................................................................................ 47

Disputed Instruction No. 19 Re RELEVANT PRODUCT MARKET – AFTERMARKETS Offered by Plaintiffs ................................................................................................. 48

Disputed Instruction No. 19 Re RELEVANT PRODUCT MARKET – AFTERMARKETS Offered by Defendants ............................................................................................... 49

Plaintiffs' Argument Re Disputed Instruction No. 19 RELEVANT PRODUCT MARKET – AFTERMARKETS ........................................................................................ 50

Defendants' Argument Re Disputed Instruction No. 19 RELEVANT PRODUCT MARKET – AFTERMARKETS ........................................................................................ 52

Disputed Instruction No. 20 Re RELEVANT PRODUCT MARKET –SUPPLY SUBSTITUTABILITY  Offered by Plaintiffs ........................................................................... 54

Disputed Instruction No. 20 Re RELEVANT PRODUCT MARKET –SUPPLY SUBSTITUTABILITY  Offered by Defendants ........................................................................ 55

Plaintiffs' Argument Re Disputed Instruction No. 20 RELEVANT PRODUCT MARKET – SUPPLY SUBSTITUTABILITY ........................................................................... 56

Defendants' Argument Re Disputed Instruction No. 20 RELEVANT PRODUCT MARKET – SUPPLY SUBSTITUTABILITY ........................................................................... 58

Disputed Instruction No. 21 Re RELEVANT GEOGRAPHIC MARKET Offered by Plaintiffs....... 59

Disputed Instruction No. 21  RELEVANT GEOGRAPHIC MARKET  Offered by Defendants ...... 60

Plaintiffs' Argument Re Disputed Instruction No. 21 RELEVANT GEOGRAPHIC MARKET ...... 61

Defendants' Argument Re Disputed Instruction No. 21 RELEVANT GEOGRAPHIC MARKET ........................................................................................................................ 63

Disputed Instruction No. 22 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – TYPES OF PROOF Offered by Plaintiffs ....................................................... 64

Disputed Instruction No. 22 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – TYPES OF PROOF Offered by Defendants ..................................................... 65

Plaintiffs' Argument Re Disputed Instruction No. 22 MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – TYPES OF PROOF.................................................................. 66

Defendants' Argument Re Disputed Instruction No. 22 MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – TYPES OF PROOF ........................................... 68

Disputed Instruction No. 23 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF  Offered by Plaintiffs ...................................... 69

Disputed Instruction No. 23 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF  Offered by Defendants ............................................. 71

Plaintiffs' Argument Re Disputed Instruction No. 23 MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF.................................................................. 73

Defendants' Argument Re Disputed Instruction No. 23 MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF ........................................ 75

Disputed Instruction No. 24 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF  Offered by Plaintiffs ........................................... 77

Disputed Instruction No. 24 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF  Offered by Defendants ....................................... 80

Plaintiffs' Argument Re Disputed Instruction No. 24 MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF ...................................... 82

Defendants' Argument Re Disputed Instruction No. 24 MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF ....................... 84

Disputed Instruction No. 25 Re MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS  Offered by Plaintiffs ....................................... 86

Disputed Instruction No. 25 Re MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS Offered by Defendants............................................. 89

Plaintiffs' Argument Re Disputed Instruction No. 25 MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS ........................................................ 93

Plaintiffs' Argument Re Inclusion of Section 1 Instructions in Disputed Instruction No. 25 MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS ....................................... 95

Defendants' Argument Re Disputed Instruction No. 25 MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS ........................................................ 97

Stipulated Instruction No. 27 Re ATTEMPT TO MONOPOLIZE – ELEMENTS ........................... 99

Stipulated Instruction No. 28 Re ATTEMPTED MONOPOLIZATION – ANTICOMPETITIVE CONDUCT ....................................................................... 100

Stipulated Instruction No. 29 Re ATTEMPTED MONOPOLIZATION – SPECIFIC INTENT ..... 101

Stipulated Instruction No. 30 Re ATTEMPTED MONOPOLIZATION – DANGEROUS
   PROBABILITY OF SUCCESS ....................................................................... 103

Stipulated Instruction No. 31 Re SECTION 1 – RESTRAINT OF TRADE .................................... 104

Disputed Instruction No. 32 Re SECTION 1 – RESTRAINT OF TRADE – PER SE
   AGREEMENT NOT TO COMPETE  Offered by Plaintiffs .................................................. 105

Disputed Instruction No. 32 Re SECTION 1 – RESTRAINT OF TRADE – PER SE
   AGREEMENT NOT TO COMPETE  Offered by Defendants ............................................. 107

Plaintiffs' Argument Re Disputed Instruction No. 32 SECTION 1 – RESTRAINT OF TRADE
   – PER SE AGREEMENT NOT TO COMPETE ................................................................. 108

Defendants' Argument Re Disputed Instruction No. 32 SECTION 1 – RESTRAINT OF
   TRADE – PER SE AGREEMENT NOT TO COMPETE .................................................... 110

Disputed Instruction No. 33 Re AGREEMENT—DEFINITION, EXISTENCE, AND
   EVIDENCE  Offered by Plaintiffs ........................................................................ 112

Disputed Instruction No. 33 Re AGREEMENT—DEFINITION, EXISTENCE, AND
   EVIDENCE  Offered by Defendants ..................................................................... 114

Plaintiffs' Argument Re Disputed Instruction No. 33 AGREEMENT—DEFINITION,
   EXISTENCE, AND EVIDENCE .................................................................................. 115

Defendants' Argument Re Disputed Instruction No. 33 AGREEMENT—DEFINITION,
   EXISTENCE, AND EVIDENCE .................................................................................. 117

Disputed Instruction No. 34 Re GOOD INTENT NOT A DEFENSE  Offered by Plaintiffs ........... 119

Disputed Instruction No. 34 Re GOOD INTENT NOT A DEFENSE  Offered by Defendants ....... 120

Plaintiffs' Argument Re Disputed Instruction No. 34 GOOD INTENT NOT A DEFENSE ............ 121

Defendants' Argument Re Disputed Instruction No. 34 GOOD INTENT NOT A DEFENSE ........ 123

Disputed Instruction No. 35 Re RULE OF REASON - SECTION ONE CLAIMS  Offered by
   Plaintiffs ............................................................................................................ 124

Disputed Instruction No. 35 Re RULE OF REASON - SECTION ONE CLAIMS  Offered by
   Defendants ......................................................................................................... 125

Plaintiffs' Argument Re Disputed Instruction No. 35 RULE OF REASON - SECTION ONE
   CLAIMS .............................................................................................................. 127

Defendants' Argument Re Disputed Instruction No. 35 RULE OF REASON - SECTION ONE
   CLAIMS .............................................................................................................. 129

The Court should adopt Google's proposed instruction, which tracks controlling precedent and
   accurately defines market power, and thereby provides the proper guidance to the jury
   to perform its task under the rule of reason ....................................................................... 129

Disputed Instruction No. 36 Re RULE OF REASON: PROOF OF COMPETITIVE HARM
   Offered by Plaintiffs ............................................................................................. 130

JOINT SET OF PROPOSED FINAL JURY INSTRUCTIONS AND OBJECTIONS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:22-cv-02746-JD

4

Disputed Instruction No. 36 Re RULE OF REASON: PROOF OF COMPETITIVE HARM Offered by Defendants ........................................................................................ 132

Plaintiffs' Argument Re Disputed Instruction No. 36 RULE OF REASON: PROOF OF COMPETITIVE HARM ........................................................................................ 133

Defendants' Argument Re Disputed Instruction No. 36 RULE OF REASON: PROOF OF COMPETITIVE HARM ........................................................................................ 135

Disputed Instruction No. 37 Re RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS  Offered by Plaintiffs .......................................................................... 137

Disputed Instruction No. 37 Re RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS  Offered by Defendants ....................................................................... 138

Plaintiffs' Argument Re Disputed Instruction No. 37 RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS ............................................................................. 139

Defendants' Argument Re Disputed Instruction No. 37 RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS ............................................................................. 141

Disputed Instruction No. 38 Re RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS  Offered by Plaintiffs ............................................................................. 143

Disputed Instruction No. 38 Re RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS  Offered by Defendants ......................................................................... 144

Plaintiffs' Argument Re Disputed Instruction No. 38 RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS ............................................................................. 145

Defendants' Argument Re Disputed Instruction No. 38 RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS ............................................................................. 147

Stipulated Instruction No. 39 Re INTRODUCTION TO TYING .................................................... 149

Stipulated Instruction No. 40 Re RATIONALE FOR PROHIBITION OF TYING ARRANGEMENTS ................................................................................................ 150

Disputed Instruction No. 41 Re ELEMENTS – PER SE ILLEGAL TYING  Offered by Plaintiffs ................................................................................................................ 151

Disputed Instruction No. 41 Re ELEMENTS – PER SE ILLEGAL TYING  Offered by Defendants ............................................................................................................ 152

Plaintiffs' Argument Re Disputed Instruction No. 41 ELEMENTS – PER SE ILLEGAL TYING ................................................................................................................... 153

Defendants' Argument Re Disputed Instruction No. 41 ELEMENTS – PER SE ILLEGAL TYING ................................................................................................................... 154

Disputed Instruction No. 42 Re ELEMENTS – RULE OF REASON TYING  Offered by Plaintiffs ................................................................................................................ 155

Disputed Instruction No. 42 Re ELEMENTS – TYING UNDER THE RULE OF REASON Offered by Defendants ......................................................................................... 156

Plaintiffs' Argument Re Disputed Instruction No. 42 ELEMENTS – TYING UNDER THE RULE OF REASON ........................................................................................................ 157

Defendants' Argument Re Disputed Instruction No. 42 ELEMENTS – TYING UNDER THE RULE OF REASON ........................................................................................................ 158

Disputed Instruction No. 43 Re TYING – PER SE AND RULE OF REASON: PRESENCE OF TWO PRODUCTS  Offered by Plaintiffs ................................................................. 159

Disputed Instruction No. 43 Re TYING – PRESENCE OF TWO PRODUCTS  Offered by Defendants ................................................................................................................ 160

Plaintiffs' Argument Re Disputed Instruction No. 43 TYING – PER SE AND RULE OF REASON: PRESENCE OF TWO PRODUCTS ................................................................ 161

Defendants' Argument Re Disputed Instruction No. 43 TYING – PER SE AND RULE OF REASON: PRESENCE OF TWO PRODUCTS ................................................................ 162

Disputed Instruction No. 44 Re TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING  Offered by Plaintiffs ................................................................. 163

Disputed Instruction No. 44 Re TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING  Offered by Defendants ............................................................... 164

Plaintiffs' Argument Re Disputed Instruction No. 44 TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING ................................................................... 165

Defendants' Argument Re Disputed Instruction No. 44 TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING ................................................................... 166

Disputed Instruction No. 45 Re TYING – PER SE AND RULE OF REASON: EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT  Offered by Plaintiffs ................................................................................................................. 167

Disputed Instruction No. 45 Re EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT  Offered by Defendants .......................................................... 168

Plaintiffs' Argument Re Disputed Instruction No. 45 EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT ................................................... 169

Defendants' Argument Re Disputed Instruction No. 45 EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT ................................................... 170

Disputed Instruction No. 46  TYING – PER SE AND RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT Offered by Plaintiffs ............................................................................. 171

Disputed Instruction No. 46 Re TYING – RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT Offered by Defendants .......................................................................... 172

Plaintiffs' Argument Re Disputed Instruction No. 46 TYING – PER SE AND RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT ................................................................... 173

JOINT SET OF PROPOSED FINAL JURY INSTRUCTIONS AND OBJECTIONS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:22-cv-02746-JD

6

Defendants' Argument Re Disputed Instruction No. 46 TYING – PER SE AND RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT ........................................................ 174

Disputed Instruction No. 47 Re TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE  Offered by Plaintiffs ........................................ 176

Disputed Instruction No. 47 Re TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE  Offered by Defendants .................................... 178

Plaintiffs' Argument Re Disputed Instruction No. 47 TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE ................................................ 179

Defendants' Argument Re Disputed Instruction No. 47 TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE ................................................ 181

Disputed Instruction No. 48 Re INJURY AND CAUSATION  Offered by Plaintiffs .................... 183

Disputed Instruction No. 48 Re INJURY AND CAUSATION  Offered by Defendants ................. 185

Plaintiffs' Argument Re Disputed Instruction No. 48 INJURY AND CAUSATION ..................... 187

Defendants' Argument Re Disputed Instruction No. 48 INJURY AND CAUSATION ................... 188

Stipulated Instruction No. 49 Re INJURY TO BUSINESS OR PROPERTY ................................. 189

Disputed Instruction No. 50 Re STATUTE OF LIMITATIONS Offered by Plaintiffs .................... 190

Disputed Instruction No. 50  STATUTE OF LIMITATIONS  Offered by Defendants ................... 191

Plaintiffs' Argument Re Disputed Instruction No. 50 STATUTE OF LIMITATIONS ................... 192

Defendants' Argument Re Disputed Instruction No. 50 STATUTE OF LIMITATIONS ............... 194

Stipulated Instruction No. 51 Re MATCH's DAMAGES .......................................................... 196

Stipulated Instruction No. 52 Re ANTITRUST DAMAGE ........................................................ 197

Stipulated Instruction No. 53 Re ANTITRUST DAMAGE - INTRODUCTION AND PURPOSE ................................................................................................................ 198

Stipulated Instruction No. 54 Re DAMAGES ON MULTIPLE LEGAL THEORIES .................... 199

Disputed Instruction No. 55 Re INTERFERENCE WITH CONTRACTUAL RELATIONS Offered by Match ................................................................................................ 200

Disputed Instruction No. 55 Re INTERFERENCE WITH CONTRACTUAL RELATIONS Offered by Defendants ........................................................................................ 201

Plaintiffs' Argument Re Disputed Instruction No. 55 INTERFERENCE WITH CONTRACTUAL RELATIONS ............................................................................ 202

Defendants' Argument Re Disputed Instruction No. 55 INTERFERENCE WITH CONTRACTUAL RELATIONS ............................................................................ 204

Stipulated Instruction No. 56 Re INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS ........................................................................................... 205

Stipulated Instruction No. 57 Re PRIVILEGE TO PROTECT OWN ECONOMIC INTEREST .... 206

Disputed Instruction No. 58 Re BREACH OF CONTRACT - INTRODUCTION  Offered by Plaintiffs ...................................................................................................... 207

Disputed Instruction No. 58  BREACH OF CONTRACT - INTRODUCTION  Offered by Defendants ................................................................................................... 208

Plaintiffs' Argument Re Disputed Instruction No. 58 BREACH OF CONTRACT - INTRODUCTION ........................................................................................... 209

Defendants' Argument Re Disputed Instruction No. 58 BREACH OF CONTRACT - INTRODUCTION ........................................................................................... 211

Disputed Instruction No. 59 Re BREACH OF CONTRACT - ELEMENTS  Offered by Plaintiffs ...................................................................................................... 212

Disputed Instruction No. 59 Re BREACH OF CONTRACT – ELEMENTS  Offered by Defendants ................................................................................................... 213

Plaintiffs' Argument Re Disputed Instruction No. 59 BREACH OF CONTRACT – ELEMENTS .................................................................................................. 214

Defendants' Argument Re Disputed Instruction No. 59 BREACH OF CONTRACT – ELEMENTS .................................................................................................. 216

Disputed Instruction No. 60 Re BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – ESSENTIAL FACTUAL ELEMENTS  Offered by Plaintiffs ...................................................................................................... 217

Disputed Instruction No. 60 Re BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - ESSENTIAL FACTUAL ELEMENTS  Offered by Defendants ................................................................................................... 218

Plaintiffs' Argument Re Disputed Instruction No. 60 BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - ESSENTIAL FACTUAL ELEMENTS .................................................................................................. 219

Defendants' Argument Re Disputed Instruction No. 60 BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - ESSENTIAL FACTUAL ELEMENTS .................................................................................................. 221

Disputed Instruction No. 61 Re AFFIRMATIVE DEFENSE—CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS  Offered by Plaintiffs ................................. 222

Disputed Instruction No. 61 Re AFFIRMATIVE DEFENSE—CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS  Offered by Defendants ............................ 223

Plaintiffs' Argument Re Disputed Instruction No. 61 AFFIRMATIVE DEFENSE— CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS ........................................ 224

Defendants' Argument Re Disputed Instruction No. 61 AFFIRMATIVE DEFENSE— CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS ........................................ 226

Disputed Instruction No. 62 Re AFFIRMATIVE DEFENSE—MODIFICATION  Offered by Match ........................................................................................................ 228

Disputed Instruction No. 62 Re AFFIRMATIVE DEFENSE—MODIFICATION  Offered by Defendants ................................................................................................... 229

Plaintiffs' Argument Re Disputed Instruction No. 62 AFFIRMATIVE DEFENSE—MODIFICATION ...................................................................................... 230

Defendants' Argument Re Disputed Instruction No. 62 AFFIRMATIVE DEFENSE—MODIFICATION ...................................................................................... 232

Stipulated Instruction No. 63 Re AFFIRMATIVE DEFENSE—WAIVER ..................................... 233

Stipulated Instruction No. 64 Re AFFIRMATIVE DEFENSE—ECONOMIC DURESS ............... 234

Stipulated Instruction No. 65 Re INTRODUCTION TO CONTRACT DAMAGES ..................... 235

Stipulated Instruction No. 66 Re CONTRACT DAMAGES ........................................................ 236

Disputed Instruction No. 67 Re FALSE PROMISE  Offered by Match ........................................... 237

Disputed Instruction No. 67 Re FALSE PROMISE  Offered by Defendants ................................... 238

Plaintiffs' Argument Re Disputed Instruction No. 67  FALSE PROMISE..................................... 239

Defendants' Argument Re Disputed Instruction No. 67  FALSE PROMISE ................................. 241

Disputed Instruction No. 68 Re RELIANCE  Offered by Match ................................................... 242

Disputed Instruction No. 68 Re RELIANCE  Offered by Defendants ............................................ 243

Plaintiffs' Argument Re Disputed Instruction No. 68  RELIANCE ................................................. 244

Defendants' Argument Re Disputed Instruction No. 68  RELIANCE ............................................ 245

Disputed Instruction No. 69 Re REASONABLE RELIANCE  Offered by Match........................... 246

Disputed Instruction No. 69 Re REASONABLE RELIANCE  Offered by Defendants.................... 247

Plaintiffs' Argument Re Disputed Instruction No. 69 REASONABLE RELIANCE ....................... 248

Defendants' Argument Re Disputed Instruction No. 69 REASONABLE RELIANCE .................... 249

Stipulated Instruction No. 70 Re DAMAGES—"OUT OF POCKET" RULE ................................ 250

Disputed Instruction No. 71 Re AFFIRMATIVE DEFENSE—ILLEGALITY UNDER THE ANTITRUST LAWS  Offered by Match ............................................................ 251

Disputed Instruction No. 71 Re AFFIRMATIVE DEFENSE—ILLEGALITY UNDER THE ANTITRUST LAWS  Offered by Defendants ...................................................... 252

Plaintiffs' Argument Re Disputed Instruction No. 71 AFFIRMATIVE DEFENSE—ILLEGALITY UNDER THE ANTITRUST LAWS ............................................................ 253

Defendants' Argument Re Disputed Instruction No. 71 AFFIRMATIVE DEFENSE— ILLEGALITY UNDER THE ANTITRUST LAWS .................................................. 255

Disputed Instruction No. 72 Re UNJUST ENRICHMENT  Offered by Plaintiffs .......................... 256

Disputed Instruction No. 72 Re UNJUST ENRICHMENT  Offered by Defendants........................ 257

Plaintiffs' Argument Re Disputed Instruction No. 72  UNJUST ENRICHMENT ........................... 258

Defendants' Argument Re Disputed Instruction No. 72  UNJUST ENRICHMENT........................ 260

Disputed Instruction No. 73 Re AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT— ILLEGALITY DEFENSE  Offered by Plaintiffs .................................................. 262

Disputed Instruction No. 73 Re AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT— ILLEGALITY DEFENSE  Offered by Defendants.............................................. 263

Plaintiffs' Argument Re Disputed Instruction No. 73 AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT—ILLEGALITY DEFENSE ........................................................ 264

Defendants' Argument Re Disputed Instruction No. 73 AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT—ILLEGALITY DEFENSE ........................................................ 266

Stipulated Instruction No. 74 Re UNJUST ENRICHMENT DAMAGES ....................................... 267

Disputed Instruction No. 75 Re AFFIRMATIVE DEFENSE—UNCLEAN HANDS  Offered by Plaintiffs.................................................................................... 268

Disputed Instruction No. 75 Re AFFIRMATIVE DEFENSE—UNCLEAN HANDS  Offered by Defendants................................................................................ 269

Plaintiffs' Argument Re Disputed Instruction No. 75 AFFIRMATIVE DEFENSE— UNCLEAN HANDS.................................................................................. 270

Defendants' Argument Re Disputed Instruction No. 75 AFFIRMATIVE DEFENSE— UNCLEAN HANDS.................................................................................. 272

Stipulated Instruction No. 76 Re PREJUDGMENT INTEREST ................................................... 274

Stipulated Instruction No. 77 Re  PUNITIVE DAMAGES ......................................................... 275

Stipulated Instruction No. 78 Re HIGHLY PROBABLE—CLEAR AND CONVINCING PROOF................................................................................................ 277

Stipulated Instruction No. 79 Re DAMAGES FROM MULTIPLE DEFENDANTS...................... 278

Stipulated Instruction No. 80 Re DAMAGES ON MULTIPLE LEGAL THEORIES .................... 279

Stipulated Instruction No. 81 Re DAMAGES—SETOFF / UNJUST ENRICHMENT .................. 280

Stipulated Instruction No. 82 Re DUTY TO DELIBERATE.......................................................... 281

Stipulated Instruction No. 83 Re CONSIDERATION OF THE EVIDENCE – CONDUCT OF THE JURY............................................................................................. 282

Stipulated Instruction No. 84 Re USE OF NOTES ..................................................................... 283

Stipulated Instruction No. 85 Re COMMUNICATION WITH THE COURT ................................. 284

**Stipulated Instruction No. 1 Re**
**DUTIES OF JURY TO FIND FACTS AND FOLLOW LAW**

Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case. You will each be given a copy of these instructions to refer to during your deliberations.

It is your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts. It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not. You must decide the case solely on the evidence and the law. Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you. You should also not be influenced by any person's race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, economic circumstances, or position in life or in the community. You will recall that you took an oath promising to do so at the beginning of the case.

You must follow all these instructions and not single out some and ignore others; they are all important. Please do not read into these instructions or into anything I may have said or done any suggestion as to what verdict you should return—that is a matter entirely up to you.

Source: *In re Capacitors* (*Avnet* trial, Case No. 17-cv-7046) Instruction No. 1

**Stipulated Instruction No. 2 Re**
**CLAIMS AND DEFENSES**

I will give you a brief summary of the positions of the parties.

The Plaintiffs are:

Epic Games, Inc. ("Epic"); and

Match Group, LLC; PlentyofFish Media ULC; Humor Rainbow, Inc.; and People Media, Inc.

I will refer to Match Group, LLC; PlentyofFish Media ULC; Humor Rainbow, Inc.; and People Media, Inc. as ("Match" or "Match Plaintiffs").

The Defendants are Google LLC and certain of its affiliates ("Google").

Plaintiffs assert that Defendant Google has violated federal and state antitrust laws through a variety of means that foreclose competition in an alleged market for Android app distribution and in an alleged market for in-app billing services on Android devices. Match further alleges that Google has interfered with Match's contracts and economic relationships in violation of California law. Plaintiffs have the burden of proving these claims. Plaintiffs allege that Google's conduct harms mobile app developers and consumers by increasing prices and reducing quality and innovation.

Google denies Plaintiffs' claims. Google contends that the relevant market is not limited to Android, but also includes Apple's iOS and other platforms where users and developers can engage in transactions for digital content. Google further contends that its conduct has not foreclosed competition, but rather has promoted competition by enabling Android to compete with iOS and other platforms. Google contends that its conduct benefited users and developers.

Google also brings counterclaims against Epic and Match. Google alleges that Epic and Match each willfully violated Google's Payment Policy and that, by doing so, they violated their contractual obligations to Google. Google alleges that Epic and Match were unjustly enriched at Google's expense. Google also asserts that Match misled Google regarding its intention to comply with Google's policies. Google has the burden of proving these counterclaims.

Plaintiffs deny Google's counterclaims. Plaintiffs contend that Google's Payment Policy is illegal and a violation of the antitrust laws, and Google therefore cannot enforce that Policy. Match further contends that Google granted Match an extension to the deadline to comply with the Payments

1    Policy, and that Match did not promise to comply with the deadline.

2

3    Source: Ninth Circuit Model Civil Jury Instruction 1.5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Stipulated Instruction No. 3 Re**
**BURDEN OF PROOF – PREPONDERANCE OF THE EVIDENCE**

3

When a party has the burden of proving any claim by a preponderance of the evidence, it means

4

you must be persuaded by the evidence that the claim is more probably true than not true.

5

You should base your decision on all of the evidence, regardless of which party presented it.

6

7

Source: Ninth Circuit Model Civil Jury Instruction 1.6

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Stipulated Instruction No. 4 Re**
**CORPORATIONS - FAIR TREATMENT**

Match, Epic Games, and Google are corporations.  All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

Under the law, a corporation is considered to be a person.  It can only act through its employees, agents, directors, or officers.  Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers, performed within the scope of their authority.  An act is within the scope of a person's authority if it is within the range of reasonable and foreseeable activities that an employee, agent, director, or officer engages in while carrying out that person's business.

Source:  *In re Capacitors Antitrust Litig.*, No. 3:17-md-02801-JD, ECF No. 1923 (N.D. Cal. May 17, 2023), Instruction No. 4

**Stipulated Instruction No. 5 Re**
**WHAT IS EVIDENCE**

The evidence you are to consider in deciding what the facts are consists of:

      1.     the sworn testimony of any witness;

      2.     the exhibits that are admitted into evidence;

      3.     any facts to which the lawyers have agreed; and

      4.     any facts that I may instruct you to accept as proved.

Source: Ninth Circuit Model Civil Jury Instruction 1.9

**Stipulated Instruction No. 6 Re**
**WHAT IS NOT EVIDENCE**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence, any facts to which the lawyers have agreed, and any facts that I may instruct you to accept as proved. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

1.  Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

2.  Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

3.  Testimony that was excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition, some evidence was received only for a limited purpose; when I have instructed you to consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

4.  Anything you may have seen or heard when the Court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

Source: Ninth Circuit Model Civil Jury Instruction 1.10

1

**Stipulated Instruction No. 7 Re**
**DIRECT AND CIRCUMSTANTIAL EVIDENCE**

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

Source: Ninth Circuit Model Civil Jury Instruction 1.12

### Stipulated Instruction No. 8 Re
### DEPOSITION IN LIEU OF LIVE TESTIMONY

During the trial, you heard testimony by witnesses in the form of previously recorded trial and deposition testimony rather than live here in court. A deposition is the sworn testimony of a witness taken before trial. The witness was placed under oath to tell the truth, and lawyers for each side asked questions. The questions and answers were recorded.

Insofar as possible, you should consider deposition testimony presented to you in court in lieu of live testimony, in the same way as if the witnesses had been present to testify.

Source: *In re Capacitors* (*Avnet* trial, Case No. 17-cv-7046) Instruction No. 9

**Stipulated Instruction No. 9 Re**
**RULING ON OBJECTIONS**

There are rules of evidence that control what can be received into evidence. When a lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought that it was not permitted by the rules of evidence, that lawyer objected. If I overruled the objection, the question was answered, or the exhibit received. If I sustained the objection, the question was not answered, or the exhibit was not received. Whenever I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I ordered that evidence be stricken from the record and that you disregard or ignore that evidence. That means that when you are deciding the case, you must not consider the stricken evidence for any purpose.

Source: Ninth Circuit Model Civil Jury Instruction 1.13

**Stipulated Instruction No. 10 Re**
**CREDIBILITY OF WITNESSES**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness said, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.   the opportunity and ability of the witness to see or hear or know the things testified to;

2.   the witness's memory;

3.   the witness's manner while testifying;

4.   the witness's interest in the outcome of the case, if any;

5.   the witness's bias or prejudice, if any;

6.   whether other evidence contradicted the witness's testimony;

7.   the reasonableness of the witness's testimony in light of all the evidence; and

8.   any other factors that bear on believability.

Sometimes a witness may have said something that is not consistent with something else he or she said. Sometimes different witnesses gave different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

Source: Ninth Circuit Model Civil Jury Instruction 1.14

**Disputed Instruction No. 11**
**CHAT SPOLIATION ADVERSE INFERENCE INSTRUCTION**

Plaintiffs contend that the Court should provide an Adverse Inference Final Instruction for the reasons explained in their brief regarding the Remedy re: Google's Destruction of Chat Evidence, in the form attached to that brief, and for the reasons explained in their reply brief.  (MDL ECF Nos. 608, 672.)  Google opposes the Instruction for the reasons in its responsive brief.  (MDL ECF No. 634.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Stipulated Instruction No. 12 Re**
**EXPERT OPINION**

You have heard testimony from expert witnesses who testified to opinions and the reasons for their opinions. This opinion testimony was allowed because of the education or experience of the expert witness.

Such opinion testimony should be judged like any other testimony. You may accept it, reject it, or give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

Source: *In re Capacitors* (*Avnet* trial, Case No. 17-cv-7046) Instruction No. 11

1

2

**Stipulated Instruction No. 13 Re**
**STIPULATIONS OF FACT**

3

4

The parties have agreed to certain facts that I will now read to you. You must treat these facts as having been proved.

5

1.      [List of stipulated facts]

6

7

Source: *In re Capacitors* (*Avnet* trial, Case No. 17-cv-7046) Instruction No. 15

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 14 Re**
**CHARTS AND SUMMARIES**

During trial, certain charts and summaries were shown to you in order to help explain the contents of books, records, documents, or other evidence in the case.  Some of those charts or summaries may have been admitted into evidence, while others were not.  Charts and summaries are only as good as the evidence that supports them.  You should, therefore, give them only such weight as you think the evidence supporting them deserves.

Sources:  *In re Capacitors Antitrust Litig.*, No. 3:17-md-02801-JD, ECF No. 1923 (N.D. Cal. May 17, 2023), Instr. No. 12; Ninth Circuit Model Instr. No. 2.14, 2.15 (omitting "underlying" before "evidence that supports" and "evidence supporting them").

1

**Disputed Instruction No. 15**
**ANTITRUST LAWS—PURPOSE**
Offered by Plaintiffs

2

3    The purpose of the Sherman Act is to preserve free and unfettered competition in the

4    marketplace. The Sherman Act rests on the central premise that competition produces the best

5    allocation of our economic resources, the lowest prices, the highest quality, and the greatest material

6    progress.

7

8    Source: ABA Model Jury Instructions in Civil Antitrust Cases 1.A

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 15 Re
ANTITRUST LAWS—PURPOSE**
Offered by Defendants

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

**Plaintiffs' Argument Re Disputed Instruction No. 15**
**ANTITRUST LAWS—PURPOSE**

In drafting their Proposed Jury Instructions, as required by the Court's Standing Order on Civil Jury Trials, Plaintiffs have endeavored to rely upon the ABA Model Jury Instructions where possible, as directed by the Ninth Circuit Manual of Model Jury Instructions—Section 14 (Antitrust) (listing ABA Model Instructions). This Proposed Instruction is quoted verbatim from the ABA Model.

Google nevertheless objects entirely to this Model Instruction. Google cannot dispute that this Model Instruction accurately states the purpose of the antitrust laws–the language is drawn directly from the Supreme Court's decision in *Northern Pacific Railway v. United States*, 356 U.S. 1, 4 (1958) ("The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress. . . ."); *see also FTC v. Qualcomm*, 969 F.3d 974, 988 (9th Cir. 2020) (quoting same language).

Plaintiffs submit that the Model Instruction is appropriate to educate the jury regarding the scope of the antitrust laws, and to provide reasons why the jury should give careful attention when deliberating on all of the Plaintiffs' antitrust claims. For these reasons, the ABA Model Instruction has repeatedly been given to juries hearing antitrust cases in this District. *See Sumotext Corp. v. Zoove, Inc.*, No. 16-cv-01370-BLF, Dkt. No. 468, at 24 (N.D. Cal. Mar. 4, 2020) ("Jury Instruction 20 re Purpose of the Sherman Act"); *Smithkline Beecham Corp. v. Abbot Lab.*, No. C 07-5702 CW, Dkt. No. 485, at 8 (N.D. Cal. Mar. 3, 2011) (Final Jury Instruction: "Antitrust Claims – Purpose of Antitrust Laws); *Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, No. C 04-02266 JW, Dkt. No. 1942, at 6 (N.D. Cal. Oct. 27, 2010) (Closing Instruction: "The Sherman Act"); *Hynix Semiconductor Inc. v. Rambus*, Nos. C-00-20905 RMW, C-05-00334 RMW, C-06-00244 RMW, at 22 (N.D. Cal. Mar. 25, 2008) ("Jury Instruction No. 18 Monopolization-General Purposes of the Antitrust and Patent Laws").

Further, this Instruction is particularly appropriate because Google has defended certain of its conduct by contending that consumers and developers benefit from having fewer app stores on Android

phones and only Google Play Billing for digital goods and services transactions occurring in apps obtained from the Google Play Store.  In the Sherman Act, however, Congress made a policy determination that competition—rather than central planning—produces better outcomes.  *See Northern Pac. R.R.*, 356 U.S. at 4 ("the policy unequivocally laid down by the Act is competition").  Together with the more specific Instructions explaining the particular elements of Plaintiffs' claims, this Instruction reinforces that the jury's ultimate focus in applying the antitrust laws is determining whether Google's conduct has restrained competition.  The jury will also be asked to determine whether Plaintiffs have shown antitrust injury, which means "the type of injury that the antitrust laws were intended to prevent".  *Glen Holly Entertainment Inc. v. Tektronix Inc.*, 352 F.3d 367, 371-72 (9th Cir. 2003). Together with the more specific Proposed Instruction regarding "Injury and Causation", this Instruction orients and guides the jury to the task of determining antirust injury as well.  Plaintiffs respectfully submit that this Instruction should be given at the outset of the substantive instructions regarding Plaintiffs' antitrust claims.

1
2

**Defendants' Argument Re Disputed Instruction No. 15**
**ANTITRUST LAWS—PURPOSE**

3

  Google objects to this instruction in its entirety.  This instruction is redundant of other instructions

4

proposed by the parties, and therefore needlessly adds to an already-lengthy jury charge.  Indeed, the

5

Court did not read this instruction to the jury in the recent *Avnet* trial.  *See In re Capacitors Antitrust*

6

*Litig.*, No. 3:17-md-02801-JD (N.D. Cal. May 17, 2023), ECF No. 1923.  Here, various instructions

7

explain—in greater detail than here—the  types of conduct proscribed by the antitrust laws.  As a result,

8

there is no reason to read the instruction here.

9

  In addition to being superfluous, the instruction lacks balance.  The instruction suggests that the

10

antitrust laws are being enforced in this case to protect competition without explaining that many types

11

of competition on the merits are lawful, even under the antitrust laws.

12

  For these reasons, Google submits that the Court should not include this instruction in its final

13

charge to the jury.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Disputed Instruction No. 16 Re**
**SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION – ELEMENTS**
**Offered by Plaintiffs**

Plaintiffs bring two types of antitrust claims, which I will now explain. First, the antitrust laws prohibit companies from willfully acquiring or maintaining monopolies in relevant markets through anticompetitive conduct. Second, the antitrust laws prohibit contracts or agreements that unreasonably restrain competition.

I will first explain Plaintiffs' monopolization claims under Section 2 of the federal Sherman Antitrust Act.  Plaintiffs allege that they were injured by Google's unlawful monopolization of two alleged markets.  Plaintiffs allege that those markets are:  (1) an Android app distribution market and (2) a market for Android in-app billing services for digital goods and services transactions.

To prevail on a claim that Google has monopolized an alleged market, a Plaintiff must prove each of the following elements by a preponderance of the evidence for that market:

1.      that the alleged market is a valid antitrust market;

2.      that Google possesses monopoly power in the alleged market;

3.      that Google "willfully" acquired or maintained its monopoly power in the alleged market by engaging in anticompetitive conduct; and

4.      that a Plaintiff was injured in its business or property because of Google's anticompetitive conduct.

If you find that a Plaintiff has proven each of these elements by a preponderance of the evidence with respect to any market, then you must find for that Plaintiff and against Google on the claim for unlawfully monopolizing that market.  If you find that a Plaintiff has failed to prove any of these elements with respect to any market, then you must find for Google and against the Plaintiff on the claim for unlawfully monopolizing that market.  You may find that Google has monopolized both, either or neither of any markets at issue.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 3.A.1

**Disputed Instruction No. 16 Re**
**SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION – ELEMENTS**
**Offered by Defendants**

Plaintiffs  bring two types of antitrust claims, which I will now explain. First, the antitrust laws prohibit companies from willfully acquiring or maintaining monopolies in relevant markets through anticompetitive conduct. Second, the antitrust laws prohibit contracts or agreements that unreasonably restrain competition.

I will first explain Plaintiffs' monopolization claims under Section 2 of the federal Sherman Antitrust Act.  Plaintiffs allege that they were injured by Google's unlawful monopolization of two alleged markets.  Plaintiffs allege that those markets are:  (1) an Android app distribution market and (2) a market for Android in-app billing services for digital goods and services transactions.

To prevail on a claim that Google has monopolized an alleged market, a Plaintiff must prove each of the following elements by a preponderance of the evidence for that market.

1.     that the alleged market is a valid antitrust market;

2.     that Google possesses monopoly power in the alleged market;

3.     that Google willfully acquired or maintained its monopoly power in the alleged market by engaging in anticompetitive conduct that is not justified by offsetting efficiencies; and

5.     that the Plaintiff was injured in its business or property because of Google's anticompetitive conduct.

You should consider whether Plaintiffs have proven their claims as to each of the alleged markets separately.  If you find that a Plaintiff has failed to prove any of these elements, then you must find for Google and against that Plaintiff on its claim.  If you find that a Plaintiff has proven each of these elements by a preponderance of the evidence, then you must find for that Plaintiff against Google on the claim.

Source: ABA Model Civil Antitrust Jury Instruction 3.A.1

States' Counts 1, 5, 8; Consumers' Counts 1, 4; Epic's Counts 1, 6; Match Plaintiffs' Counts 2, 8

**Plaintiffs' Argument Re Disputed Instruction No. 16**
**SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION – ELEMENTS**

Plaintiffs' proposal hews closely to the ABA Model Instruction, adapted only to fit the circumstances of this case.  Specifically, in addition to specifying the markets alleged here, Plaintiffs propose one minor modification that captures the fact that Plaintiffs claim monopolization of two separate markets, instructing the jury that it "may find that Google has monopolized both, either or neither of the alleged markets."  This is appropriate, as the jury can find that Google monopolized either or both of the markets (or, of course, none of the markets).

Google's proposal seeks to further deviate from the model—and to do so in ways that would only confuse the jury.  *First*, Google asks to add an instruction that "[y]ou should consider whether Plaintiffs have proven their claims as to each of the alleged markets separately".  That instruction risks confusing the jury because it may be read to suggest that the jury may find for Plaintiffs *only if* it finds that Google monopolized *both* of Plaintiffs' alleged markets.  Google then compounds that risk when it proposes that the jury be instructed that:  "If you find that a Plaintiff has failed to prove any of these elements, then you must find for Google and against that Plaintiff on its claim.  If you find that a Plaintiff has proven each of these elements by a preponderance of the evidence, then you must find for that Plaintiff against Google on the claim."  This again suggests that if the jury finds for Google on any of the elements with respect to *either* market, it must find for Google on all monopolization claims.  Plaintiffs' version of this language instead instructs the jury to consider the elements of Plaintiffs' claims separately "with respect to an alleged market" and to render a verdict as to "that market", making clear that the jury can find liability as to "both, either or neither of the alleged markets", as per the language proposed by Plaintiffs.

*Second*, Google seeks to diverge from the Model by adding the following bolded language, which does not appear in the Model, to the element of willful acquisition or maintenance of monopoly: "that Google willfully acquired or maintained its monopoly power in the alleged market by engaging in anticompetitive conduct **that is not justified by offsetting efficiencies**".  Google's addition is incomplete and misleading for two independent reasons.  *First*, Google mentions a component of its own defense—offsetting efficiencies—without mentioning how Plaintiffs may overcome that

1  defense—either by (a) showing that such efficiencies could be achieved through means that are

2  substantially less restrictive of competition, or (b) showing that anticompetitive harms substantially

3  outweigh such efficiencies.  The jury is likely to be misled that Google's alleged efficiencies can

4  themselves justify even conduct that has significant anti-competitive effect on balance.  Google's

5  addition is also unnecessary (in addition to being misleading) because the subsequent instruction

6  concerning this element of the claims (*see* Instruction No. 25) will explain how efficiencies should

7  factor into the jury's consideration.  *Second*, rather than instructing the jury that it may consider

8  efficiencies only after they are proven by Google, Google's instruction assumes that there are (or may

9  be) "offsetting efficiencies" before the jury has determined that there is any proof of such efficiencies.

10  This is an independent reason to reject Google's addition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Defendants' Argument Re Disputed Instruction No. 16**
**SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION – ELEMENTS**

3

4       The Court should instruct the jury that Plaintiffs must prove "that Google willfully acquired or

5   maintained its monopoly power in the alleged market by engaging in anticompetitive conduct **that is**

6   **not justified by offsetting efficiencies."**  Plaintiffs' proposed instruction incorrectly omits the bolded

7   language, which is important to remind the jury of the governing law that anticompetitive conduct

8   involves "attempting to exclude rivals on some basis other than efficiency."  *Aspen Skiing Co. v. Aspen*

    *Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985).

9       "[T]he elements of the established actions for 'monopolization' and 'attempted

10  monopolization' are vital to differentiate between efficient and natural monopolies on the one hand,

11  and unlawful monopolies on the other."  *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536,

12  548 (9th Cir. 1991).  This is because " [a] firm may acquire a monopoly simply by virtue of being a

13  better competitor.  For example, a firm may have better production methods or be more innovative

14  than its past and prospective competitors. . . . Because this type of monopolist behaves in an

15  economically efficient manner, the antitrust laws do not stand as an obstacle to its existence."  *Id.* at

16  547.  Thus, the Supreme Court has specifically stated that a plaintiff asserting a claim under Section 2

17  must prove "the willful acquisition or maintenance of [monopoly] power as distinguished from growth

18  or development as a consequence of a superior product, business acumen, or historic accident."

19  *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  And the Ninth

20  Circuit has explained that "an act is deemed anticompetitive under the Sherman Act only when it

21  harms both allocative efficiency and raises the prices of goods above competitive levels or diminishes

22  their quality."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).  The Court

23  should adopt Google's version of this instruction because it will correctly explain to the jury that, by

24  referencing procompetitive efficiencies, only Google's proposed instruction will give the jury a

25  complete overview of the analysis they are required to perform.

26

27

28

JOINT SET OF PROPOSED FINAL JURY INSTRUCTIONS AND OBJECTIONS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:22-cv-02746-JD

36

Disputed Instruction No. 17 Re
**MONOPOLIZATION – MONOPOLY POWER – DEFINED**
**Offered by Plaintiffs**

To prove their monopolization claims, Plaintiffs must prove that Google has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive level (or reduce or maintain quality below the competitive level) or exclude competition for a significant period of time. However, possession of monopoly power, in and of itself, is not unlawful.

I will provide further instructions about how you may determine whether Plaintiffs have met their burden of proving monopoly power in a relevant market.

Source: ABA Model Civil Antitrust Jury Instruction 3.A.2 (with edits described in Plaintiffs' Argument)

Disputed Instruction No. 17 Re
**MONOPOLIZATION – MONOPOLY POWER – DEFINED**
**Offered by Defendants**

To prove their monopolization claims, each Plaintiff must prove that Google has monopoly power in a relevant antitrust market.  Monopoly power is an extreme degree of what is called market power, which is the power to maintain prices above (or quality below) a competitive level by restricting output below a competitive level in a relevant antitrust market, considering both app users and app developers.  More precisely, a firm is a monopolist if it can profitably raise or maintain prices substantially above (or reduce or maintain quality substantially below) the competitive level for a significant period of time. However, possession of monopoly power, in and of itself, is not unlawful.

I will provide further instructions about how you may determine whether each Plaintiff has met its burden of proving monopoly power in a relevant market.

Source: ABA Model Civil Antitrust Jury Instruction 3.A.2; Ohio v. Am. Express Co., 138 S. Ct. 2274 (2018)

1

2

### Plaintiffs' Argument Re Disputed Instruction No. 17
### MONOPOLIZATION – MONOPOLY POWER – DEFINED

3

4     Plaintiffs' instruction is nearly verbatim to the cited ABA Model Instruction.  Plaintiffs only

5 make two minor revisions to the model—both of which Google has also requested.  *First*, Plaintiffs

6 clarify in the second sentence of the Model that a firm has a monopoly if it *maintains* (in addition to

7 raises) prices substantially above competitive levels.  Such clarification is necessary in a monopoly

8 maintenance case where a defendant may have "already exercised [the] power to charge a

9 supracompetitive price".  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 n.7 (9th Cir. 2023).

10 *Second*, Plaintiffs agreed to Google's proposal to clarify that monopoly power can exist when a firm

11 has the ability to profitably decrease *quality* (as an alternative to raising price and excluding

12 competition).

13     Beyond the two agreed-upon edits, Google has significantly revised the model to include highly

14 argumentative and unnecessary language.  *First*, in the second sentence of the model, Google added

15 language defining monopoly power as "**an *extreme degree* of what is called market power**".  This is

16 contrary to Ninth Circuit law.  *See Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 541, 481

17 (9th Cir. 1992) (describing monopoly power as only "something greater" than market power); *see also*

18 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 801, at 318 (2d ed. 2002) ("the Sherman Act

19 § 2 notion of monopoly power . . . is conventionally understood to mean 'substantial' market power").

20 Moreover, it would be confusing to define monopoly power in relationship to market power, a concept

21 that is not defined until the Court gets to subsequent instructions concerning Plaintiffs' Section 1

22 claims.  Google wrongly seeks to raise Plaintiffs' burden of proof through improper rhetoric.  *See*

23 *Curtis v. City of Oakland*, 2016 WL 1138457, at *4 (N.D. Cal. Mar. 23, 2015) ("It is well established

24 that instructions should not be argumentative or slanted in one party's favor." (citation omitted)).

25     *Second*, in the third sentence of the model, Google proposes adding a statement that the jury

26 should "**consider[] both app users and app developers**".  To be sure, if the jury finds the Android

27 app distribution market to be two-sided, then the market would include both app developers and

28 consumers who use Android app distribution, and the jury then needs to consider the effects on both.

Plaintiffs contend that the alleged in-app billing services market is not two-sided, nor does it include

JOINT SET OF PROPOSED FINAL JURY INSTRUCTIONS AND OBJECTIONS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:22-cv-02746-JD

39

app users.  Google's instruction suggests either that the jury must find that market to be two sided—an instruction that is clearly argumentative and improper—or that the jury "consider both app users and app developers" even as to one-sided markets (that do not involve users, a proposition that is contrary to law.  Simply put, in a case involving two markets, one of which is alleged to be two-sided and one of which is alleged to be single-sided, there is no basis to include a general instruction on two-sidedness in a general instruction pertaining to both markets.

Google's proposal that the jury should "consider" app users and app developers in assessing monopoly power also leaves the jury adrift as to how app users and app developers should be considered or in what way considering both sets of customers relates to monopoly power.  These points are covered elsewhere in Plaintiffs' proposed instructions.  *See, e.g.*, Instruction No. 18 Re Monopolization – Relevant Product Market.  At Google's request, Plaintiffs have proposed instructions to explain how the jury should define two-sided markets and evaluate competitive harms and benefits in such markets, based on the Supreme Court's holding in *Ohio v. American Express*, 138 S. Ct. 2274 (2018).  *See, e.g.*, Monopolization:  Relevant Product Market, Monopolization:  Geographic Market, Monopolization:  Willful Acquisition or Maintenance, Rule of Reason:  Competitive Harms, Rule of Reason:  Competitive Benefits.  Plaintiffs' proposed instructions concerning how the two-sidedness of a market informs market definition and the rule of reason analysis (*see e.g.*, Instructions Nos. 18, 37, 38) sufficiently cover the topic without adding complexity that would only confuse or mislead the jury.

1

2

**Defendants' Argument Re Disputed Instruction No. 17**
**MONOPOLIZATION – MONOPOLY POWER – DEFINED**

3   Google's proposed instruction correctly explains to the jury the difference between monopoly

4   power and market power.  "Monopoly power differs in degree from market power, requiring

5   'something greater.'"  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (quoting

6   *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992)).  "Courts have described

7   the distinction as 'substantial' market power or an 'extreme degree' of market power."  *Epic Games,*

8   *Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1028 (N.D. Cal. 2021), *aff'd in part, rev'd in part and*

9   *remanded,* 67 F.4th 946 (9th Cir. 2023).  Because this case implicates both monopoly power and

10   market power, and because the distinctions between those two concepts will not be immediately

11   apparent to a lay jury, it makes sense to explain the differences in a single instruction.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 18 Re**
**MONOPOLIZATION – RELEVANT PRODUCT MARKET**
**Offered by Plaintiffs**

In this case, Plaintiffs contend that there are two different relevant product markets: Android app distribution and Android in-app billing services for digital goods and services transactions. You should consider whether Plaintiffs have proven by a preponderance of the evidence either or both of the markets they have alleged.

In determining the relevant market, the "area of effective competition" must be determined by reference to (1) a product market, and (2) a geographic market.

In determining the product market, the basic idea is that the products within it are interchangeable as a practical matter from the buyer's point of view. This does not mean two products must be identical to be in the same relevant market. It means they must be, as a matter of practical fact and the actual behavior of consumers, substantially or reasonably interchangeable to fill the same consumer needs or purposes. Two products are within a single market if one item could suit buyers' needs substantially as well as the other. What you are being asked to do is to decide which products compete with each other.

The parties contend that one or more markets alleged in this case are two-sided, which means that they include services that are offered to two different groups simultaneously. For example, an app store connects app developers who wish to sell their apps and the consumers that wish to buy those apps. In this example, app developers may be one side of the market, and consumers may be the other side of the market, and each are receiving services from the app store. If you find that there is a relevant market that is two-sided, the market includes the services that are provided to both sides of the market, and you should consider both sides of the market in applying these instructions to evaluate Plaintiffs' claims based on the markets you have found to be two-sided.

Source: 3A Fed. Jury Prac. & Instr. § 150:66 (6th ed.) (with edits described in Plaintiffs' argument)

**Disputed Instruction No. 18 Re**
**MONOPOLIZATION – RELEVANT PRODUCT MARKET**
**Offered by Defendants**

In this case, Plaintiffs contend that there are two different relevant product markets: Android app distribution and Android in-app billing services for digital goods and services transactions. You should consider whether Plaintiffs have proven by a preponderance of the evidence either or both of the markets they have alleged.

In determining the relevant market, the "area of effective competition" must be determined by reference to (1) a product market, and (2) a geographic market. If you find that a Plaintiff has proven a valid relevant product market, then you should continue to evaluate the remainder of that Plaintiff's claims as they pertain to that market. However, if you find that Plaintiffs have failed to prove such a market, then you must find in Google's favor on Plaintiffs' claims.

In determining the product market, the basic idea is that the products within it are interchangeable as a practical matter from the buyer's point of view. This does not mean two products must be identical to be in the same relevant market. It means they must be, as a matter of practical fact and the actual behavior of consumers (meaning users and developers), substantially or reasonably interchangeable to fill the same consumer needs or purposes. Two products are within a single market if one item could suit buyers' needs substantially as well as the other. What you are being asked to do is to decide which products compete with each other. The relevant product market must reflect commercial realities.

Some of the relevant markets that the parties allege in this case involve products that are two-sided platforms: they offer products or services to two different groups who both depend on the platform to intermediate between them. The value of the services that a two-sided platform provides increases as the number of participants on both sides of the platform increases. In order to define a relevant market involving a two-sided platform, you must take into account consumers on both sides of the market—in this case, both users and developers.

In determining the relevant product market, you must be able to determine what, if any, economic forces restrain Google's freedom to raise prices above the competitive level (or reduce quality below the competitive level) by restricting the production level, considering both sides of the alleged relevant markets. The most likely and most important restraining force will be actual and potential competition

1    from other firms and their products.  This includes all firms and products that act or likely could act as

2    restraints on Google's power to raise prices above the competitive level or reduce quality below the

3    competitive level because customers could switch to other products if Google tried to do so.  All the

4    firms and products that exert such restraining force are within what is called the relevant product market.

5

6    Source: 3A Fed. Jury Prac. & Instr. § 150:66 (6th ed.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Plaintiffs' Argument Re Disputed Instruction No. 18**
**MONOPOLIZATION – RELEVANT PRODUCT MARKET**

Plaintiffs' instruction is based on the Federal Jury Practice Model, as authorized by the Ninth Circuit Manual of Model Civil Jury Instructions.  Plaintiffs and Google stipulated to certain edits thereto.  *First*, Plaintiffs and Google agreed to remove the first introductory paragraph of the model to make this instruction more concise.  *Second*, Plaintiffs and Google agreed to revise the language of the second paragraph of the model to account for the fact that Plaintiffs allege two different relevant product markets as opposed to just one.  *Third*, Plaintiffs and Google agreed to propose a separate geographic market instruction (*see* Instruction No. 21), and so the Parties have removed the final paragraph of the model regarding geographic market definition from this instruction.

In addition, at Google's request, Plaintiffs agreed to add a new paragraph to the model explaining how the jury should define a two-sided market.  However, the Parties disagree on the exact language that should be used.  Plaintiffs' proposed definition of a two-sided market—a market that "includes services that are offered to two different groups simultaneously"—is based on *Ohio v. American Express*, 138 S. Ct. 2274, 2286 (2018) ("[Two-sided] platforms facilitate a single, simultaneous transaction between participants.").  Plaintiffs' language then includes an example of a potential two-sided market based on the subject matter of this case (*i.e.,* a market that includes app stores that facilitate transactions between app developers and app consumers).  Plaintiffs' language then directs the jury what it should do if it finds there is a relevant two-sided market—"you should consider both sides of the market in applying these instructions to evaluate Plaintiffs' claims based on the markets you have found to be two-sided"—again based on *Ohio v. American Express*.  *Id.* at 2287 ("Evaluating both sides of a two-sided transaction platform is . . . necessary to accurately assess competition.").  By contrast, Google's proposed two-sided market language instructs the jury to *assume* that this case involves "two-sided platforms" that should be treated as two-sided markets.  This is misleading as Plaintiffs do not contend that one of their alleged markets—for in-app billing services—is two-sided or includes app users.  Moreover, Google's statement that the "value" of the two-sided platform it has asked the jury to assume exists will invariably rise as more participants join is confusing and improperly argumentative; indeed, it may suggest to the jury that for two-sided

markets, a complete monopoly is preferable to competition.  Although the *American Express* Court observed that "two-sided platforms ***often*** exhibit what economists call 'indirect network effects'", Google's instruction improperly tells the jury to assume that all "two-sided platforms" exhibit such characteristics.  138 S. Ct. at 2280.  Google is free to present evidence and argument about the supposed "value" of its platform and the factors that increase that value. But the jury instructions should not include such argument.

Google has made three additional substantial, unsupported changes to the model.  *First,* Google has added the following two lines to the end of the second paragraph in its instruction:  "If you find that a Plaintiff has proven a valid relevant product market, then you should continue to evaluate the remainder of that Plaintiff's claims as they pertain to that market.  However, if you find that Plaintiffs have failed to prove such a market, then you must find in Google's favor on Plaintiffs' claims".  That is contrary to law.  Even if the jury does not agree with the Plaintiffs' alleged markets, they should still consider the remainder of the elements of Plaintiffs' claims as to any markets they did find.  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 n.9 (9th Cir. 2023) (rejecting "radical" argument to the contrary).  *Second*, Google adds a vague, out-of-context statement that "The relevant product market must reflect commercial realities", but does not explain to the jury what commercial realities they refer to or how that should inform the jury's determination.

*Third*, Google adds a highly argumentative paragraph to the model that directs the jury to consider the economic forces that restrain Google itself, and to accept or at least presume that "[t]he ***most likely and most important*** restraining force [on Google] will be actual and potential competition from other firms and their products".  Including this language would mislead the jury by improperly instructing them that "actual and potential competition" is both "most likely" and "most relevant" constraint on Google, and that this is somehow relevant to assessing market definition.  Google is free to argue its market power is constrained by competition, but that has nothing to do with market definition and would not be an issue for the Court's instruction.  Rather, it is the type of argument Google may make through expert testimony or closing argument.  *See Curtis v. City of Oakland*, 2016 WL 1138457, at *4 (N.D. Cal. Mar. 23, 2015).

1
2

**Defendants' Argument Re Disputed Instruction No. 18**
**MONOPOLIZATION – RELEVANT PRODUCT MARKET**

3        Plaintiffs' proposed instruction does not instruct the jury regarding critical features of market

4    definition.

5        Plaintiffs' market definition instruction does not incorporate the concept of constraints on the

6    exercise of market power, which is critical to market definition.  "The goal in defining the relevant

7    market is to identify the market participants and competitive pressures that restrain an individual firm's

8    ability to raise prices or restrict output."  *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d

9    485, 496 (2d Cir. 2004).  Plaintiffs' market definition instruction omits that a relevant market includes

10   firms and products that constrain a price increase above the competitive level or  constrain a reduction

11   in quality below the competitive level.  "There can be no doubt as a matter of case law, the Merger

12   Guidelines, and economic theory, that market constraints work not only to limit one's ability to raise

13   prices above a competitive level, but also to limit one's ability to reduce quality or service below

14   competitive levels."  *Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1153 n.8 (W.D. Ark.

15   1995), *aff'd sub nom. Cmty. Publishers, Inc. v. DR Partners*, 139 F.3d 1180 (8th Cir. 1998).  The

16   evidence at trial will support this principle.  Indeed, Epic's own expert, Dr. Bernheim, opines that

17   "[t]he standard approach to defining an antitrust market" involves whether a firm "could profitably

18   raise prices significantly above (or reduce quality significantly below) competitive levels, despite the

19   possibility of substitution to other products, assuming the alternatives are competitively priced."

20
21
22
23
24
25
26
27
28

Disputed Instruction No. 19 Re
**RELEVANT PRODUCT MARKET – AFTERMARKETS**
**Offered by Plaintiffs**

Plaintiffs oppose the inclusion of this instruction for the reasons in Plaintiffs' Argument.

1

Disputed Instruction No. 19 Re
**RELEVANT PRODUCT MARKET – AFTERMARKETS**

2

**Offered by Defendants**

3

  Each of Plaintiffs' alleged relevant markets is limited to products or services for Android apps

4

used on Android-branded mobile devices.  Plaintiffs contend that the Android app distribution market

5

is a so-called aftermarket for products that consumers use after they have purchased mobile devices.

6

You are to presume that when consumers buy mobile devices, they make a knowing choice to limit

7

their options in aftermarkets for products and services for Android devices such that competition

8

between mobile devices is a factor in competition among those products and services.  In order to

9

prove the contrary, Plaintiffs must prove that (1) technical limits on what products work on mobile

10

devices are not generally known when consumers purchase those devices; (2) significant information

11

costs prevent consumers from accurately calculating the total cost of a mobile device and products and

12

services used on that device; and (3) there are significant monetary or non-monetary costs to switching

13

mobile devices.  Plaintiffs must also prove that the Android app distribution market satisfies the

14

criteria for a relevant market on which I have previously instructed you.

15

16

Source: Epic Games, Inc. v. Apple, Inc., 67 F.4th 946, 976-77 (9th Cir. 2023)

17

18

19

20

21

22

23

24

25

26

27

28

1

2

### Plaintiffs' Argument Re Disputed Instruction No. 19
### RELEVANT PRODUCT MARKET – AFTERMARKETS

3

Plaintiffs object to Google's proposal to give a separate Instruction regarding "Aftermarkets" in

4

its entirety.  The Parties agree that the jury should be instructed regarding how to define a relevant

5

antitrust market generally, based on model versions of those instructions.  Google's bespoke additional

6

Instruction regarding "Aftermarkets" is unnecessary and misleading because Plaintiffs do not contend

7

that the alleged markets constitute "aftermarkets" subject to the analysis proposed by Google.

8

Unlike in the "single-brand aftermarkets" cases cited by Google, the markets alleged by

9

Plaintiffs are not determined by or dependent on consumers' choices to purchase a durable good from

10

the alleged monopolist.  *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992); *Epic*

11

*Games v. Apple*, 67 F.4th 946 (9th Cir. 2023).  In *Kodak*, the alleged "aftermarket" included consumers

12

who had chosen to buy printing equipment from the alleged monopolist, Kodak.  That aftermarket "for

13

antitrust purposes is determined by the choices available to Kodak equipment owners".  *Kodak*, 504

14

U.S. at 482.  And because "services and parts for Kodak equipment are not interchangeable with other

15

manufacturers' service and parts, the relevant market . . . is composed of only those companies that

16

service Kodak machines".  *Id.*  Similarly, in *Apple*, the court explained that "the relevant market for

17

antitrust purposes can be an aftermarket—where demand for a good is entirely dependent on the prior

18

purchase of a durable good in a foremarket".  *Apple*, 67 F.4th at 976.  The markets alleged in *Apple*

19

involved consumers who had purchased durable goods sold exclusively by the alleged monopolist, and

20

the *Apple* court applied the aftermarket analysis to those consumers.  *See, e.g., id.* at 979 (considering

21

whether Apple had changed its policy "after some portion of consumers purchased their foremarket

22

durable goods" from Apple).

23

Unlike in *Kodak* and *Apple*, the Android app distribution market is not based on consumers

24

who have purchased their mobile devices from Google.  Rather, most consumers have purchased their

25

Android devices from mobile device manufacturers like Samsung; Google sells a very small minority

26

of Android-compatible phones.  Plaintiffs also do not contend that the in-app billing services market is

27

an aftermarket; this market includes app developers who use such services to facilitate in-app

28

transactions and have not purchased durable equipment from anyone.  These facts distinguish this case

1   from *Apple*, where Apple maintained proprietary control over:  the mobile devices it exclusively sold

2   (iPhone), the proprietary and non-licensable operating system used on those devices (iOS), and the app

3   distribution available to consumers who had purchased iPhone (its App Store).  By contrast, Google

4   has described the Android OS as open-source, Google licenses components of that OS to many other

5   manufacturers of mobile devices, and Google purports to allow (rather than exclude, as Apple does)

6   alternative app distribution channels for Android OS devices (although Google then uses

7   anticompetitive means to prevent such competition).  Even if, as Google's proposed instruction says,

8   the alleged relevant markets are "limited to products or services for Android apps used on Android-

9   branded mobile devices," that does not require an aftermarkets instruction.  Consumers' choices still

10  do not depend on whether they have bought a durable good—the mobile device—from Google or from

11  another manufacturer of mobile devices.

12          Google's proposed Aftermarkets instruction should therefore be rejected.

13          If the Court did consider giving an aftermarket instruction, it should not adopt Google's

14  proposal, which contains other legal errors.  For example, Google seeks to instruct the jury that there is

15  a "presumption" that consumers knowingly limit their subsequent choices when making foremarket

16  purchases; but the Ninth Circuit has held that the aftermarket analysis, if it does apply, asks whether

17  aftermarket restrictions are "not generally known".  Id. at 980-81.  Google also proposes to ask the jury

18  whether "technical limits on what products work on mobile devices" were known, but the correct

19  analysis would focus on whether "the challenged aftermarket restrictions" were "generally known", id.

20  (emphasis added), and Plaintiffs do not challenge the fact that some products do not work on mobile

21  devices because of technical limits.

22

23

24

25

26

27

28

Defendants' Argument Re Disputed Instruction No. 19
RELEVANT PRODUCT MARKET – AFTERMARKETS

1
2

3       Google's proposed instruction reflects the law recognized in the *Epic v. Apple* case that was

4   dispositive on the issue of whether Epic had proven its alleged relevant market.  The jury should be

5   instructed on that law so that they do not reach a result in this case that is inconsistent with the result in

6   the *Epic v. Apple* case based merely on an incorrect instruction.

7       An alleged market where the purchase of a product that depends on the purchase of a durable

8   good in a foremarket is known as an aftermarket.  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946,

9   976 (9th Cir. 2023).  Plaintiffs' alleged market for Android app distribution depends on the purchase of

10  an Android device that uses the Android operating system.  Plaintiffs allege that Google has monopoly

11  power and has harmed competition in an alleged market for Android distribution that includes the

12  Google Play store but not the Apple App Store because consumers that have purchased an Android

13  device cannot use the Apple App Store on that device.  As a result, Plaintiffs have alleged an

14  aftermarket.

15      In *Epic v. Apple*, Epic alleged an aftermarket limited to the Apple App Store that did not

16  include the Google Play store because consumers that purchase iPhones cannot use the Play store on

17  those devices.  The Ninth Circuit held that Epic had not proven a separate market for the Apple App

18  Store.  In doing so, the Ninth Circuit held that the Supreme Court's decision in *Eastman Kodak Co. v.*

19  *Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) "placed the burden on a plaintiff to rebut the economic

20  presumption that ... consumers make a knowing choice to restrict their aftermarket options when they

21  make a foremarket purchase." 67 F.4th at 979.  Google's proposed instruction correctly instructs the

22  jury regarding this presumption.

23      The Ninth Circuit further explained that, to overcome this presumption and "establish a single-

24  brand aftermarket, a plaintiff must show: (1) the challenged aftermarket restrictions are not generally

25  known when consumers make their foremarket purchase; (2) significant information costs prevent

26  accurate life-cycle pricing; (3) significant monetary or non-monetary switching costs exist; and (4)

27  general market-definition principles regarding cross-elasticity of demand do not undermine the

28  proposed single-brand market."  67 F.4th at 977.  Epic's failure to satisfy this test was dispositive of its

1    ability to prove a market for the Apple App Store that did not include the Google Play store.  In this

2    case, the jury should be instructed on this law in evaluating whether Plaintiffs have proven a separate

3    market for Android app stores like the Google Play store that does not include the Apple App Store.

4         The key issue with respect to an aftermarket is whether competition in the foremarket will

5    prevent a firm from raising prices above or reduce quality below the competitive level in the

6    aftermarket.  For example, in *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451 (1992), the

7    key issue was "whether competition in the equipment market" for copiers "will significantly restrain

8    power in the service and parts markets."  *Id.* at 470.  Kodak argued that "it could not have the ability to

9    raise prices of service and parts above the level that would be charged in a competitive market because

10   any increase in profits from a higher price in the aftermarkets at least would be offset by a

11   corresponding loss in profits from lower equipment sales as consumers began purchasing equipment

12   with more attractive service costs."  *Id.* at 465–66.  Similarly here, the question will be whether

13   vigorous competition between iPhones and Android phones restrains Google from operating the

14   Google Play store without regard to the Apple App Store.  The jury should be instructed on Ninth

15   Circuit law regarding that critical issue.

16        Because this case involves an aftermarket, and because Google's instruction accurately states

17   Ninth Circuit law, the Court should adopt Google's proposed instruction.

18

19

20

21

22

23

24

25

26

27

28

1

2

Disputed Instruction No. 20 Re
**RELEVANT PRODUCT MARKET –SUPPLY SUBSTITUTABILITY**
**Offered by Plaintiffs**

3

Plaintiffs oppose the inclusion of this instruction for the reasons in Plaintiffs' argument.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Disputed Instruction No. 20 Re
**RELEVANT PRODUCT MARKET –SUPPLY SUBSTITUTABILITY**
**Offered by Defendants**

In deciding whether Plaintiffs have proven a relevant product market, you may also consider what the law refers to as "the cross-elasticity of supply" or, in other words, the extent to which the producers of one product would be willing to shift their resources, such as intellectual property, manufacturing facilities, or personnel to producing another product in response to an increase in the price or decrease in the quality of the other product. Such producers, to the extent that they exist, can increase supply and, therefore, drive prices or quality back to competitive levels, defeating any effort by a would-be monopolist to charge significantly higher prices or significantly lower product quality.

Take two shoe manufacturers, for example. The first manufacturer produces shoes for women, while the second manufacturer produces shoes for men. Generally speaking, men's and women's shoes are not reasonably interchangeable and, therefore, might be thought of as being in a separate product markets. However, it is possible that the men's shoe manufacturer could quickly shift its resources to start producing women's shoes if the women's shoe manufacturer raised its prices or decreased its quality significantly and vice versa. Although women would not buy men's shoes, nor would men buy women's shoes, the ability of each manufacturer to alter its production could prevent the other manufacturer from raising prices or decreasing quality significantly. Thus, in this example, men's and women's shoes would be included in the same market.

If, in determining the products in the relevant product market you find that there are manufacturers that have the ability to alter their production to manufacture products that can reasonably be substituted with Google's—even though they do not presently compete with Google—you may consider whether the existence of these potential alternative suppliers can influence the prices or quality of the Google Play store. However, if you find that there are no others who would switch production to products that would compete with Google's, you may define the market solely on your evaluation of whether the existing allegedly competing products are reasonable substitutes for each other.

Source:  ABA Model Civil Antitrust Jury Instructions 3.A.5

1

2

**Plaintiffs' Argument Re Disputed Instruction No. 20**
**RELEVANT PRODUCT MARKET –SUPPLY SUBSTITUTABILITY**

3

4       Plaintiffs object to Google's proposal that the jury be separately instructed to consider supply

5   substitutability as an element of market definition.  The dominant view among antitrust courts and

6   regulators is that market definition focuses on demand-side substitutability.  *See* 2010 Horizontal

7   Merger Guidelines § 4 ("Market definition focuses solely on demand substitution factors, i.e., on

8   customers' ability and willingness to substitute away from one product to another in response to a price

9   increase or a corresponding non-price change such as a reduction in product quality or service.").

10  Even the few courts that have considered supply-side substitutability when defining antitrust markets

11  recognize that courts generally focus on demand-side substitutability, and may only consider supply-

12  side substitutability as an additional or subsidiary consideration.  *See FTC v. Meta Platforms, Inc.*,

13  2023 WL 2346238, at *13 (N.D. Cal. 2023) ("Although relevant markets are generally defined by

14  demand-side substitutability, supply-side substitution also informs whether alternative products may be

15  counted in the relevant market").  The *Meta Platforms* court, for example, drawing on the Supreme

16  Court's 1962 opinion in *Brown Shoe v. United States*, 370 U.S. 294, considered the issue as one of

17  *seven* "practical indicia" that could inform the analysis of whether plaintiffs had properly alleged a

18  relevant market.  *Id.*  But neither that court nor *Brown Shoe* suggested that the factor that *Brown Shoe*

19  described as "unique production facilities" and that others describe as "supply-side substitution" could

20  substitute for, or be considered on parity with, the fundamental question of demand substitution.  By

21  providing a separate instruction on just this topic, ABA Model Instructions erroneously elevate the

22  weight and importance of this issue to market definition, if it should be given any weight at all.

23      The parties have proposed a general market definition instruction, drawn from Federal Jury

24  Practice and Instructions, that straightforwardly explains that market definition involves determining

25  "if one item could suit buyers' needs substantially as well as the other" and "what you are being asked

26  to do is to decide which products compete with each other".  *See* Instruction No. 18.  Nonetheless,

27  Google proposes giving a lengthy, complicated instruction that is drawn not from this simplified

28  instruction, but from a separate set of longer and more convoluted market definition instructions found

    in the ABA Model.  Indeed, Google's proposed instruction on this one issue alone is ***longer*** than the

JOINT SET OF PROPOSED FINAL JURY INSTRUCTIONS AND OBJECTIONS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:22-cv-02746-JD

56

general product market definition instruction proposed by the parties.  Google's proposal thus not only proposes a dubious legal instruction, but it will also mislead the jury into thinking that this issue is the most important and dispositive consideration.

The problems with Google's proposed instruction are further compounded by the fact that the proposed instruction is itself confusing.  The instruction is highly repetitive; after explaining what supply elasticity is in the first paragraph, the instruction repeats the same concept again and again in different wording in the following paragraphs.  *See Temblador v. Hamburg-American Lines*, 368 F.2d 365, 367 (9th Cir. 1966) (holding that a judge may conclude that "to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse" (quoting *United States v. Bayer*, 331 U.S. 532, 536 (1947))).  The instruction also uses a confusing example related to shoe manufacturers, which has no relevance to the contentions in this case.  There is no analogy to this case because Google proffers no explanation as to what supplier is standing on the outskirts of the markets at issue and could somehow enter those markets to compete with Google's distribution or payment services.  The jury instructions in this case will already be long; having an additional page of confusing instruction on this issue is not only unnecessary, but poses a grave risk of misleading the jury about the nature of a central issue in this case.

1

2

**Defendants' Argument Re Disputed Instruction No. 20**
**RELEVANT PRODUCT MARKET –SUPPLY SUBSTITUTABILITY**

3

Google's proposed instruction is taken from the ABA Model Civil Antitrust Jury Instructions

4

and is necessary to ensure that the instructions are consistent with Ninth Circuit law.

5

One facet of market definition involves determining whether consumers would switch to other

6

products if prices increased or quality decreased below the competitive level.  However, under Ninth

7

Circuit law, "defining a market on the basis of demand considerations alone is erroneous."  *Rebel Oil*

8

*Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995).  Rather, "[a]reasonable market definition

9

must also be based on 'supply elasticity.'"  *Id.*  "If producers of product X can readily shift their

10

production facilities to produce product Y, then the sales of both should be included in the relevant

11

market."  *Id.*  Thus, in *Rebel Oil*, the Ninth Circuit held that it would have been erroneous to exclude

12

"full-serve gasoline" from a market that includes self-serve gasoline because "sellers of full-serve

13

gasoline can easily convert their full-serve pumps, at virtually no cost, into self-serve, cash-only pumps,

14

expanding output and thus constraining any attempt by ARCO to charge supracompetitive prices for

15

self-serve gasoline."  *Id.*  Here, too, the jury should be instructed that firms' ability to shift supply to

16

products that compete with Google Play is relevant to market definition so that they do not erroneously

17

exclude those firms from the relevant market.

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed** Instruction No. 21 Re
**RELEVANT GEOGRAPHIC MARKET**
**Offered by Plaintiffs**

2

3   The relevant geographic market is the area in which Google faces competition from other firms

4   that compete in the relevant product markets and to which customers can reasonably turn for

5   purchases.  When analyzing the relevant geographic market, you should consider whether changes in

6   prices or product quality in one geographic area have substantial effects on prices or sales in another

7   geographic area, which would tend to show that both areas are in the same relevant geographic market.

8   The geographic market may be as large as global or nationwide, or as small as a single town or

9   neighborhood.

10   Plaintiffs have the burden of proving the relevant geographic market by a preponderance of the

11   evidence.  In this case, Plaintiffs claim that the relevant geographic market is worldwide, excluding

12   China.  In determining whether Plaintiffs met their burden and demonstrated that their proposed

13   geographic market is proper, you may consider several factors, including:

14       1.   the geographic area in which Google sells and where Google's customers are

15         located;

16       2.   the geographic area to which Google's customers turn (or can turn) for supply of the

17         product;

18       3.   the geographic area to which Google's customers have turned or have seriously

19         considered turning;

20       4.   the geographic areas that app developers view as potential sources of competition;

21         and

22       5.   whether governmental licensing requirements, taxes, or quotas have the effect of

23         limiting competition in certain areas.

24

25   Source:  ABA Model Civil Antitrust Jury Instruction 3.2.A.6 (with edits described in Plaintiffs'

26   argument)

27

28

**Disputed Instruction No. 21**
**RELEVANT GEOGRAPHIC MARKET**
**Offered by Defendants**

The relevant geographic market is the area in which Google faces competition from other firms that compete in the relevant product markets and to which customers can reasonably turn for purchases. When analyzing the relevant geographic market, you should consider whether changes in prices or product quality in one geographic area have substantial effects on prices or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market. The geographic market selected must both correspond to the commercial realities of the industry and be economically significant. The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

Plaintiffs have the burden of proving the relevant geographic market by a preponderance of the evidence. In this case, Plaintiffs claim that the relevant geographic market is worldwide, excluding China. In determining whether Plaintiffs met their burden and demonstrated that their proposed geographic market is proper, you may consider several factors, including:

- the geographic area in which Google sells and where Google's customers–that is, both app developers and app users–are located;
- the geographic area to which app developers and app users turn (or can turn) for supply of the product;
- the geographic area to which app developers and app users have turned or have seriously considered turning;
- the geographic areas that app developers view as potential sources of competition; and
- whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

In defining a geographic market involving a two-sided platform, you must take into account both developers and users.

Source: ABA Model Civil Antitrust Jury Instruction 3.2.A.6

1

2

**Plaintiffs' Argument Re Disputed Instruction No. 21
RELEVANT GEOGRAPHIC MARKET**

3

4

Plaintiffs' instruction is taken verbatim (with adjustments to placeholder language) from the ABA Model Instruction.

5

6

7

8

9

10

11

Google proposes three changes to the model, all of which should be rejected. *First*, Google adds a sentence to the first paragraph stating that "[t]he geographic market selected must both correspond to the commercial realities of the industry and be economically significant." This language is vague and risks misleading the jury. It is unclear what "commercial realities" Google is referring to, and the term is undefined by both Google and the Model. The same is true for the term "economically significant". With no understanding of what this sentence or its terms mean, including them in the instructions risks confusion and inappropriately raising Plaintiffs' burden.

12

13

14

15

16

17

18

19

20

21

22

*Second*, Google seeks two additions concerning two-sided markets: Google seeks to (a) note in the first factor that its customers are "both app developers and app users" and (b) adds a sentence to the end of the model instruction stating that "[i]n defining a geographic market involving a two-sided platform, you must take into account both developers and users." These additions should be rejected since they are redundant, unnecessary and will lead to jury confusion. This is misleading and inaccurate because Plaintiffs do not contend that one of their alleged markets—for in-app billing services—is two-sided or includes app users. The jury must determine whether to credit Google's contention that the at-issue market is, in fact, two-sided before they proceed to "take into account both developers and users", as Google proposes. Google's instruction pre-determines that issue. Instead, as in Plaintiffs' proposed instructions regarding Relevant Product Market (Plaintiffs' Disputed Instruction No. 18), jurors should be instructed first to determine if an alleged market is two-sided.

23

24

25

26

27

28

Google's additions do not provide any additional direction for the jury but instead inject confusion into the instruction, because they do not specify how the jury should "consider" app users and app developers in the context of defining a geographic market. Plaintiffs have already included discussion on how the jury should consider two-sidedness when defining the relevant product market. *See, e.g.*, Instruction No. 18 Re Monopolization – Relevant Product Market. There is no reason to repeat these concepts in this Instruction. Plaintiffs' proposed instructions fairly and adequately cover the issues

1  presented.

1

2

### Defendants' Argument Re Disputed Instruction No. 21
### RELEVANT GEOGRAPHIC MARKET

3

4        Plaintiffs have omitted a crucial detail from this instruction–that the jury must consider both

5   sides of the alleged markets.  As the Ninth Circuit has explained, "to establish that a practice is

6   anticompetitive in certain two-sided markets, the plaintiff must establish an anticompetitive impact on

7   the 'market as a whole.'"  *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022).

8   As the Supreme Court explained in *Am. Express*:

9           two-sided platforms often exhibit what economists call 'indirect network effects.'
           Indirect network effects exist where the value of the two-sided platform to one group of
10          participants depends on how many members of a different group participate.  In other
           words, the value of the services that a two-sided platform provides increases as the
11          number of participants on both sides of the platform increases. A credit card, for example,
           is more valuable to cardholders when more merchants accept it, and is more valuable to
12          merchants when more cardholders use it.  To ensure sufficient participation, two-sided
           platforms must be sensitive to the prices that they charge each side.

13      *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280-81 (2018) (citations omitted).  For these reasons,

14  the Supreme Court in *Am. Express* held that "courts must include both sides of the platform—merchants

15  and cardholders—when defining the credit-card market."  *Id.* at 2286.  The need to consider both sides

16  of the market pertains to both the geographic and product market inquiries.  It would make little sense

17  to define a product market accounting for both sides of the market and then define a geographic market

18  that accounts for only one side of the market.  For example, it would make no sense to define a market

19  that includes the Play store that accounts for prices and quality for both users and developers but then

20  define the geographic market solely based on prices or equality for users and ignore prices or quality for

21  developers.

22

23

24

25

26

27

28

**Disputed** Instruction No. 22 Re
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – TYPES OF PROOF**
Offered by Plaintiffs

Once you determine what the relevant market is, then you should determine whether Google has monopoly power in that market.

You can consider two kinds of proof to determine whether Google has monopoly power: (1) direct proof and (2) indirect proof. In the following instructions, I will explain to you these two kinds of proof that you can consider.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 3.A.7, 3.A.8

**Disputed** Instruction No. 22 Re
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – TYPES OF PROOF**
**Offered by Defendants**

If you find that Plaintiffs have proven a relevant market, then you should determine whether Google has monopoly power in that market. As I instructed you earlier, monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. You must consider the monopolization claims separately with respect to the two relevant markets alleged here: (i) Android app distribution and (ii) Android in-app billing services for digital goods and services transactions. You may find that Google has monopolized both markets, one of the markets, or neither of the markets.

You can consider two kinds of proof to determine whether Google has monopoly power: (1) direct proof and (2) indirect proof. In the following instructions, I will explain to you these two kinds of proof that you can consider.

For each Plaintiff, if you find that Google has monopoly power in a relevant market, then you must consider the remaining elements of this claim.  If you find that Google does not have monopoly power, then you must find for Google and against that Plaintiff on its claim.


Source: Adapted from ABA Model Civil Antitrust Jury Instruction 3.A.7, 3.A.8

**Plaintiffs' Argument Re Disputed Instruction No. 22**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – TYPES OF PROOF**

The Parties here offer a sign-posting instruction, derived from the ABA Model Instructions, to introduce the concept of monopoly power before giving the jury instructions on the methods by which such monopoly power is proved.

Google's proposed Instruction, however, erroneously instructs the jury that they should only proceed to consider Plaintiffs' proof of monopoly power if Plaintiffs have proven the relevant markets that Plaintiffs have alleged.  The law requires the opposite:  the jury must consider the remaining elements of Plaintiffs' monopolization claims even if the jury agrees with Google's contentions about the scope of the relevant markets or comes to a different conclusion than the parties altogether.  *Epic Games v. Apple*, 67 F.4th 946, 978 n.9 (9th Cir. 2023) (rejecting "radical argument that, where the parties offer dueling market definitions, the case immediately ends if the district court finds that the record supports the defendants' proposed market (or a third in-between market, as was the case here) rather than the plaintiff's market").  Google's instruction that the jury "must consider the monopolization claims separately with respect to the two relevant markets alleged here" also erroneously instructs the jury to determine whether the elements of Plaintiffs' monopolization claims are met only with respect to the markets alleged by Plaintiffs, again contrary to this principle.

Moreover, Google's proposed instruction includes redundant sentences that need not be repeated.  *First*, Google proposes stating that "[a]s I instructed you earlier, monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market."  This is taken verbatim from Instruction No. 17, Monopoly Power—Defined ("Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market.").  *Second*, Google seeks to add that if the jury "find[s] that Google has monopoly power in a relevant market, then you must consider the remaining elements of this claim. If you find that Google does not have monopoly power, then you must find for Google and against Plaintiffs on this claim."  This language is pulled verbatim from the conclusion of the section on monopoly power, where such a concluding sentence belongs.  *See* Instruction No. 24, Monopoly Power—Indirect Proof ("If you find that Google has monopoly power in a relevant market, then you must consider the remaining elements of this

1   claim. If you find that Google does not have monopoly power, then you must find for Google and
2   against Plaintiffs on this claim.").  There is no need to repeat it here, at the introduction to the types of
3   proof that demonstrate monopoly power.  By repeating verbatim these sentences from different places
4   within the instructions, Google risks confusing the jury and increasing the burden on Plaintiffs.  *See*
5   *Temblador*, 368 F.2d at 367 (holding that a judge may conclude that "to repeat the same words would
6   make them no more clear, and to indulge in variations of statement might well confuse").  Google's
7   proposed instruction should be rejected.

1

2

**Defendants' Argument Re Disputed Instruction No. 22**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – TYPES OF PROOF**

3

4

5

6

7

8

Through their proposed instruction, Plaintiffs attempt to evade the requirement that they prove a relevant market.  Plaintiffs elide that requirement by starting their instruction with "Once you determine what a relevant market is," rather than asking whether Plaintiffs have proven a relevant market.  Through this instruction, Plaintiffs (1) flout the requirement that they prove a specific market and (2) invite the jury to find a market other than the markets they have offered into evidence.  But that is not the law.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The law is clear that Plaintiffs must prove a relevant market.  "A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)).  As the Supreme Court explained in *Am. Express*, "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market."  *Am. Express*, 138 S. Ct. at 2285; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) ("To prevail on a § 2 monopoly claim the ISOs were required to prove that Kodak: (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power.").  Therefore, a Section 2 plaintiff must first "define the relevant market" and then "show that the defendant owns a dominant share of that market."  *Eastman Kodak*, 125 F.3d at 1202; *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 993 (9th Cir. 1986); *see Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513 (3d Cir. 1998) ("The burden is on the plaintiff to define both components [product and geographic] of the relevant market."); *Double D. Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) ("It is the plaintiff's burden to define the relevant market.").

24

25

26

27

28

Disputed Instruction No. 23 Re
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF**
**Offered by Plaintiffs**

There are two ways to provide direct proof of monopoly power, which I will now explain.

### Raising or Maintaining Prices Above Competitive Levels

In order to provide direct proof of monopoly power, Plaintiffs have the burden of proving that Google has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels. Plaintiffs must prove that Google has the power to do so by itself— that is, without the assistance of, and despite competition from, any existing or potential competitors.

Plaintiffs also have the burden of proving that Google has the power to maintain prices above a competitive level for a significant period of time. If Google attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then Google does not have monopoly power.

### Power to Exclude Competition

In the alternative, in order to provide direct proof of monopoly power, Plaintiffs must prove that Google has the ability to exclude competition. For example, if Google attempted to maintain prices above competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then Google does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that Google has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that Google would lose a substantial amount of sales if it raised prices substantially, or that Google's profit margins were low compared to its competitors, or that Google's margins go up and down or are steadily decreasing, might be evidence that Google does not have monopoly power.

1    Source: ABA Model Civil Antitrust Jury Instruction 3.A.8 (with edits described in Plaintiffs'

2    argument)

Disputed Instruction No. 23 Re
## MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF
### Offered by Defendants

There are two ways to provide direct proof of monopoly power, which I will now explain.

**Raising or Maintaining Prices Above Competitive Levels**

In order to provide direct proof of monopoly power, Plaintiffs have the burden of proving that Google has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels and reduce or maintain the quality of goods or services in the relevant market below competitive levels, considering both app users and app developers. Plaintiffs must prove that Google has the power to do so by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors.

Plaintiffs also have the burden of proving that Google has the power to maintain prices above a competitive level and quality below the competitive level for a significant period of time. If Google attempted to maintain prices above competitive levels or reduce quality below competitive levels, but would lose so much business to other competitors that the price increase or quality reduction would become unprofitable and would have to be withdrawn, then Google does not have monopoly power.

**Power to Exclude Competition**

In the alternative, in order to provide direct proof of monopoly power, Plaintiffs must prove that Google has the ability to exclude competition. For example, if Google attempted to maintain prices above competitive levels or reduce quality below competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase or quality reduction would become unprofitable and would have to be withdrawn, then Google does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that Google has monopoly power. Plaintiffs cannot prove monopoly power simply by pointing to high profitability margins without also providing competent evidence for what competitive margins should be.  Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing. However, an ability to sell at higher prices or earn higher profit margins than

1  other companies for similar goods or services over a long period of time may be evidence of monopoly

2  power although it is not sufficient, on its own, to prove monopoly power. By contrast, evidence that

3  Google would lose a substantial amount of sales if it raised prices substantially or reduced quality

4  substantially, or that Google's profit margins were low compared to its competitors, or that Google's

5  margins go up and down or are steadily decreasing, might be evidence that Google does not have

6  monopoly power.

7

8  Source: Adapted from ABA Model Civil Antitrust Jury Instruction 3.A.8

**Plaintiffs' Argument Re Disputed Instruction No. 23**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF**

Plaintiffs' proposed instruction is only slightly modified from the ABA Model Instruction and is rooted in case law. *First*, Plaintiffs replace the first paragraph of the Model Instruction (which is redundant with the "Types of Proof" instruction) and replace it with a neutral introductory sentence. *Temblador*, 368 F.2d at 367 (holding that a judge may conclude that "to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse"). *Second*, Plaintiffs add headings to sections of the instruction on raising or maintaining prices above competitive levels and on the power to exclude competition. *Third*, the Parties agree to add an introductory clause to the second section, "Power to Exclude Competition", to explain that Plaintiffs, "in the alternative" to a showing of Google's power to maintain or raise prices above competitive levels, Plaintiffs can prove monopoly power through evidence of Google's power to exclude competition. This introductory language is helpful to the jury and consistent with the law. *See United States v. du Pont Co.*, 351 U.S. 377, 391 (1956) (defining monopoly power as "the power to control prices or exclude competition"). *Finally*, Plaintiffs delete the last sentence (which indicates that the jury must find for defendant if Plaintiffs fail to prove monopoly power directly) because Plaintiffs will introduce both direct and indirect proof of monopoly power, and a similar sentence appears at the conclusion of the subsequent instruction on indirect proof.

Google's revisions should be rejected. In the second, third, fourth and fifth paragraphs, Google revises the Model Instruction to state that, to prove monopoly power, Plaintiffs have the burden of proving that Google both (a) has the power to maintain prices above competitive levels, ***and*** (b) has the power to "reduce or maintain the quality of goods or services in the relevant market below competitive levels." Not so. The Supreme Court has repeatedly held that ***either*** increased prices ***or*** reduced quality or output is direct evidence of monopoly power. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (direct evidence of anticompetitive effects includes "reduced output, increased prices, or decreased quality in the relevant market"); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) ("monopoly power [is] 'the power to control prices or exclude competition'" (quoting *United States v. du Pont Co.*, 351 U.S. 377, 391 (1956)). Further, Google's argument that Plaintiffs must

JOINT SET OF PROPOSED FINAL JURY INSTRUCTIONS AND OBJECTIONS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:22-cv-02746-JD

73

prove both increased prices and decreased quality defies economic sense, as these are merely two sides of the same coin:  unless demand is entirely inelastic, increased prices will almost invariably cause consumers to buy less, thus decreasing output, and vice versa.  Moreover, Google itself concedes in its proposed Monopolization—Willful Acquisition or Maintenance instruction that "[i]n order to have an anticompetitive effect, an act must harm the competitive process and thereby harm consumers by resulting in prices that are above the competitive level *or quality or output* that is below the competitive level."  *See also* Defendants' Proposed Instruction No. 25 ("Some examples of harm to competition include increased prices, fewer transactions, decreased production levels, and reduced quality."). This demonstrates that the ABA Model Instruction is sound.

In the fifth paragraph, Google revises the Model Instruction to state that "Plaintiffs cannot prove monopoly power simply by pointing to high profitability margins without also providing competent evidence for what competitive margins should be."  Again, not so.  In *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021), *rev'd on other grounds*, 67 F.4th 946 (9th Cir. 2023), the court rejected the need for a comparison to a competitive margin, finding that, "under *any normative measure*, the record supports a finding that [defendant's] operating margins tied to [its app store] are *extraordinarily high*."  *Id.* at 953.  Because Apple's "persistently high economic profit is suggestive of market power", the court concluded that "even without comparison to other stores, the operating margins strongly show market power".  *Id.* at 993-94.  On appeal, the Ninth Circuit refused to reverse the court's finding that the defendant's prices were probative of market power.  67 F.4th at 984-85.  Moreover, Google's proposed instruction places an unwarranted burden on the plaintiff, ignoring the fact that a defendant's sustained monopoly power in a relevant market may render it impossible for a plaintiff to provide evidence for what competitive margins should be.  The Court should reject Google's unsupported changes to the ABA Model Instruction.

1

2

**Defendants' Argument Re Disputed Instruction No. 23**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF**

3

4

Plaintiffs' jury instruction on "direct proof" of monopoly power is contrary to controlling law in two critical respects.

5

6

7

8

9

10

11

12

*First*, Epic and Match erroneously propose that they can meet their burden of proving monopoly power by presenting evidence either that "Google has the power to maintain prices above a competitive level for a significant period of time" *or* "in the alternative" evidence that "Google has the ability to exclude competition" without more.  That is incorrect as a matter of law.  The Supreme Court holds that "[m]arket power is the ability to raise price profitably *by restricting output*."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (quoting Areeda & Hovenkamp § 5.01) (emphasis added by Supreme Court).  "Where ... output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand."  *Id.* at 2288.  As the Ninth Circuit has explained:

13

14

15

> A predator has sufficient market power when, *by restricting its own output*, it can restrict marketwide output and, hence, increase marketwide prices. Prices increase marketwide in response to the reduced output because consumers bid more in competing against one another to obtain the smaller quantity available.

16

17

18

19

20

21

22

23

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (internal citations omitted, emphasis added); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2156 (2021) ("Unless the firms have the power to raise price by curtailing output, their agreement is unlikely to harm consumers, and it makes sense to understand their cooperation as benign or beneficial.") (quoting *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 191 (7th Cir. 1985)).  The ABA model instruction correctly provides that a plaintiff must "prove that defendant has the power to maintain prices above a competitive level" *and* "[s]imilarly, plaintiff must prove that defendant has the ability to exclude competition."  ABA Model Civil Antitrust Jury Instr. 3.A.8.

24

25

26

27

28

*Second*, Plaintiffs' proposed instruction is incomplete because it would not instruct the jury that monopoly power also involves the power to reduce quality below a competitive level.  "There can be no doubt as a matter of case law, the Merger Guidelines, and economic theory, that market constraints work not only to limit one's ability to raise prices above a competitive level, but also to limit one's ability to reduce quality or service below competitive levels."  *Cmty. Publishers, Inc. v. Donrey Corp.*,

JOINT SET OF PROPOSED FINAL JURY INSTRUCTIONS AND OBJECTIONS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:22-cv-02746-JD

75

892 F. Supp. 1146, 1153 n.8 (W.D. Ark. 1995), *aff'd sub nom. Cmty. Publishers, Inc. v. DR Partners*, 139 F.3d 1180 (8th Cir. 1998); *see also* Merger Guidelines § 0.1, n. 6 ("Sellers with market power also may lessen competition on dimensions other than price, such as product quality, service, or innovation.").  The evidence at trial will support this instruction.  Epic's own expert, Dr. Bernheim, opines that Google can "exercise its monopoly power by persistently raising prices above competitive levels (and/or reducing quality)."

  *Third*, Plaintiffs' proposed instruction fails to account for the situation where, as here, a two-sided market is asserted.  The Supreme Court holds that where a two-sided market is at issue, it is necessary to evaluate both sides of the market to evaluate any alleged competitive impact.  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2287 (2018) ("Evaluating both sides of a two-sided transaction platform is also necessary to accurately assess competition. . . . Thus, competition cannot be accurately assessed by looking at only one side of the platform in isolation").  Moreover, the questions of whether a market is two-sided and how competition is to be assessed in such a market are issues of law, so the jury must be instructed on these considerations.  *U.S. Airways, Inc. v. Sabre Holdings*, 938 F.3d 43, 58 (2d Cir. 2019).  That the relevant market here is two-sided is particularly critical for the inquiry into monopoly power because, as the Supreme Court has recognized, "Price increases on one side of the platform likewise do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services."  *Am. Express*, 138 S. Ct. at 2286.  Thus, Plaintiffs' proposal to have the jury consider "prices" without any consideration of both sides of the platform – app developers and app users – is legal error and should be rejected.  Google's proposed instruction properly reflects the Supreme Court's guidance for assessing to-sided markets.

Disputed Instruction No. 24 Re
## MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF
**Offered by Plaintiffs**

If you find that Plaintiffs have proven a relevant market, then you should determine whether Google has monopoly power in that market. As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market. Plaintiffs have introduced evidence of the structure of their markets to show that Google has monopoly power. The evidence presented by the parties includes evidence of Google's market share, including market share trends, barriers to entry, entry and exit by other companies, and the number and size of other competitors. If this evidence establishes that Google has the power to control prices and exclude competition in the relevant antitrust markets, then you may conclude that Google has monopoly power in those market.

### Market Share

The first factor that you should consider is Google's share of the relevant markets. Based on the evidence that you have heard about Google's market shares, you should determine Google's market shares as a percentage of total sales in the relevant markets. Google must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the relevant market, such as market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with Google for sales), the entry and exit by other companies, and the number and size of competitors. Along with Google's market share, these factors should inform you as to whether Google has monopoly power. The higher the company's share, the higher the likelihood that a company has monopoly power.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that Google has monopoly power. However, if you find that the other evidence demonstrates that Google does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that Google has monopoly power.

### Market Share Trends

The trend in Google's market share is something you may consider. An increasing market share

1   may strengthen an inference that a company has monopoly power, particularly where that company has

2   a high market share, while a decreasing share might show that a company does not have monopoly

3   power.

4   **Barriers to Entry**

5   You may also consider whether there are barriers to entry into the relevant market. Barriers to

6   entry make it difficult for new competitors to enter the relevant market in a meaningful and timely

7   way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), the

8   large financial investment required to build a plant or satisfy governmental regulations, specialized

9   marketing practices, and the reputation of the companies already participating in the market (or the

10  brand name recognition of their products).

11  Evidence of low or no entry barriers may be evidence that Google does not have monopoly

12  power, regardless of Google's market share, because new competitors could enter easily if Google

13  attempted to raise prices for a substantial period of time. By contrast, evidence of high barriers to entry

14  along with high market share may support an inference that Google has monopoly power.

15  **Entry and Exit by Other Companies**

16  The history of entry and exit in the relevant market may be helpful to consider. Entry of new

17  competitors or expansion of existing competitors may be evidence that Google lacks monopoly power.

18  On the other hand, departures from the market, or the failure of firms to enter the market, particularly

19  if prices and profit margins are relatively high, may support an inference that Google has monopoly

20  power.

21  **Number and Size of Competitors**

22  You may consider whether Google's competitors are capable of effectively competing. In other

23  words, you should consider whether the financial strength, market shares, and number of competitors

24  act as a check on Google's ability to price its products. If Google's competitors are vigorous or have

25  large or increasing market shares this may be evidence that Google lacks monopoly power. On the

26  other hand, if you determine that Google's competitors are weak or have small or declining market

27  shares, this may support an inference that Google has monopoly power.

28

**<u>Conclusion</u>**

If you find that Google has monopoly power in a relevant market, then you must consider the remaining elements of this claim. If you find that Google does not have monopoly power in any relevant market, then you must find for Google and against Plaintiffs on the claim with respect to that relevant market.

Source: ABA Model Civil Antitrust Jury Instruction 3.A.7 (with edits described in Plaintiffs' argument)

Disputed Instruction No. 24 Re
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF**
**Offered by Defendants**

To demonstrate market power indirectly, a Plaintiff must show that the defendant owns a dominant share of that market, and show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run.

**Market Share**

Google must have a significant share of the market in order to possess monopoly power. Based on the evidence that you have heard about Google's market share, you should determine Google's market share as a percentage of total sales in the relevant market. The higher the company's share, the higher the likelihood that a company has monopoly power.

A market share below 65 percent is ordinarily not sufficient to support a conclusion that a defendant has monopoly power.

**Barriers to Entry**

Even if you find that Google has a high share of a relevant market that the Plaintiffs have proven, you must next determine whether there are barriers to entry into the relevant market. A mere showing of substantial or even dominant market share alone cannot establish market or monopoly power.  The Plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output if the defendant raises price above competitive levels or reduces quality below competitive levels.

Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Evidence of low or no entry barriers is evidence that Google does not have monopoly power, regardless of Google's market share, because new competitors could enter easily if Google attempted to raise prices for a substantial period of time.  If you find that Plaintiffs have not proven that there are entry barriers in a relevant antitrust market, then you must find that Plaintiffs have not proven indirectly that Google has monopoly power in that market.

**Entry and Exit by Other Companies**

The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Google lacks monopoly power.

On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Google has monopoly power.

**Number and Size of Competitors**

You may consider whether Google's competitors are or were capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on Google's ability to price its products. If Google's competitors are vigorous or have large or increasing market shares, this may be evidence that Google lacks monopoly power. On the other hand, if you determine that Google's competitors are weak or have small or declining market shares, this may support an inference that Google has monopoly power, although it is not sufficient on its own to prove that Google has monopoly power.

**Conclusion**

If you find that Google has monopoly power in a relevant market, then you must consider the remaining elements of Plaintiffs' claims for monopolizing that market. If you find that Google does not have monopoly power in a relevant market, then you must find for Google and against Plaintiffs on their claims for monopolizing that market.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 3.A.7; *Rebel Oil Co v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)

**Plaintiffs' Argument Re Disputed Instruction No. 24**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF**

Plaintiffs' instruction is a near copy of the ABA Model Instruction.  This instruction, in slightly modified form, was given in *SmithKline Beacham Corp. v. Abbott Labs.*, 07-cv-5702 (N.D. Cal.) and *Sumotext Corp. v. Zoove, Inc.*, 16-cv-1370 (N.D. Cal.).  *See* Final Jury Instructions at 11-14, 07-cv-5702, ECF No. 485 (N.D. Cal. Mar. 25, 2011); Jury Instructions at 44-45, 16-cv-1370, ECF No. 468 (N.D. Cal. Mar. 4, 2020).

Google proposes deleting most of Plaintiffs' first paragraph, which explains that the indirect forms of proof of monopoly power are intended to inform the ultimate question of whether Google has monopoly power—i.e., "the power to control prices and exclude competition"—as described in the immediately preceding instruction. Google's proposal seeks to misdirect the jury away from that question by requiring that Plaintiffs "show that the defendant owns a dominant share of that market, ***and*** show that there are significant barriers to entry ***and*** show that existing competitors lack the capacity to increase their output in the short run."  Google also makes corresponding changes to each of the subsections on these topics.  But Google's authority, *Rebel Oil Co v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995), does not require this Court to give this instruction. To begin with, *Rebel Oil* was decided nearly 30 years ago, and the ABA Model Instruction has not been revised as Google proposes. And for good reason.  The *Rebel Oil* court assessed whether there was a genuine issue of disputed fact regarding market power in the context of alleged predatory pricing.  Contrary to Google's proposed instruction, the court held that there was no universal requirement that a plaintiff demonstrate barriers to entry during a period of anti-competitive conduct.  *Id*. at 1440 ("We know of no authority that would require, as proof of market power, evidence of entry barriers throughout the period of predation.").

Google's proposal that the jury be instructed that Plaintiffs must show "existing competitors lack the capacity to increase their output" is similarly unjustified.  While it is true that the *Rebel Oil* court found competitors' ability to expand their operations to cut against a finding of market power, the court found evidence of "excess capacity" to be relevant because it informed the ultimate question of whether a dominant firm has "the ability to control output and prices—the essence of market power".  *Id*. at 1441.  This is the basic legal principle that the ABA Model Instruction already explains; evidence of market structure, including barriers to entry and excess capacity, is relevant to the ultimate

1    question of market power.  Google's proposal would eliminate the focus on that ultimate issue in favor

2    of improperly elevating subsidiary factual considerations.  The jury should not be instructed on out-of-

3    context holdings from cases involving disparate factual circumstances when the Model instruction

4    adequately covers the topic.  *See Heath v. Cast*, 813 F.2d 254, 261 (9th Cir. 1987).

5        The Court should also reject Google's proposals to deviate from the Model so as to delete or

6    mangle other factors relevant to monopoly power.  For example, Google proposes to delete an

7    instruction allowing the jury to consider market share trends, contrary to law.  *Air Passenger Comp.*

8    *Res. Sys.*, 694 F. Supp. at 1460 ("[H]istorical trends within the industry" are relevant to a finding of

9    market power).  Google proposes to inform the jury that barriers to entry exist only when "new rivals

10   are **barred**" from entry, again contrary to law, which does not require absolute bars on entry.  *E.g,. Los*

11   *Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427–28 (9th Cir. 1993) (barriers to entry exist

12   based on "additional long run costs" incurred by new entrants or "factors that deter entry while

13   permitting incumbent firms to earn monopoly returns").  Google also seeks to delete from the Model

14   relevant examples of barriers to entry, including intellectual property, large financial investments

15   required to compete, and the reputation of companies already operating in the space.  These are all

16   cognizable barriers to entry, *see* Areeda & Hovenkamp, *Antitrust Law* ¶ 941, appearing in the Model

17   Instruction.  Google further proposes to instruct the jury that it should consider whether competitors

18   "are **or were** capable of effectively competing", even though Plaintiffs' case focuses on Google's

19   **ongoing** monopoly maintenance, which is based on current market conditions.

20       Finally, Google seeks to mislead the jury by informing it that "[a] market share below 65

21   percent is ordinarily not sufficient to support a conclusion that a defendant has monopoly power"

22   without also informing the jury, as the Model does, that "if you find that the other evidence

23   demonstrates that Google does, in fact, have monopoly power despite having a market share below 50

24   percent, you may conclude that Google has monopoly power".  Google's proposal to substitute a 65%

25   standard for the 50% standard provided by the Model is contrary to law.  Google's own authority states

26   that "numerous cases" use a 50% threshold in determining whether plaintiffs have made a prima facie

27   showing of monopoly power.  *See Rebel Oil*, 51 F.3d at 1438; *see also Aya Healthcare Servs. v. AMN*

28   *Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1333 (S.D. Cal. 2020).

1

2

**Defendants' Argument Re Disputed Instruction No. 24**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF**

3

4

The jury instruction proposed by Plaintiffs on "indirect proof" of monopoly power is contrary to controlling law in two specific respects.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

*First*, Plaintiffs propose language stating that "[a] market share below 50 percent is ordinarily not sufficient to support a conclusion that Google has monopoly power." While that is consistent with the ABA model instruction, the implication is contrary to Ninth Circuit authority. In this Circuit, the market share threshold for finding a prima facie case of monopoly power is generally no less than 65 percent market share. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power"); *see also Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir. 1986) ("[A]s far as we know, neither the Supreme Court nor any other court has ever decided whether a market share as low as 60-69% is sufficient, standing alone, to sustain such a finding"). Indeed, a Fourth Circuit decision observed that "the Supreme Court has never found a party with less than 75% market share to have monopoly power. And we have observed 'that when monopolization has been found the defendant controlled seventy to one hundred percent of the relevant market.'" *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014) (citations omitted). Plaintiffs compound this legal error by proposing that the jury "may conclude that Google has monopoly power" even if it finds "a market share below 50 percent," which is contrary to controlling Ninth Circuit law.

20

21

22

23

24

Similarly, Plaintiffs' proposal that the jury may find monopoly power from "an increasing market share" regardless of Google's actual market share is contrary to the authorities discussed above and should be omitted. Plaintiffs' proposed low threshold, along with their attempts to instruct the jury to find monopoly power regardless of any market share findings, misstate the law, and they must be rejected. Google's proposal is consistent with controlling authority.

25

26

27

28

*Second*, and relatedly, Plaintiffs propose to instruct the jury to consider "barriers to entry" with no reference to any findings on market share. This would improperly permit a finding of "monopoly power" even if the jury finds that Google had a low market share or permit a finding of monopoly power without proof of barriers to entry. That is also contrary to Ninth Circuit law. A finding of monopoly or

JOINT SET OF PROPOSED FINAL JURY INSTRUCTIONS AND OBJECTIONS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:22-cv-02746-JD

84

1   market power requires that "a plaintiff must: (1) define the relevant market, (2) show that the defendant

2   owns a dominant share of that market, *and* (3) show that there are significant barriers to entry and show

3   that existing competitors lack the capacity to increase their output in the short run."  *Rebel Oil Co., Inc.*

4   *v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (emphasis added).  Thus, *even if* a defendant is

5   found to have a high—above 65%—market share, a jury can conclude it lacks monopoly power by

6   finding low barriers to entry.  Plaintiffs flip this on its head in seeking to allow the jury to find monopoly

7   power solely from barriers to entry even in the absence of a high market share.  Plaintiffs' proposal is

8   contrary to the law and must be rejected.  Google's proposed instruction follows Ninth Circuit law.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2
Disputed Instruction No. 25 Re
MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY
POWER THROUGH ANTICOMPETITIVE ACTS
Offered by Plaintiffs[1]

3

4
To prove their monopolization claims, Plaintiffs must prove that Google willfully acquired or

5
maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts,

6
other than competition on the merits, that have the effect of preventing or excluding competition or

7
frustrating the efforts of other companies to compete for customers within the relevant market.

8
Harm to competition is to be distinguished from harm to a single competitor or group of

9
competitors, which does not necessarily constitute harm to competition. Some examples of harm to

10
competition include increased prices, decreased production levels, and reduced quality.  In evaluating

11
alleged harm in a market that you have found to be two sided, you must consider whether there is harm

12
to either or both sides of the market.

13
Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws.

14
The acquisition or maintenance of monopoly power by supplying better products or services,

15
possessing superior business skills, or because of luck, is not unlawful.

16
A monopolist may compete aggressively without violating the antitrust laws, and a monopolist

17
may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only

18
becomes unlawful where it involves anticompetitive acts.

19
The difference between anticompetitive conduct and conduct that has a legitimate business

20
purpose can be difficult to determine. This is because all companies have a desire to increase their

21
profits and increase their market share. These goals are an essential part of a competitive marketplace,

22
and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long

23
as a company does not use anticompetitive means to achieve these goals.

24
_____

25

26

27

28
[1] Plaintiffs offer here the ABA Model Instruction relevant to their Section 2 claims.  Google's proposed instruction includes a heavily revised version of this ABA Model Instruction as well as language from certain revised Model Instructions copied from the instructions relevant to ***Section 1*** claims.  Plaintiffs object both to Google's proposed revisions to this proposed instruction as well as to their proposal to include the additional language copied from the Section 1 instructions.  Because Google has insisted on combining these instructions and because Plaintiffs cannot address both such objections in a single position statement, they respectfully submit two positions statements, one covering each objection.

1    In determining whether Google's conduct was anticompetitive or whether it was legitimate

2    business conduct, you should determine whether the conduct is consistent with competition on the

3    merits, whether the conduct provides benefits to consumers in the market that Google has

4    monopolized, and whether the conduct would make business sense apart from any effect it has on

5    excluding competition or harming competitors.  In evaluating alleged benefits in a market you have

6    found to be two-sided, you must consider whether there are benefits in either or both sides of the

7    market.

8    The acts or practices that result in the acquisition or maintenance of monopoly power must

9    represent something more than the conduct of business that is part of the normal competitive process or

10   commercial success. They must represent conduct that has made it very difficult or impossible for

11   competitors to compete and that was taken for no legitimate business reason. You may not find that a

12   company willfully acquired or maintained monopoly power through anticompetitive means if it has

13   acquired or maintained that power solely through the exercise of superior foresight and skill; or

14   because of natural advantages such as unique geographic access to raw materials or markets; or

15   because of economic or technological efficiency, including efficiency resulting from scientific

16   research; or by obtaining a lawful patent or patents; or because changes in cost or consumer preference

17   have driven out all but one supplier.

18   In summary, you must determine whether Google's conduct has caused substantial harm to

19   competition in a relevant market.  If there was harm to competition, you must determine whether

20   Google has justified its conduct by proving that its conduct was reasonably necessary to achieve

21   competitive benefits for consumers in that relevant market.  However, if you find that Google could

22   have readily achieved any benefits using reasonably alternative means that would have caused

23   substantially less harm to competition, those benefits cannot justify Google's conduct.  You must then

24   balance any harms you found against any benefits you found.  You must consider any harms and

25   benefits in both sides of the market for any market you have found to be two-sided.  If the harms to

26   competition resulting from Google's conduct substantially outweigh the benefits, then you must find

27   that Google willfully acquired or maintained monopoly power through anticompetitive acts.

28   If you find that Plaintiffs have proven by a preponderance of the evidence that Google willfully

1    acquired or maintained monopoly power through anticompetitive acts, then you must consider whether

2    Plaintiffs have proved the remaining elements of these claims. If, however, you find that Plaintiffs did

3    not prove this element by a preponderance of the evidence, then you must find for Google and against

4    Plaintiffs on these claims.

5

6    Source: ABA Model Civil Antitrust Jury Instruction 3.A.9 (minus examples included in Model)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Disputed Instruction No. 25 Re
**MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS**
**Offered by Defendants**

To prove their monopolization claims, Plaintiffs must prove that Google willfully acquired or maintained monopoly power through anticompetitive acts or practices (so called "exclusionary conduct").

Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.  In order to prove that Google has acquired or maintained monopoly power in a relevant market through anticompetitive acts, Plaintiffs must demonstrate that Google's challenged conduct has resulted in a substantial harm to competition in a relevant market that harms consumers in that market, considering both app users and app developers.  In order to have an anticompetitive effect, an act must harm the competitive process and thereby harm consumers by resulting in prices that are above the competitive level or quality or output that is below the competitive level.

Harm to competition is to be distinguished from harm to a single competitor or group of competitors, or a single side of the market, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, fewer transactions decreased production levels, and reduced quality. However, evidence that conduct has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently prove an injury to competition because both effects are fully consistent with a free, competitive market.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business

1   purpose can be difficult to determine. This is because all companies have a desire to increase their profits

2   and increase their market share. These goals are an essential part of a competitive marketplace, and the

3   antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a

4   company does not use anticompetitive means to achieve these goals.

5        In determining whether Google's conduct was anticompetitive or whether it was legitimate

6   business conduct, you should determine whether the conduct is consistent with competition on the merits,

7   whether the conduct provides benefits to consumers in the market that Google has monopolized, and

8   whether the conduct would make business sense apart from any effect it has on excluding competition

9   or harming competitors. The acts or practices that result in the acquisition or maintenance of monopoly

10  power must represent something more than the conduct of business that is part of the normal competitive

11  process or commercial success. They must represent conduct that has made it very difficult or impossible

12  for competitors to compete and that was taken for no legitimate business reason.  Under the antitrust

13  laws, a company generally does not have any duty to aid its competitors. Therefore, in evaluating this

14  claim, you may not base your decision on Google's policy against distributing competing app stores

15  through the Google Play Store.

16       You must determine whether Plaintiffs have proven an anticompetitive effect for each of the acts

17  that Plaintiffs allege were anticompetitive.  If you find that Plaintiffs have not proven that an alleged act

18  has made it very difficult or impossible for competitors to compete and that was taken for no legitimate

19  business reason, then that act cannot be an anticompetitive act that enabled Google to unlawfully acquire

20  or maintain monopoly power in a relevant market.

21       You may not find that a company willfully acquired or maintained monopoly power through

22  anticompetitive means if it has acquired or maintained that power solely through the exercise of superior

23  foresight and skill; or because of natural advantages such as unique geographic access to raw materials

24  or markets; or because of economic or technological efficiency, including efficiency resulting from

25  scientific research; or by obtaining a lawful patent or patents; or because changes in cost or consumer

26  preference have driven out all but one supplier.

27       If you find that Plaintiffs have not proven by a preponderance of the evidence that Google's

28  challenged conduct has resulted in a substantial harm to competition in the relevant market that harms

consumers in that market, then you must find for Google on Plaintiffs' claim that Google has unlawfully monopolized that market.

You must determine whether Plaintiffs have proven an anticompetitive effect for each of the acts that Plaintiffs allege were anticompetitive. If you find that Plaintiffs have not proven that an alleged act has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason, then that act cannot be an anticompetitive act that enabled Google to unlawfully acquire or maintain monopoly power in a relevant market.

If you determine that Plaintiffs have proven that the challenged conduct resulted in substantial harm to competition that causes harm to consumers in a relevant market, considering both app users and app developers, then you next must determine whether the conduct also benefits competition in other ways. Conduct that benefits competition can include conduct that increases output, enhances efficiency, reduces prices or enhances consumer appeal. You may consider benefits to competition that impact the relevant market in which Google allegedly harmed competition as well as benefits to competition in related markets. If you find that the challenged restraint does result in competitive benefits, then Plaintiffs must prove that all (or virtually all) of the procompetitive benefits could be achieved through substantially less restrictive means. In determining whether all of these procompetitive benefits could reasonably have been achieved through substantially less restrictive means, you must assess such factors as whether other means to achieve Google's objectives were substantially more or less expensive and more or less effective than the means chosen by Google. You must, however, give a wide berth to Google's business judgment. You may not find that there was a substantially less restrictive alternative if that alternative would cost significantly more to Google. An alternative that would require Google to give away Android, Google Play, the Google Play store, or other applications and services for free cannot be considered a viable less restrictive alternative.

If Plaintiffs are unable to show that Google could achieve all the procompetitive benefits of challenged conduct through a less restrictive alternative that would be at least as effective and that would not impose significant costs on Google, then you must find for Google on Plaintiffs' claim that Google used the challenged conduct to unlawfully acquire or maintain a monopoly unless Plaintiffs prove that competitive harm of the challenged conduct substantially outweighs the competitive

benefits. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged conduct is lawful and justified.

In conducting this analysis, you must consider the benefits and harm to competition and consumers (meaning users and developers), not just to a single competitor or group of competitors.  However, in conducting this balancing, you must give wide berth to business judgments before finding liability.  You should not second-guess whether Google's challenged conduct was reasonably necessary as a matter of degree.  You may not balance the competitive effects of Google's challenged conduct or conclude that it is anticompetitive based on your personal views of whether the conduct is fair or desirable or whether permitting or prohibiting the conduct would be sound policy; only the effect on *competition* matters.

As I noted earlier, Plaintiffs allege that Google has acquired or maintained monopoly power in relevant markets through a variety of anticompetitive acts.  You must evaluate for each alleged anticompetitive act whether Google could achieve the same procompetitive benefits of that act through substantially less restrictive means.  If Plaintiffs have not proven by a preponderance of the evidence that any procompetitive benefits could be achieved through substantially less restrictive means as defined by the instructions I have given you, then you must find for Google on Plaintiffs' monopolization claim.

Source: Adapted from ABA Model Civil Antitrust Jury Instructions 3.A.9, 1.C. 3, 1.C.4, and Ninth Circuit Model Instruction 1.7.

**Plaintiffs' Argument Re Disputed Instruction No. 25**
**MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY**
**POWER THROUGH ANTICOMPETITIVE ACTS**

Google's proposed instruction regarding "Willful Acquisition or Maintenance" is actually an amalgamation of separate Model Instructions:  (1) a heavily edited version of the "Willful Acquisition" Model Instruction given in **Section 2 cases**, and (2) heavily edited versions of two Model Instructions given in **Section 1 cases.  (**Evidence of Competitive Benefits and Balancing the Competitive Effects.) In this position statement, Plaintiffs object to Google's version of the "Willful Acquisition or Maintenance" Instruction.  In the next position statement, Plaintiffs object to Google's proposal to include the Section 1 instructions out of order here, in connection with the Section 2 claims.

Plaintiffs' "Willful Acquisition or Maintenance" Instruction is a near copy of the ABA Model Instruction.  Plaintiffs modified the Model only to remove inapplicable and lengthy examples of anticompetitive conduct not usefully explained in this case.  At Google's request, Plaintiffs also have agreed to add concise language to the Model to reflect (1) the Supreme Court's holding that competitive harms and benefits on both sides of a market are analyzed in two-sided markets, *Ohio v. American Express*, 138 S. Ct. 2274 (2018); and (2) the Ninth Circuit's guidance that the four-part rule of reason analysis is "essentially" the same in the context of Section 1 and Section 2 claims (the paragraph beginning "In summary . . ."), *see Epic Games v. Apple*, 67 F.4th 946, 974 (9th Cir. 2023). By contrast, Google proposes major revisions to the model.

In the first paragraph, Google seeks to insert a parenthetical referring to anticompetitive acts or practices as "so-called 'exclusionary conduct'".  This modification pejoratively introduces the term "exclusionary conduct" and does nothing to "fairly and adequately cover the issues presented" because the term "exclusionary conduct" is never defined in the instruction.  *Gantt v. City of L.A.*, 717 F.3d 702, 706 (9th Cir. 2013).  The Model fully addresses the conduct constituting willful acquisition or maintenance of monopoly power without the confusing detour to "exclusionary conduct".

Similarly, by stating "an act must harm the competitive process and thereby harm consumers", Google pulls its preferred language from the case law with no justification, adding unnecessary words that solely risk confusing the jury.  Google is not entitled to insert every piece of favorable language it can pull from case law into the jury instructions.  *See Heath*, 813 F.2d at 261 ("a court is not required

1    . . . to incorporate every proposition of law a party suggests").  And that language is particularly

2    confusing here, where the "consumers" include app developers, not just app users.

3    In the third paragraph, Google adds the sentence "[h]owever, evidence that conduct has the

4    effect of reducing consumers' choices or increasing prices to consumers does not sufficiently prove an

5    injury to competition because both effects are fully consistent with a free, competitive market."

6    Though this language appears in *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), the Ninth

7    Circuit went on to explain that such effects can be the consequence of an antitrust violation: "to prove

8    a violation of the Sherman Act, the plaintiff must show that diminished consumer choices and

9    increased prices are the result of a less competitive market due to either artificial restraints or predatory

10   and exclusionary conduct."  *Id.* at 990.

11   In the seventh paragraph, Google adds that "Under the antitrust laws, a company generally does

12   not have any duty to aid its competitors. Therefore, in evaluating this claim, you may not base your

13   decision on Google's policy against distributing competing app stores through the Google Play Store."

14   Again, Google is choosing its favored language from case law and risks misleading the jury about the

15   proper analysis and about the nature of Plaintiffs' claims.  Plaintiffs do not assert that Google has a

16   duty to deal with its competitors.  As Plaintiffs explained in their Opposition to Google's Motion for

17   Summary Judgment, they challenge Google's prohibition on the distribution of app stores through the

18   Google Play Store as part of "the thicket of restrictions Google employs to foreclose competing

19   stores."  Summ. J. Opp., ECF No. 509 at 5.  Google's "focus on specific individual acts of an accused

20   monopolist while refusing to consider their overall combined effect" is "not . . . proper."  *City of

21   Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992); *see Klein v. Meta Platforms, Inc.*,

22   2022 WL 17477101, at *2 (N.D. Cal. Dec. 6, 2022).  Similarly, Google adds an eighth paragraph,

23   stating that Plaintiffs must prove that each of Google's acts was anticompetitive.  But, again, it would

24   not be proper to focus on specific individual acts of an accused monopolist while refusing to consider

25   their overall combined effect.  *City of Anaheim*, 955 F.2d at 1376.

26   Google's modification to the last paragraph—to state when the jury must find for Google,

27   without stating when they must find for Plaintiffs—is also inappropriately one-sided.

28

**Plaintiffs' Argument Re Inclusion of Section 1 Instructions in Disputed Instruction No. 25**
**MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY**
**POWER THROUGH ANTICOMPETITIVE ACTS**

Google proposes to add here, in connection with Plaintiffs' **Section 2** claims, two instructions that are heavily modified versions of certain ABA Model Instructions on **Section 1** claims. (Instruction Nos. 37, 38 (Evidence of Competitive Benefits and Balancing the Competitive Effects).) These Instructions are specific to Plaintiffs' Section 1 claims; common sense and the ABA Model Instructions do not suggest or warrant giving any corollary instruction in connection with Plaintiffs' Section 2 claims.  Plaintiffs therefore object entirely to giving these Instructions in connection with the Section 2 claims.

In the alternative only, if the Court agrees with Google's request to give these Section 1 instructions within the Section 2 instructions, Plaintiffs also object to the contents of Google's proposed instructions for the reasons identified in Plaintiffs' Argument Re Instructions Nos. 37 and 38. Google's proposed instructions heavily modify the ABA's Model Instructions for Section 1 claims, and Plaintiffs request that the Court give Plaintiffs' versions of the rule of reason instructions.  *See* Disputed Instructions Nos. 37 and 38.  To avoid duplication of Plaintiffs' substantive objections to Google's proposed instructions, Plaintiffs respectfully refer the court to their statements concerning the proposed Section 1 claims where those proposed instructions appear in order below.  Plaintiffs' Arguments re Disputed Instruction Nos. 37, 38.

Google contends that duplicating these Section 1 instructions and giving them out of order, in connection with Plaintiffs' Section 2 claims, is necessary because courts have recognized the similarity between the rule of reason analysis in Section 1 and Section 2 claims.  *See FTC v. Qualcomm*, 969 F.3d 974, 991 (9th Cir. 2020).  But Section 2 instructions already explain how the rule of reason operates in the Section 2 context.  For example, Instruction No. 25 on Willful Acquisition or Maintenance instructs the jury to "determine . . . whether the conduct provides benefits to consumers in the market that Google has monopolized", and to determine whether Google's "conduct was reasonably necessary to achieve competitive benefits for consumers in that relevant market".  As a further compromise, Plaintiffs added a paragraph to the Willful Acquisition or Maintenance Model Instruction that summarizes the four-step burden shifting framework, using language drawn from the

1   Section 1 Model Instructions, to make clear that the four-step process also applies in the context of the

2   Section 2 claims.  (See Instruction No. 25 (Paragraph beginning "In summary . . .".))

3          Google's proposal to replicate here the Section 1 instructions *in addition to* the Section 2

4   instructions poses serious risk of jury confusion.  Because the existing Section 2 instructions and the

5   Section 1 instructions that Google seeks to graft onto them both discuss the rule of reason elements,

6   Google's proposal to repeat that analysis will erroneously suggest that the jury needs to go through two

7   rule of reason analyses under Section 2, which the jury will naturally conclude must be distinguishable

8   from one another.  The suggestion that Plaintiffs need to scale two rule of reason analyses would

9   improperly raise Plaintiffs' burden on their Section 2 claims.  *See Temblador v. Hamburg-American*

10  *Lines*, 368 F.2d 365, 367 (9th Cir. 1966) (holding that a judge may conclude that "to repeat the same

11  words would make them no more clear, and to indulge in variations of statement might well confuse"

12  (quoting *United States v. Bayer*, 331 U.S. 532, 536 (1947))).  By contrast, Plaintiffs' more modest

13  addition of the "In summary..." paragraph into the Willful Acquisition or Maintenance instruction

14  hews more closely to the model instructions and provides ample guidance to the jury without the risk

15  of jury confusion.  Further, Plaintiffs' proposal will not require the Court to give the same Section 1

16  instructions twice—once in connection with Section 2 and again in connection with Section 1—or else

17  to use a potentially confusing cross-reference to remind the jury of the Section 1 rule of reason analysis

18  once the Court reaches the Section 1 instructions.

19         Finally, Google seeks to add two Section 1 instructions relevant to its defense—Evidence of

20  Competitive Benefits and Balancing the Competitive Effects—without the corresponding Section 1

21  Model Instruction informing the jury about how Plaintiffs may prove competitive harm in the first

22  place.  Google thus unfairly seeks to tip the scales in its favor.  Google's proposal to use cherry-picked

23  out-of-order instructions should be rejected.  If the Court is inclined to use Google's Section 1

24  instructions out of order, then Plaintiffs submit that the Court should include all the instructions

25  relating to the burden-shifting framework at this juncture, and the Court should use the Section

26  instructions proposed by Plaintiffs (Disputed Instructions Nos. 36, 37, 38), rather than those proposed

27  by Google, for the reasons explained in the Plaintiffs' statements concerning those proposed

28  instructions.  *See* Plaintiffs' Argument Re Disputed Instruction Nos. 36, 37, 38.

**Defendants' Argument Re Disputed Instruction No. 25**
**MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS**

Plaintiffs' proposed instruction contradicts controlling authority in many respects.

*First*, Plaintiffs' do not adopt the burden-shifting framework that applies to Section 2 claims. In *Epic v. Apple*, the Ninth Circuit explained that the "anticompetitive-conduct requirement is 'essentially the same' as the Rule of Reason inquiry applicable to Section 1 claims." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (quoting *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).

> Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (citations omitted). Plaintiffs' instruction does not reflect this burden-shifting framework and therefore would not apprise the jury of the law.

*Second*, Plaintiffs' proposed instruction misstates the law in providing that if they prove that Google's conduct harmed competition in a relevant market, then Google must prove that the conduct "was reasonably necessary to achieve competitive benefits for consumers in that market." Courts "have found it appropriate in some cases to balance the anticompetitive effects on competition in one market with certain procompetitive benefits in other markets." *Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994); *accord In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1268 (9th Cir. 2020) (Smith, J., concurring) (courts "have permitted defendants to offer procompetitive effects in a collateral market as justification for anticompetitive effects in the defined market") (citing cases).[2]

---

[2] *See NCAA v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85 (1984) (considering whether preserving demand for tickets to college football games could justify restriction of competition for licensing TV broadcasts)*; NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1268 (9th Cir. 2020) (citing *Board of Regents*, 468 U.S. at 95-96)*; see also O'Bannon v. NCAA*, 802 F.3d 1049, 1072 (9th Cir. 2015) (crediting NCAA's justification that compensation rules "promote amateurism, which in turn plays a role in increasing consumer demand for college sports" even though rules "ha[d] a significant anticompetitive effect on the college education market"); *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1395-97 (9th Cir. 1984) (enhancing NFL's football ability to "compet[e] with other forms of entertainment" could justify rule limiting competition among NFL teams for stadium locations).

*Third*, Plaintiffs' instruction contradicts the Supreme Court's instructions regarding how to assess competitive effects in a two-sided market.  In *Ohio v. Am. Express*, the Supreme Court explained that "[e]valuating both sides of a two-sided transaction platform is [] necessary to accurately assess competition" and "competition cannot be accurately assessed by looking at only one side of the platform in isolation."  138 S. Ct. at 2287.  Plaintiffs' instruction contradicts this precedent by providing that the jury can consider effects on "either or both sides of the market."  That is not the law.

*Fourth*, Plaintiffs' proposed instruction does not inform the jury that it "must evaluate whether each type of alleged exclusionary practice has the requisite anticompetitive effect."  *United States v. Google, LLC*, __ F.Supp.3d __, 2023 WL 4999901, at *12 (D.D.C. Aug. 4, 2023).  The federal court in Washington, D.C. hearing the antitrust case against Google related to its search engine "agree[d] with Google" on this point and rejected the position of the government to the contrary.  That ruling is consistent with the Ninth Circuit's decision in *FTC v. Qualcomm*, where it considered the effects of each allegedly anticompetitive act.  *See* 969 F.3d at 993.  The D.C. Circuit in *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001), used the same approach.

*Fifth*, the jury should not balance competitive effects if Plaintiffs fail to prove a less restrictive alternative at the third step of the rule of reason analysis.  The Supreme Court and Ninth Circuit have referred to "a three-step" or "three-part" test.  *NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021); *Qualcomm, Inc.*, 969 F.3d at 991; *O'Bannon*, 802 F.3d at 1070.  Indeed, in its recent petition for a writ of certiorari in its litigation against Apple, Epic argued that under Ninth Circuit law, a defendant who prevails at Step 3 effectively prevails in the litigation.[3]  Google has proposed language regarding balancing in the event that this objection is overruled.

*Finally*, if Plaintiffs offer evidence that Google refused to distribute competing app stores through the Google Play store, then the jury must be instructed that Google has not duty to aid its competitors.  *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020).

---

[3] *See* Petition for a Writ of Certiorari, *Epic Games, Inc. v. Apple, Inc.*, No. 23-____, at 17 (S. Ct. 2023).

Stipulated Instruction No. 27[4] Re
**ATTEMPT TO MONOPOLIZE – ELEMENTS**

In the alternative to Match's monopolization claims, Match alleges that it was injured by Google's unlawful attempt to monopolize the market for Android in-app billing services for digital goods and services transactions. To prevail on its claim of attempted monopolization, Match must prove each of the following elements by a preponderance of the evidence:

1. Google engaged in anticompetitive conduct;

2. Google had a specific intent to achieve monopoly power in a relevant market;

3. there was a dangerous probability that Google would achieve its goal of monopoly power in the relevant market;

4. Google's conduct occurred in or affected interstate commerce; and

5. Match was injured in its business or property by Google's anticompetitive conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Google and against Match on Match's claim of attempted monopolization. If you find that the evidence is sufficient to prove all five elements as to Google, then you must find for Match and against Google on Match's claim of attempted monopolization.


Source: ABA Model Civil Antitrust Jury Instruction 3.D.1

---

[4] Footnote 26 is omitted.

Stipulated Instruction No. 28 Re
ATTEMPTED MONOPOLIZATION – ANTICOMPETITIVE CONDUCT

To prevail on its attempted monopolization claim, it is not sufficient for Match to prove that Google intended to monopolize the market for Android in-app billing services for digital goods and services transactions. Match must also show that Google engaged in anticompetitive conduct, coupled with an intent to monopolize and a dangerous probability that Google would succeed. I previously instructed you on the meaning of anticompetitive conduct.  Refer to my previous instructions in evaluating whether conduct was anticompetitive.

Source: ABA Model Civil Antitrust Jury Instruction 3.D.2

Stipulated Instruction No. 29 Re
**ATTEMPTED MONOPOLIZATION – SPECIFIC INTENT**

To prevail on its attempted monopolization claim, Match must prove that Google had a specific intent to monopolize a relevant market. To do so, Match must first prove that the market it is talking about—an alleged market for Android in-app billing services for digital goods and services transactions—is a relevant market for antitrust purposes. Match must then prove that Google had a specific intent to monopolize that market. The Court has previously instructed you on the relevant market, including the relevant product market, the relevant geographic market, and the need to account for both users and app developers in analyzing markets involving two-sided platforms.  The Court will soon discuss specific intent. If Match proves both that a market for Android in-app billing services for digital goods and services transactions is a relevant market and that Google had a specific intent to monopolize that market, you must find that Match has proven this element of its attempted monopolization claim and you should consider the other elements of the claim. If you find that Match failed to prove either of these points, then you must find for Google on Match's attempted monopolization claim.

If you find that Match has proven a relevant market, you must then decide whether Google had the specific intent to monopolize that market. In other words, you must decide if the evidence shows that Google acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the relevant market.

There are several ways in which Match may prove that Google had the specific intent to monopolize. There may be evidence of direct statements of Google's intent to obtain a monopoly in the relevant market. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Google at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Google. You must be careful, however, to distinguish between Google's lawful intent to compete aggressively, which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Google actually intended to

1   obtain a monopoly, specific intent may be inferred from what Google did. For example, if the evidence

2   shows that Google lacked a legitimate business justification and the natural and probable consequence

3   of Google's conduct in the relevant market was to give Google control over prices and to exclude or

4   destroy competition, and that this was plainly foreseeable by Google, then you may (but are not

5   required to) infer that Google specifically intended to acquire monopoly power.

6

7   Source: ABA Model Civil Antitrust Jury Instruction 3.D.3

Stipulated Instruction No. 30 Re
**ATTEMPTED MONOPOLIZATION – DANGEROUS PROBABILITY OF SUCCESS**

If you find that Google had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that Google would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

I instructed you earlier today on the meaning of monopoly power.  You must refer back to that instruction in determining whether there was a dangerous probability that Google would obtain monopoly power.

In determining whether there was a dangerous probability that Google would acquire the ability to control price in the market, you should consider such factors as:

Google's market share;

the trend in Google's market share;

whether the barriers to entry into the market made it difficult for competitors to enter the market; and

the likely effect of any anticompetitive conduct on Google's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Google would ultimately acquire monopoly power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Google would ultimately acquire monopoly power.

Source: ABA Model Civil Antitrust Jury Instruction 3.D.4

Stipulated Instruction No. 31 Re
**SECTION 1 – RESTRAINT OF TRADE**

In addition to their monopolization claims, Plaintiffs challenge Google's conduct under Section 1 of the Sherman Act and California state law. Section 1 prohibits contracts, combinations and conspiracies that unreasonably restrain trade. To establish a violation of Section 1 of the Sherman Act and California state law, Plaintiffs must prove the following:

1.  the existence of a contract, combination or conspiracy between or among at least two separate entities;

2.  that the contract, combination or conspiracy unreasonably restrains trade; and

3.  with respect to each Plaintiff, that the restraint caused that Plaintiff to suffer an injury to their business or property.

Sources: ABA Model Civil Antitrust Jury Instruction 1.B; *In re Capacitors* (Direct Purchaser Trial, Case No. 17-md-02801) Instruction No. 18 (with edits described in Plaintiffs' argument)

**Disputed Instruction No. 32 Re**
**SECTION 1 – RESTRAINT OF TRADE – PER SE AGREEMENT NOT TO COMPETE**
**Offered by Plaintiffs**

The first type of agreement Plaintiffs challenge is an alleged agreement not to compete. Plaintiffs claim that Google violated Section 1 of the federal Sherman Act by agreeing with non-parties Activision, Riot Games, and Supercell that those companies would not compete with Google in the distribution of Android apps. If you find the existence of such an agreement according to the elements I will describe, that agreement would be per se unlawful. Per se means that, to find Google liable on this particular claim, you are not required to determine whether the alleged agreement not to compete had anticompetitive effect, whether Plaintiffs successfully proved the existence of any relevant antitrust market where such effects would occur, or whether the agreement could be justified by any competitive benefits.

A business has the right to select on its own the products that it will manufacture or sell. Likewise, a business may decide not to make or sell a product, provided that the decision results from the exercise of an independent business judgment and not from any agreement with a competitor or potential competitor. The Sherman Act, however, prohibits agreements between competitors or potential competitors that they will not compete with one another.

A per se agreement not to compete is an agreement between two or more competitors (or potential competitors) to agree not to compete in making or selling a product that they would have otherwise competed in making or selling. By way of example, this includes an agreement by two or more competitors that a product sold by one of them will not be sold by the other, to confine their manufacturing efforts to particular or different products, or to require one to discontinue sales or production of a product that the other will continue to sell.

To prevail on this claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

1. Google and at least one of Activision, Riot Games, or Supercell are or were competitors or potential competitors;

2. Google and at least one of Activision, Riot Games, or Supercell entered into an contract, combination or conspiracy;

3.   Google and at least one of Activision, Riot Games, or Supercell agreed they would not compete with each other in the distribution of Android apps, and in particular that Activision, Riot Games, or Supercell would not launch Android app stores that would have competed with the Google Play Store; and

4.   One or more Plaintiffs were injured in their business or property because of the agreement.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Google and against Plaintiffs on this claim. If you find that the evidence is sufficient to prove all four elements, then you must find for Plaintiffs and against Google on Plaintiffs' claim alleging a *per se* agreement not to compete.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 2.C.3

**Disputed Instruction No. 32 Re**
**SECTION 1 – RESTRAINT OF TRADE – PER SE AGREEMENT NOT TO COMPETE**
**Offered by Defendants**

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

1

2

**Plaintiffs' Argument Re Disputed Instruction No. 32**
**SECTION 1 – RESTRAINT OF TRADE – PER SE AGREEMENT NOT TO COMPETE**

3

4

5

6

7

8

9

10

11

12

13

Nearly five months ago, Google represented to this Court "that *all* claims by *all* Plaintiffs are triable to the jury, with the exception of the claims brought under California's Unfair Competition Law." *See* May 12, 2023 Joint Submission Regarding Trial Proposal at 3 (ECF 411) (emphasis added). Yet now Google objects to the inclusion of *any* instruction on Plaintiffs' Section 1 *claim,* on the newly-minted ground that the claim should *not* go to the jury unless and until the Court determines that the agreements at issue should be considered under the *per se* rule. But Google should be estopped from raising that claim now and, in any event, has no basis to oppose an instruction on this claim for the same reasons the Court should deny Google summary judgment on it. Opp. Summ. J., ECF No. 509 at 7-12. Like the evidence submitted with Plaintiffs' opposition to Google's Motion for Summary Judgment, the evidence at trial will show (and allow the jury to conclude) that Google entered into agreements not to compete that are *per se* unlawful.

14

15

16

17

18

19

20

Plaintiffs' proposed instruction on this issue aligns closely to the language of the ABA Model Instruction on market allocation agreements. The ABA Model contemplates that market allocation in this context "means to limit, divide up or not to compete". *See also* Areeda & Hovenkamp, *Antitrust Law* ¶ 2030 (*per se* illegal market allocation agreements include agreements requiring participants to refrain from "expanding into a market in which another participant is an actual or potential rival"). Use of the ABA's market allocation model instruction is therefore appropriate, and Plaintiffs have done so subject only to limited changes detailed below.

21

22

23

24

25

26

27

28

Plaintiffs propose adding a first paragraph to distinguish this specific claim from the other types of claims the jury is required to consider, in particular from Plaintiffs' claims subject to a rule of reason analysis. This is necessary because the ABA Model does not include signposting language for cases that include both per se and rule of reason claims. This paragraph therefore explains the features distinguishing Plaintiffs' *per se* claims by (a) recounting the specific conduct Plaintiffs challenge as part of this *per se* claim (including the specific counterparties to the challenged agreements); and (b) explaining that, unlike in the rule of reason claims, the jury need not (i) find the agreement to have anticompetitive effects for it to be unlawful (*Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.,*

637 F.2d 1376, 1383 (9th Cir. 1981) (in a *per se* case the "jury [is] not required to find the existence of an anticompetitive purpose or effect")); (ii) find Plaintiffs to have proven a relevant market (*In re Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) (in a *per se* case "plaintiffs [a]re not required to establish a relevant market")); or (iii) consider any procompetitive justifications offered by Google (*Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 345 (1982)).  These additions are consistent with the law, provide context that would be helpful to the jury, and place no additional burden on Google.

In Plaintiffs' second paragraph, Plaintiffs propose adding that an agreement with a "potential competitor" not to compete is *per se* illegal.  This is consistent with the law.  *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990) (holding an agreement not to compete between potential competitors was *per se* unlawful).[5]  Indeed, elsewhere, the Model explains "[t]he Sherman Act, however, prohibits agreements between competitors or potential competitors to allocate product markets" and, as noted, defines "allocate" to include an agreement "not to compete".

In Plaintiffs' third paragraph, Plaintiffs propose replacing "conspiracy to allocate product markets" with "*per se* agreement not to compete" with "potential competitors" because, as noted above, that is the conduct Plaintiffs challenge, and Plaintiffs' statements are consistent with the law. *Id.*

In Plaintiffs' fourth paragraph, Plaintiffs propose changes specific to their claims that are generally contemplated by placeholders that are included in the model instruction.

Finally, in Plaintiffs' last paragraph, Plaintiffs again propose modifying the model to note that Plaintiffs challenge an agreement not to compete, which, as discussed above, is both helpful to the jury and consistent with the law.

---

[5] In the subsequent sentence, the Model itself refers to potential competitors, but Plaintiffs propose using the term here as well to ensure alignment and avoid confusion as to why potential competitors may be omitted here.

**Defendants' Argument Re Disputed Instruction No. 32**
**SECTION 1 – RESTRAINT OF TRADE – PER SE AGREEMENT NOT TO COMPETE**

The Court should not instruct the jury on Plaintiffs' *per se* Section 1 claims.  It would be an error to submit a *per se* and rule of reason claim to the jury based on the same conduct, because the proper mode of analysis is not a jury question.  "[T]he decision of what mode of analysis to apply–per se, rule of reason, or otherwise–is entirely a question of law for the Court[.]"  *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1007, 1010 (N.D. Cal. 2008); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004) ("Whether a plaintiff's alleged facts comprise a per se claim is normally a question of legal characterization…").  The Court must decide this issue before instructing the jury.  The ABA notes to this instruction direct that the *per se* "instruction is appropriate if a court determines that the alleged restraint is illegal per se.  If a court determines that the alleged restraint should be evaluated under the rule of reason, the jury should be instructed in accordance with the rule of reason instructions."  *See* Notes to ABA Model Civil Antitrust Jury Instruction 2.B.1.  Here, the *per se* instruction is inappropriate for two reasons:  *First*, the claims fail as a matter of law.  *Second*, no party seeks or can prove damages for these claims.

Where a claim does not involve "garden-variety horizontal division[s] of a market," *per se* treatment is inappropriate.  *Metro Indus. Inc. v. Sammi Corp.*, 82 F.3d 839, 844 (9th Cir. 1996).  Plaintiffs based this claim on Google's Games Velocity Program ("GVP") contracts with three game developers.  The contracts  involved various incentives for the developers to place their games on the Google Play store.  *Per se* treatment would be erroneous because the contracts are far from garden-variety.  Rather, they involve multi-faceted incentives from Google to its customers.  There is no tradition of courts applying *per se* rules to agreements in which a firm offers incentives to customers willing to invest in the firm's product. The "complexities" of multi-faceted value exchanges require rule-of-reason treatment.  *FTC v. Actavis*, 570 U.S. 136, 159 (2016).

In an attempt to paint the GVP agreements as garden-variety market divisions, Plaintiffs will try to adduce evidence that the agreements are horizontal.[6]  But even if Plaintiffs show horizontal

---

[6] A fact that, on its own, does not warrant *per se* treatment.  *E.g.*, *Aya Healthcare Servs. Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021) (analyzing horizontal agreements under rule of reason).

elements, the contracts are not subject to *per se* condemnation.  There is no dispute that the contracts involve a vertical relationship between Google as an application distributor and game developers as Google's customers.  Where a claim involves hybrid agreements—*i.e.,* agreements with vertical and horizontal elements—the rule of reason applies.  "That is because the interplay between the vertical and horizontal components" of the agreement "muddies the theoretical economic conclusions that a court might draw," making it impossible for a court to condemn it *per se*.  *Winn-Dixie Stores, Inc. v. Eastern Mushroom Mktg.*, 2023 WL 5521221 at *6, --- F.4th ---- (3d Cir. Aug. 28, 2023); *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 987 (W.D. Wash. 2022); *see also Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*, 637 F.2d 1376, 1385 (9th Cir. 1981).  This case does not involve one of the few circumstances where it can be "predict[ed] with confidence that [the agreements] would be invalidated in all or almost all instances under the rule of reason."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 878 (2007).

There is also no basis for this instruction because there are no damages.  Epic does not seek damages.  And Match cannot prove damages from the GVP agreements, which involved only games developers.  Even if Match succeeded in showing that the GVP agreements caused game developers not to open stores (and Match will not make that showing), Match cannot show that this caused Match injury.  Match has *no* evidence that it would have distributed apps through any app store launched by a game developer.  Nor does Match have evidence Google would have had to reduce its service fees for dating apps in order to compete with such an app store.  Without any evidence that any allegedly *per se* illegal GVP agreement damaged Match, there is no basis for the jury to be instructed on this claim because no damages are at issue.

Disputed Instruction No. 33 Re
**AGREEMENT—DEFINITION, EXISTENCE, AND EVIDENCE**
**Offered by Plaintiffs**

To prove an agreement or contract, Plaintiffs must prove both of the following elements by a preponderance of the evidence:

       1.  that an agreement or contract existed; and

       2.  that Google knowingly became a party to that agreement or contract.

To act knowingly means to participate deliberately, and not because of mistake or accident or other innocent reason.

The basis of a contract or agreement is an understanding between two or more persons or entities. An agreement or understanding between two or more persons exists when they share a commitment to a common scheme. To establish the existence of an agreement, the evidence need not show that its members entered into any formal or written agreement. It is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement. It is also not necessary that all of the means or methods claimed by Plaintiffs were agreed upon to carry out the alleged agreement, nor that all of the means or methods that were agreed upon were actually used or put into operation. It is the agreement or understanding to restrain trade that constitutes a potential violation of the antitrust laws.  Therefore, you may find an agreement existed regardless of whether it succeeded or failed.

Plaintiffs may prove the existence of the contract or agreement through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of the contract or agreement.

Direct evidence of an agreement may not be available, and therefore an agreement also may be shown through circumstantial evidence. You may infer the existence of an agreement from the circumstances, including what you find the persons actually did and the words they used.

In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole and not piecemeal.

1    Source: ABA Model Civil Antitrust Jury Instruction 2.A.1 (with edits described in Plaintiffs'

2    argument)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Disputed Instruction No. 33 Re
**AGREEMENT—DEFINITION, EXISTENCE, AND EVIDENCE**
**Offered by Defendants**

To prove a contract, Plaintiffs must prove both of the following elements by a preponderance of the evidence:

      1.  that a contract existed; and

      2.  that Google knowingly became a party to that contract.

To act knowingly means to participate deliberately, and not because of mistake or accident or other innocent reason.

The basis of a contract is an understanding between two or more persons or entities. An agreement or understanding between two or more persons exists when they share a commitment to a common scheme. To establish the existence of a contract, the evidence need not show that its members entered into any formal or written agreement.

Plaintiffs may prove the existence of the contract through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of the contract.

Direct evidence of a contract may not be available, and therefore a contract also may be shown through circumstantial evidence. You may infer the existence of a contract from the circumstances, including what you find the persons actually did and the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together, does not by itself establish the existence of a contract. If they acted similarly but independently of one another, without any common purpose, then there would not be contract.

In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole and not piecemeal.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 2.A.1

**Plaintiffs' Argument Re Disputed Instruction No. 33**
**AGREEMENT—DEFINITION, EXISTENCE, AND EVIDENCE**

Plaintiffs have adapted their proposed instruction from the ABA Model Instruction.  Plaintiffs have deleted certain material that is inapplicable in light of the factual contentions in this case.  For example, Plaintiffs deleted instructions, which Google proposes to keep, stating that "Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together, does not by itself establish the existence of a contract.  If they acted similarly but independently of one another, without any common purpose, then there would not be contract."  But this is irrelevant here because, unlike in a cartel case, Plaintiffs do not rely on "similarity" of conduct by the participants of a conspiracy as a basis on which to infer the existence of a disputed agreement with respect to many claims.  Plaintiffs instead rely principally on written agreements, and even where Plaintiffs rely on both written agreements and extracontractual understandings, those claims do not rely on similarity of conduct between Google and its counterparties.  Rather, pursuant to the agreements not to compete, each of Google's counterparties agreed *not* to enter the app distribution market that Google has monopolized.  Google's proposal to include this instruction risks misleading and confusing the jury.

Google also seeks to delete all references to "agreement" from Plaintiffs' proposed instruction, each of which appears in the Model.  That deletion is unwarranted.  The text of the Sherman Act itself states that "[e]very contract, combination . . . , or conspiracy, in restraint of trade" is illegal.  15 U.S.C. § 1.  By deleting all references to the term "agreement," Google seeks to mislead the jury into believing that only formal contracts not to compete are illegal under the Sherman Act.  But it is black-letter law that a Plaintiff need not prove an express or written contract to win a Section 1 claim.  *See, e.g.*, *Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965) ("It is not necessary to find an express agreement, either oral or written, in order to find a conspiracy [to restrain trade].").  Rather, it is enough to prove an understanding between the parties.  *United States v. Lischewski*, 2020 WL 1433272, at *3-4 (N.D. Cal. Mar. 24, 2020).  Agreements not to compete are illegal, whether they are written or oral.  Google's attempts to inform the jury otherwise should be rejected.

Google also proposes to delete text that reads, "It is not essential that all persons acted exactly

1  alike, nor is it necessary that they all possessed the same motive for entering the agreement. It is also

2  not necessary that all of the means or methods claimed by Plaintiffs were agreed upon to carry out the

3  alleged agreement, nor that all of the means or methods that were agreed upon were actually used or

4  put into operation."  These instructions appear in the Model, are helpful in the context of this case and

5  are supported by law.  *See United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948)

6  ("acquiescence in an illegal scheme" violates the Sherman Act); *Spectators' Commc'n Network v.*

7  *Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001) ("Antitrust law has never required identical

8  motives among conspirators, and even reluctant participants have been held liable for conspiracy.").

9  Google's proposed deletions should therefore be rejected.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendants' Argument Re Disputed Instruction No. 33**
**AGREEMENT—DEFINITION, EXISTENCE, AND EVIDENCE**

Plaintiffs' proposed instruction suffers from two legal infirmities: (1) it includes language specific to *per se* claims even though Plaintiffs' claims are subject to the rule of reason and (2) it omits crucial language from the ABA model instruction about what does not constitute a contract or conspiracy.

*First*, Plaintiffs have attempted to propose a *per se* instruction for their rule of reason claims. Specifically, Plaintiffs' instruction tells the jury that the agreement need not have been carried out, stating:

> It is also not necessary that all of the means or methods claimed by Plaintiffs were agreed upon to carry out the alleged agreement, nor that all of the means or methods that were agreed upon were actually used or put into operation. It is the agreement or understanding to restrain trade that constitutes a potential violation of the antitrust laws. Therefore, you may find an agreement existed regardless of whether it succeeded or failed.

*See* Plaintiff's Proposed Instruction No. 33. This language would allow the jury to find Google liable based on the mere existence of an agreement. But the hallmark of rule-of-reason analysis is assessing effects on competition. *E.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 (9th Cir. 2023) (rule of reason is used "to determine a restraints 'actual effect' on competition" (quoting *Am. Express*, 138 S. Ct. at 2284)). Indeed, the cases that the ABA cites to support this language in its model instruction involved *per se* restraints. *See United States v. Gen. Motors Corp.*, 384 U.S. 127, 145 (1966) (*per se* restraint of trade); *United States v. Paramount Pictures*, 334 U.S. 131, 142 (1948) (price-fixing conspiracy); *Interstate Circuit v. United States*, 306 U.S. 208 (1939) (hub-and-spoke price-fixing conspiracy).

*Second*, Plaintiffs have deleted important language from the ABA's model instruction about what *does not* constitute evidence of a "contract, combination, or conspiracy." Specifically, Plaintiffs omit:

> Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together, does not by itself establish the existence of a contract or conspiracy. If they acted similarly but independently of one another, without any common purpose, then there would not be contract or conspiracy.

1   *See* Plaintiff's Proposed Instruction No. 33.  Omitting that language could lead to the jury erroneously

2   finding a contract, combination, or conspiracy, based on mere parallel conduct.  It is hornbook law that

3   parallel conduct does not suffice to show an agreement.  "[A]ntitrust law limits the range of

4   permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith*

5   *Radio Corp.*, 475 U.S. 574, 588, 106 S. Ct. 1348, 1356 (1986).  Thus, "conduct as consistent with

6   permissible competition as with illegal conspiracy does not, standing alone, support an inference of

7   antitrust conspiracy." *Id.* Rather, "[t]o survive a motion for summary judgment or for a directed

8   verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude

9   the possibility' that the alleged conspirators acted independently." *Id.*  Consistent with these

10  principles, the Ninth Circuit has upheld jury instructions stating that "mere similarity of conduct" is not

11  enough to prove a contract, combination, or conspiracy in the context of a Section 1 claim, *United*

12  *States v. Lischewski*, 860 F. App'x 512, 514 (9th Cir. 2021), and the Court included this language in its

13  recent charge to the jury in the *Capacitors* MDL.  *See In re Capacitors Antitrust Litig.*, No. 3:17-md-

14  02801-JD, ECF No. 1923 (N.D. Cal. May 17, 2023),  Instr. 17.  It should do so here, too.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Disputed Instruction No. 34 Re
GOOD INTENT NOT A DEFENSE
Offered by Plaintiffs

If you find that Google engaged in a per se agreement not to compete, it is not a defense that Google acted with good motives, thought its conduct was legal, or that the conduct may have had some good results.

Source: ABA Model Civil Antitrust Jury Instruction 2.B.3 (with edits described in Plaintiffs' argument)

Disputed Instruction No. 34 Re
GOOD INTENT NOT A DEFENSE
Offered by Defendants

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

**Plaintiffs' Argument Re Disputed Instruction No. 34**
GOOD INTENT NOT A DEFENSE

Google claims this instruction should be excluded because no instruction on Plaintiffs' *per se* claims should go to the jury.  Plaintiffs address this objection above.

During a meet and confer, Google also argued that this instruction, which is ***taken almost verbatim from the ABA Model Instructions*** (the sole change replacing "price fixing conspiracy" with "*per se* agreement not to compete")  should not be given on the basis that the ABA Model includes this instruction as part of a series of instructions on price fixing.  But Google cannot reasonably dispute that good intent or economic justification are not a defense to a *per se* illegal agreement, just like it is not a defense to a claim of price fixing.  Giving the instruction is particularly warranted where, as here, Google intends to put on evidence of procompetitive justifications for other conduct, and the jury should not be misled into believing that such justification could immunize *per se* unlawful conduct.

Specifically, Plaintiffs allege that Google agreed with three potential competitors not to compete in the market for Android app distribution.  *See* Epic's Second Amended Complaint, ECF No. 378 ¶¶ 196-205; Match's First Amended Complaint, ECF No. 380 ¶¶ 271-80; *see also* ECF No. 509 at 7-12.  Agreements with potential competitors not to compete are illegal *per se*.  *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990); *Optronic Techs. v. Ningbo Sunny Elec. Co*., 20 F.4th 466, 481 (9th Cir. 2021) (holding that an agreement with a potential "horizontal competitor, either not to compete with one another in the market, or to divide customers or potential customers . . . constitutes illegal market allocation, which is a *per se* Section 1 violation.").

A defendant accused of a *per se* illegal agreement cannot avoid liability by attempting to show that the challenged agreement had a beneficial purpose or intent.  *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224-25 (1940) ("Whatever economic justification particular [*per se* illegal] agreements may be thought to have, the law does not permit an inquiry into their reasonableness.  They are all banned because of their actual or potential threat to the central nervous system of the economy.")  Such evidence is irrelevant as a matter of law, and it is error to consider it for the purposes of a *per se* claim.  *See Maricopa Cty.*, 457 U.S. at 357 (reversing the lower court for finding a *per se* scheme legal due to its purported procompetitive justifications).  Yet here, Google

1   concedes it will contend that the Games Velocity Program—including the agreements subject to *per se*

2   claims—  promotes competition.  *See* Google's Trial Brief, ECF No. 639 ("Google offered developers

3   a better deal to use the Play store".).

4          The jury must therefore understand that it cannot consider Google's procompetitive

5   justification arguments when determining whether Google violated Section 1 of the Sherman Act by

6   agreeing not to compete with potential competitors.  This instruction is "necessary to state [the] law

7   correctly and to avoid misleading the jury".  *Kisor v. Johns-Manville Corp.*, 783 F.2d 1337, 1342 (9th

8   Cir. 1986) (finding that, when giving an instruction is necessary to correctly state the law and avoid

9   misleading the jury, "refusal to give [an] instruction [is] error").  Indeed, failing to instruct the jury that

10   evidence of beneficial purpose or intent should not be considered in assessing a *per se* illegal

11   agreement would practically invite the jury to commit error by "[in]adequately inform[ing] the jury on

12   the law." *Altria Grp., Inc. v. United States*, 658 F.3d 276, 286 (2d Cir. 2011).  This instruction should

13   be provided on that basis alone.

**Defendants' Argument Re Disputed Instruction No. 34**
GOOD INTENT NOT A DEFENSE

This instruction applies only to *per se* claims. Google objects to this instruction in its entirety on grounds that Plaintiffs' *per se* Section 1 Agreement Not to Complete claim should not go to the jury. *See* Defendants' Argument re: Instruction No. 32.

Disputed Instruction No. 35 Re
**RULE OF REASON - SECTION ONE CLAIMS**
**Offered by Plaintiffs**

Under Section 1 of the Sherman Act, except for certain agreements known to be *per se* unlawful, which I have addressed, a restraint of trade is illegal only if it is found to be unreasonable. You must determine, therefore, whether any of the restraints challenged here is unreasonable. The restraints challenged here are the agreements that Google requires mobile app developers to enter as a condition of distributing apps on Google Play (called the DDA agreements); alleged agreements with Google's alleged competitors or potential competitors such as Facebook, Activision, Riot Games, or Supercell; agreements with original equipment manufacturers that sell mobile devices (including the MADA and RSA agreements); and agreements with cell phone carriers (such as AT&T, Verizon, and T-Mobile) (including the RSA agreements).

In making this determination, you must first determine whether Plaintiffs have proven that the challenged restraints have resulted in a substantial harm to competition in a relevant product and geographic market. If you find that Plaintiffs have proven that the challenged restraints result in a substantial harm to competition in a relevant market, then you must consider whether the restraints produce countervailing competitive benefits. If you find that they do, then you must balance the competitive harm against the competitive benefit. However, if you find that the competitive benefits could be achieved through substantially less restrictive alternatives, then you may not consider them when balancing harms against benefits. The challenged restraints are illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit.

I will now review each step of the analysis in more detail.

Source:  Adapted from ABA Model Civil Antitrust Jury Instruction 1.C.3A

Disputed Instruction No. 35 Re
**RULE OF REASON - SECTION ONE CLAIMS**
**Offered by Defendants**

Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable.  You must determine, therefore, whether each of the alleged agreements challenged here is unreasonable by applying what is known as the rule of reason.

The goal of the rule of reason is to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.  In order to make that determination, you will apply a similar set of legal requirements that I instructed you about earlier regarding Plaintiffs' monopolization claims.

In order to prove that a challenged agreement was an unreasonable restraint of trade, Plaintiffs must first prove that Google had market power in a relevant antitrust market where trade was allegedly restrained.  I have already instructed you regarding how to define the relevant antitrust market.  You must apply those same instructions in defining the market for purposes of determining whether a challenged restraint was an unreasonable restraint of trade.  You cannot properly apply the rule of reason without an accurate definition of the relevant market because without a definition of the market there is no way to measure Google's ability to lessen or destroy competition.

Earlier, I instructed you regarding monopoly power.  Market power, which Plaintiffs must demonstrate Google has in a relevant antitrust market in order to prove an unreasonable restraint of trade, is closely related to monopoly power.  As I explained earlier, monopoly power is an extreme degree of market power, which is the power to maintain prices above a competitive level by restricting output or maintain quality below a competitive level in a relevant antitrust market, considering both app users and app developers.  Accordingly, in determining whether Google has market power in a relevant antitrust market, you should apply the same instructions that I gave you earlier regarding monopoly power while accounting for the fact that monopoly power requires something greater than market power.  As with monopoly power, market power can be proven both directly and indirectly and a high market share, while some evidence of market power, is not sufficient to prove market power without proof of barriers to entry.  However, a market share of less than 50 percent is presumptively insufficient to establish market power.

1        If you find that Google does not have market power in a relevant antitrust market, then you

2    must find for Google on Plaintiffs' claims that Google unreasonably restrained trade.

3

4    Source:  Adapted from ABA Model Civil Antitrust Jury Instruction 1.C.3A

**Plaintiffs' Argument Re Disputed Instruction No. 35**
**RULE OF REASON - SECTION ONE CLAIMS**

Plaintiffs' instruction is nearly verbatim to the cited ABA Model Instruction.  The Model instruction, in appropriately modified form, was given in *Sumotext Corp. v. Zoove, Inc.*, 16-cv-1370 (N.D. Cal.).  *See* Final Jury Instructions at 8, 16-cv-1370, ECF No. 468 (N.D. Cal. Mar. 4, 2020).

Plaintiffs' instruction differs from the Model only in that it fills in a placeholder included in the Model for a description of the challenged restraint.  Here, Plaintiffs identify the restraints they challenge in neutral terms that will assist the jury in reaching their conclusion.  The same approach was taken in the instruction given in *Sumotext*.  *See id.*

In contrast, Google's proposed instruction is a complete rewrite of the ABA Model Instruction it is purportedly adapted from and deviates from the law.  *First*, Google asserts that a finding of market power is necessary to a finding that Google's conduct unreasonably restrains trade.  That is inconsistent with *Ohio v. American Express*, which holds that plaintiffs can show anticompetitive effects directly or indirectly:  either directly through "proof of actual detrimental effects on competition" or indirectly through "proof of market power plus some evidence that the challenged restraint harms competition."  *American Express*, 138 S. Ct. at 2284.  A showing of market power is thus unnecessary if the Plaintiff presents direct evidence of anticompetitive effects.  It is also inconsistent with ABA Model Civil Antitrust Jury Instruction 1.C.2, which provides that "If defendant does not possess market power", it is merely "less likely" that the challenged restraint will have harmful effects on competition.  *Second*, Google asserts that "a high market share, while some evidence of market power, is not sufficient to prove market power without proof of barriers to entry".  As explained in Plaintiffs' argument on the Monopoly Power:  Indirect Proof instruction, this is contrary to precedent instructions in this District and the Model.  *See* Plaintiffs' Argument Re Instruction No. 24. Google also repeats its incorrect and argumentative rhetoric that it proposed in Section 2 instructions (*see* Plaintiffs' Argument Re Instruction No. 17) that "monopoly power is an extreme degree of market power", even though monopoly power is not even at issue in these Section 1 claims.  *Third*, Google asserts that "a market share of less than 50 percent is presumptively insufficient to establish market power."  Not only is this not stated in the Model, it is inconsistent with the law.

1  *ThermoLife Intl. LLC v. Neogenis Labs Inc.*, 18-CV-02980-PHX-DWL, 2021 WL 1400818, at *9 (D.

2  Ariz. Apr. 14, 2021) ("[T]he Ninth Circuit has suggested that an allegation of a market share exceeding

3  30% may be sufficient to establish presumptive market power" (citing *Rebel Oil*, 51 F.3d at 1438).).

4  *Finally*, Google seeks to add a final paragraph stating "If you find that Google does not have market

5  power in a relevant antitrust market, then you must find for Google on Plaintiffs' claims that Google

6  unreasonably restrained trade."  As noted above, this is inconsistent with *American Express*.  138 S.

7  Ct. at 2284.  Moreover, there is no basis to divert from the Model instruction here, which provides that

8  it is merely "less likely" that Google restrained trade if it does not possess market power.  Google's

9  proposed instruction should accordingly be rejected.

**Defendants' Argument Re Disputed Instruction No. 35**
**RULE OF REASON - SECTION ONE CLAIMS**

The Court should adopt Google's proposed instruction, which tracks controlling precedent and accurately defines market power, and thereby provides the proper guidance to the jury to perform its task under the rule of reason.

The language Google proposes comes directly from controlling authority.  For example, Google's language explaining the goal of the rule of reason is drawn from the Supreme Court's *Leegin* decision.  There, the Supreme Court explained that, "[i]n its design and function the rule distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).  Similarly, the statement that the jury "cannot properly apply the rule of reason without an accurate definition of the relevant market because without a definition of the market there is no way to measure Google's ability to lessen or destroy competition" also comes from Supreme Court authority.  In *Ohio v. Am. Express Co.*, the Court explained that "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market. 'Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition.'"  138 S. Ct. 2274, 2285 (2018) (citation omitted).  Further, when instructing the jury that they must find a relevant antitrust market, it makes sense to refer the jury back to the Court's previous instructions on relevant market.  This will avoid confusion.

The Court should also adopt Google's instruction because it accurately defines market power for the jury.  Because the jury must assess market power as part of the rule of reason, *id.*, the concept should be defined here.  And Google's explanation of market power should be accepted because it is based on controlling law.  "[N]umerous cases hold that a market share of less than 50 percent is presumptively insufficient to establish market power."  *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (collecting cases).  Google's instruction reflects that authority.  Google also correctly explains that barriers to entry are a requirement for finding market power.  *Id.* at 1439 ("The plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price.").

Disputed Instruction No. 36 Re
RULE OF REASON: PROOF OF COMPETITIVE HARM
**Offered by Plaintiffs**

As I mentioned, to prove that the challenged restraint is unreasonable, Plaintiffs first must demonstrate that the restraint has resulted or is likely to result in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of plaintiff is not sufficient, by itself, to demonstrate harm to competition generally.  That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

Furthermore, Plaintiffs must show that the harm to competition occurred in an identified market, known as a relevant market. As I've described, there are two aspects to a relevant market. The first aspect is known as the relevant product market. The second aspect is known as the relevant geographic market. It is Plaintiffs' burden to prove the relevant market.

If you find that Plaintiffs have proven the existence of a relevant market, then you must determine whether Plaintiffs also have proven that the challenged restraint has or is likely to have a substantial harmful effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. If the challenged conduct has not resulted in or is not likely to result in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.  In determining whether the challenged restraint has produced or is likely to produce competitive harm in a market you have found to be two-sided, you must consider harms to either or both sides of the market.

1. In determining whether the challenged restraint has produced or is likely to produce competitive harm, you may look at the following factors:

2. the effect of the challenged restraint on prices, output, product quality, and service;

3. the purpose and nature of the challenged restraint;

4. the nature and structure of the relevant market;

5. the number of competitors in the relevant market and the level of competition

among them, both before and after the challenged restraint was imposed; and

6.   whether Google possesses market power.

The last factor mentioned, market power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. If you have found that Google has monopoly power in a relevant market, then Google necessarily has market power in that relevant market. However, you may find that Google has market power in a relevant market even if Google does not have monopoly power because market power requires less than monopoly power. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power. An important factor in determining whether Google possesses market power is Google's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether Google has, or at relevant times had, market power include:

1.   Google's profit margins;

2.   whether Google is capable of raising or maintaining prices above competitive levels;

3.   whether there are barriers to entering a market;

4.   whether Google can force developers, consumers, or others to accept undesirable contract terms; and

5.   whether Google can exclude or has excluded competition, or prevented competitors or potential competitors, from entering a market.

If Google does not possess a substantial market share, it is less likely that Google possesses market power.  If Google does not possess market power, it is less likely that the challenged restraint has resulted or will result in a substantial harmful effect on competition in the market.

Source: ABA Model Civil Antitrust Jury Instruction 1.C.2 (with edits described in Plaintiffs' argument)

Disputed Instruction No. 36 Re
RULE OF REASON: PROOF OF COMPETITIVE HARM
**Offered by Defendants**

If Plaintiffs have proven that Google has market power in a relevant antitrust market where Google allegedly restrained trade, then you must determine whether each challenged agreement resulted in substantial harm to competition and harmed consumers.  The process for making that determination is the same process that I instructed you to use in determining whether Google had acquired or maintained monopoly power using anticompetitive acts.  I will briefly repeat those instructions so they are clear to you.  You must apply these instructions to each challenged agreement.

In order to demonstrate that a challenged agreement harmed competition, Plaintiffs first must demonstrate that the restraint had an anticompetitive effect, accounting for both app users and app developers.  In order to have an anticompetitive effect, an act must harm the competitive process and thereby harm consumers by resulting in prices that are above the competitive level or quality that is below the competitive level.  Although it may be relevant to the inquiry, harm that occurs merely to the individual business of a Plaintiff or a competitor is not sufficient, by itself, to demonstrate harm to competition generally.  That is, evidence of harm to a single user, developer, competitor, or group of competitors does not necessarily mean that there has been harm to competition.  Further, evidence that conduct has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently prove an injury to competition because both effects are fully consistent with a free, competitive market.

If you find that Plaintiffs have not proven by a preponderance of the evidence that a challenged agreement has resulted in a substantial harm to competition in the relevant market that harms consumers in that market, considering both app users and app developers, then you must find for Google on Plaintiffs' claim that the agreement was an unreasonable restraint of trade.

Source:  Adapted from ABA Model Civil Antitrust Jury Instruction 1.C.3B

1

2

**Plaintiffs' Argument Re Disputed Instruction No. 36**
RULE OF REASON: PROOF OF COMPETITIVE HARM

3

4
Plaintiffs' proposed instruction is taken nearly verbatim from the ABA Model Instructions.  The

5
Model instruction, in appropriately modified form, was given in *Sumotext Corp. v. Zoove, Inc.*, 16-cv-

6
1370 (N.D. Cal.).  *See* Final Jury Instructions at 9-10, 16-cv-1370, ECF No. 468 (N.D. Cal. Mar. 4,

7
2020).  Plaintiffs propose minor deviations from the model that are specific to this case.  Specifically,

8
Plaintiffs add two sentences that do not appear in the model, explaining that if the jury finds that Google

9
has monopoly power, it necessarily has market power, but if the jury finds that Google does not have

10
monopoly power, it may still have market power.  This instruction is helpful to the jury in orienting them

11
to the different standards that apply to the Section 1 and Section 2 claims they will have to address.  The

12
ABA Model lacks such instructions because it does not appear to contemplate that a jury would need to

13
decide both Section 1 and Section 2 claims in the same case.  The remainder of Plaintiffs' instructions

14
are minor changes that are contemplated by the Model itself, such as describing the "factors relevant to

15
the facts of the case, such as the existence of barriers to entry or potential competitors".

16
Google's proposed instruction is again a complete rewrite of the ABA Model Instruction and

17
deviates from the law.  *First*, Google seeks to add that "[i]n order to have an anticompetitive effect, an

18
act must harm the competitive process and thereby harm consumers by resulting in prices that are above

19
the competitive level or quality that is below the competitive level."  Google is not entitled to multiply

20
jury instructions by inserting misleading language or holdings from caselaw it deems favorable to its

21
position when the existing instruction already permits the jury to decide the issue presented.  *See Heath*,

22
813 F.2d at 261 ("A court is not required to instruct the jury in words chosen by a party nor to incorporate

23
every proposition of law a party suggests. It is sufficient if the instructions as given allow the jury to

24
determine intelligently the issues presented.").  And as noted above, the proposed language will be

25
particularly confusing to the jury here, where the ultimate "consumers" in some of the harmed markets

26
are app developers, rather than users.  *Second*, Google seeks to add that "evidence that conduct has the

27
effect of reducing consumers' choices or increasing prices to consumers does not sufficiently prove an

28
injury to competition because both effects are fully consistent with a free, competitive market."  Again,

1    Google improperly selects isolated language from case law that risks misleading the jury, and moreover

2    confusingly focuses the instructions on "consumers" without an explanation who those consumers would

3    be in the present case.  Though this language appears in *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir.

4    2020), the Ninth Circuit went on to provide appropriate context that Google omits, explaining that "to

5    prove a violation of the Sherman Act, the plaintiff must show that diminished consumer choices and

6    increased prices are the result of a less competitive market due to either artificial restraints or predatory

7    and exclusionary conduct."  *Id.* at 990.  Thus, contrary to the implication of Google's proposed

8    Instruction, reduced consumer choice and increased consumer price are probative of a Sherman Act

9    violation when they are caused by anti-competitive conduct.  The Model is therefore appropriate.

10       *Finally*, Google again seeks a one-sided paragraph at the end of its proposed Instruction,

11    informing the jury that they must find for Google if Plaintiffs fail to prove substantial harm to

12    competition, without reciprocally informing the jury of next steps if they find Google's conduct did harm

13    competition, as the Model does.  Google's additional paragraph also improperly attempts to direct the

14    jury to consider the effects of each "challenged agreement" in isolation; rather, the jury should consider

15    the effects of the challenged agreements in the context of all of Google's anti-competitive conduct.  *See*

16    *City of Anaheim*, 955 F.2d at 1376 ("it would not be proper to focus on specific individual acts of an

17    accused monopolist while refusing to consider their overall combined effect").  There is no basis to divert

18    from the Model as Google proposes.  Google's proposed revisions should be rejected.

19

20

21

22

23

24

25

26

27

28

**Defendants' Argument Re Disputed Instruction No. 36**
RULE OF REASON: PROOF OF COMPETITIVE HARM

Plaintiffs' proposed jury instruction on their burden to prove competitive harm misstates the law and is incomplete.

*First*, Plaintiffs' instruction fails to tell the jury that it must consider both sides of the market. Rather, Plaintiffs suggest that the jury can decide whether to consider harm on "either or both" sides of the market. That is directly contrary to law. The Supreme Court holds that where a two-sided market is at issue, both sides of the market *must* be evaluated. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018). *See* Defendants' Argument re: Instruction No. 21.

*Second*, Plaintiffs' reference to profit margins is erroneous. Profit margins provide little to no evidentiary value on the question of monopoly or market power. "[T]he inference that a defendant that enjoys healthy profits only does so because of an unhealthy market structure is not a strong one." *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 981 (N.D. Cal. 1979). This is because "competitive firms may be highly profitable merely by virtue of having low costs as a result of superior efficiency." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995). "Many courts have disparaged the evidentiary value of high profits to indicate monopoly power." *High Tech. Careers v. San Jose Mercury News*, No. 90-CV-20579, 1995 WL 115480, at *3 (N.D. Cal. Mar. 14, 1995).

Even if "profit margins" were relevant, Plaintiffs' instruction omits critical factors. "The ability to earn high profit margins or a high rate of return does not necessarily mean that defendant has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing." ABA Model Civil Antitrust Jury Instr. 3.A.8. Plaintiffs' error is magnified because they improperly ask the jury to consider "profit margins" in a vacuum, without reference to margins of comparable firms. But it is only by comparison to comparable firms that Google's profit margins could be probative. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018). Any consideration of profits must focus on whether the defendant has "an ability to sell at higher prices or earn higher profit margins *than other companies for similar goods or services* over a

long period of time."  ABA Model Civil Antitrust Jury Instr. 3.A.8 ).  Asking the jury to consider "profit margins" without comparison to "other companies" with "similar goods or services" is legal error.

Plaintiffs next ask the jury to consider "whether there are barriers to entering a market" but that is not the proper inquiry.  For such barriers to matter, they must "protect the properly defined . . . market," and also be "significant."  *United States v. Microsoft Corp.*, 253 F.3d 34, 82 (D.C. Cir. 2001); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  Moreover, any barriers considered by the jury must be cognizable under the antitrust laws.  *Rebel Oil*, 51 F.3d at 1439 (explaining the "main sources of entry barriers").  Moreover, the jury *must* find barriers to entry.  As the Ninth Circuit explained in *Rebel Oil*, a "plaintiff *must* show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price."  *Id.*  By treating barriers to entry as a mere factor, rather than a requirement, Plaintiffs' instruction is erroneous.

*Finally*, Plaintiffs' proposal to have the jury consider "whether Google can force developers, consumers, or others to accept undesirable contract terms" is erroneous because it has nothing to do with market power," *i.e.*, "the ability to raise prices above those that would be charged in a competitive market."  *NCAA v. Board of Regents*, 468 U.S. 85, 109 n.38 (1984).  Standardized contract terms are commonplace.  *See*, *e.g.*, *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1176-77 (9th Cir. 2014) (discussing standardized "terms of use" agreements).  They are not an indicator of market power or anything else relevant to this issue, and Plaintiffs' proposal should be rejected.

Disputed Instruction No. 37 Re
RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS
**Offered by Plaintiffs**

If you find that Plaintiffs have proven that a challenged restraint resulted in substantial harm to competition in a relevant market, then you next must determine whether Google has proven that the restraint also benefits competition in other ways. In determining whether there are benefits in a market you have found to be two-sided, you must consider benefits to either or both sides of the market. You may only consider benefits to competition that impact the relevant market in which Google restrained trade. If you find that the challenged restraint does result in competitive benefits in the market where Google has restrained trade, then you also must consider whether the restraint resulted in competitive benefits that were not achievable through substantially less restrictive means. If Plaintiffs prove that any of the benefits were achievable through substantially less restrictive means, then those benefits cannot be used to justify the restraint.

Source: ABA Model Civil Antitrust Jury Instruction 1.C.3 (with edits described in Plaintiffs' argument)

1

Disputed Instruction No. 37 Re
RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS
**Offered by Defendants**

2

3   If Plaintiffs have proven that challenged conduct resulted in substantial harm to competition

4 that causes harm to consumers in a relevant market, considering both app users and app developers,

5 then you next must determine whether the conduct also benefits competition in other ways.  Conduct

6 that benefits competition can include conduct that increases output, enhances efficiency, reduces prices

7 or enhances consumer appeal.  You may consider benefits to competition that impact the relevant

8 market in which Google allegedly harmed competition as well as benefits to competition in related

9 markets. If you find that the challenged restraint does result in competitive benefits, then Plaintiffs

10 must prove that all (or virtually all) of the procompetitive benefits could be achieved through

11 substantially less restrictive means.  In determining whether all of these procompetitive benefits could

12 reasonably have been achieved through substantially less restrictive means, you must assess such

13 factors as whether other means to achieve Google's objectives were substantially more or less

14 expensive and more or less effective than the means chosen by Google.  You must, however, give a

15 wide berth to Google's business judgment.  You may not find that there was a substantially less

16 restrictive alternative if that alternative would cost significantly more to Google.  An alternative that

17 would require Google to give away Android, Google Play, the Google Play store, or other applications

18 and services for free cannot be considered a viable less restrictive alternative.

19   As I noted earlier, Plaintiffs allege that Google has acquired or maintained monopoly power in

20 relevant markets through a variety of anticompetitive acts.  You must evaluate for each alleged

21 anticompetitive act whether Google could achieve the same procompetitive benefits of that act through

22 substantially less restrictive means.

23   If Plaintiffs have not proven by a preponderance of the evidence that any procompetitive

24 benefits could be achieved through substantially less restrictive means as defined by the instructions I

25 have given you, then you must find for Google on Plaintiffs' monopolization claim.

26

27 Source: ABA Model Civil Antitrust Jury Instruction 1.C.3

28

**Plaintiffs' Argument Re Disputed Instruction No. 37**
RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS

Plaintiffs' proposed instruction is nearly verbatim from the ABA Model, was given in appropriately modified form in *Sumotext Corp. v. Zoove, Inc.*, Final Jury Instructions at 13, 16-cv-1370, ECF No. 468 (N.D. Cal., Mar. 4, 2020). Plaintiffs make three minor changes from the Model. *First*, Plaintiffs explain that Google bears the burden to prove benefits to competition in a rule of reason analysis. *See NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021). *Second*, Plaintiffs correctly explain that the jury "may only consider benefits to competition that impact the relevant market in which Google restrained trade." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 609-10 (1972) (courts cannot weigh "destruction of competition in one sector of the economy against promotion of competition in another sector"). *Third*, Plaintiffs make minor alterations to the Model to explain that the jury "must consider whether the restraint resulted in competitive benefits that were not achievable through substantially less restrictive means." This aligns the instruction with the Supreme Court's recent decision in *NCAA v. Alston*, and correctly articulates the standard that the jury must apply. *See* 141 S. Ct. at 2162 ("[The] rule of reason [asks whether] substantially less restrictive means exist to achieve any proven procompetitive benefits").

In contrast, Google again completely rewrites the Model. *First*, Google seeks to instruct the jury it may consider benefits in "related markets". Google fails to explain what "related markets" are, and the instruction is inconsistent with *Topco*. *Second*, Google adds that "Plaintiffs must prove that all (or virtually all) of the procompetitive benefits could be achieved through substantially less restrictive means". Google's language would mislead the jury into believing that if Plaintiffs fail to prove that ***all*** claimed pro-competitive benefits could be achieved, the jury must return a verdict for Google. However, even if some pro-competitive benefits could not be achieved through less restrictive means, the jury must balance the unattained benefits against the harm to competition, as explained in the Models and required by law. *See FTC v. Qualcomm*, 969 F.3d 974, 991 (9th Cir. 2020) ("If the plaintiff cannot rebut the monopolist's procompetitive justification, 'then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit'"); *United States v. Microsoft* , 253 F.3d 34, 59 (D.C. Cir. 2001) ( "In cases arising under § 1 of the Sherman Act, the courts routinely apply a similar balancing approach under the rubric of the 'rule of

1  reason'"). Google also adds argumentative language that the jury "must, however, give a wide berth to

2  Google's business judgment", which is taken out of context from *Alston*, 141 S. Ct. at 2163. But the

3  Court was simply explaining that, in applying the rule of reason, "the district court honored [certain]

4  principles", like giving a wide berth to the defendant's business judgment. *Id.* at 2163-64. The district

5  court had evaluated whether an alternative "represented a significantly (not marginally) less restrictive

6  means", *id.* at 2164, which is already reflected in Plaintiffs' proposal ("substantially less harm to

7  competition"). Relatedly, Google inserts an argument that the jury "may not find that there was a

8  substantially less restrictive alternative if that alternative would cost significantly more to Google."

9  Although the Ninth Circuit has considered defendants' costs, the Supreme Court and other Circuits

10  have not when assessing less restrictive alternatives. *See Alston*, 141 S. Ct. at 2126 (the test is whether

11  "substantially less restrictive means exist to achieve any proven procompetitive benefits"); *N. Am.*

12  *Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,* 883 F.3d 32, 45 (2d Cir. 2018) (not adopting district

13  court's use of "cost" as an element of the inquiry); *United States v. Brown Univ.,* 5 F.3d 658, 679 (3d

14  Cir. 1993); *Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 497 (5th Cir. 2001). Google's addition would

15  mislead the jury into disqualifying alternatives that cause substantially less harm to competition on the

16  basis of Google's *own* administrative burden in adopting such alternatives. *Third*, Google adds that

17  "[a]n alternative that would require Google to give away . . . applications and services for free cannot

18  be considered a viable less restrictive alternative." Google may argue that Plaintiffs' proposed

19  alternatives would be equivalent to requiring Google to "give away" services, but that is disputed and

20  not the law. Plaintiffs argue that Google benefits from the developers and users who use Android and

21  the Google Play Store without paying Google a monetary price (for example, through ad sales or more

22  users with default payment information in GPB). Google may bias the jury in its favor by inserting

23  this argumentative and slanted language into jury instructions. *Finally*, Google adds that the jury

24  "must evaluate for each alleged anticompetitive act whether Google could achieve the same

25  procompetitive benefits of that act through substantially less restrictive means." But "it would not be

26  proper to focus on specific individual acts of an accused monopolist while refusing to consider their

27  overall combined effect." *City of Anaheim*, 955 F.2d at 1376. That principle applies with no less force

28  when an accused monopolist engages in several anticompetitive restraints that violate Section 1.

## Defendants' Argument Re Disputed Instruction No. 37
### RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS

Plaintiffs' proposed instruction is flawed in several respects.

*First*, Plaintiffs' proposed instruction contradicts the Supreme Court's decision in *Ohio v. American Express* regarding how to assess competitive effects in a two-sided market.  In that case, the Supreme Court explained that "[e]valuating both sides of a two-sided transaction platform is [] necessary to accurately assess competition" and "competition cannot be accurately assessed by looking at only one side of the platform in isolation." 138 S. Ct. 2274, 2287 (2018).  Plaintiffs' proposed instruction contradicts this precedent by providing that the jury can consider the effects of Google's challenged conduct on "either or both sides of the market."  That is not the law.  *See* Defendants' Argument re: Instruction No. 25.

*Second*, Plaintiffs modify the model instruction by instructing the jury that they "may only consider benefits to competition that impact the relevant market in which Google restrained trade."  As an initial matter, the jury cannot be instructed that "Google restrained trade" as that directs them to assume a critical disputed fact.  Further, Plaintiffs' proposed instruction misstates the law in providing that if they prove that Google's conduct harmed competition in a relevant market, then Google must prove that the conduct "was reasonably necessary to achieve competitive benefits for consumers in that market."  Courts "have found it appropriate in some cases to balance the anticompetitive effects on competition in one market with certain procompetitive benefits in other markets."  *Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994); *accord In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1268 (9th Cir. 2020) (Smith, J., concurring) (courts "have permitted defendants to offer procompetitive effects in a collateral market as justification for anticompetitive effects in the defined market") (citing cases).[7]

---

[7] *See NCAA v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85 (1984) (considering whether preserving demand for tickets to college football games could justify restriction of competition for licensing TV broadcasts); *NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d at 1268 (citing *Board of Regents*, 468 U.S. at 95-96); *see also O'Bannon v. NCAA*, 802 F.3d 1049, 1072 (9th Cir. 2015) (crediting NCAA's justification that compensation rules "promote amateurism, which in turn plays a role in increasing consumer demand for college sports" even though rules "had a significant anticompetitive effect on the college education market"); *Los Angeles Mem'l Coliseum Comm'n v.*

1    *Third*, the last sentence of Plaintiffs' proposed instruction misstates the law on less restrictive

2    alternatives as set forth by the Supreme Court.  Plaintiffs seek an instruction that the jury must find for

3    Plaintiffs if they can show *any* "reasonably available alternative means that create substantially less harm

4    to competition."  Under Plaintiffs' formulation, Google must demonstrate that it used the least restrictive

5    means regardless of cost or effectiveness.  That is not the law.  In *NCAA v. Alston*, 141 S. Ct. 2141

6    (2021), the Supreme Court held that "antitrust law does not require businesses to use anything like the

7    least restrictive means of achieving legitimate business purposes. To the contrary, courts should not

8    second-guess degrees of reasonable necessity so that the lawfulness of conduct turn[s] upon judgments

9    of degrees of efficiency."  *Id*. at 2161 (internal citation and quotations omitted).  The Court added that

10   "[a]s we have discussed, antitrust courts must give wide berth to business judgments before finding

11   liability."  *Id*. at 2163.  This 2021 Supreme Court decision post-dates the ABA model instructions, so

12   they should be modified on this point to reflect controlling precedent.  Google's proposed jury instruction

13   properly reflects the Supreme Court's holding in *Alston* and the jury should be instructed on the relevant

14   considerations as directed by the Supreme Court.

15

16

17

18

19

20

21

22

23

24

25

26

27

28   *NFL*, 726 F.2d 1381, 1395-97 (9th Cir. 1984) (enhancing NFL's football ability to "compet[e] with other forms of entertainment" could justify rule limiting competition among NFL teams for stadium locations).

Disputed Instruction No. 38 Re
**RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS**
**Offered by Plaintiffs**

If you find that a challenged restraint resulted in competitive benefits in a relevant market in which Google restrained trade that were not achievable through substantially less restrictive means, then you must balance those competitive benefits against the competitive harm resulting from the same restraint.

If the competitive harm substantially outweighs the competitive benefits in the market in which Google has restrained trade, then the challenged restraint is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits in the market in which Google has restrained trade, then the challenged restraint is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers in the market in which Google has restrained trade, not just to a single competitor or group of competitors. If you have found a market that is two-sided, you must balance the harms and benefits in both sides of the market. Plaintiffs bear the burden of proving by a preponderance of the evidence that the anticompetitive effect of the conduct substantially outweighs its benefits.

Source: ABA Model Civil Antitrust Jury Instruction 1.C.4 (with edits described in Plaintiffs' argument)

Disputed Instruction No. 38 Re
**RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS**
**Offered by Defendants[8]**

If Plaintiffs are unable to show that Google could achieve all the procompetitive benefits of challenged conduct through a less restrictive alternative that would be at least as effective and that would not impose significant costs on Google, then you must find for Google on Plaintiffs' claim that Google used the challenged conduct to unlawfully acquire or maintain a monopoly unless Plaintiffs prove that competitive harm of the challenged conduct substantially outweighs the competitive benefits. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged conduct is lawful and justified.

In conducting this analysis, you must consider the benefits and harm to competition and consumers (meaning users and developers), not just to a single competitor or group of competitors. However, in conducting this balancing, you must give wide berth to business judgments before finding liability.  You should not second-guess whether Google's challenged conduct was reasonably necessary as a matter of degree.  You may not balance the competitive effects of Google's challenged conduct or conclude that it is anticompetitive based on your personal views of whether the conduct is fair or desirable or whether permitting or prohibiting the conduct would be sound policy; only the effect on *competition* matters.

Plaintiffs bear the burden of proving that the anticompetitive effect of the conduct substantially outweighs its benefits.


Source: ABA Model Civil Antitrust Jury Instruction 1.C.4; Ninth Circuit Model Instruction 1.7

---

[8] Google objects to this instruction entirely, but offers this as its proposed version in the event its objection is overruled.

**Plaintiffs' Argument Re Disputed Instruction No. 38**
**RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS**

Plaintiffs' proposed instruction is taken nearly verbatim from the ABA Model Instructions. The Model, in appropriately modified form, was given in *Sumotext Corp. v. Zoove, Inc.*, 16-cv-1370 (N.D. Cal.).  *See* Final Jury Instructions at 14, 16-cv-1370, ECF No. 468 (N.D. Cal. Mar. 4, 2020). Plaintiffs' sole deviations are twofold.  *First*, as noted above, Plaintiffs explain that the jury "may only consider benefits to competition that impact the relevant market in which Google restrained trade." *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 609-10 (1972).  *Second*, Plaintiffs explain that the burden is on Plaintiffs to prove that the anticompetitive effect of the conduct substantially outweighs its benefits only by a preponderance of the evidence.  This is black-letter law.  *See Alston*, 141 S Ct. at 2160.  *Third*, Plaintiffs make minor alterations to the Model Instructions to explain that the jury "must consider whether the restraint resulted in competitive benefits that were not achievable through substantially less restrictive means."  This aligns the Instruction with the Supreme Court's recent decision in *NCAA v. Alston*, and correctly articulates the standard that the jury must apply.  *See* 141 S. Ct. 2141, 2162 (2021) ("[The] rule of reason [asks whether] substantially less restrictive means exist to achieve any proven procompetitive benefits").

Google proposes major deviations from the Model.  *First*, Google reiterates from its proposed changes to the prior instruction that "[i]f Plaintiffs are unable to show that Google could achieve the procompetitive benefits of challenged conduct through a less restrictive alternative that would be at least as effective and that would not impose significant costs on Google, then you must find for Google on Plaintiffs' claim that Google used the challenged conduct to unlawfully acquire or maintain a monopoly unless Plaintiffs prove that competitive harm of the challenged conduct substantially outweighs the competitive benefits."  As discussed above, although the Ninth Circuit has considered the defendants' costs in evaluating less restrictive alternatives, the Supreme Court and other Circuits have not considered defendants' costs when assessing less restrictive alternatives.  *See* Plaintiffs' Argument re Disputed Instruction No. 37, Competitive Benefits.  Google's addition would mislead the jury into disqualifying alternatives that clearly cause substantially less harm to competition on the basis of Google's *own* administrative burden in adopting such alternatives.

*Second*, Google seeks to change "the restraint is not unreasonable", as it appears in the Model, to "the conduct is lawful and justified".  There is no basis for this change.  It is again inconsistent with the Model and the *Sumotext* instruction.

*Third*, Google yet again seeks to state that the jury "must give wide berth to business judgments before finding liability" and that they "should not second-guess whether Google's challenged conduct was reasonably necessary as a matter of degree."  Google has no basis to propose adding this argumentative language.  Google appears to be taking out of context similar language from *NCAA v. Alston*, 141 S. Ct. 2141, 2163 (2021).  But, as explained above, the Court was simply explaining that, in applying the rule of reason and crafting an injunction, "the district court honored [certain] principles", one of which was affording the defendant's business judgment a wide berth.  *Id.*  Google's proposed addition is unnecessary in addition to being prejudicially slanted in Google's favor.  Moreover, this language is vague and ambiguous and risks confusing (and potentially misleading) the jury.  *Fourth*, Google seeks to add that the "jury may not balance the competitive effects of Google's challenged conduct or conclude that it is anticompetitive based on your personal views of whether the conduct is fair or desirable or whether permitting or prohibiting the conduct would be sound policy."  This limiting language is unnecessary, as the parties have stipulated in the Duty to Deliberate instruction that the jury must "not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence" them.  There is no justification to duplicate it here.  Finally, Google includes a footnote stating that it objects to the Court offering this balancing instruction in its entirety, but it provides no sound basis for omitting this essential step in the rule of reason analysis.  See *FTC v. Qualcomm*, 969 F.3d 974, 991 (9th Cir. 2020) ( "If the plaintiff cannot rebut the monopolist's procompetitive justification, 'then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit'"); *see also United States v. Microsoft* , 253 F.3d 34, 59 (D.C. Cir. 2001).

1

2

### Defendants' Argument Re Disputed Instruction No. 38
### RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS

3

4       Because there is no fourth step to the rule of reason, the jury should not be instructed on a

5   fourth step.  The jury should not balance competitive effects if Plaintiffs fail to prove a less restrictive

6   alternative at the third step of the rule of reason analysis.  The Supreme Court has referred to "a three-

7   step, burden-shifting framework" for applying the rule of reason.  *NCAA v. Alston*, 141 S. Ct. 2141,

8   2160 (2021).  Likewise, to determine whether a restraint is unlawful, the Ninth Circuit "appl[ies] a

9   three-step, burden-shifting framework."  *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th

10  1102, 1111 (9th Cir. 2021); *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (referring to

11  rule of reason as a "three-part burden-shifting test"); *O'Bannon v. NCAA*, 802 F.3d 1049, 1070 (9th

12  Cir. 2015) ("follow[ing] the three-step framework of the Rule of Reason").  Indeed, in its recent

13  petition for a writ of certiorari in its litigation against Apple, Epic argued that under Ninth Circuit law,

14  a defendant who prevails at Step 3 effectively prevails in the litigation.  *See* Petition for a Writ of

15  Certiorari, *Epic Games, Inc. v. Apple, Inc.*, No. 23-____, at 17 (S. Ct. 2023) (arguing that under Ninth

16  Circuit law, a defendant who prevails at Step 3 effectively prevails in the litigation).

17      However, if the Court deviated from controlling precedent and gave such an instruction, it

18  should give the instruction proposed by Google.  As with Plaintiffs' proposed instruction on proof of

19  competitive harm, Plaintiffs' proposed instruction incorrectly states that the jury should only consider

20  "competitive benefits in a relevant market in which Google restrained trade."  For the reasons stated in

21  Google's Defendants' Argument Re: Instruction No. 25, this instruction is erroneous.  On the

22  balancing step, Plaintiffs have the burden to "demonstrate that the anticompetitive harm of the conduct

23  outweighs the procompetitive benefit," *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020),

24  without the restrictions Plaintiffs seek.  Indeed, courts have held that such restrictions are legal error.

25  In *Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994), for example, the court held it was an error to

26  instruct the jury as Plaintiffs propose here because courts, including the Ninth Circuit, "have found it

27  appropriate in some cases to balance the anticompetitive effects on competition in one market with

28  certain procompetitive benefits in other markets," and "courts should generally give a measure of

latitude to antitrust defendants in their efforts to explain the procompetitive justifications for their

policies and practices."

1

2

**Stipulated Instruction No. 39 Re**
**INTRODUCTION TO TYING**

3

4

Plaintiffs also claim that Google engaged in an unlawful tying arrangement. A tying

arrangement is one in which the seller will sell one product or service (referred to as the tying product)

only on the condition that the buyer also purchase a different product or service (referred to as the tied

product) from the seller, or at least agrees not to purchase the tied product or service from any other

seller. In this case, Plaintiffs claim that Google's app distribution product (the Google Play Store) is

the tying product and its in-app billing service (Google Play Billing) is the tied product.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 2.E.1

1

2

**Stipulated Instruction No. 40 Re**
**RATIONALE FOR PROHIBITION OF TYING ARRANGEMENTS**

3

4

Not all tying arrangements are unlawful. The essential characteristic of an invalid tying

arrangement is a seller's exploitation of its market power over the tying product (app distribution

5

services) to force a buyer to purchase the tied product (in-app billing services) that the buyer might

6

have preferred to purchase elsewhere.  I will now instruct you regarding how to determine whether, if

7

there was a tying arrangement, that alleged tying arrangement is unlawful.

8

9

Source: ABA Model Civil Antitrust Jury Instruction 2.E.2

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Disputed Instruction No. 41 Re**
**ELEMENTS – PER SE ILLEGAL TYING**
**Offered by Plaintiffs**

3   Plaintiffs assert *per se* tying claims. To prevail on a *per se* tying claim, Plaintiffs must prove

4   each of the following elements by a preponderance of the evidence:

5       1.   Android app distribution services (like the Google Play Store) and Android in-app

6            billing services for digital goods and services transactions (like Google Play Billing)

7            are separate and distinct services;

8       2.   Google will distribute Android apps through the Google Play Store only on the

9            condition that the app developers use Google Play Billing for in-app transactions of

10           digital goods and services;

11      3.   Google has sufficient market power via the Google Play Store with respect to

12           Android app distribution to enable it to restrain competition from other Android in-

13           app billing services;

14      4.   The alleged tying arrangement has foreclosed a substantial volume of commerce as

15           to Android in-app billing services; and

16      5.   One or more Plaintiffs were injured in their business or property because of the

17           tying arrangement.

18   If you find that the evidence is sufficient to prove all five elements, then you must find for

19   Plaintiffs and against Google on Plaintiffs' *per se* tying claims. If you find that the evidence is

20   insufficient to prove any one of these elements, then you must find for Google and against Plaintiffs on

21   Plaintiffs' *per se* tying claims.  Because these are *per se* tying claims, if these elements are met, you

22   need not determine whether the tying arrangements could be justified by competitive benefits to find

23   Google liable.

24

25   Source: Adapted from ABA Model Civil Antitrust Jury Instruction 2.E.3

26

27

28

**Disputed Instruction No. 41 Re**
**ELEMENTS – PER SE ILLEGAL TYING**
**Offered by Defendants**

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

**Plaintiffs' Argument Re Disputed Instruction No. 41**
**ELEMENTS – PER SE ILLEGAL TYING**

Plaintiffs offer the ABA Model Instruction on *per se* tying in slightly modified form. Aside from standard modifications primarily contemplated by placeholders in the Model, Plaintiffs propose to add a final sentence stating that "[b]ecause these are *per se* tying claims, if these elements are met, you need not determine whether the tying arrangements could be justified by competitive benefits to find Google liable." This language is consistent with the case law. *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008); *see also Epic Games, Inc. v. Apple, Inc*., 67 F.4th 946, 997 (9th Cir. 2023) ("A tie is per se unlawful if (1) the defendant has market power in the tying product market, and (2) the 'tying arrangement affects a "not insubstantial volume of commerce" in the tied product market.'"). Moreover, as discussed in Plaintiffs' argument on the *per se* Section 1 instruction, it is particularly important that the jury understand that Google's procompetitive justifications are irrelevant to Plaintiffs' *per se* claims because Google will argue the existence of procompetitive justifications for its conduct in this case. Google's Trial Brief, ECF No. 639 at 6 ("Google's challenged conduct is procompetitive."). Absent this language, the jury may improperly consider those procompetitive justifications in considering Plaintiffs' *per se* tying claim, which would be error. *Maricopa Cty.*, 457 U.S. at 357.

Google disputes that this instruction should be offered. Google similarly argued that Plaintiffs' *per se* tying claim should be dismissed at summary judgment. *See* Defendants' Mot. for Summ. J., ECF No. 480 at 20-24. Its argument was predicated on language from *Epic v. Apple* stating that "[b]ased on the record, we do not have the level of confidence needed to universally condemn ties related to app-transaction platforms that combine multiple functionalities." 67 F.4th at 997. But, at its hearing on Google's motion for summary judgment, this Court explained that the Ninth Circuit in *Apple* was "saying act with caution and humility until there's a clear record about the industry" and that "[t]here is no per se barrier in Epic that forevermore this cannot be considered per se." Mot. Summ. J. Hearing Tr. 40:8-9, 21-22. This reasoning is sound. There is no basis to conclude that, as a matter of law, Plaintiffs' *per se* tying claim is foreclosed. The jury should therefore be instructed on *per se* tying.

1

2

### Defendants' Argument Re Disputed Instruction No. 41
### ELEMENTS – PER SE ILLEGAL TYING

The *per se* instruction contravenes Ninth Circuit precedent and should not be given.  Google objects to each of Plaintiffs' *per se* instructions in their entirety.  The Ninth Circuit holds that "*per se* condemnation is inappropriate for ties 'involv[ing] software that serves as a platform for third-party applications." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 997 (9th Cir. 2023) (quoting *U.S. v. Microsoft Corp.*, 253 F.3d 34, 89 (D.C. Cir. 2001)).  Evaluating Epic's similar claim against Apple, the Ninth Circuit explained that the alleged tie at issue was not "plainly anticompetitive" such that it could be "conclusively presumed illegal." *Id.* (citations omitted).  The Ninth Circuit said that it lacked the requisite experience to "have the level of confidence needed to universally condemn ties related to app-transaction platforms that combine multiple functionalities." *Id.*  Quite the contrary, the Ninth Circuit held that the alleged tie was *lawful*. *Id.* at 998 ("Applying the Rule of Reason to the tie involved here, it is clearly lawful.").

The same result is required here.  Given that the Ninth Circuit found the *Epic. v. Apple* tie to be *lawful*, it would be impossible for this court to "have the level of confidence needed to universally condemn" the alleged tie in this case. *Id.* at 997.

**Disputed Instruction No. 42 Re**
**ELEMENTS – RULE OF REASON TYING**
**Offered by Plaintiffs**

In addition, Plaintiffs also assert rule of reason tying claims against Google. To prevail on their rule of reason tying claims, Plaintiffs must prove by a preponderance of the evidence each of the elements I just gave you for *per se* tying claims plus the following sixth element:

6.   The tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect on competition in a relevant market.

If you find that the evidence is sufficient to prove all of these elements, then you must find for Plaintiffs and against Google on Plaintiffs' rule of reason tying claims. If you find that the evidence is insufficient to prove any one of these elements, then you must find for Google and against Plaintiffs on Plaintiffs' rule of reason tying claims.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 2.E.4

**Disputed Instruction No. 42 Re**
**ELEMENTS – TYING UNDER THE RULE OF REASON**
**Offered by Defendants**

To prevail on their tying claim, plaintiffs must prove each of the following elements by a preponderance of the evidence:

1. App distribution services and in-app billing services are separate and distinct products;

2. Google will provide app distribution services only on the condition that the buyer also use Google Play Billing, or that the buyer not use in-app billing services from any other supplier;

3. Google has sufficient market power with respect to the app distribution services to enable it to restrain competition as to an alleged market for in-app billing services;

4. the alleged tying arrangement has foreclosed a substantial volume of commerce as to an alleged market for in-app billing services;

5. the tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect on competition as to an alleged market for in-app billing services; and

6. Plaintiffs were injured in their business or property because of the tying arrangement.

If you find that the evidence is sufficient to prove all six of these elements, then you must consider Google's business justification defense, which I will instruct you on later. If you find for Plaintiffs on all six of these elements and against Google on Google's business justification defense, then you must find for Plaintiffs and against Google on plaintiffs' tying claim. If you find that the evidence is insufficient to prove any one of these elements, then you must find for Google and against Plaintiffs on Plaintiffs' tying claim. Alternatively, if you find for Google on Google's business justification defense, then you must find for Google on Plaintiffs' tying claim.

Source: ABA Model Civil Antitrust Jury Instruction 2.E.4

**Plaintiffs' Argument Re Disputed Instruction No. 42**
**ELEMENTS – TYING UNDER THE RULE OF REASON**

Plaintiffs have proposed a Rule of Reason Tying instruction that adds the only non-overlapping element not already explained in Plaintiffs' proposed *Per Se* Tying instruction.  Google disputes that a *per se* tying instruction be given.  Plaintiffs here address each of the elements of rule or reason tying, though Plaintiffs submit that if the jury is instructed on *per se* tying, it will only be necessary to add the additional instruction on market effects in the instruction on rule of reason tying.

Plaintiffs propose an instruction that closely tracks the ABA Model Instruction, with the following revisions.  Plaintiffs propose replacing the "product A" placeholder in the Model with "Android app distribution services (like the Google Play Store)" and the "product B" placeholder in the Model with "Android in-app billing services for digital goods and services transactions (like Google Play Billing)".  This accurately describes Plaintiffs' claims in neutral terms, and provides helpful parentheticals to the Google services that Plaintiffs' claims refer to.  Plaintiffs propose additional minor edits to the language of the Model to ensure it comports with Plaintiffs' claims.

Google proposes several modifications from the model that should be rejected.  *First*, Google disputes Plaintiffs' description of "product A" and "product B".  Google submits that product A should be "App distribution services" and product B should be "in-app billing services."  This description should not be given to the jury, as it misrepresents Plaintiffs' claims.  Plaintiffs assert that product A, the tying product, is Google's Android app distribution services (namely, the Google Play Store) and that product B, the tied product, is Google's Android in-app billing services for digital goods and services transactions (Google Play Billing).  Google's product A description is inadequate because it is overbroad, including all app distribution services (regardless of platform or device) and Google's product B description is inadequate for the same reason, and also because Plaintiffs solely allege that Google has tied Android in-app billing services for digital goods and services to Google Play.

*Second*, Google refers to product A and product B as products, when Plaintiffs describe them as services.  This should be rejected because ***Google itself*** refers to each as "services"; namely, "App distribution services" and "in-app billing services".  That description is apt.

1

2

### Defendants' Argument Re Disputed Instruction No. 42
### ELEMENTS – TYING UNDER THE RULE OF REASON

3

Because the *per se* claim should be dismissed as a matter of law, there is no reason to have an

4

instruction dedicated to only this element.  *See* Defendants' Argument re: Instruction No. 41.  Rather,

5

the Court should give Google's instruction on the elements of a rule-of-reason tying claim.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 43 Re**
**TYING – PER SE AND RULE OF REASON: PRESENCE OF TWO PRODUCTS**
**Offered by Plaintiffs**

To determine whether Android app distribution services (like the Google Play Store) and Android in-app billing services for digital goods and services transactions (like Google Play Billing) are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough Android app developers would want to use in-app billing services separate from the Android app distribution services they are using, so that providers would be induced generally to provide Android app distribution and in-app billing services separately, then Android app distribution and in-app billing services are separate products.

In making this determination, you may consider whether Android app developers have requested to use the Google Play Store separately from Google Play Billing, whether app developers have used alternative billing services, whether competing app stores do not require use of a particular payment processor, and whether Google has historically not required all app developers to use Google Play Billing for in-app transactions of digital goods and services. The presence of one or more of these factors shows that the Google Play Store and Google Play Billing are separate and distinct products.

Products may be separate products even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

Source: ABA Model Civil Antitrust Jury Instruction 2.E.5, with second paragraph added based on *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 995-96 (9th Cir. 2023)

1

**Disputed Instruction No. 43 Re
TYING – PRESENCE OF TWO PRODUCTS
Offered by Defendants**

2

3      To determine whether the Google Play store and Google Play Billing are separate and distinct

4 products, you should consider whether there would be demand for each of them if they were offered

5 separately.  If enough app developers would want to use app distribution services like the Google Play

6 Store alone and in-app billing services like Google Play Billing alone to induce sellers generally to

7 provide access to them separately then they are separate products.  On the other hand, if there is very

8 little demand for one of the products by itself, that is, without the other product, then the Google Play

9 store and Google Play Billing are not two separate products for the purposes of the tying claim, even if

10 they are sometimes used separately.

11      Products may be separate products even if one of them is useless without the other.  The

12 relevant issue is whether there is sufficient demand from customers to induce sellers to provide them

13 separately, even if the customer needs to obtain both products from one or more suppliers.

14

15 Source: ABA Model Civil Antitrust Jury Instruction 2.E.5

16

17

18

19

20

21

22

23

24

25

26

27

28

**Plaintiffs' Argument Re Disputed Instruction No. 43**
**TYING – PER SE AND RULE OF REASON: PRESENCE OF TWO PRODUCTS**

Plaintiffs propose minor revisions to the ABA Model Instruction.  *First*, as discussed in Plaintiffs' Tying: Rule of Reason Argument, Plaintiffs propose referring to product A as "Android app distribution products (like the Google Play Store)" and "product B" as "Android in-app billing services for digital goods and services transactions (like Google Play Billing)".  These changes are warranted for the reasons discussed above.

*Second*, Plaintiffs propose adding a second paragraph listing the *Epic v. Apple* factors: "whether Android app developers have requested to use the Google Play Store separately from Google Play Billing, whether app developers have used alternative billing services, whether competing app stores do not require use of a particular payment processor, and whether Google has historically not required all app developers to use Google Play Billing for in-app transactions of digital goods and services. The presence of one or more of these factors shows that the Google Play Store and Google Play Billing are separate and distinct products." *Epic Games*, 67 F.4th at 996.

Plaintiffs object to Google's description of product A and product B in their instruction. Google describes product A as "the Google Play store" and product B as "Google Play Billing".  By narrowing these descriptions to the Google Play store and Google Play Billing, Google limits the two-products inquiry to its own products.  But the two-products inquiry is not limited to the specific products offered by the defendant.  Instead, it asks whether the ***type*** of products offered by the defendant are separate products.  For example, in *United States v. Microsoft*, the focus of the two-products inquiry was whether operating systems and browsers, generally, were separate products, not whether Windows and Internet Explorer were separate products.  253 F.3d at 85-89; *see also Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992) (asking whether the product category of "services" is separate from the product category of "parts").  By limiting the inquiry to only the specific products it sells, Google may mislead the jury into finding that the Google Play store and Google Play Billing are the same product not based on their "functional relation", *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984), but on irrelevant factors like Google's choice of branding and appearance.  Google's proposed instruction should be rejected.

1
2

**Defendants' Argument Re Disputed Instruction No. 43**
**TYING – PER SE AND RULE OF REASON: PRESENCE OF TWO PRODUCTS**

3       The Court should give Google's proposed instruction, which adheres to the ABA's model

4   instruction and, more importantly, the law.

5       *First*, Plaintiffs' propose to erroneously ask the jury whether types of products are distinct,

6   rather than the products at issue in this case—the Google Play store and Google Play Billing.  The

7   relevant question is whether "the tying and tied goods are two separate products."  *See United States v.*

8   *Microsoft Corp.*, 253 F.3d 34, 85 (D.C. Cir. 2001) (considering whether Windows and Internet

9   Explorer are separate products); ABA Model Civil Antitrust Jury Instr. 2.E.5 (same).  Plaintiffs

10  obfuscate and confuse the inquiry by asking about broad categories of products (Android app

11  distribution services and in-app billing services) rather than the products at issue in this case (the

12  Google Play store and Google Play Billing).

13      *Second*, while Google has adhered strictly to the model, Plaintiffs have created a second

14  paragraph out of whole cloth that reads like an advocacy piece rather than a jury instruction.  Citing the

15  Ninth Circuit's decision in Epic's case against Apple, Plaintiffs have created a list of factors for the

16  jury to consider.  But the Ninth Circuit did not create a set of factors for juries.  At most, it endorsed a

17  consumer-demand test that asks whether "it is possible to separate the products" and whether it is

18  "efficient to do so."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 995 (9th Cir. 2023). Plaintiffs cite

19  no case in which this instruction was given.

20      The Court should reject Epic's instruction, which lacks a basis in the law, and instead give

21  Google's proposed instruction, which is neutral, legally sound, and based on the ABA's model

22  instruction.

23
24
25
26
27
28

Disputed Instruction No. 44 Re
TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING
Offered by Plaintiffs

You may find that a tie exists between the Google Play Store and Google Play Billing if you find that Google refuses to distribute Android apps through the Google Play Store unless Android app developers agree to use Google Play Billing to facilitate the sale of digital goods or services in those apps. You may also find that a tie exists if Google effectively coerced Android app developers into using only Google Play Billing. To prove coercion, Plaintiffs must prove by a preponderance of the evidence that Google exploited its control over the Google Play Store to force Android app developers to use Google Play Billing for these transactions, when the app developers either did not want to use Google Play Billing at all, or might have preferred to use a different in-app billing service, and that any appearance of choice was illusory. Mere sales pressure or persuasion is not coercion.

If Google has made the use of the Google Play store and Google Play Billing together the only viable economic option, you may find that Google has effectively tied the Google Play store to Google Play Billing.  However, there is no coercion if the Google Play store and Google Play Billing are offered separately and separate use is economically feasible.

Source: ABA Model Civil Antitrust Jury Instruction 2.E.7  (with edits described in Plaintiffs' argument)

Disputed Instruction No. 44 Re
TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING
Offered by Defendants

You may find that a tying arrangement exists between the Google Play store and Google Play Billing if Google either refused to distribute apps on the Google Play store unless developers also agreed to use Google Play Billing (or not to use in-app billing services from another supplier). To prove coercion, Plaintiffs must prove by a preponderance of the evidence that Google exploited its control over the Google Play store to force developers into using Google Play Billing, when developers might have preferred to use other billing services on different terms, and that any appearance of choice was illusory. Mere sales pressure or persuasion is not coercion.

If Google has made the use of the Google Play store and Google Play Billing together the only viable economic option, you may find that Google has effectively tied the Google Play store to Google Play Billing. However, there is no coercion if the Google Play store and Google Play Billing are offered separately and separate use is economically feasible.

Source: ABA Model Civil Antitrust Jury Instruction 2.E.7

1

2

**Plaintiffs' Argument Re Disputed Instruction No. 44**
TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING

3

4

Plaintiffs propose an instruction that closely tracks the model, with some minor, justified

modifications.  Plaintiffs propose replacing placeholder language at the beginning of the model with

5

"[y]ou may find that a tie exists between the Google Play Store and Google Play Billing if you find

6

that Google refuses to distribute Android apps through the Google Play Store unless Android app

7

developers agree to use Google Play Billing to facilitate the sale of digital goods or services in those

8

apps."  Plaintiffs propose similar edits to placeholders elsewhere in the instruction.  This accurately

9

describes Plaintiffs' claims in neutral terms, and is consistent with the law.  Plaintiffs propose

10

additional minor edits to the language of the Model to ensure it comports with Plaintiffs' claims.

11

Google's proposed Instruction omits language from the ABA Model that Plaintiffs retain,

12

which is:  "You may also find that a tie exists if Google effectively coerced Android app developers

13

into using only Google Play Billing."  Google's Instruction does go on to explain *how* Plaintiffs prove

14

coercion, but provides no explanation as to how such a showing of coercion impacts the jury's

15

consideration of Plaintiffs' claims.  The jury should be instructed that a finding of effective coercion

16

establishes the "conditioning" element of Plaintiffs' tying claim.

17

18

19

20

21

22

23

24

25

26

27

28

**Defendants' Argument Re Disputed Instruction No. 44**
TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING

Rather than propose a legally correct instruction, Plaintiffs have distorted the law to fit their arguments on the merits.  In doing so, they have introduced error.

Rather than ask whether Google conditions distribution on the Google Play store on the use of Google Play Billing, Plaintiffs narrow this instruction to ask whether Google conditions the use of the Google Play store on the use of Google Play Billing in one of the few circumstances that Google Play Billing is required—that is, for in-app purchases.  Plaintiffs' instruction effectively tells the jury to consider the only scenario in which Google Play Billing is required, while ignoring the many ways that developers could avoid using Google Play Billing.  In effect, Plaintiffs are asking whether a tie exists if developers choose to distribute apps through the Google Play store *and also* choose to monetize through the specific method of in-app purchases of digital content.  That is not the test.  "A tie only exists where 'the defendant improperly imposes conditions that explicitly or practically require buyers to take the second product if they want the first one.'"  *Aerotec Int'l, Inc. v. Honeywell Int'l Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016).  Google, on the other hand, has proposed even-handed language derived from the ABA's model instruction that is supported by the law.  ABA Model Civil Antitrust Jury Instruction 2.E.7.

1

2

Disputed Instruction No. 45 Re
TYING – PER SE AND RULE OF REASON: EXISTENCE OF MARKET POWER WITH
RESPECT TO THE TYING PRODUCT
Offered by Plaintiffs

3

4

You must next determine whether Google has market power with respect to the tying product

5

(in an alleged market for Android app distribution services).  I have already instructed you on the

6

meaning of market power.  You must apply that instruction when determining whether Google has

7

market power with respect to the tying product.  In addition, if you have found that Google has

8

monopoly power in a relevant market, then Google necessarily has market power in that relevant

9

market. However, you may find that Google has market power in a relevant market even if Google

10

does not have monopoly power in that market because market power requires less than monopoly

11

power.  Further, if Google's share of the market for the Android app distribution services is below 30

12

percent, Google does not have market power for the purposes of the tying claim. But if Google's

13

market share of the market for Android app distribution services is above 30 percent, you may consider

14

that in determining whether Google has market power.

15

16

Source: ABA Model Civil Antitrust Jury Instruction 2.E.8  (with edits described in Plaintiffs'

17

argument)

18

19

20

21

22

23

24

25

26

27

28

1

Disputed Instruction No. 45 Re
EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT

2

Offered by Defendants

3        You must next determine whether Google has market power with respect to the tying product

4   (in an alleged market for Android app distribution services).  I have already instructed you on the

5   meaning of market power.  You must apply that instruction when determining whether Google has

6   market power with respect to the tying product.

7

8   Source: ABA Model Civil Antitrust Jury Instruction 2.E.8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Plaintiffs' Argument Re Disputed Instruction No. 45**
EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT

Plaintiffs propose adding two sentences that are not in the relevant ABA Model Instruction, and propose keeping two sentences from the relevant ABA Model Instruction that Google proposes deleting.

Plaintiffs propose adding that "if you have found that Google has monopoly power in a relevant market, then Google necessarily has market power in that relevant market. However, you may find that Google has market power in a relevant market even if Google does not have monopoly power in that market because market power requires less than monopoly power." This is supported in the law, as it is well-established that if an entity has monopoly power, it has market power. *Epic Games*, 67 F.4th at 998 ("Monopoly power differs in degree from market power, requiring something greater.") These sentences correctly state the law and will clarify the relationship between the showing required for Plaintiffs' Section 2 monopolization claims (monopoly power) and the corresponding showing that is relevant to their consideration of Section 1 restraint of trade claims (market power). This addition is necessary because the ABA Model does not contemplate instructions covering both Section 1 and Section 2 claims, and without them the jury may be confused into believing that the two sets of claims require an equivalent showing on this issue—or may even reach internally inconsistent conclusions.

Plaintiffs propose keeping the following two sentences from the Model that Google proposes deleting: "if Google's share of the market for the Android app distribution services is below 30 percent, Google does not have market power for the purposes of the tying claim. But if Google's market share of the market for Android app distribution services is above 30 percent, you may consider that in determining whether Google has market power." Not only are these taken verbatim from the Model, they are consistent with the law. *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1123 (N.D. Cal. 2004) (using 30% as a presumptive but not binding cut-off for market power). There is no basis to delete this language that would assist the jury in reaching its decision.

1

2

**Defendants' Argument Re Disputed Instruction No. 45**
EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT

3

4

5

In the context of these lengthy instructions, there is no need to instruct the jury on the meaning of market power twice.  Rather, the Court should adopt Google's proposed instruction, which refers to previous instructions on market power.

6

7

8

9

10

11

12

13

Moreover, the Court should not adopt Plaintiffs' proposed instruction because it is erroneous insofar as it suggests that a market share above 30 percent indicates market power.  "[N]umerous cases hold that a market share of less than 50 percent is presumptively insufficient to establish market power."  *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (collecting cases).  Some cases have stated that a 30 percent share is insufficient to find power in the tying product market. *See Jefferson Parish Hosp. Dist. No. 2. v. Hyde*, 466 U.S. 2, 27 (1984); *accord Sherwin-Williams Co. v. Dynamic Auto Images, Inc.*, 2017 WL 3081822, at *7 (C.D. Cal. Mar. 10, 2017).  But that is not inconsistent with Google's proposed instruction.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 46**
**TYING – PER SE AND RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL**
**VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT**
**Offered by Plaintiffs**

If you determine that the Google Play Store and Google Play Billing are separate products that have been tied to one another and that Google has market power in Android app distribution, then you must determine whether Plaintiffs have proven that Google has foreclosed a substantial amount of interstate commerce with respect to Android in-app billing services for digital goods and services transactions.

In determining whether Google has foreclosed a substantial amount of commerce with respect to Android in-app billing services for digital goods and services transactions, you should first consider the total dollar amount Google earned from Google Play Billing by the tying arrangement in absolute terms.

If the dollar amount of Google's earnings from Google Play Billing was substantial, then the substantial volume of commerce element is met with respect to the Plaintiffs' *per se* tying claim.

With respect to the Plaintiffs' rule of reason tying claim only, you should also consider whether there has been a substantial adverse effect on competition in a relevant market due to the tying arrangement. If there was not a substantial adverse effect on competition in a relevant market due to the tying arrangement, then you must find in favor of Google on the rule of reason tying claim.

There is no substantial foreclosure if only a small percentage of sales in the market for Android in-app payment solutions for digital goods and services transactions was affected by the tying arrangement. There also is no substantial foreclosure if you find that Android app developers would not have used Android in-app payment solutions at all in the absence of the tying arrangement.

Source: ABA Model Civil Antitrust Jury Instruction 2.E.9  (with edits described in Plaintiffs' argument)

**Disputed Instruction No. 46 Re**
**TYING – RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL VOLUME OF**
**COMMERCE WITH RESPECT TO THE TIED PRODUCT**
**Offered by Defendants**

If you determine that the Google Play Store and Google Play Billing are separate products that have been tied to one another and that Google has market power in an alleged market for Android app distribution services, then you must determine whether Plaintiffs have proven that Google has foreclosed a substantial amount of interstate commerce with respect to an alleged market for in-app billing services.

In determining whether Google has foreclosed a substantial amount of commerce with respect to an alleged market for in-app billing services, you should first consider the total dollar amount of Google's sales of in-app billing services achieved by the tying arrangement in absolute terms.

If the dollar amount of Google's sales of in-app billing services was substantial, you should next consider whether there has been a substantial adverse effect on competition with respect to the market for in-app billing services due to the tying arrangement.  In making that determination, you should apply the instructions regarding anticompetitive effect that I provided to you earlier.  If there was not a substantial adverse effect on competition with respect to a market for in-app billing services due to the tying arrangement, then you must find in favor of Google on Plaintiffs' tying claims.

There is no substantial foreclosure if only a small percentage of sales in the market for in-app billing services was affected by the tying arrangement.

1

2

**Plaintiffs' Argument Re Disputed Instruction No. 46**
**TYING – PER SE AND RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL**
**VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT**

3

4        Plaintiffs propose an instruction that closely tracks the model, with some minor, justified

5   modifications.  Aside from replacing placeholder language with descriptions of product A and product

6   B discussed further in Plaintiffs' prior arguments on the tying instructions, Plaintiffs propose

7   modifying the Model because Plaintiffs assert both rule of reason and *per se* tying claims.  A

8   substantial adverse effect on competition is only an element of a rule of reason tying claim.  *Epic*

9   *Games*, 67 F.4th at 997 ("A tie is per se unlawful if (1) the defendant has market power in the tying

10  product market, and (2) the tying arrangement affects a not insubstantial volume of commerce in the

11  tied product market.").  Thus, Plaintiffs propose language clarifying that the Model Instruction

12  language concerning adverse effect on competition is only applicable to the rule of reason tying claims

13  ("With respect to the Plaintiffs' rule of reason tying claim only . . .").

14        *Second*, Plaintiffs add clarifying language to explain that the "substantial volume of commerce"

15  test is otherwise met so long as the tie affects more than a "minimal" amount of commerce.  *In Fortner*

16  *Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501 (1969), the Supreme Court explained that the

17  inquiry "is whether a total amount of business, substantial enough in terms of dollar-volume so as not

18  to be merely de minimis, is foreclosed to competitors by the tie."  *Id.*; *see also Blough v. Holland*

19  *Realty*, 574 F.3d 1084, 1089 (9th Cir. 2009).  Indeed, "[t]he requirement that a 'not insubstantial'

20  amount of commerce be involved makes no reference to the scope of any particular market or to the

21  share of that market foreclosed by the tie." *Fortner*, 394 U.S. at 501.

22

23

24

25

26

27

28

**Defendants' Argument Re Disputed Instruction No. 46**
**TYING – PER SE AND RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL**
**VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT**

Google objects to Plaintiffs' proposed instruction on grounds that *per se* tying instructions are inapplicable to this case as a matter of law.  *See* Defendants' Argument re: Instruction No. 41.

Insofar as Plaintiffs' instruction addresses the rule-of-reason analysis, it is flawed, because it asks about substantial foreclosure in a relevant market rather than in the tied product market particularly.  This misstates the law.  The Ninth Circuit has stated many times that there must be substantial foreclosure in the tied product market.  *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012) ("The potential injury to competition threatened by this practice is that the tying arrangement will either 'harm existing competitors or create barriers to entry of new competitors *in the market for the tied product*[.]'" (emphasis added)); *id.* ("courts distinguish between tying arrangements in which a company exploits its market power by attempting 'to impose restraints on competition *in the market for a tied product*' (which may threaten an injury to competition) and arrangements that let a company exploit its market power 'by merely enhancing the price of the tying product' (which does not)." (emphasis added)); *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1088–89 (9th Cir. 2009) (holding that a plaintiff must prove "the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market."); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008) ("A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market.").  Accordingly, the Court should adopt Google's proposed instruction.

*United States v. Microsoft* does not support Plaintiffs' instruction.  In that case, the government alleged that Microsoft had tied its browser, Internet Explorer, to the Windows operating system.  With respect to the government's Section 1 tying claim, the D.C. Circuit held that "plaintiffs must show that Microsoft's conduct unreasonably restrained competition" and that "[m]eeting that burden 'involves an inquiry into the actual effect' of Microsoft's conduct on competition *in the tied good market*, the putative market for browsers."  253 F.3d 34, 95 (D.C. Cir. 2001) (emphasis added).  Although the government also alleged that this practice harmed competition in the market for the tying product–

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

operating systems like Windows–for purposes of the government's Section 2 claim, the Court did not say that this theory was a permissible Section 1 tying theory.

Disputed Instruction No. 47 Re
TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE
Offered by Plaintiffs

Google contends that the alleged tying arrangement is justified. However, if you find that Plaintiffs have proven all elements of their per se tying claims, it is not a defense to the per se claim that Google's arrangement was justified.

When considering Plaintiffs' rule of reason tying claims, you should consider whether Google has proven, by a preponderance of the evidence, a business justification for the tying arrangement. You may only consider business justifications that affect the market containing the tied product. Google has the burden of proof on this issue.

In determining whether the tying arrangement is justified, you must decide whether it serves a legitimate business purpose of Google in the market containing the tied product. In making this determination, you should consider whether the justification Google offers is the real reason that it imposed the tying arrangement.

You must also consider whether Google's claimed legitimate business purpose could reasonably have been realized through substantially less restrictive means. Even if some type of constraint is necessary to promote a legitimate business interest, Google must not adopt a constraint that is more restrictive than reasonably necessary to achieve that interest.

In determining whether Google's claimed legitimate business purpose could reasonably have been achieved through other means, you may assess such factors as whether other means to achieve Google's objective were more or less expensive and more or less effective than the means chosen by Google, but even if alternative means would cost Google more to use, those costs do not prevent those means from being substantially less restrictive of competition.

If you find that Google could reasonably have achieved its claimed legitimate business purpose by less restrictive means, then you may find that there was no business justification and find for Plaintiffs on the tying claims. If you find  that there were no less restrictive means to achieve competitive benefits in a relevant market, then you must balance those competitive benefits against competitive harms resulting from the tying arrangement.  If the competitive harm substantially outweighs the competitive benefits, then the tying arrangement is unreasonable and then you must find

1  for Plaintiffs.

2

3  Source: ABA Model Civil Antitrust Jury Instruction 2.E.11  (with edits described in Plaintiffs'

4  argument)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

Disputed Instruction No. 47 Re
TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE
Offered by Defendants

3      Google contends that the alleged tying arrangement is justified.  If you find that Plaintiffs have

4  proven all of the elements of a tying claim, then you should consider whether Google has proven, by a

5  preponderance of the evidence, a business justification for the tying arrangement.  Google has the

6  burden of proof on this issue.

7      Google contends that the tying arrangement is justified because, among other things, it enables

8  Google efficiently to collect compensation for the use of its services and intellectual property and

9  ensures that Google can receive compensation for its services and intellectual property.

10     In determining whether the tying arrangement is justified, you must decide whether it serves a

11  legitimate business purpose of Google. If Google shows that its policy had a legitimate purpose, then

12  Plaintiffs must prove that the procompetitive benefits of Google's policy could be achieved through

13  substantially less restrictive means.

14     In determining whether all of Google's legitimate objectives could reasonably have been

15  achieved through substantially less restrictive means, you may assess such factors as whether other

16  means to achieve Google's objectives were substantially more or less expensive and more or less

17  effective than the means chosen by Google.  You must, however, give a wide berth to Google's

18  business judgment.  You may not find that there was a substantially less restrictive alternative if that

19  alternative would cost significantly more to Google.

20     If you find that Plaintiffs have demonstrated that Google could reasonably have achieved its

21  legitimate business purposes by substantially less restrictive means, including without significantly

22  increased costs, then you may find that there was no business justification and find for Plaintiffs on the

23  tying claim.  If you find that the tying arrangement serves a legitimate business purpose of Google, and

24  that Plaintiffs have not demonstrated that there are substantially less restrictive means reasonably

25  available without significantly increased costs to achieve that purpose, then you must find for Google

26  and against plaintiffs on the tying claim.

27

28     Source:  ABA Model Civil Antitrust Jury Instruction 2.E.11

1

**Plaintiffs' Argument Re Disputed Instruction No. 47**
TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE

2     Plaintiffs' proposed version of the Business Justification instruction is a more faithful

3    application of the ABA Model Instruction than Google's, and it should therefore be provided to the

4    jury.  Google's proposal is a substantial and unnecessary departure from the Model Instruction that is

5    not required by law.

6          Plaintiffs propose only minor changes from the Model.  *First*, aside from filling placeholders,

7    Plaintiffs propose to explain that "it is not a defense to the per se claim that Google's arrangement was

8    justified" and that Google's business justification only be considered "[w]hen considering Plaintiffs'

9    rule of reason tying claims".  This is black-letter law (*see Epic Games, Inc. v. Apple, Inc.*, 67 F.4th

10   946, 996 (9th Cir. 2023)), and important to help the jury distinguish the elements of the Plaintiffs' *per*

11   *se* tying claim from their rule of reason tying claim.  *Second*, Plaintiffs add "[y]ou may only consider

12   business justifications that affect the market containing the tied product" because, as discussed in

13   *Topco*, courts cannot consider procompetitive effects outside the relevant market.  *Topco*, 405 U.S. at

14   610-11.  Plaintiffs also propose edits to the last paragraph to clarify that, even if Plaintiffs do not prove

15   less restrictive alternatives as to any benefits, the jury must still balance those benefits against the

16   harms resulting from the tie.  *FTC v. Qualcomm*, 969 F.3d 974, 991 (9th Cir. 2020).

17         Google's proposed instruction includes major changes to the Model and should be rejected.

18   *First*, Google adds a lengthy second paragraph outlining in detail its proposed procompetitive

19   justification.  The language in Google's proposed paragraph is biased in Google's favor.  For example,

20   Google requests the Court instruct the jury that "Google Play Billing offers a consistent, trustworthy

21   experience to users", that "Google Play Billing protects users by protecting their sensitive data and

22   enabling them to cancel subscriptions easily", that "[i]t allows developers to design, distribute, and

23   monetize their apps easily", and "[i]t allows for the existence of the freemium model".  These

24   statements are all facts that Google may try to *prove*, and Google may argue in closing, but they are

25   not proper jury instructions.  *See, e.g.*, *Curtis v. City of Oakland*, 2016 WL 1138457, at *4 (N.D. Cal.

26   Mar. 23, 2015) ("It is well established that instructions should not be argumentative or slanted in one

27   party's favor" (citing *United States v. Maxwell*, 579 F.3d 1283, 1304 (9th Cir. 2009)).

28   *Second*, Google proposes deleting language from the Model instructing the jury to "consider whether

the justification Google offers is the real reason that it imposed the tying arrangement."  This Model language Google proposes deleting is black-letter law.  *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) ("[A] procompetitive justification [must be] nonpretextual".)  *Third*, Google proposes deleting the fifth paragraph of the Model, which identifies factors the jury may consider in determining whether Google's purported procompetitive justifications may be achieved through other means.  Google proposes replacing that paragraph with one explaining that "if Google shows that its policy had a legitimate purpose, then Plaintiffs must prove that all (or virtually all) the procompetitive benefits of Google's policy could be achieved through substantially less restrictive means."  Google's language would mislead the jury into believing that if Plaintiffs fail to prove that ***all*** of the claimed pro-competitive benefits could be achieved, the jury must return a verdict for Google.  However, even if some pro-competitive benefits could not be achieved through less restrictive means, the jury must balance those benefits against the harm to competition, as explained in the Model Instructions and required by law.  *Qualcomm*, 969 F.3d at 991; *see also Apple*, 67 F.4th at 986 (although "Apple was entitled to 'some compensation'" Epic needed only provide evidence "calibrated to achieving that general goal, instead of one achieving the level of compensation that Apple currently achieves").  Later, Google proposes adding that "You may not find that there was a substantially less restrictive alternative if that alternative would cost significantly more to Google", and other similar language.  As noted above, though the Ninth Circuit may have considered defendants' costs when considering less restrictive alternatives, the Supreme Court and other Circuits have not.  *See* Plaintiffs' Argument re Instruction No. 37, Competitive Benefits.  Google's addition would mislead the jury to reject alternatives that clearly cause substantially less harm to competition on the basis of Google's *own* administrative burden in adopting such alternatives.  Finally, Google proposes adding "You must, however, give a wide berth to Google's business judgment."  Google takes out of context similar language from *NCAA v. Alston*, 141 S. Ct. 2141, 2163 (2021).  But the Court was simply explaining that, in applying the rule of reason analysis set forth in Plaintiffs' proposed instruction and in crafting an injunction, "the district court honored [certain] principles", including that the district court gave the defendant's business judgment a wide berth.  *Id.*  Google's proposed addition is prejudicially slanted in Google's favor.

**Defendants' Argument Re Disputed Instruction No. 47**
TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE

Plaintiffs' proposed instruction is legally flawed.

*First*, Plaintiffs' proposed instruction asserts that "it is not a defense to the per se claim that Google's arrangement was justified."  That is not the law in the Ninth Circuit.  *Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1348 (9th Cir. 1987) ("We have recognized that antitrust defendants may demonstrate a business justification for an otherwise per se illegal tying arrangement").  Indeed, in its lawsuit against Apple, Epic conceded as an "undisputed principle" that "[t]he Ninth Circuit has 'recognized that antitrust defendants may demonstrate a business justification for an otherwise per se illegal tying arrangement.'"  *Epic Games, Inc. v. Apple, Inc.*, Case No. 20-CV-05640-YGR (N.D. Cal.), ECF No. 276 at 48.  In addition, as explained in Defendants' Argument re: Instruction No. 41, Plaintiffs' proposed "*per se*" instruction is improper as a matter of law because their tying claim must be assessed under the rule of reason.  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 997 (9th Cir. 2023).  But even if a *per se* claim is presented to the jury, an instruction on the business justification defense must be given.

*Second*, Plaintiffs' proposed instruction asserts: "You may only consider business justifications that affect the market containing the tied product," and further: "In determining whether the tying arrangement is justified, you must decide whether it serves a legitimate business purpose of Google in the market containing the tied product."   This also is contrary to law and is, unsurprisingly, not part of the ABA model instruction.  The relevant inquiry, as stated in the model instruction, is whether there is a business justification for "the tying arrangement."  *Mozart Co.*, 833 F.2d at 1348.  Plaintiffs' attempt to limit the consideration of Google's business justifications to "the market containing the tied product" is contrary to the law and must be rejected.  *See also* Defendants' Argument re: Instruction No. 25 (explaining that procompetitive benefits need not be in a particular market).

*Third*, Plaintiffs improperly omit the second paragraph of the ABA model instruction.  This paragraph describes the business justifications for the alleged tying arrangement so that the jury is informed what justifications it should consider.  Plaintiffs' attempt to omit this paragraph is an obvious attempt at denying the jury critical information needed to make the requisite assessment of the asserted

justifications.  Google's proposed instruction properly reflects governing law and the ABA model, and Plaintiffs' modifications must be rejected.

*Fourth*, Plaintiffs incorrectly suggest that the jury must find for Plaintiffs unless Google demonstrates there were no less restrictive means available to achieve legitimate business objectives – i.e. that Google must demonstrate it used the least restrictive means.  That is not the law and is contrary to controlling Supreme Court authority.  In *NCAA v. Alston*, 141 S. Ct. 2141 (2021), the Court held that "antitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes. To the contrary, courts should not second-guess degrees of reasonable necessity so that the lawfulness of conduct turn[s] upon judgments of degrees of efficiency." *Id*. at 2161 (internal citation and quotations omitted).  The Court added that "[a]s we have discussed, antitrust courts must give wide berth to business judgments before finding liability." *Id*. at 2163.  Google's proposed jury instruction properly reflects the Supreme Court's holding in *Alston* and the jury should be instructed on the relevant considerations as directed by the Supreme Court.  *See also* Defendants' Argument re: Instruction No. 37 (explaining legal principles that control the least restrictive alternative analysis).

**Disputed Instruction No. 48 Re**
**INJURY AND CAUSATION**
**Offered by Plaintiffs**

If you find that Google has violated the antitrust laws as alleged by Plaintiffs, then you must decide if Match is entitled to recover damages from Google. Epic does not seek any damages from Google. However, you must still consider whether Epic was injured as a result of Google's violations of the antitrust laws by applying the following elements.

Match is entitled to recover damages for an injury to its business or property, and Epic is entitled to a verdict that Google is liable, if they can establish these elements of injury and causation:

1. Plaintiffs were in fact injured as a result of Google's alleged violations of the antitrust laws;

2. Google's alleged illegal conduct was a material cause of Plaintiffs' injury; and

3. Plaintiffs' injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For Plaintiffs to establish that they are entitled to recover damages, they must prove that they were injured as a result of Google's alleged violations of the antitrust laws. Proving the fact of damages does not require Plaintiffs to prove the dollar value of their injury. It requires only that Plaintiffs prove that they were in fact injured by Google's antitrust violations. If you find that Plaintiffs have established that they were in fact injured, you may then consider the amount of Match's damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that Match has established that it was in fact injured.

Second, Plaintiffs must offer evidence that establishes by a preponderance of the evidence that Google's alleged illegal conduct was a material cause of Plaintiffs' injury. This means that Plaintiffs must have proved that some damage occurred to them as a result of Google's alleged antitrust violations, and not some other cause. Plaintiffs are not required to prove that Google's alleged antitrust violations were the sole cause of their injury; nor need Plaintiffs eliminate all other possible causes of injury. It is enough if Plaintiffs have proved that the alleged antitrust violations were a material cause

1   of their injury.

2   You should bear in mind that businesses may incur losses for many reasons that the antitrust

3   laws are not designed to prohibit or protect against–such as where a competitor offers better products

4   or services, or where a competitor is more efficient and can charge lower prices and still earn a profit.

5   The antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the

6   competitive process or conduct that benefits consumers.

7   Finally, for Plaintiffs' antitrust claims, Plaintiffs must establish that their injury is the type of

8   injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust

9   injury." If Plaintiffs' injuries were caused by a reduction in competition, acts that would lead to a

10  reduction in competition, or acts that would otherwise harm consumers, then Plaintiffs' injuries are

11  antitrust injuries. On the other hand, if Plaintiffs' injuries were caused by heightened competition, the

12  competitive process itself, or by acts that would benefit consumers in the market in which Google

13  harmed competition, then Plaintiffs' injuries are not antitrust injuries and Plaintiffs may not recover

14  damages for those injuries under the antitrust laws.

15  In summary, if Match can establish that it was in fact injured by Google's conduct and that

16  Google's conduct was a material cause of their injury, then Match is entitled to recover damages for

17  the injury to its business or property.  If Epic can establish that it was in fact injured by Google's

18  conduct and that Google's conduct was a material cause of its injury, then Epic is entitled to a verdict

19  that Google has violated the antitrust laws.

20

21  Source: Adapted from ABA Model Civil Antitrust Jury Instruction 6.A.1

22

23

24

25

26

27

28

**Disputed Instruction No. 48 Re**
**INJURY AND CAUSATION**
**Offered by Defendants**

If you find that Google has violated the antitrust laws, then you must decide if Match is entitled to recover damages from Google.  Epic does not seek any damages from Google. However, you must still consider whether Epic was injured as a result of Google's violations of the antitrust laws by applying the following elements.

Plaintiffs are entitled to recover damages for an injury to their business or property, if they can establish these elements of injury and causation:

1.      Plaintiffs were in fact injured as a result of Google's alleged violations of the antitrust laws;

2.      Google's alleged illegal conduct was a material cause of Plaintiffs' injuries; and

3.      Plaintiffs' injuries are an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For Plaintiffs to establish that they are entitled to recover damages, they each must prove that they were injured as a result of Google's alleged violations of the antitrust laws. Proving the fact of damages does not require Plaintiffs to prove the dollar value of their injuries. It requires only that Plaintiffs prove that they were in fact injured by Google's antitrust violations. If you find that each Plaintiff has established that it was in fact injured, you may then consider the amount of that Plaintiff's, except for Epic, which does not seek damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that each Plaintiff has established that it was in fact injured.

Second, Plaintiffs must offer evidence that establishes by a preponderance of the evidence that Google's alleged illegal conduct was a material cause of Plaintiffs' injury. This means that Plaintiffs must have proved that some damage occurred to them as a result of Google's alleged antitrust violations, and not some other cause. Plaintiffs are not required to prove that Google's alleged antitrust violations were the sole cause of their injury; nor need Plaintiffs eliminate all other possible causes of injury. It is enough if Plaintiffs have proved that the alleged antitrust violations were a material cause

of their injury.

You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against–such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit. The antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

Finally, Plaintiffs must establish that their injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If Plaintiffs' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition ,that would otherwise harm consumers, then Plaintiffs' injuries are antitrust injuries. On the other hand, if Plaintiffs' injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then Plaintiffs' injuries are not antitrust injuries and Plaintiffs may not recover damages for those injuries under the antitrust laws.

In summary, if each Plaintiff seeking damages can establish that they were in fact injured by Google's conduct, that Google's conduct was a material cause of their injury, and that the injury was the type that the antitrust laws were intended to prevent, then that Plaintiff is entitled to recover damages for the injury to their business or property.

Source: ABA Model Civil Antitrust Jury Instruction 6.A.1

1

2

### Plaintiffs' Argument Re Disputed Instruction No. 48
### INJURY AND CAUSATION

3

4

Plaintiffs propose the ABA Model Instruction, with the following modifications.  In the second paragraph, Plaintiffs propose indicating that the "Match is entitled to recover damages for an injury to their business or property, and Epic is entitled to a verdict that Google is liable, if they can establish these elements of injury and causation."  Elsewhere in the instruction, Plaintiffs similarly propose prefacing references to plaintiffs seeking money damages with references to "Match", to make clear that only Match seeks money damages.  The Model solely addresses claims for money damages, and because Epic seeks no money damages, it is essential that the instruction indicate that.

Plaintiffs next propose adding "for Plaintiffs' antitrust claims" at the start of the paragraph introducing antitrust injury.  This is because antitrust injury is solely relevant to Plaintiffs' antitrust claims, and Match brings non-antitrust claims that will be tried to the jury.  *See* First Amended Complaint, ECF No. 380 at 89-92.  This clarifying language will prevent jury confusion.  In the same paragraph, Plaintiffs propose adding "in the market in which Google harmed competition" to the sentence discussing procompetitive justifications, as the *Topco* case prohibits a defendant from justifying its anticompetitive conduct with procompetitive effects that are felt outside the relevant market.  *See Topco*, 405 U.S. at 610 ("[Competition] cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy.").  This clarification is necessary to conform the Model to the law.

Finally, in the last paragraph, Plaintiffs again propose clarifying that, between Epic and Match, only Match seeks money damages.  As discussed above, this clarification is necessary to prevent jury confusion.  Plaintiffs' modifications are therefore warranted and should be accepted.

JOINT SET OF PROPOSED FINAL JURY INSTRUCTIONS AND OBJECTIONS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:22-cv-02746-JD

187

1
2

**Defendants' Argument Re Disputed Instruction No. 48**
**INJURY AND CAUSATION**

3

4          The parties are near agreement on this instruction, with one crucial exception.  Plaintiffs would

5     limit procompetitive benefits to an alleged market, but the law does not require that Google's

6     procompetitive benefits affect a particular market.  *See* Defendants' Argument Re: Instruction No. 25.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

**Stipulated Instruction No. 49 Re**
**INJURY TO BUSINESS OR PROPERTY**

3

4

5

6

7

8

9

10

11

12

To prevail on its attempted monopolization claim, Match must prove that the injury it claims to have suffered was an injury to its business or property.  The term "business" includes any commercial interest or venture.  A plaintiff has been injured in its business if you find that it has suffered injury to any of its commercial interests or enterprises as a result of Google's alleged antitrust violation.  The term property includes anything of value a plaintiff owns, possesses, or in which that plaintiff has a protectable legal interest.  A plaintiff has been injured in its property if you find that anything of value that it owns, possesses, or has a legal interest in has been damaged as a result of Google's alleged antitrust violation.  A plaintiff has been injured in its property if you find that it has paid an inflated price for goods, services, any legal interest of value, or has lost money as a result of Google's alleged antitrust violation.

13

14

Source:  ABA Model Civil Antitrust Jury Instruction 6.A.2

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 50 Re
STATUTE OF LIMITATIONS
Offered by Plaintiffs**

The statute of limitations for the antitrust laws does not permit recovery of damages for any injuries caused by conduct that occurred prior to August 13, 2016. In particular, you have heard evidence in this case about agreements that Google reached before August 13, 2016. Epic does not seek any damages from Google, and Match only seeks damages dating back to July 7, 2017.

If you find that a Plaintiff suffered injuries caused by conduct that occurred both before and after August 13, 2016, then you must apportion the damages between the two periods and you may award damages only for the portion of the injuries caused by conduct that occurred after August 13, 2016. When apportioning the damages between the two periods, you should be guided by the same principles I will explain to you. That is, you are permitted to make just and reasonable estimates in apportioning the Plaintiffs' damages. You are not required to apportion damages with absolute mathematical certainty or precision. However, the apportionment of damages must have a reasonable basis in the evidence. If you find that you cannot apportion damages between the two periods without relying on guesswork or speculation for conduct that occurred both before and after August 13, 2016, then you may not award damages at all for that particular conduct.

Source: Adapted from *In re Capacitors Antitrust Litig.*, No. 3:14-cv-03264-JD (N.D. Cal.), ECF No. 2899, at 36

**Disputed Instruction No. 50**
**STATUTE OF LIMITATIONS**
**Offered by Defendants**

The statute of limitations for the antitrust laws does not permit recovery of damages for any injuries caused by conduct that occurred prior to August 13, 2016.  In particular, you have heard evidence in this case about agreements that Google reached before August 13, 2016.  Those agreements are outside of the limitations period.  You may not consider those agreements to be part of the conduct that Plaintiffs are challenging in this case.  Moreover, Epic does not seek any damages from Google, and Match only seeks damages dating back to July 7, 2017.  Agreements that Google reached before August 13, 2016, may be considered, at most, as background to help you understand the claims and counterclaims in this case.

If you find that a Plaintiff suffered injuries caused by conduct that occurred both before and after August 13, 2016, then you must apportion the damages between the two periods and you may award damages only for the portion of the injuries caused by conduct that occurred after August 13, 2016. When apportioning the damages between the two periods, you should be guided by the same principles I will explain to you. That is, you are permitted to make just and reasonable estimates in apportioning the Plaintiffs' damages. You are not required to apportion damages with absolute mathematical certainty or precision. However, the apportionment of damages must have a reasonable basis in the evidence. If you find that you cannot apportion damages between the two periods without relying on guesswork or speculation for conduct that occurred both before and after August 13, 2016, then you may not award damages at all for that particular conduct.

Source:  *In re Capacitors Antitrust Litig.*, No. 3:14-cv-03264-JD (N.D. Cal.), ECF No. 2899, at 36

1

2

**Plaintiffs' Argument Re Disputed Instruction No. 50**
**STATUTE OF LIMITATIONS**

3

4        Match has adapted its proposed instruction from the ABA Model Instruction, but Google seeks

5   to add legally improper and slanted instructions that prevent the full consideration of its conduct.  Epic

6   objects to the inclusion of a Statute of Limitations instruction as to its claims because it does not seek

    damages and the defense is therefore irrelevant.

7        *First,* Epic objects to the inclusion of any Statute of Limitations instruction as it relates to

8   Epic's claims because Epic does not seek damages on any claims, and statute of limitations is solely a

9   defense to damages claims.  *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1084 (9th Cir. 2014) ("Because

10  Plaintiffs seek only injunctive relief under federal law, their federal antitrust claim is subject to the

11  equitable doctrine of laches and not the four-year statute of limitations in section 4B of the Clayton

12  Act, 15 U.S.C. § 15b.").  Google's instruction has no relevance to claims involving Epic.  A simple

13  instruction that "Epic does not seek damages from Google" (as Match proposes including) moots any

14  need for a statute of limitations instruction related to its claims.

15       *Second*, Plaintiffs submit that the contents of Google's instructions are contrary to law and

16  would mislead the jury.  Google proposes to instruct the jury that:  "In particular, you have heard

17  evidence in this case about agreements that Google reached before August 13, 2016.  Those

18  agreements are outside of the limitations period. ***You may not consider those agreements to be part of***

19  ***the conduct that plaintiffs are challenging in this case***."  This paragraph is legally erroneous, contrary

20  to this Court's ruling on Google's Motion for Partial Summary Judgment, and should be rejected.  As

21  the Court noted at oral argument on Google's Motion for Summary Judgment, that pre-limitations

22  conduct is "part of the story. It's part of the narrative arc."  Summ. J. Hearing Tr. 29:5-6.  The Court

23  ultimately stated that the Plaintiffs may present pre-limitations conduct at trial.  *Id*. at 29:27-19.  The

24  Court ultimately denied Google's motion for summary judgment on the ground that "No plaintiff in

25  this case seeks to use facts about the carrier agreements to recover damages prior to the four-year

26  limitations period".  That is still true.  Plaintiffs' proposed instructions—that Epic does not seek

27  damages at all, and that "Match only seeks damages dating back to July 7, 2017"—fully implement

28  this instruction without introducing Google's numerous legal errors.  Additionally, in the context of

1   Google's incorrect legal statements, Google says the pre-limitations agreements "may be considered as

2   background to help the jury understand the claims and counterclaims in this case".  This statement is

3   vague and ambiguous, as it is unclear how the jury should consider mere "background" agreements in

4   weighing Plaintiffs' claims.

5   *Third*, Google ignores that some agreements it reached before August 2016 are still operative,

6   continue to restrain trade, and contribute to its monopolization.  The Court previously recognized:

7   "Plaintiff may offer the earlier carrier agreements into evidence by way of table-setting[.]"  Dkt. 571.

8   *Fourth*, even if Google's proposal were limited to agreements that *expired* before August 2016,

9   case law permits the fact-finder to consider pre-limitations conduct when weighing Plaintiffs' claims.

10   *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002); Areeda & Hovenkamp, Antitrust

11   Law ¶ 320 (2022) ("[A plaintiff can] rely on pre-limitation conduct in order to establish the

12   exclusionary practices portion of a monopolization claim.").  Moreover, Google has committed

13   numerous overt acts during the limitations period to obtain and maintain monopoly power, and

14   "[w]hen a plaintiff alleges a continuing violation of the law, an overt act . . .restart[s] the statute of

15   limitations and the statute of limitations runs from the last overt act."  *Eichman v. Fotomat Corp.*, 880

16   F.2d 149, 160 (9th Cir. 1989).

17   *Finally*, Google seeks to modify the last sentence of the instruction as proposed by Plaintiffs.

18   Plaintiffs seek to inform the jury that "If you find that you cannot apportion damages between the two

19   periods without relying on guesswork or speculation for conduct that occurred both before and after

20   August 13, 2016, then you may not award damages at all for that particular conduct."  Google, by

21   contrast, seeks to inform the jury that "If you find that you cannot apportion damages between the two

22   periods without relying on guesswork or speculation, then you may not award damages at all."

23   Plaintiffs' additions help explain that the jury may not award damages for conduct that may have

24   occurred during the pre-limitations period.  Conversely, Google suggests to the jury that it cannot

25   award damages at all if **any** of Match's damages cannot be apportioned to the post-limitations period

26   without guesswork or speculation.  That result would be inconsistent with the law, and should be

27   rejected.

28

1

2

**Defendants' Argument Re Disputed Instruction No. 50**
**STATUTE OF LIMITATIONS**

3

4

Plaintiffs cannot base liability on alleged restraints that occurred outside of the four-year

limitations period.  *See* 15 U.S.C. § 15a.  When Google made this argument in its motion for partial

5

summary judgment, 3:21-md-02981-JD, ECF No. 483, at 14, Plaintiffs responded by representing to

6

the Court that "No plaintiff in this case seeks to use facts about the carrier agreements to recover

7

damages prior to the four-year limitations period."  3:21-md-02981, ECF No. 511-01, at 14 n.7.  The

8

Court expressly relied on Plaintiffs' representation to deny this aspect of Google's motion as moot.

9

August 3, 2023 Hr'g Tr. at 26:6-11 (explaining that Plaintiffs' footnote 7 alleviates Google's statute-

10

of-limitations concern).  Based on the Court's ruling, at most, the Plaintiffs can rely on pre-limitations

11

period conduct for "table setting."  *Id.* at 26:17.  But, as the Court rightly understood Plaintiffs'

12

representation, they had "expressly renounced they're going to make any argument for damages or

13

anything else based on those older agreements."  *Id.* at 26:17-21.  Plaintiffs then affirmed the Court's

14

understanding, saying that, at most, they would use pre-limitations agreements as "part of the story."

15

*Id.* at 29:3-8.  The colloquy ended with the Court telling Plaintiffs that the Court was "banking on

16

Footnote 7," and Plaintiffs' counsel stating, "All right.  Thank you."  *Id.* at 29:16-22.

17

Plaintiffs have taken an 180-degree turn.  They now propose an instruction, contrary to their

18

previous representations, that would permit them to recover damages for pre-limitations period

19

conduct.  They've removed Google's proposed language that "Agreements that Google reached before

20

August 13, 2016, may be considered, at most, as background to help you understand the claims and

21

counterclaims in this case."  But that sentence Google proposed directly reflects Plaintiffs'

22

representations to the Court in their summary judgment opposition brief and during the hearing, as

23

described above.  Worse still, Plaintiffs have deleted Google's proposed sentences that "Those

24

agreements are outside of the limitations period.  You may not consider those agreements to be part of

25

the conduct that Plaintiffs are challenging in this case."

26

Plaintiffs are now turning their back on their previous representations, and are seeking an

27

instruction that would permit them to recover based on pre-limitations conduct.  The Court should not

28

allow this gamesmanship.  For all of the reasons Google argued on summary judgment, Plaintiffs

1

2

3

4

5

should not be permitted to recover for pre-limitations period conduct.  Rather, the Court should give the instruction proposed by Google, which is based on an instruction the Court read recently in the *Capacitors* MDL.  *See In re Capacitors Antitrust Litig.*, No. 3:14-cv-03264-JD (N.D. Cal.), ECF No. 2899, at 36.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Stipulated Instruction No. 51 Re**
**MATCH's DAMAGES**

3

4

Match is also seeking to recover damages. If you have determined that Google is liable for any of Plaintiffs' antitrust claims or Match's additional claims, you must consider the extent of Match's damages.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 52 Re**
**ANTITRUST DAMAGE**

Only Match seeks money damages.  If you find that Google violated the antitrust laws and that this violation caused injury to Plaintiffs, then you must determine the amount of damages, if any, Match is entitled to recover.  The fact that I am giving you instructions concerning the issue of Match's damages does not mean that I believe Match should, or should not, prevail in this case.  If you reach a verdict for Google on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that Match should be fairly compensated for all damages to business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible in the position in which it would have been had the alleged antitrust violation not occurred.  The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future.  Furthermore, you are not permitted to award to Match an amount for attorneys' fees or the costs of maintaining this lawsuit.

Source: ABA Model Civil Antitrust Jury Instruction 6.B.1

1

2

**Stipulated Instruction No. 53 Re**
**ANTITRUST DAMAGE - INTRODUCTION AND PURPOSE**

You are permitted to make just and reasonable estimates in calculating Match's damages, if any.  You are not required to calculate damages with mathematical certainty or precision.  However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates.  Damages may not be based on guesswork or speculation.  Match must prove the reasonableness of each of the assumptions upon which the damages calculation is based.  Moreover, you cannot consider any impact or harm to developers other than Match.

If you find that Match has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

If you find that Match has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages or you may award nominal damages, not to exceed one dollar.

Source: ABA Model Civil Antitrust Jury Instruction 6.B.3

**Stipulated Instruction No. 54 Re**
**DAMAGES ON MULTIPLE LEGAL THEORIES**

Match seeks damages from Google under more than one legal theory. However, each item of damages may be awarded only once, regardless of the number of legal theories alleged.  If you award damages, the damages must be caused by the particular conduct you found to be unlawful.

Source: CACI 3934

**Disputed Instruction No. 55 Re**
**INTERFERENCE WITH CONTRACTUAL RELATIONS**
**Offered by Match**

Match has asserted additional claims against Google under California law. First, Match claims that Google interfered with the contracts between Match and its users. To establish this claim, Match must prove each of the following elements by a preponderance of the evidence:

1.      That there was a contract between one or more of the Match Plaintiffs and their users;

2.      That Google knew of the contract;

3.      That Google's conduct prevented, or would prevent, performance of the contract or made, or would make, performance more expensive or difficult;

4.      That Google intended to disrupt the performance of the contract or knew that disruption of performance was or is certain or substantially certain to occur;

6.      That one or more Match Plaintiffs were or would be harmed; and

7.      That Google's conduct was or is a substantial factor in causing the harm.


Source: CACI 2201

**Disputed Instruction No. 55 Re**
**INTERFERENCE WITH CONTRACTUAL RELATIONS**
**Offered by Defendants**

Match has asserted additional claims against Google under California law. First, Match claims that Google interfered with the contracts between Match and its users. To establish this claim, Match must prove each of the following elements by a preponderance of the evidence:

1.      That there was a contract between one or more of the Match Plaintiffs and their users;

2.      That Google knew of the contract;

3.      That Google's conduct prevented performance of the contract or made performance more expensive or difficult;

4.      That Google intended to disrupt the performance of the contract or knew that disruption of performance was certain or substantially certain to occur;

5.      That Google's conduct was wrongful by some legal measure other than the fact of the interference itself;

5.      That the Match Plaintiffs were harmed; and

6.      That Google's conduct was a substantial factor in causing the harm.


Source: CACI 2201

**Plaintiffs' Argument Re Disputed Instruction No. 55**
**INTERFERENCE WITH CONTRACTUAL RELATIONS**

Google's proposed instruction adds an additional "independently wrongful" element to the model instruction that is not appropriate here.  Although the "independently wrongful" element applies to claims for intentional interference with prospective economic advantage, it does not apply to claims for interference with contractual relationships, subject to certain exceptions that do not apply here.  That is because "intentionally interfering with an existing contract is 'a wrong in and of itself[.]'"  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1158 (2003) (quoting *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 56 (1998)).

Google apparently (and inappropriately) seeks to expand the holding of *Ixchel Pharma, LLC v. Biogen, Inc.*, which found that "for interference with **an at-will** contract by a third party, the plaintiff must allege that the defendant engaged in an independently wrongful act."  9 Cal. 5th 1130, 1148 (2020) (emphasis added).  But the specific contracts at issue on this claim are not at-will.  Match has contracts with millions of customers who have purchased subscriptions to dating services offered on Match's apps on Android devices.  *See Match Group, LLC et al. v. Google LLC et al.*, Case No. 3:22-CV-02746-JD (N.D. Cal.) ("Match Dkt."), Match Dkt. 12-2 (Declaration of Peter Foster) ¶¶ 13, 93–105.  Those users agreed to the apps' terms of use in exchange for, among other things, limited licenses to use subscription benefits until the end of the subscription period they paid for.  *Id.* ¶ 99; Match Dkt. 12-16 (Foster Decl. Ex. 14) §§ 6, 8 (Match Terms of User) ("For as long as you comply with these Terms, Match grants you a personal, worldwide, royalty-free, non-assignable, non-exclusive, revocable, and non-sublicensable license to access and use our Services."; "you will continue to have access to your subscription benefits until the end of your subscription period"); Match Dkt. 12-14 (Foster Decl. Ex. 12) §§ 6, 10 (Tinder Terms of Use) ("you may use your subscription until the end of your then-current subscription term"); Match Dkt. 12-15 (Foster Decl. Ex. 13) §§ 6, 8 (PlentyofFish Terms of Use Agreement) ("you will continue to have access to your subscription benefits until the end of your subscription term"); Match Dkt. 12-17 (Foster Decl. Ex. 15) §§ 6, 8 (OurTime Terms and Conditions) ("you will continue to have access to your subscription benefits until the end of your subscription term"); Match Dkt. 12-18 (Foster

Decl. Ex. 16) (OkCupid Terms & Conditions) §§ 6, 8 ("you will continue to have access to your subscription benefits until the end of your subscription period").

For this reason, Google's proposed instruction is legally incorrect and invites error. Even Google's cited case (*Ixchel*) recognizes that "intentionally interfering with an existing contract is generally 'a wrong in and of itself'" and does not require separate proof of independent wrongfulness. *Ixchel Pharma, LLC*, 9 Cal. 5th at 1142. Match respectfully requests that the Court adopt Match's proposed instruction.

1

2

### Defendants' Argument Re Disputed Instruction No. 55
### INTERFERENCE WITH CONTRACTUAL RELATIONS

When the contracts at issue are at-will, a plaintiff pursuing an interference with contractual relations claim must prove that the alleged interference was "independently wrongful."  "Like parties to a prospective economic relationship, parties to at-will contracts have no legal assurance of future economic relations." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1148 (2020).  Therefore, the California Supreme Court holds "that to state a claim for interference with an at-will contract by a third party, the plaintiff must allege that the defendant engaged in an independently wrongful act." *Id*.  The Match Plaintiffs do not disagree with this settled proposition.  Rather, they assert that the contracts between the Match Plaintiffs and their customers are not at will.

The Match Plaintiffs' contracts with their users, however, are at will, as the evidence will show at trial.  The defining feature of an at-will contract is that the "parties to at-will contracts have no legal assurance of future economic relations." *See Pech v. Doniger*, 75 Cal. App. 5th 443, 457 (2022).  The express terms of the Match Plaintiffs' contracts with their users, which will be put into evidence at trial, will show that users may terminate their accounts at any time and that the Match Plaintiffs likewise may terminate a user account at any time.

Because the Match Plaintiffs' proposed instruction omits the "independently wrongful" element of their claim, it is erroneous.  Because Google cannot, under controlling law, be found liable for interference with contractual relations without a finding that Google's conduct was independently wrongful, the jury instructions must account for this element, either by instructing the jury on it, or by declining to instruct the jury on this claim without a requisite finding on wrongfulness being made in the first place.

**Stipulated Instruction No. 56 Re**
**INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

Match also claims that Google interfered with a prospective economic relationship between Match and its users. To establish this claim, Match must prove each of the following elements by a preponderance of the evidence:

1.   That one or more Match Plaintiffs and their users were in an economic relationship that probably would have resulted in an economic benefit to one or more Match Plaintiffs;

2.   That Google knew of the relationship;

3.   That Google engaged in one or more of the following acts: (a) prohibited the Match Plaintiffs' apps and their users from using the Match Plaintiffs' billing systems; (b) prohibited the Match Plaintiffs from using in-app notifications, links, or buttons to inform their users of alternative methods of payment that can be accessed outside the app; (c) threatened to remove the Match Plaintiffs' apps from the Google Play Store; or (d) blocked or threatened to block the Match Plaintiffs' apps from delivering updates to their users;

4.   That Google's conduct was wrongful by some legal measure other than the fact of the interference itself;

5.   That by engaging in this conduct, Google intended to disrupt the relationship or knew that disruption of the relationship was certain or substantially certain to occur;

6.   That the relationship was, or would be, disrupted;

7.   That the Match Plaintiffs were, or would be, harmed; and

8.   That Google's conduct was or is a substantial factor in causing the Match Plaintiffs' harm.

Source: CACI 2202

**Stipulated Instruction No. 57 Re**
**PRIVILEGE TO PROTECT OWN ECONOMIC INTEREST**

Google claims that there was no intentional interference with contractual relations or prospective economic advantage because it acted only to protect its legitimate economic interests. To succeed, Google must prove all of the following:

1. That Google had a legitimate economic interest in the contractual relations because, among other things, Match distributes its apps by using Google's distribution services on the Google Play Store;

2. That Google acted only to protect its own economic interest;

3. That Google acted reasonably and in good faith to protect it; and

4. That Google used appropriate means to protect it.

Source: CACI Instr. No. 2210

**Disputed Instruction No. 58 Re**
**BREACH OF CONTRACT - INTRODUCTION**
**Offered by Plaintiffs**

Google claims that Epic and/or Match agreed to follow the terms of Google's Developer Distribution Agreement and its incorporated Payments Policy.

Google claims that Epic and/or Match breached Google's Payments Policy by using payment solutions other than Google Play Billing to process in-app purchases and subscriptions for Android apps that were distributed through the Google Play store.

Google also claims that Epic's and/or Match's breach of Google's Payments Policy caused harm to Google for which Epic and/or Match should compensate Google.

Epic and Match deny Google's claims for breach of contract. Epic and Match claim that Google cannot establish its breach of contract claims because the federal and state antitrust laws make Google's Payments Policy illegal and prevent Google from enforcing that Payments Policy against them. In addition, Match claims that it was not required to use Google Play Billing before March 31, 2022, because Google granted Match an extension.

Source:  Adapted from CACI Instr. No. 300

1

**Disputed Instruction No. 58**
**BREACH OF CONTRACT - INTRODUCTION**
**Offered by Defendants**

2

3       Google claims that Epic and/or Match agreed to follow the terms of Google's Developer

4   Distribution Agreement and its incorporated Payments Policy.

5       Google claims that Epic and/or Match breached Google's Payments Policy by using services

6   other than Google Play Billing to process in-app purchases and subscriptions for Android apps that were

7   distributed through the Google Play store.

8       Google also claims that Epic's and/or Match's breach of the Developer Distribution Agreement

9   caused harm to Google for which Epic and/or Match should pay.

10      Epic and Match deny Google's claims for breach of contract.  Match claims that it was not

11  required to use Google Play Billing before March 31, 2022, because Google granted Match an extension.

12

13  Source:  CACI 300

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Plaintiffs' Argument Re Disputed Instruction No. 58
### BREACH OF CONTRACT - INTRODUCTION

Plaintiffs' proposed instruction follows the form CACI jury instruction promulgated by the Judicial Council of California, which has a placeholder for affirmative defenses and denials.  Google's proposed instruction improperly omits a key and contested affirmative defense and element of Google's breach of contract claim, namely that "Epic and Match claim that Google cannot establish its breach of contract claims because the federal and state antitrust laws make Google's Payments Policy illegal and prevent Google from enforcing that Payments Policy against them."

*First*, Google must acknowledge that lawfulness is a part of its breach of contract claim: "Under California law, the essential elements for a contract are (1) '[p]arties capable of contracting;' (2) '[t]heir consent;' (3) *'[a] lawful object;'* and (4) '[s]ufficient cause or consideration.'" *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (emphasis added) (quoting Cal. Civ. Code § 1550)). *Canedo v. Pac. Bell Tel. Co.*, 341 F. Supp. 3d 1116, 1128 (S.D. Cal. 2018) ("In California, the elements of a breach of contract claim are 1) existence of a contract . . . . The first element requires a valid contract. And a valid contract, in turn, requires . . . a lawful object[.]").

*Second*, illegality is a key affirmative defense that must be tried to the jury.  *United Food Com. Wkrs. v. Food Employers*, 827 F.2d 519, 525 (9th Cir. 1987) (recognizing "antitrust illegality" as a "defense to performance of a contract").  Google opposes such an instruction based on its erroneous contention that the illegality of the contract is a *matter of law* to be decided by the Court.  It may be true that the illegality of a contract can be decided as a matter of law when that question does not turn on disputed factual claims, or possibly when the issue depends on factual disputes that are *independent* of any claims to be decided by a jury.  July 22, 2021 Minute Order at 2 (ECF 67) (recognizing that the Court would take up equitable claims after the jury trial only "to the extent an equitable claim is independent of the legal claims").  Not so here.  Rather, one of the central factual disputes in this case is whether Google has entered into anti-competitive agreements, including the DDA, that violate the Sherman Act.  The Parties do not dispute  that these Sherman Act claims must be heard and determined by the jury.  The jury thus will necessarily need to decide whether the DDA violates the Sherman Act, which is the same issue that would excuse any breach of the DDA pursuant to the illegality defense.

Because "the same finder of fact must resolve all intertwined factual issues, . . . the defenses as a whole must be tried to the jury." *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1102-03 (N.D. Cal. 2007) (citing *Beacon Theatres*, 358 U.S. at 509); *Shum v. Intel Corp.*, 630 F. Supp. 2d 1063, 1077–78 (N.D. Cal. 2009), *aff'd*, 633 F.3d 1067 (Fed. Cir. 2010) (citing *Shum v. Intel Corp.*, 499 F.3d 1272, 1279 (Fed.Cir.2007)) ("Under the Seventh Amendment, a party has a right to a jury trial on any equitable claim that shares common issues of fact with a legal claim asserted by the party.").

*Finally*, omission of this sentence unfairly allows Google to present the scope of its breach of contract claim while restricting Plaintiffs' ability to describe their defenses. Additionally, by offering an instruction that states that "Epic and Match deny Google's claims for breach of contract" and only stating one affirmative defense offered by Match—"Match claims that they were not required to use Google Play Billing before March 31, 2022, because Google granted Match an extension."—Google's instruction improperly prevents Epic and Match from instructing the jury that their affirmative defenses based on illegality would excuse any breaches. Google should not be permitted to suggest that breaches by either Plaintiff are not capable of being excused.

For these reasons, Plaintiffs respectfully request that the Court reject Google's proposed instruction and adopt that proposed by Plaintiffs.

1

2

**Defendants' Argument Re Disputed Instruction No. 58**
**BREACH OF CONTRACT - INTRODUCTION**

3

4

Plaintiffs improperly attempt to insert an illegality defense into this introductory instruction.  For

reasons briefed *infra*, the illegality defense is a question of law for the court, and should not go to the

5

6

jury.  *See* Defendants' Argument re: Instruction No. 61; *e.g., Dunkin v. Boskey*, 82 Cal. App. 4th 171,

183 (2000) ("Whether a contract is illegal or contrary to public policy is a question of law to be

7

determined from the circumstances of each particular case.").  Accordingly, the Court should adopt

8

Google's version of this instruction.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 59 Re**
**BREACH OF CONTRACT - ELEMENTS**
**Offered by Plaintiffs**

To recover damages from Epic and/or Match for breach of contract, Google must prove all of the following:

1. That Epic and/or Match agreed to follow the terms of Google's Payments Policy;

2. That the Payments Policy is lawful and enforceable;

3. That Epic and/or Match, by using a payment solution other than Google Play Billing to sell digital goods in apps distributed in the Google Play Store, did something that the Payments Policy prohibited them from doing;

4. That Google was harmed; and

5. That Epic's and/or Match's breaches of the Payments Policy were a substantial factor in causing Google's harm.


Source: Adapted from CACI Instr. No. 303

**Disputed Instruction No. 59 Re**
**BREACH OF CONTRACT – ELEMENTS**
**Offered by Defendants**

To recover damages from Epic and/or Match for breach of contract, Google must prove all of the following:

1. That Epic and/or Match  agreed to follow the terms of Google's Developer Distribution Agreement;

2. That Epic and/or Match sold in-app purchases and subscriptions on apps that they distributed through the Google Play store

3. That Epic and/or Match did something that the Developer Distribution Agreement prohibited them from doing;

4. That Google was harmed; and

5. That Epic's and/or Match's breaches of contract were a substantial factor in causing Google's harm.

Source:  CACI 303

1

2

### Plaintiffs' Argument Re Disputed Instruction No. 59
### BREACH OF CONTRACT – ELEMENTS

3

4

Plaintiffs' proposed instruction follows the form CACI jury instructions promulgated by the

5 Judicial Council of California, with the sole addition of the second listed element—that the contract is

6 "lawful and enforceable"—which CACI recommends adding if this element is subject to a factual

7 dispute, as it is here.  The Court should use Plaintiffs' proposed instruction rather than Google's for

two reasons.

8

*First*, Google's proposed instruction omits a key disputed element of its breach of contract

9 claim: "[t]hat the Payments Policy is lawful and enforceable."  "Under California law, the essential

10 elements for a contract are (1) '[p]arties capable of contracting;' (2) '[t]heir consent;' (3) *'[a] lawful*

11 *object;'* and (4) '[s]ufficient cause or consideration.'" *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457,

12 462 (9th Cir. 1999) (emphasis added) (quoting Cal. Civ. Code § 1550)). *Canedo v. Pac. Bell Tel. Co.*,

13 341 F. Supp. 3d 1116, 1128 (S.D. Cal. 2018) ("In California, the elements of a breach of contract claim

14 are 1) existence of a contract . . . . The first element requires a valid contract. And a valid contract, in

15 turn, requires . . . a lawful object[.]").

16

CACI instructions also recommend that if "legal purpose is factually disputed then this

17 instruction should be amended to add that issue as an element." CACI No. 302 (Contract Formation—

18 Essential Factual Elements); *see also* BAJI 10.55 ("A [valid] contract requires . . . [a] lawful

19 objective[.]").  Accordingly, it would be error to omit this key disputed element of Google's claim.

20

*Second*, Google improperly seeks to expand the scope of its claim by including breach of the

21 Developer Distribution Agreement writ-large, rather than breach of the Payments Policy.  But the only

22 breach of contract theory Google has ever pled or otherwise asserted in this case is that "Epic and/or

23 Match, by using a payment solution other than Google Play Billing to sell digital goods in apps

24 distributed in the Google Play Store, did something that the Payments Policy prohibited them from

25 doing[.]"  Plaintiffs' Proposed Instr. Element 3; *see also* Dkt. 536-1 (Ex. A-13) ¶ 53 (Google's

26 damages expert calculating "compensatory damages in the form of lost service fees"); *id.* ¶ 37 n.44  ("I

27 understand that Google also invested in adding features to its billing system under the expectation that

28 Match Group would bring its apps into compliance with the DDA. . . .  [M]y calculations of Google's

damages and/or restitution based on Match Group's conduct does not include the value of these investments . . . ."); Dkt. 388-1 ¶ 59 (Google's Counterclaims Against Match) (alleging breach by Match "by using its own external payment systems in its apps made available through Google Play and by failing to pay Google's agreed-to service fees on its in-app transactions"); Dkt. 386 ¶ 54 (Google's Counterclaims Against Epic) (alleging breach by Epic "by activating its own external payment system through a hotfix in *Fortnite* designed to bypass Google Play Billing" and "by failing to pay Google's agreed-to service fees on its in-app sales through *Fortnite*").  The Payments Policy—and not the Developer Distribution Agreement generally—identifies which types of developers and transactions Google subjects to its purported "service" fees, and the Payments Policy identifies the applicable fees (which do not appear in the Developer Distribution Agreement).  *See Payments*, Google's Policy Center, available at https://support.google.com/googleplay/android-developer/answer/9858738 ("Play-distributed apps requiring or accepting payment for access to in-app features or services, including any app functionality, digital content or goods . . . must use Google Play's billing system for those transactions unless Section 3 or Section 8 applies."); *Service fees*, Google's Play Console Help, available at https://support.google.com/googleplay/android-developer/answer/112622 ("This table provides an overview of Google Play's service fees[.]").  Google's claimed damages for breach of contract are its claimed lost fees as identified in the Payments Policy.  Therefore, it would be prejudicial to Plaintiffs to instruct the jury on conduct that is not at issue in this case, and that Google has not identified in the three years these related cases have been pending.

1

2

### Defendants' Argument Re Disputed Instruction No. 59
### BREACH OF CONTRACT – ELEMENTS

3

The Court should reject Plaintiffs' proposed instruction and adopt Google's.

4

5

6

7

8

9

10

Plaintiffs attempt to insert their illegality defense into this instruction as an element of a claim. For reasons briefed *infra*, the illegality defense is a question of law for the court, and should not go to the jury.  *See* Defendants' Argument re: Instruction No. 61; *e.g., Dunkin v. Boskey*, 82 Cal. App. 4th 171, 183 (2000) ("Whether a contract is illegal or contrary to public policy is a question of law to be determined from the circumstances of each particular case.").  Plaintiffs cite no authority for including it as an *element* of their claim.  As Google explains *infra*, it should not even go to the jury as an affirmative defense.

11

12

13

14

15

16

17

18

19

20

21

Second, Plaintiffs' proposed instruction lacks precision.  Their instruction refers to the "Payments Policy," but that is not the contract at issue.  The contract at issue is the Developer Distribution Agreement ("DDA"), which requires developers, as a matter of contract, to comply with the Payments Policy.  *Cf., e.g., Medtronic, Inc. v. White*, 526 F.3d 487, 496 (9th Cir. 2008) (holding that "[p]arties may incorporate the terms of other documents into a contract 'so long as [the contract] guides the reader to the incorporated document'").  Section 4.1 of the DDA explicitly incorporates the terms of Google's Payment Policy by stating that the developer "must adhere to the Developer Program Policies", which links to the Payment Policy.  Therefore, the precise question for the jury to decide is whether Plaintiffs breached the DDA.  Even if the breach was by way of non-compliance with the Payments Policy, Google's instruction adheres closer to the legal question at hand and is therefore the instruction the Court should give to the jury.

22

23

24

25

26

27

28

**Disputed Instruction No. 60 Re**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING –**
**ESSENTIAL FACTUAL ELEMENTS**
**Offered by Plaintiffs**

In every contract or agreement there is an implied promise of good faith and fair dealing. This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another. Generally speaking, it means being faithful to one's duty or obligation. However, the implied promise of good faith and fair dealing cannot create obligations that are inconsistent with the terms of the contract.

Google claims that Epic and/or Match violated the duty to act fairly and in good faith. To establish this claim, Google must prove all of the following:

1. That Epic and/or Match agreed to follow the terms of Google's Payments Policy;

2. That the Payments Policy is lawful and enforceable;

3. That Epic breached the Payments Policy to avoid Google's service fees,

4. That Match intentionally and in bad faith led Google to believe that it would make necessary modifications to comply with the Payments Policy;

5. That by this conduct, Epic and/or Match did not act fairly and in good faith; and

6. That Google was harmed by Epic's and/or Match's conduct.

Source: Adapted from CACI Instr. No. 325

**Disputed Instruction No. 60 Re**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING -**
**ESSENTIAL FACTUAL ELEMENTS**
**Offered by Defendants**

In every contract or agreement there is an implied promise of good faith and fair dealing. This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another. Generally speaking, it means being faithful to one's duty or obligation. However, the implied promise of good faith and fair dealing cannot create obligations that are inconsistent with the terms of the contract.

Google claims that Epic and/or Match violated the duty to act fairly and in good faith. To establish this claim, Google must prove all of the following:

1.      That Epic and/or Match agreed to follow the terms of Google's Developer Distribution Agreement;

2.      That Epic breached the terms of the Developer Distribution Agreement to avoid Google's service fees;

3.      That Match intentionally and in bad faith led Google to believe that it would make necessary modifications to comply with the Developer Distribution Agreement;

4.      That by this conduct, Epic and/or Match did not act fairly and in good faith; and

5.      That Google was harmed by Epic's and/or Match's conduct.

Source:  CACI 325

**Plaintiffs' Argument Re Disputed Instruction No. 60**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING -**
**ESSENTIAL FACTUAL ELEMENTS**

The Court should use Plaintiffs' proposed instruction, which follows CACI with the exception of the added "lawful and enforceable" element, for two reasons.

*First*, Google's proposed instruction omits a key disputed element of its breach of the implied covenant of good faith and fair dealing claim: "[t]hat the Payments Policy is lawful and enforceable." *Ali v. L.A. Focus Publ'n*, 112 Cal. App. 4th 1477, 1489 (2003), *disapproved of on other grounds by Reid v. Google, Inc.*, 50 Cal. 4th 512 (2010) ("The cause of action for breach of the implied covenant of good faith and fair dealing [] depends on the existence of an enforceable contract."). A required element of a claim for breach of the implied covenant of good faith and fair dealing is "[t]hat [the parties] entered into a contract[.]"  CACI No. 325 (Breach of Implied Covenant of Good Faith and Fair Dealing—Essential Factual Elements); And, as explained above, "[u]nder California law, the essential elements for a contract are (1) '[p]arties capable of contracting;' (2) '[t]heir consent;' (3) *'[a] lawful object;'* and (4) '[s]ufficient cause or consideration.'" *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (emphasis added) (quoting Cal. Civ. Code § 1550)). *Canedo v. Pac. Bell Tel. Co.*, 341 F. Supp. 3d 1116, 1128 (S.D. Cal. 2018) ("In California, the elements of a breach of contract claim are 1) existence of a contract . . . . The first element requires a valid contract. And a valid contract, in turn, requires . . . a lawful object[.]").  Because the lawfulness of the contract is a key disputed factual element of Google's claim for breach of the implied covenant of Good faith and fair dealing, it would be error to omit an element requiring that the jury find the underlying contract is lawful and enforceable.

*Second*, Google improperly seeks to expand the scope of its claim by including breach of an implied covenant to the Developer Distribution Agreement writ-large, rather than the Payments Policy. The only breach of implied covenant theory that Google has ever pleaded or otherwise asserted  in this case is based on the Payments Policy.  Specifically, Google alleges that Epic attempted to "avoid Google's service fees" in violation of the Payments Policy and that Match did not implement Google Play Billing exclusively as required by the Payments Policy.  *See* Defendants' Proposed Instr.

1   Elements 2 & 3; *see also* Dkt. 388-1 ¶ 65 (Google's Counterclaims Against Match) (alleging that the

2   "incorporated Payments policy, among other things, expressly requires that Match Group use Google

3   Play's billing system for in-app purchases in apps downloaded through Google Play and that Google

4   be paid a service fee on such in-app purchases" and that the DDA's "incorporated policies prohibit

5   Match Group from making sales to users through payment systems other than Google Play Billing in

6   order to avoid Google's service fee"); Dkt. 386 ¶ 62 (Google's Counterclaims Against Epic) (alleging

7   that the DDA's "incorporated policies prohibit Epic from making sales to users outside of Google Play

8   Billing in order to avoid Google's service fee").  The Payments Policy—and not the Developer

9   Distribution Agreement generally—identifies which types of developers and transactions Google

10  subjects to its fees, and the Payments Policy identifies the applicable fees (which do not appear in the

11  Developer Distribution Agreement).  *See Payments*, Google's Policy Center, available at

12  https://support.google.com/googleplay/android-developer/answer/9858738 ("Play-distributed apps

13  requiring or accepting payment for access to in-app features or services, including any app

14  functionality, digital content or goods . . . must use Google Play's billing system for those transactions

15  unless Section 3 or Section 8 applies."); *Service fees*, Google's Play Console Help, available at

16  https://support.google.com/googleplay/android-developer/answer/112622 ("This table provides an

17  overview of Google Play's service fees[.]").  Google's claimed damages for breach of contract are its

18  claimed lost service fees identified in the Payments Policy.  It would thus be prejudicial to Plaintiffs to

19  instruct the jury on conduct that is not at issue in this case, and that Google has never even identified.

20

21

22

23

24

25

26

27

28

1
2

**Defendants' Argument Re Disputed Instruction No. 60**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING -**
**ESSENTIAL FACTUAL ELEMENTS**

3
4

Plaintiffs' proposed jury instruction regarding Google's counterclaims against Epic and Match

5

for breach of implied covenant of good faith and fair dealing is imprecise and introduces error.

6

The breach of implied covenant of good faith and fair dealing refers to obligations arising out

7

of a specific contract. *Racine & Laramie, Ltd. v. Department of Parks & Recreation*, 11 Cal. App. 4th

8

1026, 1031–32 (1992) ("[t]he implied covenant of good faith and fair dealing rests upon the existence

9

of some *specific contractual obligation*") (emphasis added); *see also Comunale v. Traders & General*

10

*Ins. Co.* 50 Cal. 2d 654, 658 (1958) ("[t]here is an implied covenant of good faith and fair dealing in

11

every *contract* that neither party will do anything which will injure the right of the other to receive the

12

benefits of the agreement") (emphasis added).

13

The contract at issue is Google's Developer Distribution Agreement ("DDA").  *See* Google's

14

Answer, Defs., & Counterclaims to Match's Complaint ¶ 64 (July 11, 2022) ("Match Group entered

15

into a valid and enforceable contract with Google, the DDA"); Google's Answer, Defs., &

16

Counterclaims to Epic's Second Amended Complaint ¶ 61 (Dec. 1, 2022) ("Epic entered into valid

17

contracts with Google, including the DDA.").  Yet in the first and third element of their proposed

18

instruction, Epic and Match refer to Google's "Payments Policy" — not Google's DDA — as the

19

underlying contract. This is inconsistent with Google's actual claim and CACI's instruction, which

20

refers explicitly to a "contract."  Google's proposed instruction aligns with its counterclaim and CACI,

21

while Epic and Match attempt to narrow the contractual obligations they are charged with breaching.

22

Google's proposed instruction should be given.

23
24
25
26
27
28

**Disputed Instruction No. 61 Re**
**AFFIRMATIVE DEFENSE—CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS**
**Offered by Plaintiffs**

Epic and Match claim that Google's Payments Policy cannot be enforced even if Google proves all the elements of a breach claim because it violates the federal and state antitrust laws.

To succeed, Epic or Match must prove that the Payments Policy or Developer Distribution Agreement violated the antitrust laws because they were an illegal tie, an illegal restraint of trade, or anticompetitive conduct that was used to monopolize a relevant market, according to the instructions I have given you regarding Plaintiffs' antitrust claims.

If you decide that Epic or Match have proven any of these antitrust claims, then the Payments Policy is not enforceable, and Epic and Match cannot be liable for breach of contract or breach of the implied duty of good faith and fair dealing.

Source: Adapted from CACI Instr. No. 337 (Affirmative Defense—Novation).

**Disputed Instruction No. 61 Re**
**AFFIRMATIVE DEFENSE—CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS**
**Offered by Defendants**

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

**Plaintiffs' Argument Re Disputed Instruction No. 61**
**AFFIRMATIVE DEFENSE—CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS**

Google seeks damages for breach of contract arising from alleged violations of the DDA and the Payment Policy incorporated into the DDA. The Plaintiffs therefore propose that the jury be instructed that the illegality of the agreements is an affirmative defense to Google's counterclaims under federal law. *United Food Com. Wkrs. v. Food Employers*, 827 F.2d 519, 525 (9th Cir. 1987) (recognizing "antitrust illegality" as a "defense to performance of a contract"). The proposed instruction is bespoke because California model instructions do not provide a relevant model.

Google opposes his instruction based on its erroneous contention that the illegality of the contract is a ***matter of law*** to be decided by the Court. It may be true that the illegality of a contract can be decided as a matter of law when that question does not turn on disputed factual claims, or possibly when the issue depends on factual disputes that are ***independent*** of any claims to be decided by a jury. July 22, 2021 Minute Order at 2 (ECF 67) (recognizing that the Court would take up equitable claims after the jury trial only "to the extent an equitable claim is independent of the legal claims"). Not so here. Rather, one of the central factual disputes in this case is whether Google has entered into anti-competitive agreements, including the DDA, that violate the Sherman Act. The Parties agree that these Sherman Act claims must be heard and determined by the jury. The jury thus will necessarily need to decide whether the DDA violates the Sherman Act, which is the same issue that would excuse any breach of the DDA pursuant to the illegality defense. Because "the same finder of fact must resolve all intertwined factual issues, . . . the defenses as a whole must be tried to the jury." *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1102-03 (N.D. Cal. 2007) (citing *Beacon Theatres*, 358 U.S. at 509).

As the Court has recognized, even if Plaintiffs' illegality defense could be characterized as an equitable matter for the Court, "as a general organizing principle, the Court intends to utilize a jury as the finder of fact for issues common to the legal and equitable claims". July 22, 2021 Minute Order at 2 (ECF 67) (citing Seventh Amendment cases). Indeed, Plaintiffs have a Seventh Amendment right to have overlapping issues resolved by the jury. *Id.*; *see also Ross v. Bernhard*, 396 U.S. 531 (1970). Because Plaintiffs' affirmative defense of illegality overlaps with their antitrust claims, that defense

1  cannot be resolved by the Court "as a matter of law" as Google proposes.

2        Google's proposal is also impractical.  Google proposes that the jury return a verdict as to its

3  breach of contract counterclaims, but not as to Plaintiffs' affirmative defenses to those same claims.

4  At best, Google's proposal would result in the jury wasting time and effort in determining

5  counterclaims that would be unnecessary in light of the jury's verdict on the Sherman Act claims.  At

6  worst, Google's proposal could set up an impermissible conflict between the jury's verdict and the

7  Court's determination of Plaintiffs' defenses, if the jury first returned a verdict in favor of Google on

8  the counterclaims, but the Court later determined that the jury's verdict was erroneous because

9  Plaintiffs have prevailed on their affirmative defenses.  The Seventh Amendment does not permit such

10 a result.  *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1476 (9th Cir. 1993)

11 (explaining that factual findings by a court that are inconsistent with the factual findings of a jury

12 "must give way under the Seventh Amendment")

13       Finally, denying an instruction on Plaintiffs' illegality defense would prejudice Plaintiffs by

14 failing to inform the jury that any breach by them is excused if Plaintiffs demonstrate that the contract

15 violates the antitrust laws, leading the jury to believe that Plaintiffs' conduct was inexcusable.  Google

16 has articulated no legitimate reason why the jury should be deprived of legally accurate information on

17 that topic.

18

19

20

21

22

23

24

25

26

27

28

**Defendants' Argument Re Disputed Instruction No. 61**
**AFFIRMATIVE DEFENSE—CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS**

Google objects to this instruction in its entirety. *First*, "the determination of whether the contract is illegal or contrary to public policy, are questions of law for the court," not the jury. *LUX EAP, LLC v. Bruner*, 2018 WL 6016973, at \*7 (C.D. Cal. July 31, 2018); *Dunkin v. Boskey*, 82 Cal. App. 4th 171, 183 (2000); *OCA v. Christie*, 415 F. Supp. 2d 115, 119 (D. Conn. 2006); 17A Am. Jur. 2d Contracts § 322.

*Second*, the fact that this defense has been asserted against a breach of contract claim that is triable to a jury does not change this result. The fact that a claim will be tried to a jury does not mean that an affirmative defense to the claim will also be tried to the jury. *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1027 (9th Cir. 1996); *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 735 (7th Cir. 2004) ("Even when a plaintiff is entitled to a jury trial on his legal claims, the district court must nonetheless make an independent judgment as to any equitable issue.").

In *BC Tech*, for example, the Tenth Circuit affirmed a trial court's decision not to instruct the jury on illegality defense to a breach of contract claim because under Utah law (which is the same as California law on this point) "the legality of a contract is [a question] for the court to decide." *BC Tech., Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 701-02 (10th Cir. 2012). Similarly, in *Meta Platforms*, the district court rejected an antitrust illegality defense to a contract claim as a matter of law, holding that the defense was "a question of law to be determined from the circumstances of each particular case." *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1243-44, 1252 (N.D. Cal. 2022) (citation omitted).

*Third*, other analogous affirmative defenses, such as patent misuse and inequitable conduct, are tried to the court, not a jury. *See, e.g.*, *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 507 F. Supp. 2d 870, 871–72 (N.D. Ill. 2007); *Freescale Semiconductor, Inc. v. ChipMOS Techs.*, 2013 WL 308919, at \*5 (N.D. Cal. Jan. 25, 2013).

*Fourth*, Plaintiffs' proposed instruction is wildly overbroad. Any illegality defense to a breach of contract claim based on a violation of the antitrust laws has been narrowly circumscribed by the

1   Supreme Court, directing that courts should be reluctant to "create a policy of nonenforcement of

2   contracts beyond that which is clearly the requirement of the Sherman Act." *Kelly v. Kosuga*, 358 U.S.

3   516, 519 (1959).  Thus, even if a contract violates the antitrust laws, a court should decline to enforce

4   the contract only if "the judgment of the Court would itself be enforcing the precise conduct made

5   unlawful by the Act." Id. at 520; *see Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982).

6        Based on these principles, in *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus.*

7   *Sachsen GmbH*, 867 F.3d 692 (6th Cir. 2017), the Sixth Circuit rejected an illegality defense.  The

8   court instead upheld the contract at issue as enforceable, noting that "the policy interest in preventing

9   [the purchaser] from obtaining the benefit of its bargain without paying applies."  *Id*. at 699.  So too

10  here.  Plaintiffs asserted defense would have them obtain the benefits of the DDA for no consideration

11  at all.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 62 Re**
**AFFIRMATIVE DEFENSE—MODIFICATION**
**Offered by Match**

Match claims that Google granted Match an extension such that it was not required to comply with Google's Payments Policy until March 31, 2022. Match must prove that the parties agreed to modify the Payments Policy. Google denies that the Payments Policy was modified as to Match.

The parties to a contract may agree to modify its terms. You must decide whether a reasonable person would conclude from the words and conduct of Google and Match that they agreed to modify Match's deadline to comply with the Payments Policy. You cannot consider the parties' hidden intentions.

A contract in writing may be modified by a contract in writing.

A contract in writing may be modified by an oral agreement to the extent the oral agreement is carried out by the parties.

Source: CACI Instr. No. 313

**Disputed Instruction No. 62 Re**
**AFFIRMATIVE DEFENSE—MODIFICATION**
**Offered by Defendants**

Match claims that the Developer Distribution Agreement was modified or changed.  Match must prove that the parties agreed to the modification.  Google denies that the Developer Distribution Agreement was modified.

The parties to a contract may agree to modify its terms. You must decide whether a reasonable person would conclude from the words and conduct of Google and Match that they agreed to modify the Developer Distribution Agreement. You cannot consider the parties' hidden intentions.

A contract in writing may be modified by a contract in writing.

A contract in writing may be modified by an oral agreement to the extent the oral agreement is carried out by the parties.

Source:  CACI 313

**Plaintiffs' Argument Re Disputed Instruction No. 62**
**AFFIRMATIVE DEFENSE—MODIFICATION**

The Court should reject Google's proposed instruction for two reasons:

*First*, Google refuses to add Match's proposed sentence that explains what modification that Match is alleging—that the parties agreed to a modification such that Match's apps "were not required to comply with Google's Payments Policy until March 31, 2022." Without this context, the jury may not understand what modification is at issue, and could wrongly conclude that the parties needed to have modified all terms of the entire Developer Distribution Agreement and all incorporated policies. Google has no legitimate justification for refusing to add this sentence. In fact, Google has modified many model instructions to reflect Google's theories and allegations.[9] As such, it is appropriate to include this clarifying sentence.

*Second*, Google's Proposed Instruction states that the parties "agreed to modify the Developer Distribution Agreement," would be confusing the jury, as the original deadline to comply was was not mentioned in the Developer Distribution Agreement; rather, it was announced publicly in a blog post and added to the Payments Policy. *See* Sameer Samat, *Listening to Developer Feedback to Improve Google Play*, Android Developers Blog (Sept. 28, 2020), available at https://android-developers.googleblog.com/2020/09/listening-to-developer-feedback-to.html ("[F]or those who already have an app on Google Play that requires technical work to integrate our billing system, we . . . are giving a year (until September 30, 2021) to complete any needed updates."); *Understanding Google Play's Payments Policy*, Google, available at https://support.google.com/googleplay/android-developer/answer/10281818 ("In 2020, we clarified the language in our Payments policy . . . . [W]e gave a one-year grace period for any that needed to make changes to their apps. Based on developer feedback,

---

[9] *See, e.g.*, Stipulated Instruction No. 2 Re CLAIMS AND DEFENSES ("Google contends that the relevant market is not limited to Android, but also includes Apple's iOS and other platforms where users and developers can engage in transactions for digital content. Google further contends that its conduct has not foreclosed competition, but rather has promoted competition by enabling Android to compete with iOS and other platforms. Google contends that its conduct benefited users and developers."); Disputed Instruction No. 58 Re BREACH OF CONTRACT—INTRODUCTION ("Google claims that Epic and/or Match breached Google's Payments Policy by using payment solutions other than Google Play Billing to process in-app purchases and subscriptions for Android apps that were distributed through the Google Play store. Google also claims that Epic's and/or Match's breach of Google's Payments Policy caused harm to Google for which Epic and/or Match should compensate Google.").

1   we gave eligible developers the option to request an additional six months, giving them more than 18

2   months to bring their apps into compliance.").  For this reason, Match requests that the Court adopt its

3   Proposed Instruction.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendants' Argument Re Disputed Instruction No. 62**
**AFFIRMATIVE DEFENSE—MODIFICATION**

The Court should adopt Google's proposed instruction.  The Match Plaintiffs depart from the model instruction in a manner that introduces legal error.  Instead of instructing on "modification," in the first sentence, the Match Plaintiffs elide the law, telling the jury that Google extended the time for them to comply with the Developer Distribution Agreement's ("DDA") Payments Policy.  The Match Plaintiffs have offered no basis in law for suggesting to the jury that an extension amounts to a modification.  If that is the Match Plaintiffs' theory, they can present it to the jury, but it does not belong in an instruction from the Court.

### Stipulated Instruction No. 63 Re
### AFFIRMATIVE DEFENSE—WAIVER

Match claims that they did not have to comply with Google's Payments Policy between September 30, 2021 and March 31, 2022 because Google granted Match an extension and thereby gave up its right to have Match comply during that period. This is called a "waiver."

1.   To succeed, Match must prove both of the following by clear and convincing evidence:

2.   That Google knew that Match was required to comply with Google's Payments Policy between September 30, 2021 and March 31, 2022; and

3.   That Google freely and knowingly gave up its right to have Match comply when Google extended Match's compliance deadline to March 31, 2022.

4.   A waiver may be oral or written or may arise from conduct that shows that Google gave up that right.

If Match proves that Google gave up its right to have Match comply between September 30, 2021 and March 31, 2022, then Match was not required to comply during that time period.

Source: CACI Instr. No. 336

**Stipulated Instruction No. 64 Re**
**AFFIRMATIVE DEFENSE—ECONOMIC DURESS**

Match claims that it was not required to comply with Google's Payments Policy because its claimed consent was given under duress. To succeed, Match must prove all of the following:

1. That Google used a wrongful act or wrongful threat to pressure Match into consenting to the Payments Policy;

2. That a reasonable person in Match's position would have believed that there was no reasonable alternative except to consent to the Payments Policy; and

3. That Match would not have consented to the Payments Policy without the wrongful act or wrongful threat.

A threat is improper if

1. what is threatened is a crime or a tort,

2. what is threatened is a criminal prosecution,

3. what is threatened is the use of civil process and the threat is made in bad faith, or

4. the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient.

An act or a threat is also improper if the resulting exchange is not on fair terms, and

1. the threatened act would harm the recipient and would not significantly benefit the party making the threat,

2. the effectiveness of the threat in inducing the manifestation of assent is significantly increased by prior unfair dealing by the party making the threat, or

3. what is threatened is otherwise a use of power for illegitimate ends.

If you decide that Match has proved all of the above, then Match was not required to comply with Google's Payments Policy.

Source: CACI Instr. No. 333; Restatement (Second) of Contracts § 176 (1981)

**Stipulated Instruction No. 65 Re**
**INTRODUCTION TO CONTRACT DAMAGES**

If you decide that Google has proved its claims against Epic and/or Match for breach of contract or breach of the implied covenant of good faith and fair dealing, you also must decide how much money will reasonably compensate Google for the harm caused by the breaches. This compensation is called "damages." The purpose of such damages is to put Google in as good a position as it would have been if Epic and/or Match had performed as promised or not breached the implied covenant of good faith and fair dealing.

To recover damages for any harm, Google must prove that when the contracts were made, all parties knew or could reasonably have foreseen that the harm was likely to occur in the ordinary course of events as a result of the claimed breaches.

Google also must prove the amount of its damages according to the following instructions. It does not have to prove the exact amount of damages. You must not speculate or guess in awarding damages.

Google claims damages for breach of the obligation to pay money.

Source:  CACI 350

1

**Stipulated Instruction No. 66 Re**
**CONTRACT DAMAGES**

2

3

To recover damages for the breach of a contract to pay money, Google must prove the amount

4

due under the contract.

5

6

Source: CACI Instr. No. 355

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 67 Re**
**FALSE PROMISE**
**Offered by Match**

Google claims it was harmed because Match made a false promise. A promise that is vague, general, or indeterminate is not enforceable. To establish this claim, Google must prove all of the following:

1.   That Match made a promise to comply with Google's Payments Policy;

2.   That Match did not intend to perform this promise when it made it;

3.   That Match intended that Google rely on this promise;

4.   That Google reasonably and justifiably relied on Match's promise;

5.   That Match did not perform the promised act;

6.   That Google was harmed; and

7.   That Google's reliance on Match's promise was a substantial factor in causing Google's harm.

Source: CACI Instr. No. 1902; *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1017 (9th Cir. 2003); *Whiteley v. Philip Morris Inc.*, 117 Cal. App. 4th 635, 693 (2004)

**Disputed Instruction No. 67 Re**
**FALSE PROMISE**
**Offered by Defendants**

Google claims it was harmed because Match made a false promise. To establish this claim, Google must prove all of the following:

      1.     That Match made a promise to Google;

      2.     That Match did not intend to perform this promise when it made it;

      3.     That Match intended that Google rely on this promise;

      4.     That Google reasonably relied on Match's promise;

      5.     That Match did not perform the promised act;

      6.     That Google was harmed; and

      7.     That Google's reliance on Match's promise was a substantial factor in causing Google's harm.

Source:  CACI 1902

**Plaintiffs' Argument Re Disputed Instruction No. 67**
**FALSE PROMISE**

Match's and Google's proposals differ in two ways.

*First*, Match's proposal includes a sentence that "[a] promise that is vague, general, or indeterminate is not enforceable." This is black-letter law. *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 381 (9th Cir. 2003) ("[A] promise that is 'vague, general or of indeterminate application' is not enforceable.") quoting *Aguilar v. Int'l Longshoremen's Union Loc. No. 10*, 966 F.2d 443, 446 (9th Cir. 1992)). "Promises too vague to be enforced will not support a fraud claim any more than they will one in contract." *Louis v. Nailtiques Cosm. Corp.*, 423 F. App'x 711, 713 (9th Cir. 2011) (quoting *Rochlis v. Walt Disney Co.,* 19 Cal. App. 4th 201 (1993)). "[T]he promise must be 'clear and unambiguous.'" *Aguilar*, 966 F.2d at 446 (quoting (*Laks v. Coast Fed. Sav. & Loan Ass'n,* 60 Cal. App. 3d 885, 890 (1976)); *see also Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178, 1198 (2014), *as modified on denial of reh'g* (Aug. 13, 2014) (in false promise case, affirming trial court and finding statement was "too vague to be enforced"); *Conrad v. Bank of Am.*, 45 Cal. App. 4th 133, 156 (1996) (affirming judgment after jury verdict in false promise case, finding that a "promise was vague, "that it "does not establish a fraudulent promise," and that it "establishes nothing more than a willingness to consider" future requests).

Moreover, this is a key disputed factual element of Google's false promise claim. Match maintains it made no promise to Google—much less the kind of clear and definite promise that is necessary to maintain a false promise claim. Even now, Google's proposed jury instruction contains no identification of any false promise. Rather, as it did in its Opposition to Match's Motion for Partial Summary Judgment, Google apparently intends to rely on non-actionable and fatally vague promises, including under a legally incorrect "implied promise" theory. Dkt. 507-1 at 19 (arguing that "[s]uch an implication establishes a false promise"). As such, the jury must be instructed on the limitations of what types of promises are enforceable.

*Second*, the fourth element of the false promise instruction must include—in addition to "reasonable reliance"—that the reliance must have been "justifiable." *Hoffman*, 228 Cal. App. 4th at 1198 ("Even assuming the statement satisfied the element of making . . . a false promise . . . the

1   [plaintiffs'] misrepresentation claim fails because the record shows no justifiable reliance."); *see also*

2   BAJI 12.40 (Fraud and Deceit—False Promise) ("The essential elements of a claim of fraud by false

3   promise are . . . 3. The Plaintiff was . . . justified in relying upon the promise . . . ."). "In addition to

4   pleading actual reliance, the plaintiff must set 'forth facts to show that his or her actual reliance on the

5   representations was justifiable . . . ." *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1066 (2012) (quoting 5

6   Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 732)); *Whiteley v. Philip Morris Inc.*, 117 Cal. App.

7   4th 635, 693 n.28 (2004), *as modified on denial of reh'g* (Apr. 29, 2004) (affirming verdict on false

8   promise claim where the jury was instructed that the plaintiff "must have acted in reliance on the [false]

9   promise" and that the plaintiff "***must have been justified*** in relying upon the promise" (emphasis added)).

10   As such, the jury must be instructed "[t]hat Google reasonably ***and justifiably*** relied on Match's [alleged]

11   promise."

**Defendants' Argument Re Disputed Instruction No. 67**
**FALSE PROMISE**

Google's proposed instruction is taken directly from the CACI model, with only the necessary modifications, such as party names.  The Match Plaintiffs have provided no basis in the law for their departures from the model, which are all adjectives and arguments—an apparent attempt by the Match Plaintiffs to bolster their defense to this claim with modifications not found in the law.  The Court should adopt Google's proposed instruction, which is neutral to the parties and based on the model instruction and the law.

1

**Disputed Instruction No. 68 Re**
**RELIANCE**
**Offered by Match**

2

3      Google relied on Match's false promise if:

4          1.          The false promise substantially influenced Google to extend the deadline from

5                      September 30, 2021 to March 31, 2022 for Match to comply with Google Play's

6                      Payments Policy; and

7          2.          Google would probably not have granted Match an extension to come into

8                      compliance with Google's Payments Policy without the false promise.

9      It is not necessary for a false promise to be the only reason for Google's conduct.

10

11    Source: CACI Instr. No. 1907

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 68 Re**
**RELIANCE**
**Offered by Defendants**

Google relied on Match's false promise if:

1.  The false promise substantially influenced Google to extend the deadline for Match to comply with Google Play's payments policy and/or to modify Google's billing system to assist Match with coming into compliance; and

2.  Google would probably not have granted Match an extension to come into compliance with Google's Payments policy or modified its billing system without the false promise.

It is not necessary for a false promise to be the only reason for Google's conduct.

Source:  CACI 1907

**Plaintiffs' Argument Re Disputed Instruction No. 68**
**RELIANCE**

Google improperly seeks to introduce a new fraud claim and theory of damages by expanding the reliance that it alleged in its counterclaims. Now, on the eve of trial and through jury instructions, Google argues that the alleged false promise "substantially influenced Google . . . to modify Google's billing system" and that "Google would probably not have . . . modified its billing system without the false promise." Defendants' Proposed Instr. Elements 1 & 2.

*First*, Google claims no damages for the value or expense of any such modifications; its expert has no opinion on them. (Dkt. 536-1 (Ex. A-13) ¶ 37 n.44 ("I understand that Google also invested in adding features to its billing system under the expectation that Match Group would bring its apps into compliance with the DDA. . . . [M]y calculations of Google's damages and/or restitution based on Match Group's conduct does not include the value of these investments . . . .").) As such, should not now be allowed to add a theory of false promise for which it claims no damages.

*Second*, Google cannot now amend its false promise claim to assert a new theory of fraud. Google's counterclaims allege that "Google reasonably relied" on the alleged promise and that "Google ***would not have granted the extension*** if it knew that [Match] would not bring its apps into compliance with the DDA and Google's Payments policy during the extension period." Dkt. 388-1 (Google's Counterclaims Against Match) ¶ 73 (emphasis added). "Defendants failed to allege this theory of fraud in their Counterclaim, and are precluded after the close of discovery and on the eve of trial from relying on this completely new and different theory." *Textron Fin. Corp. v. Vaquero De Los Robles, LLC*, 2009 WL 10673956, at *6 (C.D. Cal. Nov. 30, 2009); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) ("Allowing [the plaintiffs] to proceed with their disparate impact theory after the close of discovery would prejudice [the defendant].")*; see also Lawson v. Citicorp Tr. Bank*, 576 F. App'x 696 (9th Cir. 2014) (citations omitted) ("We review for an abuse of discretion the denial of a motion to amend. We may affirm on any basis supported by the record, and we affirm.").

1
2

**Defendants' Argument Re Disputed Instruction No. 68**
**RELIANCE**

3

4        The Court should adopt Google's proposed instruction.  The Match Plaintiffs have deleted

5  language from Google's proposed instruction that would modify the scope of Google's counterclaim.

6  Google has based its counterclaim on both its extension of the time for the Match Plaintiffs to comply

7  with the Payments Policy and on the modifications that Google made to its billing system in order to

8  assist the Match Plaintiffs with complying.  The Court should not allow the Match Plaintiffs to narrow

9  Google's claim through a jury instruction.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 69 Re**
**REASONABLE RELIANCE**
**Offered by Match**

In determining whether Google's reliance on the false promise was reasonable, it must first prove that the claimed false promise was material. A promise is material if a reasonable person would find it important in deciding what to do.

If you decide that the claimed false promise is material, you must then decide whether it was reasonable for Google to rely on the false promise. In making this decision, take into consideration Google's intelligence, knowledge, education, and experience.

However, it is not reasonable for anyone to rely on a false promise that is preposterous. It also is not reasonable for anyone to rely on a false promise if facts that are within its observation show that the promise is obviously false.

Source: CACI Instr. No. 1908

**Disputed Instruction No. 69 Re**
**REASONABLE RELIANCE**
**Offered by Defendants**

In determining whether Google's reliance on the false promise was reasonable, it must first prove that the matter was material. A matter is material if a reasonable person would find it important in deciding what to do.

If you decide that the matter is material, you must then decide whether it was reasonable for Google to rely on the false promise. In making this decision, take into consideration Google's knowledge and experience.

However, it is not reasonable for anyone to rely on a false promise that is preposterous. It also is not reasonable for anyone to rely on a false promise if facts that are within its observation show that the promise is obviously false.

Source:  CACI 1908

### Plaintiffs' Argument Re Disputed Instruction No. 69
### REASONABLE RELIANCE

Google's proposed instruction omits from the model CACI instruction several considerations for taking into account whether Google's reliance was reasonable. In particular, the model CACI instruction states that when the jury is considering materiality of the alleged false promise, the jury is to "take into consideration [name of plaintiff]'s intelligence, knowledge, education, and experience." CACI Instr. No. 1908.   Google's proposal improperly omits "intelligence and education". The parties have already stipulated to Instruction No. 4, which states that a corporation "can only act through its employees, agents, directors, or officers" and that "a corporation is responsive for the acts of its employees, agents, directors, and officers, performed within the scope of their authority." Stipulated Instruction No. 4. Intelligence and education are properly considered when assessing the reasonable reliance of a corporation. CACI Instr. 1908 (quoting *Pub. Employees' Ret. Sys. v. Moody's Invs. Serv., Inc.*, 226 Cal. App. 4th 643, 673 (2014) (applying intelligence consideration to entity)). In a case assessing an entity's reasonable and justifiable reliance, the Ninth Circuit found that "[r]easonable reliance, judged 'in light of the plaintiff's intelligence and experience,' remains the standard in fraudulent misrepresentation actions, and California courts do not, as [plaintiff] suggests, merely wink at this requirement, but rather take it quite seriously." *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1031 (9th Cir. 1992) (quoting *Kruse v. Bank of Am.*, 202 Cal. App. 3d 38, 54 (1988)).

Additionally, in two instances, Match clarifies that the jury is assessing a "claimed" false promise, rather than one that has already been found. This is consistent with other stipulated instructions and those proposed by Google. *See* Stipulated Instruction No. 65 (Introduction to Contract Damages) ("claimed breaches"); Defendants' Disputed Instruction No. 35 (Rule of Reason—Section One Claims) ("alleged agreements" and "trade was allegedly restrained"); Defendants' Disputed Instruction No. 37 (Rule of Reason—Evidence of Competitive Benefits) ("each alleged anticompetitive act"). In fairness and consistency, these two instances should identify a "claimed false promise" rather than asserting that a false promise has occurred.

Match respectfully requests that the Court adopt its proposed instruction and reject Google's.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendants' Argument Re Disputed Instruction No. 69**
**REASONABLE RELIANCE**

The parties' proposed instructions are nearly identical.  The only difference is that where Google says "matter," the Match Plaintiffs say "claimed false promise."  Google's instruction is taken directly from the model instruction, and the Match Plaintiffs have provided no reason to depart from that instruction.  Accordingly, the Court should adopt Google's proposed instruction.

**Stipulated Instruction No. 70 Re**
**DAMAGES—"OUT OF POCKET" RULE**

If you decide that Google has proved its false promise claim against Match, you also must decide how much money will reasonably compensate Google for the harm. This compensation is called "damages."

The amount of damages must include an award for all harm that Match was a substantial factor in causing, even if the particular harm could not have been anticipated.

Google must prove the amount of its damages. However, Google does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

To decide the amount of damages you must determine the fair market value of what Google gave Match between September 30, 2021 and March 31, 2022, and subtract from that amount the fair market value of what it received.

"Fair market value" is the highest price that a willing buyer would have paid on the date of the transaction to a willing seller, assuming:

    1.    That there is no pressure on either one to buy or sell; and

    2.    That the buyer and seller know all the uses and purposes for which the Google Play Store and Google Play Billing are reasonably capable of being used.

Source: CACI Instr. No. 1923

**Disputed Instruction No. 71 Re**
**AFFIRMATIVE DEFENSE—ILLEGALITY UNDER THE ANTITRUST LAWS**
**Offered by Match**

Match claims that Google's false promise claim cannot be enforced because Google's Payments Policy violates the federal and state antitrust laws.

To succeed, Match must prove that the Payments Policy violated the antitrust laws because it is an illegal tie, an illegal restraint of trade, or anticompetitive conduct that was used to monopolize a relevant market, according to the instructions I have given you regarding Plaintiffs' antitrust claims.

If you decide that Epic or Match have proven any of these antitrust claims, then Match cannot be liable for false promise.

Source: Adapted from CACI Instr. No. 337 (Affirmative Defense—Novation)

**Disputed Instruction No. 71 Re**
**AFFIRMATIVE DEFENSE—ILLEGALITY UNDER THE ANTITRUST LAWS**
**Offered by Defendants**

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

1

**Plaintiffs' Argument Re Disputed Instruction No. 71**
**AFFIRMATIVE DEFENSE—ILLEGALITY UNDER THE ANTITRUST LAWS**

2

3        Google seeks lost service fees for false promise arising from alleged violations of the

4   Developer Distribution Agreement ("DDA") and the Payment Policy incorporated into the DDA.

5   Google claims that Match had an obligation to comply with the DDA and falsely promised it would do

6   so. And if the DDA were found illegal, any promise by Match to comply would also not be

7   enforceable. *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77–82 (1982) ("illegal promises will not

8   be enforced").  Match therefore proposes that the jury be instructed that the illegality of the agreements

9   is an affirmative defense to Google's counterclaims under federal law.

10       Additionally, Google seeks damages in the form of "service fees that Match owes Google" due

11  to "noncompliance with Google's payments policies."  Dkt. 573 at 9 n.2; *id.* at 7 ("[T]here will be

12  damages evidence for the counterclaims . . . principally a calculation of lost service fees based on the

13  number of transactions after specific dates.").  But as before, if those policies in the DDA and

14  Payments Policy are determined to be illegal, then Google has no entitlement to damages or justifiable

15  reliance—essential elements of its false promise claim.  *Marentes v. State Farm Mut. Auto. Ins. Co.*,

16  224 F. Supp. 3d 891, 922 (N.D. Cal. 2016) (granting summary judgment where plaintiffs "have not

17  shown reliance resulting in damages"; therefore, "Plaintiffs' claim for promissory fraud fails").

18       Google opposes this instruction based on its erroneous contention that the illegality of the

19  contract is a ***matter of law*** to be decided by the Court.  It may be true that the illegality of a contract

20  can be decided as a matter of law when that question does not turn on disputed factual claims, or

21  possibly when the issue depends on factual disputes that are ***independent*** of any claims to be decided

22  by a jury.  *See* July 22, 2021 Minute Order at 2 (ECF 67) (recognizing that the Court would take up

23  equitable claims after the jury trial only "to the extent an equitable claim is independent of the legal

24  claims").  Not so here.  Rather, one of the central factual disputes in this case is whether Google has

25  entered into anti-competitive agreements, including the DDA, that violate the Sherman Act.  The

26  Parties agree that these Sherman Act claims must be heard and determined by the jury.  The jury thus

27  will necessarily need to decide whether the DDA violates the Sherman Act, which is the same issue

28  that would excuse Google's claim for false promise pursuant to the illegality defense.  Because "the

JOINT SET OF PROPOSED FINAL JURY INSTRUCTIONS AND OBJECTIONS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:22-cv-02746-JD

253

1   same finder of fact must resolve all intertwined factual issues, . . . the defenses as a whole must be tried

2   to the jury."  *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1102-03 (N.D. Cal.

3   2007) (citing *Beacon Theatres*, 358 U.S. at 509); *Shum v. Intel Corp.*, 630 F. Supp. 2d 1063, 1077–78

4   (N.D. Cal. 2009), *aff'd*, 633 F.3d 1067 (Fed. Cir. 2010) (citing *Shum v. Intel Corp.*, 499 F.3d 1272,

5   1279 (Fed.Cir.2007)) ("Under the Seventh Amendment, a party has a right to a jury trial on any

6   equitable claim that shares common issues of fact with a legal claim asserted by the party.").  As the

7   Court has recognized, even if Match's illegality defense could be characterized as an equitable matter

8   for the Court, "as a general organizing principle, the Court intends to utilize a jury as the finder of fact

9   for issues common to the legal and equitable claims".  July 22, 2021 Minute Order at 2 (ECF 67)

10  (citing Seventh Amendment cases).  Indeed, Match has a Seventh Amendment right to have

11  overlapping issues resolved by the jury.  *Id.*; *Ross v. Bernhard*, 396 U.S. 531 (1970).  Because Match's

12  affirmative defense of illegality overlaps with their antitrust claims, that defense cannot be resolved by

13  the Court "as a matter of law" as Google proposes.

14       Google's proposal is also impractical.  Google proposes that the jury return a verdict as to its

15  false promise counterclaim, but not as to Match's affirmative defenses to those same claims.  At best,

16  Google's proposal would result in the jury wasting time and effort in determining the false promise

17  claim that would be unnecessary in light of the jury's verdict on the Sherman Act claims.  At worst,

18  Google's proposal could set up an impermissible conflict between the jury's verdict and the Court's

19  determination of Match's defenses, if the jury first returned a verdict in favor of Google on the false

20  promise claim, but the Court later determined that the jury's verdict was erroneous because Match has

21  prevailed on their affirmative defenses.  The Seventh Amendment does not permit such a result.

22       Finally, denying an instruction on Match's illegality defense would prejudice Match by failing

23  to inform the jury that any false promise by it is excused if it demonstrates that DDA and Payments

24  Policy violates the antitrust laws.  Google has articulated no legitimate reason why the jury should be

25  deprived of legally accurate information on that topic.

26

27

28

**Defendants' Argument Re Disputed Instruction No. 71**
**AFFIRMATIVE DEFENSE—ILLEGALITY UNDER THE ANTITRUST LAWS**

For the reasons stated in its previous objections, the illegality defense is a question of law for the court, not a question of fact for the jury, and this instruction is overbroad, in any event. *See* Defendants' Argument re: Instruction No. 61.

1

**Disputed Instruction No. 72 Re**
**UNJUST ENRICHMENT**
**Offered by Plaintiffs**

2

3   Google alleges that Epic and/or Match have been unjustly enriched as a result of those companies

4   not paying the service fee collected through Google Play Billing.  If you find that Google's Payments

5   Policy covers the same subject matter as Google's claim for unjust enrichment, then Google cannot

6   prevail on this claim.

7   The mere fact that a recipient has obtained a benefit without paying for it does not itself establish

8   that a recipient was unjustly enriched.

9   To establish this claim, Google must prove the following:

10   1(a).   For Epic, that Epic received a benefit from Google as a result of Google's technical

11   assistance;

12   1(b).   For Match, that Match received a benefit by inducing Google that caused it to provide

13   distribution and other services to Match under the understanding that Match would bring its apps into

14   compliance with the Payments Policy;

15   2.  That Epic and/or Match knowingly accepted the benefit; and

16   3.  That, at the time Google conferred that benefit, the relevant parties expected that Google

17   would be compensated by Epic and/or Match for it; and

18   4.  That Epic and/or Match unjustly retained that benefit, such that it would be inequitable for

19   Epic and/or Match to retain the benefit without paying for its value.

20

21   Source: Adapted from 1 Witkin, Summary 11th Contracts §§ 1050, 1057, 1073 (2023); *MH Pillars Ltd.*

22   *v. Realini*, 277 F. Supp. 3d 1077, 1094 (N.D. Cal. 2017) (citing <u>*Hernandez v. Lopez*</u>, 180 Cal. App. 4th

23   932, 938 (2009), <u>as modified</u> (Dec. 28, 2009))

24

25

26

27

28

1

**Disputed Instruction No. 72 Re**
**UNJUST ENRICHMENT**
**Offered by Defendants**

2

3        If you find the Developer Distribution Agreement not to be a valid contract, then you must decide

4    whether Epic and/or Match were unjustly enriched.

5        Google alleges that Epic and/or Match have been unjustly enriched as a result of those companies

6    failing to pay the service fee collected through Google Play's billing system.

7        To establish this claim, Google must prove the following:

8        1(a):    For Epic, that Epic received a benefit from using the Google Play store, including by

9    diverting services fees that Google was entitled to by implementing the hotfix;

10        1(b):    For Match, that Match received a benefit by inducing Google to make modifications to

11    its billing systems and/or provide distribution and other services to Match under the understanding that

12    Match would bring its apps into compliance with Google Play's billing policy;

13        2:       That Epic and/or Match unjustly retained that benefit.

14        For purposes of this claim, a benefit means any type of advantage, including earning money,

15    saving money, or preventing an expense or loss.

16

17    Sources:  *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1065 (N.D. Cal. 2021); *Tufeld Corp. v.*

18    *Beverly Hills Gateway, L.P.*, 86 Cal. App. 5th 12, 31-32 (2022); *Prof. Tax Appeal v. Kennedy-Wilson*

19    *Holdings, Inc.*, 29 Cal. App. 5th 230, 238 (2018); *Shum v. Intel Corp.*, 630 F. Supp. 2d 1063, 1077-78

20    (N.D. Cal. 2009)

21

22

23

24

25

26

27

28

1

2

**Plaintiffs' Argument Re Disputed Instruction No. 72**
**UNJUST ENRICHMENT**

3

4

Google's proposed instruction is untethered to California law for several reasons.  It should be rejected.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

*First*, at a minimum, the jury should be instructed that Google cannot seek recovery under an unjust enrichment theory when its contract claim covers the same subject matter.[10]  Google's own proposed instructions make clear that Google seeks recovery because it is supposedly "entitled" to service fees under its contract; this is simply breach of contract under another name.  "[A]s a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights."  *California Med. Ass'n, Inc. v. Aetna U.S. Healthcare of California, Inc.*, 94 Cal. App. 4th 151, 172 (2001).  "When parties have an actual contract covering a subject, a court **cannot—not even under the guise of equity jurisprudence**—substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract."  *Hedging Concepts, Inc. v. First All. Mortg. Co.*, 41 Cal. App. 4th 1410, 1420 (1996), *as modified on denial of reh'g* (Feb. 22, 1996) (emphasis added).  An express agreement defining the parties' rights bars unjust enrichment even when that agreement is found to be unenforceable.  *See Ryan v. Mike-Ron Corp.*, 226 Cal. App. 2d 71, 75 (1964).  This is true even when the agreement is unlawful.  *Owens v. Haslett*, 98 Cal. App. 2d 829, 833 (1950) (the law "precludes recovery on principles of quasicontract for benefits conferred under an illegal bargain, as well as an action on the bargain itself" (citation omitted)).  Google improperly omits this information from its proposed instruction.

21

22

23

24

25

*Second*, unjust enrichment is not a cause of action under California law, which should instead be a claim for quasi-contract. *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) ("As the district court correctly noted, in California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.' . . . The return of [a] benefit is the remedy typically sought in a quasi-contract cause of action." (citations and quotations omitted)).  Indeed,

26

27

28

---

[10] Specifically, Plaintiffs request that the following sentence be read to the jury: "If you find that Google's Payments Policy covers the same subject matter as Google's claim for unjust enrichment, then Google cannot prevail on this claim."  Plaintiffs' Proposed Instr.

Google has identified no model jury instruction for a claim of unjust enrichment.

*Third*, even if Google could assert a claim based on a theory of unjust enrichment (it cannot) Google omits the second element in Plaintiffs' Proposed Instruction, which is required under California law.  "The doctrine applies where plaintiffs, while having no enforceable contract, *nonetheless have conferred a benefit on defendant which defendant has knowingly accepted* under circumstances that make it inequitable for the defendant to retain the benefit without paying for its value."  *Hernandez v. Lopez*, 180 Cal. App. 4th 932, 938 (2009), *as modified* (Dec. 28, 2009) (emphasis added).  Google's cited cases in its "Sources" for its proposed instruction confirm this.  *See* Defendants' Proposed Instr. Sources (citing *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1065 (N.D. Cal. 2021) (quoting the same from *Hernandez*)).

*Fourth*, Google further  omits the third element in Plaintiffs' Proposed Instruction, which is also required under California law.  Google " must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made.'"  *E.J. Franks Constr., Inc. v. Sahota*, 226 Cal. App. 4th 1123, 1127 (2014) (quoting *Miller v. Campbell, Warburton, Fitzsimmons, Smith, Mendel & Pastore*, 162 Cal. App. 4th 1331, 1344 (2008)) ("The underlying idea behind quantum meruit is the law's distaste for unjust enrichment."); 1 Witkin, Summary 11th Contracts § 1073 (2023) ("To entitle the plaintiff to recover [under unjust enrichment], the circumstances must be such as to warrant the inference that *it was the expectation of both parties* during the time that the services were rendered *that compensation should be made*." (emphases added)).  Omitting this element is inconsistent with California law.

For these reasons, Plaintiffs respectfully request that the Court reject Defendants' Proposed Instruction and adopt Plaintiffs' proposed Instruction.

**Defendants' Argument Re Disputed Instruction No. 72**
**UNJUST ENRICHMENT**

As an initial matter, Plaintiffs' assertion that unjust enrichment is not a cause of action under California law is incorrect.  Time and again, California courts have recognized unjust enrichment as a cause of action, including after the 2010 case cited by Plaintiffs.[11] *E.g.*, *Prof. Tax Appeal v. Kennedy-Wilson Holdings, Inc.*, 29 Cal. App. 5th 230, 242 (2018) (overruling judgment sustaining demurrer to unjust enrichment claim); *FDIC v. Dintino*, 167 Cal. App. 4th 333, 346 (2008); *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 50 (1996) (holding that plaintiff was "entitled to seek relief under traditional equitable principles of unjust enrichment").

The Court should adopt Google's proposed instruction.  Plaintiffs' proposal adds elements that are not part of the claim.  Most notably, Plaintiffs' proposed element–that "at the time Google conferred that benefit, the relevant parties expected that Google would be compensated by Epic and/or the Match Plaintiffs for it"–is not part of a unjust enrichment claim, but a quantum meruit claim. The source Plaintiffs cite for that element, Witkin on Contracts Section 1073, is not on point.  That Section of Witkin addresses "services performed at request," and it addresses a different theory of recovery, quantum meruit.  *E.g., E.J. Franks Constr., Inc. v. Sahota*, 226 Cal. App. 4th 1123, 1127 (2014) (explaining that quantum meruit does not provide recovery for services gratuitously rendered and, rather, plaintiff must show that the parties expected compensation to be made).  "Quantum meruit refers to the well-established principle that the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered. To recover in quantum meruit, a party need not prove the existence of a contract, but it must show the circumstances were such that the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made." *Huskinson & Brown v. Wolf*, 32 Cal. 4th 453, 458 (2004) (quotation marks and citations omitted).  Google does not assert a quantum meruit claim.

As to unjust enrichment, the claim Google asserts, California law is clear that there are two elements, and those are the elements proposed by Google in its instruction.  *E.g.*, *Kennedy-Wilson*

---

[11] Plaintiffs cite *Levine v. Blue Shield of California*, 189 Cal. App. 4th 1117, 1138 (2010) for that proposition.

1
2
3
4
5
6
7
8
9
10

*Holdings*, 29 Cal. App. 5th at 238 ("The elements of a cause of action for unjust enrichment are simply stated as receipt of a benefit and unjust retention of the benefit at the expense of another." (citation and quotation marks omitted); *Tufeld Corp. v. Beverly Hills Gateway, L.P.*, 86 Cal. App. 5th 12, 31-32 (2022) (same); *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000).  Indeed, even Plaintiffs' authority, *MH Pillars Ltd. v. Realini*, describes unjust enrichment as a two-element claim.  277 F. Supp. 3d 1077, 1094 (N.D. Cal. 2017) ("The elements of a claim of quasi-contract or unjust enrichment are (1) a defendant's receipt of a benefit and (2) unjust retention of that benefit at the plaintiff's expense.").  Plaintiffs should not be permitted to add elements that are not part of the claim to the jury instructions.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Disputed Instruction No. 73 Re**
**AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT—ILLEGALITY DEFENSE**
**Offered by Plaintiffs**

Epic and Match claim that Google's claim for unjust enrichment cannot be enforced because Google's Payments Policy violates the federal and state antitrust laws.

To succeed, Epic or Match must prove that the Payments Policy violated the antitrust laws because it is an illegal tie, an illegal restraint of trade, or anticompetitive conduct that was used to monopolize a relevant market, according to the instructions I have given you regarding Plaintiffs' antitrust claims.

If you decide that Epic or Match have proved these antitrust claims, then Epic and Match cannot be liable for unjust enrichment.

Source: Adapted from 1 Witkin, Summary 11th Contracts § 1054 (2023)

**Disputed Instruction No. 73 Re**
**AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT—ILLEGALITY DEFENSE**
**Offered by Defendants**

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

**Plaintiffs' Argument Re Disputed Instruction No. 73
AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT—ILLEGALITY DEFENSE**

Google seeks restitution for quasi-contract / unjust enrichment arising from alleged violations of the Developer Distribution Agreement ("DDA") and the Payment Policy incorporated into the DDA.  The Plaintiffs therefore propose that the jury be instructed that the illegality of the agreements is an affirmative defense to Google's quasi-contract / unjust enrichment claim under federal law.  "[A] guilty party to an illegal contract cannot recover in quasi contract for the benefit conferred."  *Ryan v. Mike-Ron Corp.*, 226 Cal. App. 2d 71, 75 (1964) ("That the application of this rule may leave one of the parties unjustly enriched is generally deemed unimportant since the purpose of the rule is not to effect justice between the parties, but to discourage transactions in derogation of the public interest."); *Owens v. Haslett*, 98 Cal. App. 2d 829, 833 (1950) (the law "precludes recovery on principles of quasicontract for benefits conferred under an illegal bargain, as well as an action on the bargain itself" (citation omitted)).  The proposed instruction is bespoke because California model instructions do not provide a relevant model.

Google opposes his instruction based on its erroneous contention that the illegality of an agreement is a ***matter of law*** to be decided by the Court.  It may be true that the illegality of a contract can be decided as a matter of law when that question does not turn on disputed factual claims, or possibly when the issue depends on factual disputes that are ***independent*** of any claims to be decided by a jury.  *See* July 22, 2021 Minute Order at 2 (ECF 67) (recognizing that the Court would take up equitable claims after the jury trial only "to the extent an equitable claim is independent of the legal claims").  Not so here.  Rather, one of the central factual disputes in this case is whether Google has entered into anti-competitive agreements, including the DDA, that violate the Sherman Act.  The Parties do not dispute that these Sherman Act claims must be heard and determined by the jury.  The jury thus will necessarily need to decide whether the DDA violates the Sherman Act, which is the same issue that would excuse any unjust enrichment under the DDA pursuant to the illegality defense.  Because "the same finder of fact must resolve all intertwined factual issues, . . . the defenses as a whole must be tried to the jury."  *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1102-03 (N.D. Cal. 2007) (citing *Beacon Theatres*, 358 U.S. at 509); *Shum v. Intel Corp.*, 630 F. Supp.

2d 1063, 1077–78 (N.D. Cal. 2009), *aff'd*, 633 F.3d 1067 (Fed. Cir. 2010) (citing *Shum v. Intel Corp.*, 499 F.3d 1272, 1279 (Fed.Cir.2007)) ("Under the Seventh Amendment, a party has a right to a jury trial on any equitable claim that shares common issues of fact with a legal claim asserted by the party.").

As the Court has recognized, even if Plaintiffs' illegality defense could be characterized as an equitable matter for the Court, "as a general organizing principle, the Court intends to utilize a jury as the finder of fact for issues common to the legal and equitable claims". July 22, 2021 Minute Order at 2 (ECF 67) (citing Seventh Amendment cases). Indeed, Plaintiffs have a Seventh Amendment right to have overlapping issues resolved by the jury. *Id.*; *Ross v. Bernhard*, 396 U.S. 531 (1970). Because Plaintiffs' affirmative defense of illegality overlaps with their antitrust claims, that defense cannot be resolved by the Court "as a matter of law" as Google proposes.

Google's proposal is also impractical. Google proposes that the jury return a verdict as to its unjust enrichment counterclaims, but not as to Plaintiffs' affirmative defenses to those same claims. At best, Google's proposal would result in the jury wasting time and effort in determining counterclaims that would be unnecessary in light of the jury's verdict on the Sherman Act claims. At worst, Google's proposal could set up an impermissible conflict between the jury's verdict and the Court's determination of Plaintiffs' defenses, if the jury first returned a verdict in favor of Google on the counterclaims, but the Court later determined that the jury's verdict was erroneous because Plaintiffs have prevailed on their affirmative defenses. The Seventh Amendment does not permit such a result.

Finally, denying an instruction on Plaintiffs' illegality defense would prejudice Plaintiffs by failing to inform the jury that any unjust enrichment under the DDA and the Payments Policy is excused if Plaintiffs demonstrate that the contract violates the antitrust laws. Google has articulated no legitimate reason why the jury should be deprived of legally accurate information on that topic.

**Defendants' Argument Re Disputed Instruction No. 73**
**AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT—ILLEGALITY DEFENSE**

For the reasons stated in its previous objections, the illegality defense is a question of law for the court, not a question of fact for the jury, and this instruction is overbroad, in any event. *See* Defendants' Argument re: Instruction No. 61.

1

2

**Stipulated Instruction No. 74 Re**
**UNJUST ENRICHMENT DAMAGES**

3

4

  If you find that Epic and/or Match were unjustly enriched, then you must award Google restitution.

5

6

  This means that Epic and/or Match must restore to Google the value of the benefits that Epic and/or Match retained, but that really should belong to Google.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 75 Re**
**AFFIRMATIVE DEFENSE—UNCLEAN HANDS**
**Offered by Plaintiffs**

Epic and Match contend that the doctrine of unclean hands bars Google from prevailing on its counterclaims.  Not every wrongful act constitutes unclean hands.  The misconduct need not be a crime or an actionable tort.  Any conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient to invoke the doctrine.  There must be a direct relationship between Google and the claimed harm by Epic and/or Match so that it would be unfair to allow Google to recover on its counterclaims.

Source: Adapted from *Padideh v. Moradi*, Case No. 16CV292889 (Santa Clara Cty. Ct. Jan. 16, 2020), *aff'd by Padideh v. Moradi*, 89 Cal. App. 5th 418, 444 (2023)

**Disputed Instruction No. 75 Re**
**AFFIRMATIVE DEFENSE—UNCLEAN HANDS**
**Offered by Defendants**

Google opposes the inclusion of this instruction for the reasons in Google's Argument..

1
2

**Plaintiffs' Argument Re Disputed Instruction No. 75**
**AFFIRMATIVE DEFENSE—UNCLEAN HANDS**

3        Google asserts—for the first time—that the affirmative defense of unclean hands does not

4  apply to Google's counterclaims, despite this affirmative defense appearing in Epic and Match's

5  Answers to Google's Counterclaims.  Dkts. 144, (Epic's Eighth Defense) 335 (Match's Eighth

6  Defense).  Google specifically has claimed that because *Padideh v. Moradi*, finds that "[t]he defense of

7  unclean hands may be raised in an action . . . for malicious prosecution," 89 Cal. App. 5th 418, 425

8  (2023), unclean hands is not available as an affirmative defense in other types of cases, including

9  contract and fraud cases.

10       Google is wrong that the affirmative defense of unclean hands is unavailable outside the

11  context of malicious prosecution.  "In California, the doctrine of unclean hands may apply to legal as

12  well as equitable claims and to both tort and contract remedies" *Camp v. Jeffer, Mangels, Butler &*

13  *Marmaro*, 35 Cal. App. 4th 620, 638 (1995), as modified on denial of reh'g (June 29, 1995) (citation

14  omitted); *Defense of Unclean Hands*, 3 Witkin, Summary 11th Agency § 269 (2023) ("The doctrine of

15  unclean hands provides that . . . the court will neither enforce a contract that is illegal or against public

16  policy, nor relieve one of the parties to a fraud from its consequences.").  "The general principle

17  behind the 'clean hands' doctrine is that a court will neither aid in the commission of a fraud by

18  enforcing a contract, nor relieve one of two parties to a fraud from its consequences, where both are in

19  pari delicto. Any unconscientious conduct in the transaction may give rise to the defense." *Burton v.*

20  *Sosinsky*, 203 Cal. App. 3d 562, 573 (1988); *see also Seymour v. Cariker*, 220 Cal. App. 2d 300, 305

21  (1963) (reversing trial court's striking of affirmative defense of unclean hands in action involving

22  reformation of deed "since both the claim of unclean hands and fraud claimed in the second affirmative

23  defense in the answer were stricken, we believe this to be error").

24       *Padideh* also recognizes that the unclean hands doctrine applies beyond malicious prosecution

25  cases.  *Padideh*, 89 Cal. App. 5th at 437 ("We note that the unclean-hands doctrine is available as a

26  defense in both equitable actions decided by a court and legal actions more often decided by a jury.");

27  *id.* at 449–50 (unclean hands is appropriate where conduct "is shown to have occurred in a transaction

28  or matter directly related to and infecting the one presently before the court, and that it has affected the

1  equitable relationship between the litigants").

2      Moreover, the instruction that Plaintiffs have offered for unclean hands has been directly

3  affirmed and approved of by the California Court of Appeal.  *See Padideh v. Moradi*, Case No.

4  16CV292889 (Santa Clara Cty. Ct. Jan. 16, 2020), *aff'd by Padideh v. Moradi*, 89 Cal. App. 5th 418,

5  444 (2023) (stating that the unclean hands jury instruction was "accurately described").  Google has

6  not provided any competing instruction.

7      Google's conduct—and the conduct that will be proven at trial—justifies inclusion of an

8  unclean hands affirmative defense.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

**Defendants' Argument Re Disputed Instruction No. 75**
**AFFIRMATIVE DEFENSE—UNCLEAN HANDS**

3
4

Google objects to this instruction in its entirety.  Plaintiffs' unclean hands defense is not triable to the jury.

5
6
7
8
9
10

Plaintiffs misstep by relying on California *state court cases* suggesting that a *state trial court* may submit the unclean hands defense to the jury.  In the federal courts, "*federal law* governs whether a party is entitled to a jury trial and if so, on what issues," including "in a diversity action." *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1026-27 (9th Cir. 1996) (emphasis added). Indeed, "[t]he characterization of the issues 'as legal or equitable for purposes of whether a right to a jury trial is indicated must be made by recourse to federal law.'" *Id.* (citation omitted).

11
12
13
14
15
16
17

Under federal law, "a litigant is not entitled to have a jury resolve a disputed affirmative defense if the defense is equitable in nature." *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1027 (9th Cir. 1996).  Accordingly, "[e]ven when a plaintiff is entitled to a jury trial on his legal claims, the district court must nonetheless make an independent judgment as to any equitable issue." *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 735 (7th Cir. 2004); *see also Freescale Semiconductor, Inc. v. ChipMOS Techs.*, 2013 WL 308919, at *4 (N.D. Cal. Jan. 25, 2013).

18
19
20
21
22
23
24

Federal courts hold that unclean hands is an equitable defense to which no jury right attaches. *See, e.g.*, *Nat.-Immunogenics Corp. v. Newport Trial Grp.*, 2019 WL 3099725, at *6 (C.D. Cal. Apr. 15, 2019) ("[U]nclean hands is an equitable defense tried to the Court."); *Hope Medical Enters. v. Faragon*, 2021 WL 2941546, at *6 n.2 (C.D. Cal. July 12, 2021) (holding that unclean hands is an equitable defense that does not trigger a jury right); *Freescale Semiconductor, Inc. v. ChipMOS Techs.*, 2013 WL 308919, at *5 (N.D. Cal. Jan. 25, 2013) ("Patent misuse arises from the equitable doctrine of unclean hands and is considered to be an equitable defense and claim.").

25
26
27
28

*Cal-Agrex, Inc. v. Tassell*, 408 F. App'x 58, 61 (9th Cir. 2011) is directly on point. In that case, the plaintiff won a breach of contract claim, and the defendant argued on appeal that the district court erred in refusing to instruct the jury on unclean hands. The Ninth Circuit rejected this argument: "[T]he district judge did not err in making a determination himself as to the viability of that defense. 'The

application or rejection of the clean hands doctrine in a given case is equitable in nature and within the discretion of the trial court.'" *Id.* (citation omitted).

The defense is unavailable for the additional reason that Epic and the Match Plaintiffs do not themselves have clean hands.  Under both federal and California law, a party can only assert the unclean hands defense if that party's hands are clean.  *See, e.g., DD Hair Lounge, LLC v. State Farm Gen. Ins. Co.*, 20 Cal. App. 5th 1238, 1246 (2018) ("[Plaintiff] must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim."); *RLI Ins. Co. v. City of Visalia*, 297 F. Supp. 3d 1038, 1058 (E.D. Cal. 2018), *aff'd*, 770 F. App'x 377 (9th Cir. 2019) ("The unclean hands doctrine bars recovery by a plaintiff (1) whose behavior is tainted by inequity or bad faith (2) that occurred in acquiring the right he now asserts"). There is no dispute that Epic intentionally and in bad faith misled Google and submitted a noncompliant version of its game Fortnite to the Google Play store in order to avoid paying anything to Google for the services it provides.  And the evidence will show that the Match Plaintiffs intentionally and in bad faith misled Google about its intention to comply with Google Play's payments policy, which induced Google to pour resources into making its billing system work well for the Match Plaintiffs and provide the Match Plaintiffs an extension to comply.

**Stipulated Instruction No. 76 Re**
**PREJUDGMENT INTEREST**

For its false promise claim against Match, Google seeks prejudgment interest.

If you decide that Google is entitled to recover damages for its false promise claim, then you must decide whether it should also receive prejudgment interest on each item of loss in those categories. Prejudgment interest is the amount of interest the law provides to a plaintiff to compensate for the loss of the ability to use the funds. If prejudgment interest is awarded, it is computed from the date on which each loss was incurred until the date on which you sign your verdict.

Source: CACI Instr. No. 3935

### Stipulated Instruction No. 77 Re
### PUNITIVE DAMAGES

For its false promise claim against Match, Google also seeks punitive damages.

If you decide that Match's conduct caused Google harm, you must decide whether that conduct justifies an award of punitive damages. The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future.

You may award punitive damages against Match only if Google proves that Match engaged in that conduct with malice, oppression, or fraud. To do this, Google must prove one of the following by clear and convincing evidence:

1.    That the conduct constituting malice, oppression, or fraud was committed by one or more officers, directors, or managing agents of Match, who acted on behalf of Match;

2.    That one or more officers, directors, or managing agents of Match knew of the conduct constituting malice, oppression, or fraud and authorized, adopted, or approved that conduct after it occurred.

"Malice" means that Match acted with intent to cause injury or that Match's conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another. A person acts with knowing disregard when the person is aware of the probable dangerous consequences of the person's conduct and deliberately fails to avoid those consequences.

"Oppression" means that Match's conduct was despicable and subjected Google to cruel and unjust hardship in knowing disregard of its rights.

"Despicable conduct" is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people.

"Fraud" means that Match intentionally misrepresented or concealed a material fact and did so intending to harm Google.

An employee is a "managing agent" if the employee exercises substantial independent authority and judgment in corporate decision-making such that the employee's decisions ultimately determine corporate policy.

There is no fixed formula for determining the amount of punitive damages, and you are not required to award any punitive damages. If you decide to award punitive damages, you should consider all of the following factors in determining the amount:

1.    How reprehensible was Match's conduct? In deciding how reprehensible Match's conduct was, you may consider, among other factors:

    (a)    Whether the conduct caused physical harm;

    (b)    Whether Match disregarded the health or safety of others;

    (c)    Whether Google was financially weak or vulnerable and Match knew Google was financially weak or vulnerable and took advantage of it;

    (d)    Whether Match's conduct involved a pattern or practice; and

    (e)    Whether Match acted with trickery or deceit.

2.    Is there a reasonable relationship between the amount of punitive damages and Google's harm that Match knew was likely to occur because of its conduct? You may not increase the punitive award above an amount that is otherwise appropriate merely because Match has substantial financial resources.

3.    In view of Match's financial condition, what amount is necessary to punish it and discourage future wrongful conduct? You may not increase the punitive award above an amount that is otherwise appropriate merely because Match has substantial financial resources.

Punitive damages may not be used to punish Match for the impact of its alleged misconduct on persons other than Google.

Source: CACI Instr. No. 3945

**Stipulated Instruction No. 78 Re**
**HIGHLY PROBABLE—CLEAR AND CONVINCING PROOF**

Google's claim for punitive damages must be proved by clear and convincing evidence, which is a higher burden of proof than preponderance of the evidence. This means that Google must persuade you that it is highly probable that the facts it is required to prove to obtain punitive damages are true.  I have already instructed you on those facts.  Refer to my previous instructions when determining whether Google has shown those facts by clear and convincing proof.

Source: CACI Instr. No. 201

**Stipulated Instruction No. 79 Re**
**DAMAGES FROM MULTIPLE DEFENDANTS**

In this case, Google seeks damages from both Epic and Match. You must determine the liability of each of Epic and Match to Google separately.

In deciding on the amount of damages, consider only Google's claimed losses.

Source: CACI Instr. No. 3933

**Stipulated Instruction No. 80 Re**
**DAMAGES ON MULTIPLE LEGAL THEORIES**

Google seeks damages from Epic and Match under more than one legal theory. However, each item of damages may be awarded only once, regardless of the number of legal theories alleged.

You will be asked to decide whether Epic and Match are liable to Google under the following legal theories:

1.   breach of contract;

2.   breach of the implied covenant of good faith and fair dealing;

3.   unjust enrichment; and

4.   as to Match only, false promise.

The following items of damages are recoverable only once as to each of Epic and Match under all of the above legal theories:

1.   Google's claimed lost service fees.

Source: CACI Instr. No. 3934

**Stipulated Instruction No. 81 Re**
**DAMAGES—SETOFF / UNJUST ENRICHMENT**

The right of setoff allows two parties that owe each other money to apply their mutual debts against one another. If you find that Google is entitled to recover damages from Match, and you find that Match is entitled to recover damages from Google, then you may reduce the amount of any damages awarded to Google by the damages that Google owes Match, and vice versa.

Source: California Code of Civil Procedure § 431.70; *Constr. Protective Servs., Inc. v. TIG Specialty Ins. Co.*, 29 Cal. 4th 189 (2002); *Unicom Sys., Inc. v. Farmers Grp., Inc.*, 405 F. App'x 152, 154 (9th Cir. Dec. 2, 2010)

**Stipulated Instruction No. 82 Re**
**DUTY TO DELIBERATE**

When you begin your deliberations, elect one member of the jury as your presiding juror who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict, whether liable or not liable, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially. Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you. You should also not be influenced by any person's race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, economic circumstances, or position in life or in the community.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so. During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

Source: In re Capacitors (Avnet trial, Case No. 17-cv-7046) Instruction No. 31

**Stipulated Instruction No. 83 Re**
**CONSIDERATION OF THE EVIDENCE – CONDUCT OF THE JURY**

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via email, text messaging, or any Internet social media site, blog, website or other feature. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and report the contact to the Court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the Court immediately.

Source:  In re Capacitors (Avnet trial, Case No. 17-cv-7046) Instruction No. 32

**Stipulated Instruction No. 84 Re**
**USE OF NOTES**

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

Source: In re Capacitors (Avnet trial, Case No. 17-cv-7046) Instruction No. 33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Stipulated Instruction No. 85 Re**
**COMMUNICATION WITH THE COURT**

If it becomes necessary during your deliberations to communicate with me, you may send a note through Ms. Clark, signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me or Ms. Clark—how the jury stands, numerically or otherwise, on any question submitted to you, including the questions of Google's liability, Epic's liability, or Match's liability, until after you have reached a unanimous verdict or have been discharged.

Source: In re Capacitors (Avnet trial, Case No. 17-cv-7046) Instruction No. 34

**Stipulated Instruction No. 86 Re**
**RETURN OF VERDICT**

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror should complete the verdict form according to your deliberations, sign and date it, and advise Ms. Clark that you are ready to return to the courtroom.

Source: In re Capacitors (Avnet trial, Case No. 17-cv-7046) Instruction No. 35

Dated:                 CRAVATH, SWAINE & MOORE LLP
                               Christine Varney *(pro hac vice)*
                               Gary A. Bornstein *(pro hac vice)*
                               Timothy G. Cameron *(pro hac vice)*
                               Yonatan Even *(pro hac vice)*
                               Lauren A. Moskowitz *(pro hac vice)*
                               Justin C. Clarke *(pro hac vice)*
                               Michael J. Zaken *(pro hac vice)*
                               M. Brent Byars *(pro hac vice)*

                              FAEGRE DRINKER BIDDLE & REATH LLP
                               Paul J. Riehle (SBN 115199)

                              Respectfully submitted,

                              By: */s/ Gary A. Bornstein*
                               Gary. A. Bornstein

                               *Counsel for Plaintiff Epic Games, Inc.*

Dated:                 HUESTON HENNIGAN LLP
                               Douglas J. Dixon
                               Christine Woodin
                               Joseph A. Reiter

                              Respectfully submitted,

                              By: */s/ Douglas J. Dixon*
                               Douglas J. Dixon

                               *Counsel for Plaintiffs Match Group, LLC et al.*

DATED:              MUNGER, TOLLES & OLSON LLP

                              By: */s/ Glenn D. Pomerantz*
                               Glenn D. Pomerantz
                               *Attorneys for Defendants Google LLC et al.*

DATED:              MORGAN, LEWIS & BOCKIUS LLP

                              By: */s/ Brian C. Rocca*
                               Brian C. Rocca
                               *Attorneys for Defendants Google LLC et al.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## E-FILING ATTESTATION

I, Douglas J. Dixon, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

*/s/ Douglas J. Dixon*
Douglas J. Dixon